## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| OLIVER LUCK, | : | CASE NO. 3:20-cv-00516-VAB |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| VINCENT K. MCMAHON, | : | |
| | : | |
| Defendant. | : | MAY 12, 2020 |

### DEFENDANT VINCENT K. MCMAHON'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR PREJUDGMENT REMEDY

Jerry S. McDevitt *(pro hac vice pending)*
Curtis B. Krasik *(pro hac vice pending)*
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone: (412) 355-6500
Fax: (412) 355-6501
Email: jerry.mcdevitt@klgates.com
Email: curtis.krasik@klgates.com

Jeffrey P. Mueller
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT  06103
Phone: (860) 275-0100
Fax: (860) 275-0343
Email: jmueller@daypitney.com

*Attorneys for Defendant Vincent K. McMahon*

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 3

I.   Alpha's Employment of Luck.................................................................................... 3

   A.   The Employment Contract and Guaranty ............................................................ 3

   B.   Luck's Gross Negligence and Failure to Follow XFL Policies and Directives ................. 4

      1.   Luck's Improper Hiring of Antonio Callaway............................................. 4

      2.   Luck Fails to Timely Terminate Callaway ................................................ 6

      3.   Luck Violates the XFL Technology Policies................................................ 6

      4.   Luck's Gross Neglect of His Duties After March 13, 2020 ........................... 6

   C.   Alpha's Termination of Luck................................................................. 7

II.   Luck's Lawsuit and Prejudgment Remedy Application ......................................... 8

   A.   Luck's Lawsuit Against McMahon ...................................................... 8

   B.   Luck's False Affidavit In Support of His Application........................................ 8

   C.   Luck's Unnecessary and Abusive Request for Relief........................................ 9

LEGAL STANDARD........................................................................................... 11

I.   Purpose of Prejudgment Remedy........................................................................... 11

II.   Standard for Issuance of a Prejudgment Remedy .................................................. 12

ARGUMENT .................................................................................................... 14

I.   Luck's Application Is Not Supported By Probable Cause................................... 14

   A.   Luck Has Failed To Join An Indispensable Party........................................... 14

   B.   Luck Was Properly Terminated For Cause................................................. 19

      1.   Alpha's Decision to Terminate Luck for Cause Is Entitled to Substantial Deference Under Connecticut Law. ................................................................ 19

      2.   Alpha Properly Terminated Luck For Cause Under the Contract ............................. 20

      3.   McMahon Is Not Liable Under the Guaranty Because Alpha Properly Terminated Luck For Cause .............................................................. 25

   C.   Luck Is Not Entitled To Bonuses He Never Earned .................................... 25

   D.   A Prejudgment Remedy Is Unwarranted Given McMahon's Clear Ability To Pay Any Possible Judgment.......................................................................... 26

II.   The Issuance of a Prejudgment Remedy Under The Circumstances Of This Case Would Violate Due Process ........................................................................................ 28

   A.   Standards for Due Process Challenge to Prejudgment Remedy Statute ......................... 28

   B.   Granting A Prejudgment Remedy Despite McMahon's Ability To Pay Would Violate Due Process....................................................................................... 30

      1.   Prejudgment Attachment Will Significantly Impact McMahon's Property Rights.... 30

2.    There Is A Substantial Risk That McMahon's Property Rights Will Be Erroneously Impaired ............................................................................................................ 30

3.    Luck Has No Significant Interest In A Prejudgment Attachment ............................. 32

C.   Granting a Prejudgment Remedy Without Requiring A Bond From Luck Would Violate Due Process........................................................................................................... 33

CONCLUSION................................................................................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acton Co., Inc. of Massachusetts v. Bachman Foods, Inc.*,
    668 F.2d 76 (1st Cir. 1982) ...................................................................................................17

*ASPIC, LLC v. Poitier*,
    179 Conn. App. 631 (2018) ...................................................................................................14

*Augeri v. C. F. Wooding Co.*,
    173 Conn. 426 (1977) ............................................................................................................14

*Ayala-Gerena v. Bristol Myers-Squibb Co.*,
    95 F.3d 86 (1st Cir. 1996) .....................................................................................................16

*Bernhard-Thomas Bldg. Sys., LLC v. Dunican*,
    286 Conn. 548 (2008) ............................................................................................................11

*Blakeslee Arpaia Chapman, Inc. v. EI Constructors, Inc.*,
    32 Conn. App. 118 (1993) ........................................................................................13, 26, 27

*Bosco v. Arrowhead by the Lake, Inc.*,
    53 Conn. App. 873 (1999) .....................................................................................................12

*Canty v. Otto*,
    304 Conn. 546 (2012) ............................................................................................................31

*City of New York v. Tavern on the Green Int'l LLC*,
    351 F. Supp. 3d 680 (S.D.N.Y. 2018) ..................................................................................24

*Connecticut v. Doehr*,
    501 U.S. 1 (1991) ..........................................................................11, 28, 29, 30, 31, 32, 33, 34

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ...............................................................................................................33

*Crowley v. Courville*,
    76 F.3d 47 (2d Cir. 1996) ......................................................................................................33

*Dean v. Priceline.com, Inc.*,
    No. 3:00CV1273, 2001 WL 35962826 (D. Conn. Apr. 6, 2001) ...........................................13

*Delcon Constr. Corp. v. U.S. Dep't of Hous. & Urban Dev.*,
    205 F.R.D. 145 (S.D.N.Y.2002) ...........................................................................................18

*Denkmann Assocs. v. Int'l Paper Co.*,
132 F.R.D. 168 (M.D. La. 1990) .........................................................................17

*Diaz v. Paterson*,
547 F.3d 88 (2d Cir. 2008)...................................................................................29

*Dou Yee Enterprises (S) PTE, Ltd. v. Advantek, Inc.*,
149 F.R.D. 185 (D. Minn. 1993)...........................................................................17

*Eplet, LLC v. DTE Pontiac N., LLC*,
No. 2:17-CV-11462, 2019 WL 932033 (E.D. Mich. Feb. 26, 2019).....................25

*Fluent v. Salamanca Indian Lease Auth.*,
928 F.2d 542 (2d Cir. 1991)..................................................................................16

*Gaudio v. Griffin Health Servs. Corp.*,
249 Conn. 523 (1999) ....................................................................................19, 20

*Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*,
960 F. Supp. 701 (S.D.N.Y. 1997) .......................................................................16

*Gloria v. Manuel*,
No. 27 22 38, 1991 WL 84000 (Conn. Super. Ct. May 2, 1991)...........................12

*Harbour Pointe, LLC v. Harbour Landing Condo. Ass'n, Inc.*,
300 Conn. 254 (2011) ..........................................................................................26

*Haxhi v. Moss*,
25 Conn. App. 16 (1991) ......................................................................................14

*In re Ionosphere Clubs, Inc.*,
111 B.R. 423 (Bankr. S.D.N.Y. 1990) ..................................................................19

*In re James Wilson Assocs.*,
965 F. 2d 160 (7th Cir 1992) ................................................................................19

*Kern v. Palmer College of Chiropractic*,
757 N.W.2d 651 (Iowa 2008) ..........................................................................19, 20

*L. Suzio Concrete Co., Inc. v. Salafia*,
3 Conn. App. 404 (1985) ......................................................................................12

*In re Lazarus Burman Associates*,
161 B.R. 891 (Bankr. E.D.N.Y. 1993)...................................................................19

*Leslie v. Mortgage Elec. Registration Sys., Inc.*,
No. 3:05CV1725, 2007 WL 9754481 (D. Conn. Jun 12, 2007) .......................15, 18

*Lowrance v. Achtyl*,
20 F.3d 529 (2d Cir. 1994)....................................................................................33

*Mathews v. Eldridge,*
    424 U.S. 319 (1976).......................................................................................29

*Mazzio v. Kane,*
    No. 14-CV-616, 2014 WL 2866040 (E.D.N.Y. June 24, 2014) .............................16

*In re Metal Ctr., Inc.,*
    31 B.R. 458 (Bankr. D. Conn. 1983) ...................................................................19

*In Matter of Motors Liquidation Co.,*
    829 F.3d 135 (2d Cir. 2016)...............................................................................28

*Nash v. Weed & Duryea Co.,*
    236 Conn. 746 (1996) .......................................................................................13

*In re New Breed Realty Enterprises, Inc.,*
    278 B.R. 314 (Bankr. E.D.N.Y. 2002)..................................................................24

*Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians,*
    862 F. Supp. 995 (W.D.N.Y. 1994) .....................................................................16

*Polmatier v. Russ,*
    206 Conn. 229 (1988) .......................................................................................20

*Queenie, Ltd. v. Nygard Int'l,*
    321 F.3d 282 (2d Cir. 2003)...............................................................................19

*Random House, Inc. v. Gemini Star Prods, Ltd.,*
    No. 94 CIV. 0657, 1995 WL 234736 (S.D.N.Y. Apr. 20, 1995)............................16

*Result Shipping Co. v. Ferruzzi Trading USA Inc.,*
    56 F.3d 394 (2d Cir. 1995).................................................................................34

*Saylavee LLC v. Hockler,*
    No. 3:04-CV-1344, 2007 WL 9759997 (D. Conn. Jun. 1, 2007) ..........................15

*Sea Tow Services Int'l, Inc. v. Pontin,*
    607 F. Supp. 2d 378 (E.D.N.Y. 2009) .................................................................24

*Sever v. Glickman,*
    298 F. Supp. 2d 267 (D. Conn. 2004).................................................................15

*Shaumyan v. O'Neill,*
    987 F.2d 122 (2d Cir. 1993)...............................................................................34

*Soltesz v. Miller,*
    56 Conn. App. 114 (1999) .................................................................................12

*SS & C Techs., Inc. v. Providence Inv. Mgmt.,*
    582 F. Supp. 2d 255 (D. Conn. 2008).................................................................13

*Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P.*,
  252 Conn. 479 (2000) ...................................................................................................25

*TES Franchising, LLC* v. *Feldman*,
  286 Conn. 132 (2008) ...................................................................................................14

*In re Third Eighty-Ninth Associates*,
  138 B.R. 144 (S.D.N.Y. 1992)......................................................................................19

*Travelers Indem. Co. v. Household Int'l, Inc.*,
  775 F. Supp. 518 (D. Conn. 1991) ................................................................................15

*UCF I Tr. 1 v. Dimenna*,
  No. 16-CV-00156, 2016 WL 3620716 (D. Conn. June 29, 2016)..................................12

*In re United Health Care Org.*,
  210 B.R. 228 (S.D.N.Y. 1997)......................................................................................19

*Vedder Price Kaufman & Kammholz v. First Dynasty Mines, Ltd.*,
  No. 01 CIV. 3970, 2001 WL 1190996 (S.D.N.Y. Oct 9, 2001) ....................................18

*Viacom Int'l, Inc. v. Kearney*,
  212 F.3d 721 (2d Cir. 2000)..........................................................................................15

*Weeks v. Hous. Auth. of City of Opp, Ala.*,
  292 F.R.D. 689 (M.D. Ala. 2013)..................................................................................17

*Winchester Bd. of Educ. v. W.L. Gilbert Sch. Corp.*,
  No. CV 970073312, 1997 WL 585763 (Conn. Super. Ct. Sept. 10, 1997) ....................27

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*,
  946 F.2d 1003 (2d Cir. 1991)........................................................................................23

**Statutes**

15 U.S.C. § 78m.........................................................................................................................27

Conn. Gen. Stat. § 52-278a.........................................................................................................11

Conn. Gen. Stat. § 52-278d..................................................................................................13, 27

**Regulations**

17 C.F.R. § 240.13d-1.................................................................................................................27

**Rules**

Fed. R. Civ. P. 19.......................................................................................................14, 15, 18

Fed. R. Civ. P. 64.....................................................................................................................11

Defendant Vincent K. McMahon ("McMahon") respectfully submits this memorandum of law in opposition to Plaintiff Oliver Luck's ("Luck") Application for Prejudgment Remedy dated April 21, 2020 ("Application") (Doc. No. 21).

## PRELIMINARY STATEMENT

Luck's Application is a wholly unnecessary and baseless attempt to obtain a prejudgment remedy against McMahon on an expedited basis in the middle of a pandemic that has curtailed this Court's operations.  Luck's Application is wholly unnecessary because McMahon indisputably has the ability to pay any possible judgment that could be entered in this case and is baseless because Luck's claims against McMahon in this action are meritless.

As the case law makes clear and Luck concedes in his Application, the purpose of a prejudgment remedy is to provide the plaintiff with security against the risk that the defendant will be unable to satisfy any judgment that may be entered and to prevent the defendant's fraudulent transfer or wrongful dissipation of assets to defeat any such judgment.  In this case, the entire rationale for the prejudgment remedy statute does not apply because McMahon currently has over $1.2 billion in publicly disclosed assets—all of which is known to Luck and his legal counsel.  That fact alone is reason to deny Luck's Application.  Indeed, a prejudgment attachment of McMahon's assets under the circumstances of this case would be a deprivation of McMahon's property rights for no reason at all in violation of his constitutional right of due process.

Moreover, Luck's Application for a prejudgment remedy is baseless because he cannot establish probable cause that a judgment will be entered in his favor in the first place.  McMahon is not obligated to pay Luck under the guaranty of his employment contract with the XFL because that contract was terminated for cause.  Under the express terms of Luck's employment

contract, the XFL unquestionably could terminate him *at any time*, and do so for cause for a single act of gross negligence, which was defined by his contract to include an intentional failure to follow *any* XFL policy or directive.  Luck intentionally failed to follow *multiple* XFL policies and directives, including the player personnel policy and policies prohibiting the use of XFL supplied electronics for personal use.[1]  For example, Luck signed Antonio Callaway in clear violation of the XFL's policy and McMahon's directive not to hire players with questionable or problematic backgrounds.  After McMahon learned of Callaway's background and directed Luck to terminate Callaway, Luck failed to do so.  As a result, Callaway was allowed to continue to practice and sustained a knee injury that caused the XFL to incur substantial costs that would have been avoided if Luck had followed the applicable policies and directives.  Then, beginning on March 13, 2020, Luck effectively abandoned his responsibilities as the CEO and Commissioner of the XFL at a time when the league faced its most significant crisis—the threat to its business caused by the COVID-19 pandemic.  During this critical time for the XFL, Luck decided to leave Connecticut and did not devote substantially all of his business time to his XFL duties as required by the contract.  Accordingly, the XFL had more than ample reasons to terminate Luck for cause under his employment contract.  Luck now seeks a windfall in this action by submitting an affidavit that is false and deliberately misleading in material respects.

For the reasons set forth herein, the Court should summarily deny Luck's Application.  If the Court decides to proceed despite the arguments here, McMahon requests an evidentiary

---

[1] When he was terminated, Luck was asked to return an iPhone provided to him by the XFL for business purposes.  Luck did not do so, and his Texas counsel recently asked the XFL's bankruptcy counsel whether there was a policy prohibiting personal use of that phone before returning it to the bankrupt estate.  There was such a policy.  Thus, that phone and its contents are now evidence supporting Luck's termination for cause.

hearing on the Application at which Luck can be cross-examined under oath in the presence of the Court once the current restrictions are lifted.

## STATEMENT OF FACTS

**I.     Alpha's Employment of Luck**

**A.     The Employment Contract and Guaranty**

On May 30, 2018, Luck entered into an employment contract ("Contract") with Alpha Entertainment LLC ("Alpha").  (Doc. No. 23, Luck Decl. ¶ 3, Ex. 1.)  In the Contract, Luck agreed to serve as the "Commissioner and CEO" of a new professional football league known as the XFL.  (*Id.* Ex. 1 at 1.)  Luck was responsible for "all football and business-related operations" of the XFL and was required to "devote substantially all of his business time to the performance of his duties to the XFL." (*Id.*)  In exchange for his services, the Contract provided that Luck would be paid a Base Salary of $5 million per Contract Year and a "Guaranteed Annual Bonus" of $2 million "on the last day of each Contract Year, subject to his continued employment on the scheduled payment date."  (*Id.* at 2.)

The Contract provided that Luck's employment "may be terminated by Alpha ***at any time***, with or without cause."  (*Id.* at 3) (emphasis added).  The Contract's definition of "Cause" sets forth a number of grounds for termination, including Luck's "***gross negligence of his duties*** (other than due to any illness or disability), ***including an intentional failure to follow any applicable XFL policies or directives***."  (*Id.*) (emphasis added).  The Contract provided that Luck could be terminated for Cause without prior written notice if the act or omission that constitutes Cause "is not reasonably susceptible to cure."  (*Id.*)  If Luck were terminated for Cause, then he would "only be entitled to be paid for previously accrued salary and any vested employee benefits."  (*Id.*)

McMahon provided a guaranty ("Guaranty") of "the due and punctual payment and performance by [Alpha] of all of its agreements and obligations" under Contract.  (*Id.* Ex. A.) McMahon's obligations under the Guaranty remained in effect "until the full performance by [Alpha] of all of its agreements and its obligations" under the Contract.  (*Id.*)

**B.     Luck's Gross Negligence and Failure to Follow XFL Policies and Directives**

As McMahon will demonstrate at any evidentiary hearing if the Court proceeds, Luck engaged in gross negligence, as defined in the Contract, and intentionally failed to follow applicable XFL policies and directives.

**1.     Luck's Improper Hiring of Antonio Callaway**

From the inception of the XFL, McMahon made clear that the league would only hire quality football players with good character—an important strategy for both building the XFL's brand and engaging a fan base.  The XFL instituted a policy requiring background checks for all potential players and McMahon's approval for all players with questionable or problematic backgrounds.  Luck was fully aware of this policy and demonstrated his knowledge of this policy through his public statements and his own conduct.  On several occasions, Luck disclosed to McMahon accusations of misconduct (including sexual assault and drug use) against several potential players.  In each case, McMahon instructed Luck not to sign such players because they did not meet the XFL's policy.

Despite his knowledge of the XFL's policy and McMahon's prior refusal to sign such players, Luck proceeded to sign a contract with Antonio Callaway—a player with a lengthy history of misconduct allegations—without disclosing this information to McMahon when advising him of the signing.  Luck was well aware of information that Callaway did not meet the standards of the policy established by Mr. McMahon, including that:

- In August 2019, Callaway was suspended from the first four games of the NFL season for violating the league's drug policy.

- In August 2018, Callaway was cited for possession of marijuana and driving with a suspended license.  The police also reportedly found bullets and a gun part while searching his vehicle.  He was ultimately sentenced to probation for driving with a suspended license.

- In April 2018, Callaway tested positive for marijuana at the NFL combine.

- In May 2017, Callaway was cited for possession of marijuana and drug paraphernalia during a traffic stop in Florida.

- Callaway was reportedly suspended from the University of Florida's football team for the entire 2017 season due to an investigation for felony credit card fraud.

- Callaway was reportedly suspended from the University of Florida's team in January 2016 after being accused of sexual assault.

Indeed, the only reason Callaway was even available to join an XFL team was because the Cleveland Browns waived his contract following his 10-game suspension for again violating the NFL's substance abuse policy.

Despite being well aware of these issues, Luck provided Callaway with a draft contract promising a $125,000 signing bonus not even offered to other wide receivers and included him in the pool of players to be drafted by XFL teams before even mentioning him to McMahon.  At the same time Luck advised McMahon of Callaway's signing, he requested that McMahon revisit a prior decision not to sign another player who had been banned from his college campus due to a sexual assault allegation, which McMahon refused to reconsider.  On January 13, 2020, Luck advised McMahon that one of the XFL's teams had claimed Callaway but did not disclose any of Callaway's many instances of known misconduct.  On January 16, 2020, Callaway signed his contract to join the Tampa Bay Vipers.  Luck countersigned the contract on January 23, 2020.

### 2.     Luck Fails to Timely Terminate Callaway

Once Callaway's signing with the XFL became public, news reports noted his history of drug and other legal problems.  After learning of Callaway's problematic history, McMahon directed Luck to terminate Callaway.  (*See* Luck Decl. ¶ 14 (admitting that "McMahon told me, during the week of January 26, 2020, that he wanted Callaway terminated").)  Luck failed to promptly terminate Callaway in accordance with McMahon's instruction.  As a result, Callaway was still practicing with the Tampa Bay Vipers on January 29, 2020, when he sustained a knee injury.  Because of Luck's failure to promptly terminate Callaway, Alpha had to honor his contract, pay for the costs of surgery on Callaway's knee, and may incur significant worker's compensation payments.  The cost to the XFL of this episode of gross negligence was in excess of six figures.

### 3.     Luck Violates the XFL Technology Policies

Luck also knew that the XFL had policies prohibiting the use of company technology for personal matters.  The XFL policy provided in relevant part:

> All XFL Technology is the property of the XFL.  Use of such XFL Technology is to be used for XFL related business only; users must not store or transmit any non-business-related files, including but not limited to personal data such as documents, spreadsheets, reports, presentations, images, videos or music files, databases and application source code.

Luck knowingly and repeatedly violated this policy by using the XFL's technology for personal use and for matters unrelated to the XFL's business.  The full extent of Luck's violations will be determined once the XFL-issued cell phone that Luck delayed returning to Alpha and the contents of that phone are forensically examined.

### 4.     Luck's Gross Neglect of His Duties After March 13, 2020

In March 2020, the XFL was forced to halt its first season in order to comply with venue restrictions arising from the COVID-19 pandemic.  Instead of providing much needed leadership

to address this new challenge, Luck decided to leave Connecticut and disengage from the XFL's operations.  (*See* Luck Decl. ¶ 16 & n.1 (admitting that "[o]n March 13, 2020, I returned home to Indiana for the weekend" and did not come back).)  Luck did not advise McMahon of his intentions at the time and did not place so much as a single phone call to McMahon prior to his termination for Cause by letter dated April 9, 2020.

During this critical make-or-break period for the XFL, Luck only claims in his affidavit to have performed minimal work, and his affidavit contains deliberately misleading statements about what he did in this time frame that will be exposed on cross-examination at any hearing should the Court proceed.  (*Id.* ¶ 17.)  Put simply, at the very moment when his leadership as CEO was needed most, Luck did not devote substantially all of his business time to the XFL, as required by his Contract.

### C.    Alpha's Termination of Luck

On April 9, 2020, Alpha notified Luck that he was being terminated for Cause under the Contract.  (Luck Decl. ¶¶ 7-9, Ex. 2.)  Although not required to do so, the termination letter provided several examples of Luck's gross negligence and violation of XFL policies, including his wrongful hiring of Callaway and failure to timely terminate Callaway despite McMahon's directive.  (*Id.* Ex. 2, at 1-2.)  The letter also explained that Luck failed to exhibit "any of the vigor and work ethic required of a CEO of a start-up enterprise in these trying times" and failed to devote "substantially all of [his] business time to the performance of [his] duties since March 13th, which itself is grossly negligent under the circumstances."  (*Id.* at 2.)  The letter noted that it was not intended to be "an exhaustive and comprehensive statement of all facts justifying Alpha's decision to terminate [Luck's] contract for cause" and expressly reserved "all rights to offer all evidence demonstrating cause to terminate" should he challenge whether Cause existed.  (*Id.*)

## II.      Luck's Lawsuit and Prejudgment Remedy Application

### A.      Luck's Lawsuit Against McMahon

On April 16, 2020, Luck filed the instant lawsuit against McMahon alleging that Alpha had not validly terminated Luck for Cause, Alpha was in breach of the Contract, and McMahon was therefore liable to Luck under the Guaranty.  (Compl. ¶¶ 1, 10-14.)  Despite admitting that *Alpha* was the party to the Contract with Luck and the entity that terminated him, Luck failed to join Alpha as party to the lawsuit because Alpha had filed for bankruptcy.  (*Id.*)

After filing this action, Luck secured McMahon's agreement to waive service and agreed that McMahon's responsive pleading would not be due until June 19.  (Doc. No. 32.)  After obtaining McMahon's waiver of service on April 20, Luck proceeded to file an Application for a prejudgment remedy the *very next day*.  (Doc. No. 21.)  By filing the Application on April 21, Luck effectively disrupted the orderly schedule to which the parties had just agreed.

### B.      Luck's False Affidavit In Support of His Application

In support of his Application, Luck submitted a declaration under penalty of perjury. (Doc. No. 23.)  As will be demonstrated if the Court proceeds to a hearing in this action, Luck's declaration is replete with categorically false and deliberately misleading statements.

- Luck falsely avers that that "the signing of Callaway did not violate XFL policy or McMahon's directives."  (Luck Decl. ¶ 12.)  The signing of Callaway plainly violated the XFL policy and McMahon's directive against signing players with questionable or problematic backgrounds without his approval.

- Luck falsely avers that the "XFL policy, also approved by McMahon, was to reject an athlete from a pool of players who could be drafted only if: (a) he had a felony conviction or a conviction for dealing drugs; (b) he had multiple convictions for misdemeanors that established a pattern or habit; or (c) a credible allegation of sexual assault or domestic violence had been made against him." (Luck Decl. ¶ 12.)  In reality, Luck's statement is further evidence of his gross negligence as this was *not* the XFL's policy.

- Based on the supposed policy set forth in paragraph 12 of his affidavit, Luck falsely avers that "Callaway did not fit into any of those categories and was not

disqualified under XFL policies that were in place at the time he was signed to play in the XFL." (Luck Decl. ¶ 13.)  Luck knew that McMahon would not have approved of Luck's decision to hire Callaway if Luck had disclosed Callaway's lengthy history of misconduct to McMahon as required by XFL policy.  Indeed, Luck had consulted with McMahon concerning other potential players with issues similar to Callaway and had been instructed not to hire them.

- Luck's statement that "McMahon had *instructed me* to upgrade the quality of the receivers in the XFL" and that he had done so by signing Callaway is deliberately misleading.  (Luck Decl. ¶ 14) (emphasis in original).  Luck, not McMahon, was the person responsible for evaluating the skill levels of players.  McMahon never told Luck to hire Callaway to upgrade the receiver corps as inferred by Luck, and specifically instructed him on more than one occasion not to hire players with questionable backgrounds.  It was Luck who was singularly focused on improving the quality of the receivers regardless of their character and who signed Callaway without telling McMahon of his past.

- Referring to the need to upgrade wide receivers, Luck states that "[t]he signing of Callaway, which I informed McMahon about (without any objection by him) prior to his signing, did just that."  (Luck Decl. ¶ 14.)  Luck did not even mention Callaway to McMahon until after Callaway was sent a draft contract and included in the pool of players to be drafted by XFL teams.  When Luck did mention Callaway to McMahon, Luck never disclosed Callaway's history of misconduct to McMahon before he was signed.

- Luck falsely avers that "when McMahon told me, during the week of January 26, 2020, that he wanted Callaway terminated, I promptly followed his instruction." (Luck Decl. ¶ 14.)  Although Luck acknowledges that McMahon instructed him to terminate Callaway, Luck in fact failed to promptly follow that instruction, and as a result, Callaway continued to practice, during which he was injured.

- Luck's statement that Callaway "never played a single down in the XFL" is again deliberately misleading.  (Luck Decl. ¶ 14.)  Callaway never played a single down in the XFL because he was injured in practice before the season started after Luck failed to promptly terminate him in accordance with McMahon's instruction, resulting in substantial additional costs to the XFL that could have been avoided.

The above list is not exhaustive as to the false and misleading statements in Luck's affidavit—all of which will be exposed on cross-examination if the Court proceeds to a hearing.

### C.    Luck's Unnecessary and Abusive Request for Relief

In his Application, Luck claims that he is entitled to $23.8 million in salary and bonuses under the Contract and seeks a prejudgment attachment of McMahon's home and other assets in

that amount.  (Luck Decl ¶ 14; Doc. No. 26.)  But Luck's Application never explains why the extraordinarily invasive remedy he seeks on an expedited basis while this Court's operations are limited by the COVID-19 pandemic is necessary at all.  As Luck acknowledges, the purpose of seeking a prejudgment attachment of a defendant's assets is to ensure that sufficient funds are available to pay the plaintiff in the event that he prevails.  (Luck Mem. at 7.)  But that rationale is wholly inapplicable here because McMahon has over a billion dollars in publicly disclosed and highly liquid assets—the stock of World Wrestling Entertainment ("WWE").

Given this obvious fact, McMahon's counsel asked Luck's counsel *three separate times* to explain why Luck was pursuing a wholly unnecessary and costly effort to obtain a prejudgment attachment of McMahon's assets.  (Exs. 1-3.)  Luck's counsel's first response failed to provide any explanation at all.  (Ex. 4.)  After being informed of McMahon's WWE stock holdings, his second flippant response was that he had "no transparency regarding Mr. McMahon's stock holdings" and did not "play the market."  (Ex. 5.)  McMahon's counsel then sent Luck's counsel of a copy of the Amended Schedule 13D filed with the Securities and Exchange Commission ("SEC") on March 25, 2020.  (Ex. 3.)  The Amended Schedule 13D discloses that McMahon is the record owner of 28,697,568 shares of WWE stock.  (Ex. 6.) WWE stock is publicly traded on the New York Stock Exchange ("NYSE") and recently closed at price of $46.06 per share on May 8, 2020.  Accordingly, the current value of McMahon's stock holdings is approximately $1.3 billion—over 50 times the $23.8 million prejudgment remedy that Luck seeks in his Application.  After receiving the Amended Schedule 13D disclosing McMahon's stock ownership, Luck's counsel was still unable to articulate any reason for burdening the Court or harassing McMahon with this wholly unnecessary Application other than claiming that he was "[p]rotecting his client's interest."   (Ex. 7.)   The inescapable

conclusion is that Luck is not seeking a prejudgment remedy because of any good faith belief that he needs security for any judgment that may be entered in this action but rather to harass McMahon because he was terminated for cause.

## LEGAL STANDARD

### I.     Purpose of Prejudgment Remedy

Federal Rule of Civil Procedure 64 authorizes the Court to issue prejudgment remedies available under state law to "secure satisfaction of the potential judgment" that may be rendered in a federal action.  *See* Fed. R. Civ. P. 64(a).  Connecticut law provides that "[p]rejudgment remedy means any remedy or combination of remedies that enables a person by way of attachment, foreign attachment, garnishment or replevin to deprive the defendant in a civil action of, or affect the use, possession or enjoyment by such defendant of, his property prior to final judgment."  Conn. Gen. Stat. §52–278a(d).

The United States Supreme Court, the Connecticut Supreme Court, and this Court have all recognized that the purpose of the Connecticut prejudgment remedy statute is to protect the plaintiff against the risk that the defendant will be unable to pay a judgment that may be entered in the plaintiff's favor and to prevent the dissipation of assets by the defendant prior to the entry of judgment.  *See Connecticut v. Doehr*, 501 U.S. 1, 12 (1991) ("By definition, attachment statutes premise a deprivation of property on one ultimate factual contingency—the award of damages to the plaintiff which the defendant ***may not be able to satisfy***.") (emphasis added); *Bernhard-Thomas Bldg. Sys., LLC v. Dunican*, 286 Conn. 548, 557–58 (2008) ("The purpose of the prejudgment remedy of attachment is security for the satisfaction of the plaintiff's judgment, should he obtain one.  It is primarily designed to forestall any dissipation of assets by the defendant and to bring [those assets] into the custody of the law to be held as security for the

satisfaction of such judgment as the plaintiff may recover.")  (internal quotation marks and ellipses omitted); *UCF I Tr. 1 v. Dimenna*, No. 16-CV-00156, 2016 WL 3620716, at *1 (D. Conn. June 29, 2016) (Bolden, J.) ("[A] prejudgment remedy is intended to secure the satisfaction of a judgment should the plaintiff prevail.").  Luck similarly concedes in his Application that the intended purpose of a prejudgment remedy under Connecticut law is to "secure the satisfaction of a judgment should the movant prevail."  (Luck Mem. at 7.)

## II.      Standard for Issuance of a Prejudgment Remedy

As one of Luck's counsel, then-Judge Katz recognized, the prejudgment remedy "is an extraordinary power granted in derogation of common right and common law."  *Gloria v. Manuel*, No. 27 22 38, 1991 WL 84000, at *1 (Conn. Super. Ct. May 2, 1991) (Katz, J.).  The plaintiff has the burden of proving his entitlement to a prejudgment remedy.  *See Bosco v. Arrowhead by the Lake, Inc.*, 53 Conn. App. 873, 875 (1999) (stating that the court "must determine whether the plaintiff has sustained its burden of showing probable cause to sustain the validity of the claim").  The defendant is entitled to a meaningful evidentiary hearing to examine witnesses and present evidence in opposition to the plaintiff's application for a prejudgment remedy.  *See Soltesz v. Miller*, 56 Conn. App. 114, 115–17 (1999) ("It is clear that a hearing must allow the defendant an opportunity to present evidence in opposition to the plaintiff's motion for prejudgment remedy") (internal quotation marks omitted); *L. Suzio Concrete Co., Inc. v. Salafia*, 3 Conn. App. 404, 407–08 (1985) (stating that the defendant is entitled to present "whatever reasons he may have to show lack of probable cause" at an evidentiary hearing).  At a prejudgment remedy hearing, the trial court must determine:

> [W]hether or not there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff, (2) whether payment of any judgment that may be rendered against the defendant is

adequately secured by insurance, (3) whether the property sought to be subjected to the prejudgment remedy is exempt from execution, and (4) if the court finds that the application for the prejudgment remedy should be granted, whether the plaintiff should be required to post a bond to secure the defendant against damages that may result from the prejudgment remedy or whether the defendant should be allowed to substitute a bond for the prejudgment remedy.

Conn. Gen. Stat. § 52-278d(a).  In determining whether to issue a prejudgment remedy, the court must weigh the probabilities in light of the strength of the evidence presented by both parties. *See SS & C Techs., Inc. v. Providence Inv. Mgmt.*, 582 F. Supp. 2d 255, 258 (D. Conn. 2008) (stating that "[t]he court must weigh the probabilities in light of the evidence presented, and determine if the movant has shown probable cause to sustain the validity of its claim" and "must consider not only the substantiality of the evidence underlying the movant's claims, but also the apparent strength of the evidence underlying the opponent's defenses and set-offs"); *Dean v. Priceline.com, Inc.*, No. 3:00CV1273, 2001 WL 35962826, at *3 (D. Conn. Apr. 6, 2001) (stating that "the court must consider not only the substantiality *vel non* of the evidence underlying the movant's claims, but also the apparent strength of the evidence underlying an opponent's defenses, which may in some circumstances negate movant's claims.").  The court's determination of whether the plaintiff has met his burden must be based on assessment of the credibility of the witnesses and the legal issues.  *See Nash v. Weed & Duryea Co.,* 236 Conn. 746, 749 (1996) (stating that the trial court "must determine, in light of its assessment of the legal issues and the credibility of the witnesses, whether a plaintiff has sustained the burden of showing probable cause to sustain the validity of its claim") (internal quotation marks and citation omitted); *Blakeslee Arpaia Chapman, Inc. v. EI Constructors, Inc.*, 32 Conn. App. 118, 126 (1993) ("[I]t is the trial court that must determine, in light of its assessment of the legal issues and the credibility of the witnesses, whether a plaintiff has sustained the burden of showing probable cause to sustain the validity of its claim.") (internal quotation marks omitted).

In determining whether there is probable cause to issue a prejudgment remedy, the court must take into account any defenses presented by the defendant. *See TES Franchising, LLC* v. *Feldman*, 286 Conn. 132, 141, (2008) ("Section 52-27d(a) explicitly requires that a trial court's determination of probable cause in granting a prejudgment remedy include the court's taking into account any defenses, counterclaims or [setoffs].")  (internal quotations omitted); *Haxhi v. Moss*, 25 Conn. App. 16, 20 (1991) ("[T]he court must evaluate not only the plaintiff's claim but also any defenses raised by the defendant.").  A valid defense is sufficient to show that there is no probable cause that a judgment will be entered in the plaintiff's favor. *See ASPIC, LLC v. Poitier*, 179 Conn. App. 631, 640–41 (2018) ("[A] valid defense has the ability to defeat a finding of probable cause."); *Augeri* v. *C. F. Wooding Co.*, 173 Conn. 426, 429 (1977) (stating that "at a prejudgment remedy hearing a good defense" is "enough to show that there is no 'probable cause that judgment will be rendered in the matter in favor of the plaintiff'").

## ARGUMENT

### I.    Luck's Application Is Not Supported By Probable Cause

#### A.    Luck Has Failed To Join An Indispensable Party

As an initial matter, Luck cannot maintain this action under Federal Rule of Civil Procedure 19 because he has failed to join an indispensable party.  As McMahon will further demonstrate in his motion to dismiss when filed on June 19, 2020, Alpha is an indispensable party because it is a party to the Contract and has an interest in establishing the validity of its termination of Luck for Cause, which is central to Luck's claim and McMahon's defense.

Federal Rule of Civil Procedure 19 "sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party.  First, the court must determine whether an absent party belongs in the suit, *i.e.*, whether the party qualifies as a

necessary party under Rule 19(a)." *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000) (internal quotation marks omitted). Second, "where the court makes a threshold determination that a party is necessary under Rule 19(a), and joinder of the absent party is not feasible for jurisdictional or other reasons, the court must finally determine whether the party is indispensable. If the court determines that a party is indispensable, then the court must dismiss the action pursuant to Rule 19(b)." *Id.* at 725 (internal quotation marks and citation omitted).

*First*, Alpha is a necessary party under Rule 19(a) because it is a party to the contract that is the subject of Luck's lawsuit. *See Sever v. Glickman*, 298 F. Supp. 2d 267, 275 (D. Conn. 2004) ("It is well-established that a party to a contract which is the subject of the litigation is considered a necessary party."); *Travelers Indem. Co. v. Household Int'l, Inc.*, 775 F. Supp. 518, 527 (D. Conn. 1991) ("The precedent supports the proposition that a contracting party is the paradigm of an indispensable party."). Moreover, Luck's own allegations in the Complaint make clear that whether Alpha validly terminated Luck for cause is the central issue in this case. (*See* Compl. ¶ 10 (alleging that "on April 9, 2020, Alpha wrongfully terminated Mr. Luck's employment allegedly for cause, effective immediately, and repudiated the Employment Contract"), *id.* ¶ 13 (alleging that "[b]ecause Alpha wrongfully terminated and repudiated the Employment Contract without cause, all future salary, bonuses and other compensation are now immediately due and payable to Mr. Luck.").)

*Second*, Alpha cannot feasibly be joined in this lawsuit because it has filed for bankruptcy and is subject to the automatic stay. *See Saylavee LLC v. Hockler*, No. 3:04-CV-1344, 2007 WL 9759997, at *2 (D. Conn. Jun. 1, 2007) (holding that necessary party could not feasibly be joined because of bankruptcy proceeding); *Leslie v. Mortgage Elec. Registration Sys.*,

*Inc.*, No. 3:05CV1725, 2007 WL 9754481, at *2 (D. Conn. Jun 12, 2007) (holding that necessary party could not feasibly be joined because he was a debtor in bankruptcy).

**Third**, Alpha is an indispensable party because proceeding with the case without Alpha would significantly prejudice the interests of both Alpha and McMahon.

The Second Circuit has held that "[n]o procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable." *Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 547 (2d Cir. 1991) (internal quotation marks omitted). This principle is equally applicable when the plaintiff seeks an interpretation of the contract that would place an absent party in breach. *See Mazzio v. Kane*, No. 14-CV-616, 2014 WL 2866040, at *6-8 (E.D.N.Y. June 24, 2014) (holding that contract party was indispensable because the claim asserted by plaintiff "will necessarily require the court to determine whether [party] breached the employment agreement"); *Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 707–09 (S.D.N.Y. 1997) (holding that contract party was indispensable in suit between other parties to the contract because construction of the contract would impact absent party's rights); *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 862 F. Supp. 995, 1003–04 (W.D.N.Y. 1994) (holding that contract party was indispensable because an interpretation of the contract in the counterclaimants' favor would significantly affect the absent party's interest). Moreover, this principle applies with particular force where the action concerns whether a contract was properly terminated. *See Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 99–101 (1st Cir. 1996) (holding that subsidiary was an indispensable party to an action claiming that corporate parent had violated employment contracts by directing subsidiary to terminate plaintiffs); *Random House, Inc. v. Gemini Star Prods, Ltd.*, No. 94 CIV 0657, 1995

WL 234736, at *2–3 (S.D.N.Y. Apr. 20, 1995) (holding that subsidiary was indispensable party in parent's suit to terminate contract because subsidiary was party to interrelated contract that contained the same grounds for termination); *Weeks v. Hous. Auth. of City of Opp, Ala.*, 292 F.R.D. 689, 695 (M.D. Ala. 2013) (holding that HUD was indispensable party in action challenging local housing authority's termination of plaintiff where it provided all of authority's funding and directed authority to terminate plaintiff); *Dou Yee Enterprises (S) PTE, Ltd. v. Advantek, Inc.*, 149 F.R.D. 185, 187–90 (D. Minn. 1993) (holding that subsidiary was indispensable party in action against parent challenging subsidiary's termination of contract); *Denkmann Assocs. v. Int'l Paper Co.*, 132 F.R.D. 168, 178 (M.D. La. 1990) (holding that holder of rights under a contract was an indispensable party to plaintiff's action seeking termination).

Such principles compel dismissal this case. Alpha has a strong interest in arguing that Luck's contract was validly terminated for Cause and that it did not breach the Contract. Moreover, the Court's ruling in this case plainly could affect Alpha's interests. For example, if the Court ruled in McMahon's favor and found that the Contract was validly terminated, then Luck could attempt to pursue an action against Alpha and re-litigate the same issues to Alpha's detriment. The Court's ruling in this case also could be persuasive authority in any subsequent action involving Alpha on the issue of termination. *See Acton Co., Inc. of Massachusetts v. Bachman Foods, Inc.*, 668 F.2d 76, 78–79, 81 (1st Cir. 1982) ("Even if Acton would not be legally bound, an adverse ruling would be a persuasive precedent in a subsequent proceeding.").[2]

---

[2] Although Luck alleges in his Complaint that Alpha moved to reject the Contract in the Bankruptcy Court and therefore is in breach of the Contract (Compl. ¶ 1, n.1), Alpha's motion makes clear that "certain of the Rejected Contracts may have terminated" pursuant to their terms prior to the petition date and that Alpha was seeking authority to reject any such contracts "out of an abundance of caution." (Alpha's Motion ¶ 6 n.6.) And in fact, Luck's Contract was terminated prior to the petition date.

Alpha also has unique defenses and counterclaims to assert as a result of Luck's breach. *See Vedder Price Kaufman & Kammholz v. First Dynasty Mines, Ltd.*, No. 01 CIV. 3970, 2001 WL 1190996, at *2–3 (S.D.N.Y. Oct 9, 2001) (holding that co-obligor was indispensable party because it was primary recipient of services under the contract, made payments under contract, and could assert offset defense based on payments to the plaintiff); *Delcon Constr. Corp. v. U.S. Dep't of Hous. & Urban Dev.*, 205 F.R.D. 145, 147 (S.D.N.Y.2002) (holding that company that "was a party to the underlying contract, is a necessary party, and should be joined so it can assert its defenses and claims against [plaintiff] relating to the matters in suit").

McMahon also will be prejudiced if Alpha is not joined in this action because Alpha would not be able to as effectively assist in its defense or be present to assert or waive privileges on issues directly relevant to Luck's affidavit and its truthfulness.

The remaining factors considered under Rule 19(b) also weigh in favor of considering Alpha an indispensable party. The court cannot shape a judgment or relief in this case to lessen or mitigate the prejudice to Alpha if a judgment were rendered in its absence. Any such judgment would be incomplete and inadequate because it would not include Alpha and therefore would not settle the dispute between all necessary parties. And Luck would not be deprived an adequate remedy if he re-files the action against McMahon once Alpha's bankruptcy proceeding is complete. *See Leslie v. Mortgage Elec. Registration Sys., Inc.*, No. 3:05CV1725, 2007 WL 9754481, at *2 (D. Conn. Jun 12, 2007) ("The plaintiffs may have an adequate remedy if they re-file this case upon the closure of the bankruptcy case or abandonment by the bankruptcy trustee"). Because Alpha is an indispensable party that cannot be joined, Luck's action must be dismissed and his Application for a prejudgment remedy must be denied.[3]

---

[3] Alternatively, and at a minimum, Luck's action should be stayed pending resolution of

## B.  Luck Was Properly Terminated For Cause

Even if the Court were inclined to reach the merits of Luck's claim, his Application should still be denied because Alpha properly terminated Luck for Cause.

### 1.  Alpha's Decision to Terminate Luck for Cause Is Entitled to Substantial Deference Under Connecticut Law.

"[A]n employer who wishes to terminate an employee for cause must do nothing more rigorous than proffer a proper reason for dismissal." *Gaudio v. Griffin Health Servs. Corp.,* 249 Conn. 523, 539 (1999) (internal quotation marks omitted).  "A majority of courts addressing the standard by which performance of employment contracts is judged view employment contracts as fundamentally different from other contracts, and consequently grant employers great deference in making 'cause' termination decisions."  *Kern v. Palmer College of Chiropractic,*

---

the bankruptcy case.  *See In re James Wilson Assocs.,* 965 F. 2d 160, 170 (7th Cir 1992) ("[I]f the debtor is an indispensable party, protected by the stay from involvement in the litigation, the litigation cannot proceed in [its] absence and therefore must be stayed as against the third party."); *In re Metal Ctr., Inc.,* 31 B.R. 458, 462–63 (Bankr. D. Conn. 1983) (holding that failure to extend the stay "potentially exposes [guarantor] to inconsistent judgments" and "the interests of equity and judicial economy dictate that the issues between the debtor, [plaintiff], and [guarantor] be litigated in the same forum").  Even if Alpha were not an indispensable party, a stay would be warranted to ensure that McMahon is not distracted by this litigation and is able to focus on the timely resolution of Alpha's affairs.  *See Queenie, Ltd. v. Nygard Int'l,* 321 F.3d 282, 287–88 (2d Cir. 2003) ("The automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate."); *In re United Health Care Org.,* 210 B.R. 228, 232 (S.D.N.Y. 1997) (stating that courts have stayed creditor actions against non-debtors when the creditor's action "would consume time and energy of the non-debtor that would otherwise be devoted to a reorganization effort."); *In re Lazarus Burman Associates,* 161 B.R. 891, 898–900 (Bankr. E.D.N.Y. 1993) (holding that automatic stay should apply to lawsuit against non-debtor defendants because the principals' attention would be diverted substantially from the debtors' reorganization); *In re Third Eighty-Ninth Associates,* 138 B.R. 144, 147–48 (S.D.N.Y. 1992) (imposing stay of creditor against guarantors because the "estate would suffer if the Guarantors' services and attention were compromised by the distraction of defending against the Guaranty Action"); *In re Ionosphere Clubs, Inc.,* 111 B.R. 423, 434–35 (Bankr. S.D.N.Y. 1990) (holding that automatic stay should apply to lawsuit against non-debtor defendants because the lawsuit "will surely involve, burden and directly impact [the debtor] and will likely prejudice [the debtor's] future defense against identical claims based upon identical facts").

757 N.W.2d 651, 658-59 (Iowa 2008) (collecting cases).  Under this rule of deference to an employer's termination decisions,

> [t]he judicial fact-finder's role is not to determine whether the facts underlying the employer's "cause" determination were actually true, or to conduct de novo review of whether the facts found by the employer amounted to "cause" for termination under the terms of the contract.  Instead, the judicial fact-finder determines only whether the cause claimed by the employer for termination was "a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power," based on facts "supported by substantial evidence and reasonably believed by the employer to be true," and "not for any arbitrary, capricious, or illegal reason."

*Id.* at 659 (citations omitted).  Applying these principles in *Gaudio,* the Connecticut Supreme Court affirmed a jury instruction stating in part that "an employer rightfully has managerial discretion in making [termination] decisions and the right to make independent good faith judgments [and] [i]n making your decision, you cannot interfere with the legitimate exercise of managerial discretion" and further noting that the jury's task is only "to determine whether the [employer] acted in an arbitrary and capricious manner."  *Gaudio*, 249 Conn. at 539-40 & n. 13 (internal quotation marks omitted).  Accordingly, Alpha's decision to terminate Luck for Cause should not be second-guessed by a judicial factfinder and is entitled to substantial deference.

## 2.    Alpha Properly Terminated Luck For Cause Under the Contract

The Contract provides that Luck can be terminated for Cause for "gross negligence of his duties."  (Luck Decl., Ex. 1 at 3.).  It specifically defines gross negligence to include "an intentional failure to follow ***any*** applicable XFL policies or directives."  (*Id.*) (emphasis added). Under Connecticut law, intentional conduct is not "limited to consequences which are desired" and "[i]f the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result."  *Polmatier v. Russ*, 206 Conn. 229, 240 (1988) (internal quotation marks omitted). Accordingly, a single intentional failure by Luck to follow a single XFL policy or directive is

grounds for termination for Cause under the clear language of his Contract.  Indeed, as the CEO, he is expected to enforce standards of conduct and policies applicable to all employees, including most of all himself.

Contrary to Luck's contention, his action or omission does not need to be "willful" as defined by the Contract ("in bad faith or without reasonable belief that Mr. Luck's action or omission was in the best interest of the XFL") to constitute gross negligence and provide grounds for termination for Cause.  (Luck Decl., Ex. 1 at 3.)  To be sure, Luck's Contract provided that, in addition to being subject to termination for gross negligence, Luck was also subject to termination for "willful and intentional material misconduct in the performance of duties."  (*Id.*)  The willful misconduct termination provision, however, is disjunctively set apart from the gross negligence provision and is an entirely different ground to terminate.

Although only a single intentional failure to follow a single XFL policy or directive can constitute grounds for termination for Cause, McMahon intends to demonstrate at any hearing in this matter multiple failures by Luck to follow XFL policies or directives including, the following:

***First***, Luck's hiring of Callaway was an intentional failure to follow XFL policies.  Luck knew of McMahon's directive not to employ players with questionable or problematic backgrounds and to discuss any such players with McMahon before hiring them.  Indeed, Luck's affidavit tries to avoid that conclusion by first stating a three factor test that he swears was the policy, which would have required a felony conviction, a drug distribution conviction, multiple misdemeanor convictions, or a credible sexual or domestic assault allegation to disqualify a player from being in the league.  Having falsely testified that this was the policy, Luck then testifies that Callaway was not disqualified under that so-called, but in reality non-existent,

policy.  Luck knows his statement is false because he had brought to McMahon's attention the questionable or problematic backgrounds of several players who did not meet such criteria, and McMahon consistently told him that they could not play in the XFL.  Luck knew that Callaway had a questionable or problematic background and does not deny that fact in his declaration. (*See* Luck Decl. ¶¶ 12-13.)  Nevertheless, Luck never disclosed Callaway's issues to McMahon and proceeded to sign him anyway in violation of McMahon's directive, and has now offered false testimony to escape the for Cause decision.

**Second**, Luck's failure to terminate Callaway after McMahon learned of his history and directed Luck to terminate his contract was a second intentional failure to follow an XFL policy or directive.  Luck squarely admits that McMahon directed him to terminate Callaway after McMahon learned about Callaway's questionable or problematic background.  (Luck Decl. ¶ 14.)  Yet Luck failed to terminate Callaway in accordance with McMahon's directive, and again resorts to deception, telling the Court that he "promptly followed his instruction" and that, as a result, Callaway "never played a single down" in the XFL.  (*Id.*)  In fact, as Luck knows full well when he made these highly deceptive statements, Callaway was allowed to continue to practice, injured his knee during practice, and could no longer be terminated—all of which resulted in a six-figure loss to the XFL, a start-up league.  Callaway never played a down in the XFL not because Luck promptly carried out McMahon's directive and terminated his contract, but because he was injured when Luck failed to do so.

**Third**, Luck violated the XFL's Code of Business Conduct and policies on the use of electronic systems, which specified that all XFL Technology was the property of the XFL and to be used for XFL-related business only.  Luck used such technology for his personal use and for matters unrelated to the business of the XFL, including when he took absence after March 13,

2020.  The full extent of Luck's violations of these policies will not be known until the iPhone he was issued by the XFL is forensically examined by experts.

*Fourth,* Luck was grossly negligent in his duties by failing to provide the leadership required of a CEO after the COVID-19 pandemic brought the XFL season to a halt and placed its business in jeopardy.  The Contract made Luck responsible for "all football and business-related operations" of the XFL and required him to "devote substantially all of his business time to the performance of his duties to the XFL."  (Luck Decl. Ex. 1 at 1.)  After March 13, 2020, Luck failed to perform these obligations at the very moment when the XFL needed his leadership the most—in the face of the existential threat created by the COVID-19 pandemic.  Tellingly, Luck does not even claim in his self-serving affidavit that he devoted substantially all of his business time to the performance of his duties to the XFL after March 13.  Rather, he admits that he returned to his home in Indiana and performed only minimal work.  (Luck Decl. ¶ 16, n.1.)  Luck was completely disengaged from the XFL and its efforts to determine whether there was a viable path forward for the league.  He did not make a single phone call to McMahon about any work-related matters and failed to attend important telephonic meetings.  Luck's affidavit in regard to his activities on behalf of the XFL after March 13 is again false and deliberately misleading in ways which will be exposed on cross-examination.

Luck wrongly contends that his misconduct does not constitute Cause because he was not given prior written notice and 30 days to cure.  (Luck Decl. ¶ 20.)  The Contract makes clear that notice and an opportunity to cure are not required where the misconduct "is not reasonably susceptible to cure."  (Luck Decl., Ex. 1 at 3.)  It is well settled that notice and an opportunity to cure are futile where the conduct cannot be undone.  *See Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991) (holding that compliance with notice and

cure provision is not required where it would amount to a "useless gesture"); *City of New York v. Tavern on the Green Int'l LLC*, 351 F. Supp. 3d 680, 692 (S.D.N.Y. 2018) ("[P]roviding notice and cure is not required where it would be futile") (internal quotation marks and citation omitted); *Sea Tow Services Int'l, Inc. v. Pontin*, 607 F. Supp. 2d 378, 389 (E.D.N.Y. 2009) ("[A]dherence to the cure provision of a contract is not required where it would be a futile act."); *In re New Breed Realty Enterprises, Inc.*, 278 B.R. 314, 320 (Bankr. E.D.N.Y. 2002) (holding that default "cannot be cured because it is a historical fact" that cannot be undone).

Here, Luck's actions and omissions that provided grounds for termination of Cause were not susceptible to cure because the harm they caused to Alpha could not be undone. The harm caused by Luck's hiring of Callaway in violation of XFL policies and his ensuing failure to timely terminate Callaway was not susceptible to cure because Callaway injured his knee during practice, which irreversibly obligated Alpha to pay out his contract and for the resulting costs of his surgery and exposed Alpha to potential liability for worker's compensation payments. Moreover, Luck was repeatedly told not to hire players with dubious backgrounds on several occasions prior to the Callaway episode, and failed to correct his propensity to do so. Luck's gross neglect of his duties in the weeks after March 13 also was not curable under the Contract. The COVID-19 pandemic posed a sudden and existential threat to XFL's business that required a bold and immediate response from its senior leadership. By the time it became clear that Luck was completely disengaged from the XFL's operations, Alpha simply did not have 30 days to wait for Luck to attempt to do his job. Alpha was forced to suspend its operations on April 10— 28 days after Luck left for his home in Indiana on March 13 and effectively abandoned his responsibilities as its CEO—and thereafter filed for Chapter 11 relief on April 13.

### 3. McMahon Is Not Liable Under the Guaranty Because Alpha Properly Terminated Luck For Cause

McMahon is not liable under the Guaranty because Alpha properly terminated the Contract for Cause. McMahon only guaranteed Alpha's performance of obligations that were actually owed to Luck under the Contract. The Guaranty accordingly provides that it only remains in effect "until the full performance by [Alpha] of its agreements and obligations under the Contract." (Luck Decl., Ex. 1 at Ex. A.) Because the Contract was validly terminated for Cause, Alpha owes no further obligations to Luck under the Contract, and there is nothing left for McMahon to guarantee. *See Eplet, LLC v. DTE Pontiac N., LLC*, No. 2:17-CV-11462, 2019 WL 932033, at *4 (E.D. Mich. Feb. 26, 2019) ("After the utility services agreement's termination, [guarantor] could not accrue further obligations under the parental guaranty agreement, which applied only to obligations arising under the utility services agreement.").

### C. Luck Is Not Entitled To Bonuses He Never Earned

Under no circumstances is Luck entitled to the $8 million in additional bonus payments he seeks because the Contract clearly specified that each year's bonus is payable at the end of each Contract Year only if Luck is still employed by Alpha at that time. (Luck Decl. Ex. 1 at 1.)

The Contract must be interpreted according to well-settled Connecticut law that "[t]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479, 498 (2000) (internal quotation marks and ellipses omitted). "[A] contract must be viewed in its entirety, with each provision read in light of the other provisions and every provision must be given effect if it is possible to do so."

*Harbour Pointe, LLC v. Harbour Landing Condo. Ass'n, Inc.*, 300 Conn. 254, 261 (2011) (internal quotation marks and ellipses omitted).

The Contract expressly provided that Luck will be paid a Guaranteed Annual Bonus "on the last day of each Contract Year, ***subject to his continued employment on the scheduled payment date***." (Luck Decl., Ex. 1 at 1) (emphasis added). Each Contract Year ended on June 30 of that calendar year. Because Luck was terminated prior to June 30, 2020, he is not entitled to any further bonuses under any circumstances. Indeed, even if Luck had been terminated without Cause, he was only entitled to a lump sum payment "equal to the aggregate amount of Base Salary and Guaranteed Annual Bonuses that ***would otherwise be payable to him*** during the remaining scheduled term of the Contract (*i.e.*, through June 30, 2023 or, if applicable, any Renewal Periods)." (*Id.* at 3) (emphasis added). By the Contract's plain terms, there are no bonuses that "would otherwise be payable" to Luck if he were terminated prior to the scheduled payment date for the bonus, which was June 30 of each Contract Year. Thus, if terminated without Cause prior to the end of a given Contract Year, Luck would have been entitled only to the remaining Base Salary and not any bonus. Luck's contrary interpretation fails to give effect to the clear and unambiguous terms of the Contract that conditioned his eligibility for bonuses on his continued employment with Alpha in contravention of the well-established canons of contract interpretation under Connecticut law.

### D. A Prejudgment Remedy Is Unwarranted Given McMahon's Clear Ability To Pay Any Possible Judgment

A prejudgment remedy is particularly unwarranted here given McMahon's clear ability to pay any possible judgment. As Luck concedes, settled Connecticut law holds that the purpose of a prejudgment remedy is to ensure payment of the judgment if the plaintiff prevails. *See Blakeslee Arpaia Chapman, Inc. v. EI Constructors, Inc.*, 32 Conn. App. 118, 131 (1993) (stating

that prejudgment remedies "are premised on the contingency that a defendant may not be able to satisfy the eventual award of damages to a plaintiff").   The prejudgment remedy statute accordingly recognizes that the availability of funds to pay a future judgment is relevant to whether a prejudgment remedy should be issued.  *See* Conn. Gen. Stat. § 52-278d(a) (stating that the trial court must consider "whether payment of any judgment that may be rendered against the defendant is adequately secured by insurance").   "Thus, a plaintiff may be entitled to a prejudgment remedy because it has demonstrated the requisite probable cause, but it may still be denied the remedy if its interest is already adequately secured."  *Blakeslee*, 32 Conn. App. at 131.  Other courts similarly have stated that "a prejudgment attachment is unnecessary where the applicant has not shown that it needed additional security to safeguard its 'probable judgment' or that its interest is not already adequately secured."  *Winchester Bd. of Educ. v. W.L. Gilbert Sch. Corp.*, No. CV 970073312, 1997 WL 585763, at *3 & n.2 (Conn. Super. Ct. Sept. 10, 1997) (stating that a prejudgment remedy was unnecessary in a lawsuit against a municipal corporation because its access to the "resources of the entire community" provides adequate security).

Luck's Application should be denied because he has not shown and cannot show that he needs additional security for any judgment that may be entered in his favor.  Reliable and publicly available reports make clear that McMahon has over a billion dollars in highly liquid assets—many times more than the $23.8 million that Luck seeks to attach.

Because McMahon holds more than 5% of WWE stock, SEC regulations require the filing of a Schedule 13D disclosing his stock holdings.  *See* 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-1.  McMahon most recently filed an Amended Schedule 13D on March 24, 2020, which discloses that he is the beneficial owner and has "sole dispositive power" of 28,697,568 shares of WWE stock.  (Ex. 6.)  WWE stock is publicly traded on the New York Stock Exchange and

recently closed at price of $46.06 per share on May 8, 2020, placing the value of McMahon's stock at over $1.3 billion—more than 50 times the $23.8 million prejudgment remedy that Luck seeks.  WWE recently reported strong Q1 earnings despite the challenges presented by the COVID-19 pandemic.  But even at the lowest closing price in WWE's 21-year history on the NYSE ($6.86 per share), McMahon's stock holdings would still be worth over $196 million—more than eight times the amount Luck seeks.  In any case, because McMahon's WWE holdings and WWE's stock price are public, Luck can easily monitor McMahon's ability to pay any judgment that may be entered in this action.  In the highly unlikely event that there were ever a significant risk of non-payment that might warrant a prejudgment remedy, Luck could seek relief from this Court at that time.

Because McMahon's holdings of WWE stock provide more than adequate security for any judgment that may enter in this matter, Luck's Application for a prejudgment remedy should be summarily denied.  There are simply no exigent circumstances requiring a hearing during an ongoing pandemic, and summarily denying the Application avoids collateral litigation over the as applied constitutionality of the remedy.

## II.    The Issuance of a Prejudgment Remedy Under The Circumstances Of This Case Would Violate Due Process

Luck's attempt to place restraints on McMahon's property in the unique circumstances presented here raises serious due process concerns and would cause collateral litigation in what is actually a relatively simple and straightforward case.

### A.    Standards for Due Process Challenge to Prejudgment Remedy Statute

The Supreme Court's decision in *Connecticut v. Doehr*, 501 U.S. 1 (1991) articulates the controlling legal standards governing a procedural due process clause challenge to issuance of a prejudgment remedy.  *See In Matter of Motors Liquidation Co.*, 829 F.3d 135, 158 (2d Cir. 2016)

(relying on *Doehr* in challenge to bankruptcy court proceeding); *Diaz v. Paterson*, 547 F.3d 88, 89 (2d Cir. 2008) (applying *Doehr* to constitutional challenge to New York's *lis pendens* statute).

As the Court in *Doehr* recognized, the prejudgment attachment of a defendant's property constitutes a deprivation of a constitutionally protected property interest and therefore implicates procedural due process requirements. *See Doehr*, 501 U.S. at 12 ("Without doubt, state procedures for creating and enforcing attachments, as with liens, 'are subject to the strictures of due process.'"). Once a deprivation has been shown, the adequacy of the state's procedures are evaluated under the three-factor balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976), as adjusted to reflect the primarily private interest advanced by the prejudgment remedy statutes:

> [F]irst, consideration of the private interest that will be affected by the prejudgment measure;
>
> [S]econd, an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and
>
> [T]hird, in contrast to *Mathews*, principal attention to the interest of the party seeking the prejudgment remedy, with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections.

*Doehr*, 501 U.S. at 11. *Doehr* applied these factors to Connecticut General Statutes § 52-278e, which at that time authorized prejudgment attachment prior to any hearing on the plaintiff's application for a prejudgment remedy. The Court found that prejudgment attachment resulted in a significant impairment of the defendant's property rights and that Connecticut's "probable cause" standard created a substantial risk that this deprivation would be erroneous. *See Doehr*, 501 U.S. at 15. Absent a showing of exigent circumstances, such as the defendants transferring or dissipating assets, the Court found that the plaintiff had no significant interest in obtaining a pre-hearing attachment that could justify the substantial risk that the defendant's property rights

would be erroneously impaired.  *Id.* at 16-17.  Accordingly, the Court held that the Connecticut statute violated the defendant's constitutional rights to due process.

### B.    Granting A Prejudgment Remedy Despite McMahon's Ability To Pay Would Violate Due Process

The reasoning of *Doehr* is squarely applicable here and similarly precludes issuance of a prejudgment attachment that is wholly unnecessary in light of McMahon's clear ability to pay any judgment Luck could obtain in this action.

### 1.    Prejudgment Attachment Will Significantly Impact McMahon's Property Rights

As in *Doehr*, the prejudgment remedy Luck seeks will significantly impact McMahon's property rights.  In *Doehr*, the plaintiff had obtained an attachment in the amount of $75,000 on the defendant's home.  The Court recognized:

> [T]he property interests that attachment affects are significant.  For a property owner like Doehr, attachment ordinarily clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause.

*Doehr*, 501 U.S. at 11.  Here, Luck's proposed writ of attachment specifically recites McMahon's home address and seeks the attachment of his "interest in real property."  (Doc. No. 26.)  Furthermore, Luck seeks a $23.8 million attachment—more than 300 times the $75,000 attachment that the Court found to be a "significant" impairment in *Doehr*.  As in *Doehr*, Luck also has no independent right, title, or interest in McMahon's property that might justify such an attachment. *See Doehr*, 501 U.S. at 16

### 2.    There Is A Substantial Risk That McMahon's Property Rights Will Be Erroneously Impaired

In *Doehr*, the Court stated that "[a] party must show more than the mere existence of a claim before subjecting an opponent to prejudgment proceedings that carry a significant risk of

erroneous deprivation." *Doehr*, 501 U.S. at 21.  The Court recognized that the probable cause standard for issuing a prejudgment remedy under Connecticut law was "obscure" and that "ambiguous state cases" created "confusion" over its meaning in this context.  *Id.* at 13-14.  The Court expressed concern that the vague "probable cause" standard could be satisfied by a "skeletal affidavit" and noted that "[i]t is self-evident that the judge could make no realistic assessment concerning the likelihood of an action's success based upon these one-sided, self-serving, and conclusory submissions."  *Id.* at 14.  The Court also recognized that Connecticut's "probable cause" standard creates a substantial risk of an erroneous deprivation particularly where the claims do not involve "ordinarily uncomplicated matters [like the existence of a debt or delinquent] payments that lend themselves to documentary proof."  *Id.* (internal quotation marks and citation omitted).

The risk of erroneous deprivation is at least as significant in this case.  As in *Doehr*, Luck's claim requires far more than merely establishing a debt or delinquent payments and instead requires him to show that he was not properly terminated for Cause.  *See Doehr*, 501 U.S. at 17 ("[D]isputes between debtors and creditors more readily lend themselves to accurate *ex parte* assessments of the merits.  Tort actions, like the assault and battery claim at issue here, do not.").  Connecticut courts also continue to rely on the same vague standards for probable cause that the Court found problematic in *Doehr*.  *Compare Doehr*, 501 U.S. at 12-13 (discussing Connecticut standards for probable cause) with *Canty v. Otto*, 304 Conn. 546, 565–66 (2012) (articulating the same standards).

As explained above, Luck cannot meet the "probable cause" standard given the clear evidence of his gross negligence and intentional violation of XFL policies.  But even if the Court were to find probable cause supporting Luck's claim, there remains at least a "substantial risk"

(and in fact a high probability) that Luck will not ultimately prevail on his claim and that McMahon's property will have been erroneously impaired for the duration of this case.

### 3.     Luck Has No Significant Interest In A Prejudgment Attachment

As in *Doehr*, Luck can point to no interest that justifies this substantial risk of erroneous deprivation.    In *Doehr*, Court noted that "[b]y definition, attachment statutes premise a deprivation of property on one ultimate factual contingency—the award of damages to the plaintiff which the defendant may not be able to satisfy."  501 U.S. at 12.  The Court explained that the plaintiff "had no existing interest in Doehr's real estate when he sought the attachment" and that "[h]is only interest in attaching the property was to ensure the availability of assets to satisfy his judgment if he prevailed on the merits of his action."  *Id.* at 16.  But because "there was no allegation that Doehr was about to transfer or encumber his real estate or take any other action during the pendency of the action that would render his real estate unavailable to satisfy a judgment," the plaintiff's interest was "too minimal" to justify attachment.  *Id.*

The same rationale is equally applicable here.  Luck's only interest in obtaining a prejudgment attachment is "to ensure the availability of assets to satisfy his judgment if he prevail[s] on the merits of his action."  *Id.*  Luck does not allege that he has any existing interest in McMahon's property.  He does not allege that there is any risk of waste or dissipation of McMahon's assets or that his assets will be fraudulently transferred or removed from the jurisdiction of the Court.  He also does not allege that McMahon will be unable to satisfy any judgment that could be rendered in Luck's favor.  Nor could Luck make such a showing because, as demonstrated above, McMahon holds over a billion dollars of highly liquid assets in the form of WWE stock, which are publicly disclosed pursuant to SEC regulations and easily monitored by Luck.  (Ex. 6.)  Given these facts, there is no legitimate reason to deprive McMahon of the full use of his property during the pendency of this action.  Because there is no reason for such a

deprivation, the impairment of McMahon's property rights in the form of a prejudgment remedy

would constitute an unconstitutional violation of due process.[4]

### C.   Granting a Prejudgment Remedy Without Requiring A Bond From Luck Would Violate Due Process

The issuance of a prejudgment remedy without requiring Luck to post a bond also would

violate McMahon's constitutional rights to due process.

A plurality of the Court in *Doehr* recognized that, "[w]ithout a bond, at the time of

attachment, the danger that these property rights may be wrongfully deprived remains

unacceptably high even with such safeguards as a hearing or exigency requirement." *Doehr*, 501

U.S. at 19 (plurality opinion).  The Court explained:

> A defendant's property rights remain at undue risk even when there has been an
> adversarial hearing to determine the plaintiff's likelihood of recovery.  At best, a
> court's initial assessment of each party's case cannot produce more than an
> educated prediction as to who will win.  This is especially true when, as here, the
> nature of the claim makes any accurate prediction elusive.  In consequence, even
> a full hearing under a proper probable-cause standard would not prevent many
> defendants from having title to their homes impaired during the pendency of suits
> that never result in the contingency that ultimately justifies such impairment,
> namely, an award to the plaintiff.

*Id.* at 20 (internal citation omitted).  Consistent with this reality, the Court recognized that all but

a handful of states *require* a bond before granting a prejudgment remedy.  *Id.*

---

[4] Attaching McMahon's property under these circumstances also would be so arbitrary and irrational that it would violate the requirements of substantive due process.  See *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) ("[T]he touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective.") (internal quotation marks and citations omitted); *Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir. 1996) ("[A] party asserting a deprivation of substantive due process must first establish a valid property interest within the meaning of the Constitution" and then must demonstrate government action "in an arbitrary or irrational manner in depriving him of that property interest."); *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) ("[G]overnment action might be so arbitrary that it violates substantive due process regardless of the fairness of the procedures used.") (internal quotation marks omitted).

Although not binding, the reasoning of the plurality in *Doehr* is sound and should be followed under the circumstances of this case.  First, given McMahon's strong defense described above and further demonstrated at any hearing, the risk of an erroneous deprivation of McMahon's property is especially high in this case.  Second, Luck is insisting on a prejudgment remedy that is completely unnecessary to protect his interests given McMahon's clear ability to pay any judgment.  Accordingly, the failure to require Luck to post a bond in the event that any prejudgment remedy were issued would offend due process.[5]

## CONCLUSION

For the reasons set forth above, McMahon respectfully requests that the Court summarily deny Luck's Application for a prejudgment remedy.  If the Court does not do so, McMahon requests an evidentiary hearing and the right to cross-examine Luck in the physical presence of the Court.

---

[5] Counsel recognizes that the Second Circuit has held that due process does not require a plaintiff to post a bond to obtain a prejudgment remedy.  *See Result Shipping Co. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394, 402 (2d Cir. 1995); *Shaumyan v. O'Neill*, 987 F.2d 122, 126–27 (2d Cir. 1993).  But these cases are distinguishable because they did not consider a defendant who can clearly pay any judgment that is likely to issue in this action.

DEFENDANT VINCENT K. MCMAHON

By: */s/ Jerry S. McDevitt*
Jerry S. McDevitt *(pro hac vice pending)*
Curtis B. Krasik *(pro hac vice pending)*
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone: (412) 355-6500
Fax: (412) 355-6501
Email: jerry.mcdevitt@klgates.com
Email: curtis.krasik@klgates.com

Jeffrey P. Mueller (ct27870)
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
Phone: (860) 275-0100
Fax: (860) 275-0343
Email: jmueller@daypitney.com

## CERTIFICATION OF SERVICE

I hereby certify that, on May 12, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jeffrey P. Mueller*
Jeffrey P. Mueller (ct27870)