**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| OLIVER LUCK | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | CIVIL NO. 3:20-cv-516 (VAB) |
| | § | |
| VINCENT K. MCMAHON | § | |
| | § | APRIL 24, 2020 |
| *Defendant.* | § | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**<u>APPLICATION FOR PREJUDGMENT REMEDY</u>**

Pursuant to Rule 64 of the Federal Rules of Civil Procedure, Rule 4(c) of the Local Rules of Civil Procedure for District of Connecticut, and Connecticut General Statutes § 52-278a *et seq.*, plaintiff Oliver Luck respectfully submits this memorandum of law in support of his application for a prejudgment remedy.

**PRELIMINARY STATEMENT**

This action arises from a personal guaranty (the "Guaranty") made by Defendant Vincent K. McMahon ("McMahon") in favor of Plaintiff Oliver Luck to induce Mr. Luck to serve as the Commissioner and CEO of the XFL, a professional football league owned by Alpha Entertainment LLC ("Alpha").[1]  McMahon is the Chairman and the controlling owner of Alpha. Under the Guaranty, McMahon personally, unconditionally, and irrevocably guaranteed—as a primary obligor—the payment and performance of Alpha's agreement and obligations to Mr. Luck under the Employment Contract.  Specifically, McMahon waived all "circumstances that

---

[1] By its Application for Prejudgment Remedy and this Memorandum, Plaintiff seeks no relief, recovery, or remedy against Alpha. On April 13, 2020, Alpha filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware, Cause No. 20-10940 (LSS).

may . . . constitute a legal or equitable discharge or defense" to any action to enforce the Guaranty.

By letter dated April 9, 2020, Alpha wrongfully terminated Mr. Luck's employment and repudiated the Employment Contract (the "Termination Letter"). The Termination Letter purports to terminate the Employment Contract for cause and makes pretextual and meritless allegations regarding Mr. Luck's performance as Commissioner and CEO of the XFL. Mr. Luck wholly disputes and rejects the allegations in the Termination Letter. As described in Mr. Luck's response letter to the Termination Letter dated April 16, 2020 (the "Response Letter"), Mr. Luck did not commit any act or omission during his employment with Alpha that would qualify for termination for cause. Despite the express terms of the Employment Contract, Alpha and its chairman McMahon never provided written notice and a thirty (30) day opportunity to cure.

Consequently, Alpha's termination of Mr. Luck's employment, purportedly for cause, was wrongful and constituted a repudiation of its obligations under the Employment Contract. Despite the terms of his Guaranty, McMahon has failed and refused to pay Mr. Luck in full for all compensation due to him throughout the remaining duration of the Employment Contract. Therefore, McMahon has breached the Guaranty.

As shown below, and as will be demonstrated at the hearing of this matter, Mr. Luck has more than satisfied the standard for a prejudgment remedy under Connecticut law, which requires only a showing of probable cause to believe that Mr. Luck will prevail and obtain a judgment in the amount of the prejudgment remedy. The Court should grant this Application and order a prejudgment remedy against McMahon in the amount of $23.8 million.

## STATEMENT OF FACTS

On May 30, 2018, Mr. Luck entered into a five-year Employment Contract with Alpha.

*See* Ex. 1.[2]  As set forth in the Employment Contract, Mr. Luck agreed to serve as the

Commissioner and CEO of the XFL, a professional football league, from July 1, 2018 to June 30,

2023.  *Id*. at p. 2.  The Employment Contract provides that Mr. Luck is to receive, *inter alia*, an

annual base salary of $5,000,000 per contract year, paid monthly, and a guaranteed annual bonus

of $2,000,000 payable on the last day of each contract year, subject to his continued employment

on the scheduled payment date.  *Id*.  Under the Guaranty, McMahon—as the controlling owner

of Alpha and primary (if not exclusive) funder of XFL operations—personally, unconditionally,

and irrevocably guaranteed Alpha's performance of its agreements and obligations to Mr. Luck

under the Employment Contract, including, but not limited to, payment of Mr. Luck's base salary

and guaranteed annual bonuses.  *See* Ex. A to Ex. 1.  McMahon's obligations pursuant to the

Guaranty are unconditional, absolute, continuing, and irrevocable.  *Id*.  Further, McMahon

waived all "circumstances that may . . . constitute a legal or equitable discharge or defense" to

any action to enforce the Guaranty.  *Id*.

The Employment Contract provides that Mr. Luck could be terminated "for Cause" or

"without Cause."  Ex. 1 at p. 3.  The definition of "Cause" includes "Mr. Luck's willful and

intentional material misconduct in performance of his duties or gross negligence of his duties."

*Id*.  As defined in the Employment Contract, an act or omission is considered "willful" only

when done, or omitted to be done, by Mr. Luck in bad faith or without the reasonable belief that

it is in the best interest of the XFL.  *Id*.  A termination for Cause entitles Mr. Luck to be paid

only for previously accrued salary and vested employee benefits, while a termination without

Cause entitles Mr. Luck to receive a lump sum cash payment consisting of, *inter alia*,  Mr.

---

[2]All references to exhibits are the exhibits attached to Oliver Luck's Declaration in Support of
Plaintiff's Application for Prejudgment Remedy (ECF No. 23).

Luck's base salary and guaranteed annual bonuses that would otherwise be payable throughout the remaining duration of the Employment Contract.  *Id*.  Further, pursuant to the Employment Contract, if the act or omission that would otherwise constitute "Cause" under the Employment Contract is reasonably susceptible to cure, Alpha must give Mr. Luck thirty (30) days written notice to cure.  *Id*.

In a letter dated April 9, 2020, which was approved by McMahon, Alpha wrongfully terminated Mr. Luck's employment—purportedly for Cause—effective immediately, and repudiated the Employment Contract.  Ex. 2.  The Termination Letter set forth pretextual and meritless allegations related to Mr. Luck's acts or omissions as Commissioner and CEO of the XFL.  *Id*.  The Termination Letter falsely accused Mr. Luck of "gross negligence," "willful disregard of the lawful instructions of McMahon concerning [his] material duties," and "not devot[ing] all of [his] business time to the performance of [his XFL] duties since March 13th."  *Id*.  Mr. Luck wholly disputes and rejects the allegations in the Termination Letter and responded to the baseless allegations via his Response Letter.  Ex. 3.

As set forth in his Response Letter, throughout Mr. Luck's tenure as Commissioner and CEO of the XFL, he worked diligently and cooperatively with McMahon and others to establish, build, and promote the XFL.  *Id*.  Mr. Luck oversaw issues relating to football game-play personnel, football operations, football safety, and football rule innovation.  *Id*.  All of Mr. Luck's acts and omissions as Commissioner and CEO of the XFL were done in good faith and with the reasonable belief that such acts and omissions were in the best interests of the XFL and Alpha.  *Id*.

The Termination Letter contains numerous inaccuracies.  For example, the Termination Letter falsely states that Mr. Luck violated XFL policy and directives issued by McMahon when

Mr. Luck signed wide receiver Antonio Callaway ("Callaway").  Ex. 2.  Yet contrary to the

claim in the Termination Letter, the XFL had no policy in place at the time that would have

disqualified Callaway when he signed to play in the XFL.  *See* Ex. 3.  Further, McMahon was

made aware of the signing of Callaway in advance and did not object at the time.  *Id*.  In fact,

McMahon had instructed Mr. Luck to upgrade the quality of receivers in the XFL, and the

signing of Callaway accomplished that goal.  *Id*.  When McMahon told Mr. Luck in January

2020 that he wanted Callaway terminated, Mr. Luck promptly followed McMahon's directive.

*Id*.  At no time did Mr. Luck intentionally violate XFL policy or directive.

The Termination Letter also falsely states that since March 13, 2020, Mr. Luck has been

disengaged with the XFL.  Ex. 2.  While the COVID-19 pandemic and resulting XFL and

government orders prohibited Mr. Luck from returning to the XFL offices after March 15, 2020,

Mr. Luck continued to fulfill his obligations and responsibilities to the XFL and Alpha until his

termination on April 9, 2020.  Ex. 3.  During this time, Mr. Luck communicated with McMahon

via text message and McMahon was well aware of Mr. Luck's efforts related to the XFL, as

evidenced by McMahon's responses to the text messages.  *Id*.  For example, Mr. Luck

communicated with college athletic administrators regarding the possibility of the college

football season being moved to the spring of 2021, and Mr. Luck shared this information with

McMahon.  *Id*.  Mr. Luck worked with numerous other XFL employees and representatives

regarding the shutdown of XFL operations and facilities and had numerous conversations

regarding the possibility of signing certain XFL players for the 2021 season.  *Id*.  Mr. Luck also

worked with other XFL staff members to finalize the 2021 football budget request by McMahon,

and submitted it on March 27, 2020.  *Id*.  Since early March 2020, Mr. Luck was part of the

XFL's COVID-19 working group to monitor the impact of the virus on the XFL's operations.

*Id*.  Further, Mr. Luck prepared a video, at McMahon's request, thanking XFL fans for their support.  *Id*.  Mr. Luck and McMahon had a meeting scheduled for April 3, 2020, and the meeting was cancelled by McMahon's office.  *Id*.  All of the evidence supports Mr. Luck's claim that he was very much engaged in the XFL operations after March 13, 2020, and continued to devote substantially all of his business time to his XFL duties.  The allegations in the Termination Letter are simply false.

The Termination Letter also claims, without merit, that the manner and method that Mr. Luck used to locate teams and negotiate term sheets with venues, was grossly negligent.  Ex. 2. The selection of venues, however, along with the negotiation of terms sheets, were a joint effort by numerous XFL employees and consultants.  Ex. 3.  McMahon was kept apprised of the site selections and negotiations.  *Id*.  No cities or stadiums were selected, or agreements signed, without McMahon's prior authorization and approval.  *Id*.

During his time as Commissioner and CEO of the XFL, neither Alpha nor McMahon provided Mr. Luck with written notice of any purported belief that he was not executing his responsibilities with competence or diligence, nor did either provide written notice that any of Mr. Luck's acts or omissions constituted "Cause" under the Employment Contract.  Despite the fact that the supposed deficiencies in performance described in the Termination Letter, if accurate, would have been susceptible to cure, neither Alpha nor McMahon provided Mr. Luck with the required thirty (30) day written notice to effect the cure.

One day after sending Mr. Luck the Termination Letter, Alpha suspended operations of the XFL and laid off virtually its entire staff.  On April 13, 2020, Alpha filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware.

Mr. Luck promptly commenced this action against McMahon for failing to pay all

6

amounts owed to Mr. Luck and McMahon's breach of his obligations under the Guaranty.  Mr. Luck now seeks a prejudgment remedy to ensure the preservation of McMahon's assets pending a final judgment.

## LEGAL STANDARD

Connecticut General Statute § 52-278a *et seq*. authorizes the issuance of prejudgment remedies in Connecticut.  This statute applies with equal force in Connecticut federal courts. Rule 64 of the Federal Rules of Civil Procedures provides that, in federal court, "every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment."  Fed. R. Civ. P. 64(a); *see also Bahrain Telecommunications Co. v. Discoverytel, Inc.*, 476 F. Supp. 2d 176, 183 (D. Conn. 2007) ("Rule 64 thus authorizes a federal court to borrow relevant state law on provisional remedies.").  Further, Rule 4(c) of the Local Rules of Civil Procedure for the District of Connecticut provides that "a party may secure a pre-judgment remedy ('PJR') as permitted by, and in accordance with, the law of the State of Connecticut."

Under Connecticut law, a prejudgment remedy is intended to secure the satisfaction of a judgment should the movant prevail.  *SS & C Techs., Inc. v. Providence Inv. Mgmt.*, 582 F. Supp. 2d 255, 257 (D. Conn. 2008).  The Connecticut prejudgment remedy statute provides:

> If the court, upon consideration of the facts before it and taking into account any defenses, counterclaims or set-offs, claims of exemption and claims of adequate insurance, finds that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought and finds that a prejudgment remedy securing the judgment should be granted, the prejudgment remedy applied for shall be granted as requested or as modified by the court.

Conn. Gen. Stat. § 52-278d(a).  Therefore, an application for a prejudgment remedy "shall be granted" whenever there is "probable cause that such a judgment will be rendered in the matter

in the plaintiff's favor."  *Id.*

"'Probable cause' is less demanding than the 'preponderance of the evidence' or the 'likelihood of success' standards. . . .  It is a flexible common sense standard, . . . consisting of a bona fide belief in the existence of facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it."  (Citations omitted; internal quotation marks omitted.)  *SS & C Techs., Inc. v. Providence Inv. Mgmt.*, 582 F. Supp. 2d at 257.  "The plaintiff does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim. . . .  The court's role in such a hearing is to determine probable success by weighing probabilities."  (Citation omitted.)  *New England Land Co. v. DeMarkey*, 213 Conn. 612, 620 (1990).

## ARGUMENT

I.    *Mr. Luck's termination was wrongful; Alpha has repudiated the Employment Contract; and McMahon has failed to perform pursuant to the Guaranty.*

Mr. Luck more than meets the probable cause standard in this case.  The facts clearly demonstrate that Mr. Luck never performed any act or omission that would qualify for termination for Cause under the Employment Contract.  To the contrary, all of Mr. Luck's acts or omissions were done in good faith and in furtherance of the XFL's interests.  As the evidence at the hearing of this matter will demonstrate, Alpha's allegations in the Termination Letter are meritless and pretextual.  The COVID-19 pandemic had a severe economic impact on Alpha's business, as evidenced by Alpha's decision to cease operations shortly after the pandemic forced the cancellation of the XFL's inaugural season.  It is not a coincidence that Alpha issued the Termination Letter to Mr. Luck contemporaneously with its cessation of operations.  By manufacturing a basis to terminate the Employment Contract for Cause, it is clear that McMahon is simply attempting to avoid his obligations to Mr. Luck under the Guaranty.

No basis existed to terminate Mr. Luck's employment for Cause.  By so doing, Alpha wrongfully terminated Mr. Luck's employment and repudiated the Employment Contract.  A contract repudiation entitles Mr. Luck to full contract damages.  *See Coppola Constr. Co. v. Hoffman Enterprises Ltd. Partnership*, 157 Conn. App. 139, 161-62 (2015).  Here, McMahon personally, unconditionally, and irrevocably guaranteed Alpha's performance of its agreements and obligations to Mr. Luck under the Employment Contract and waived any legal or equitable defenses to Mr. Luck's enforcement of the Guaranty.  Further, in the Response Letter, demand was made on McMahon to perform under his Guaranty. *See* Ex. 3 at p. 4.  He has failed and refused to do so.  Thus, McMahon is obligated under the Guaranty to immediately pay Mr. Luck the amounts due under the Employment Contract.  *See A.T. Clayton & Co. v. Hachenberger*, 920 F. Supp. 2d 258, 263 (D. Conn. 2013) ("In Connecticut, [a] guarantee is a promise to answer for the debt, default or miscarriage of another.") (citations and internal quotation marks omitted).

II.     *Alpha repudiated the Employment Contract because it never gave Mr. Luck the required written notice to cure the alleged deficiencies, and McMahon is liable to Mr. Luck pursuant to the Guaranty.*

Pursuant to the express terms of the Employment Contract, Alpha was required to give thirty (30) days written notice to Mr. Luck to effect the cure of any act or omission that constitute "Cause" under the contract and is reasonably susceptible to cure.  All of Mr. Luck's supposed deficiencies outlined in the Termination Letter, even if true (which Mr. Luck vigorously denies), would have been reasonably susceptible to cure.  For example, if the allegation were true that Mr. Luck was not devoting substantially all of his business time to his XFL duties, it could have been cured following notice.  Similarly, if the allegation were true that Mr. Luck was acting in violation of XFL policy and directive, this too could have been cured following notice.  Yet, Alpha never provided Mr. Luck with any notice, and the first time Mr.

Luck was informed that his conduct constituted "Cause" under the Agreement was when he received the Termination Letter.

When Alpha failed to provide the required written notice to cure and then purported summarily to terminate Mr. Luck's employment for Cause, Alpha repudiated the Employment Contract, and materially breached the agreement.

> "[I]f a party who has a power of termination by notice fails to give the notice in the form and at the time required by the agreement, it is ineffective as a termination. . . .  One who deviates from the terms and the circumstances specified in the agreement for giving notice . . . may be regarded as having repudiated the contract, with all the effects of repudiation including giving the injured party a right to damages . . . .  [A] party's failure to comply with the notice provision in a termination clause . . . amounts to a material breach of the contract."

*Semac Elec. Co., Inc. v. Skanska USA Bldg., Inc.*, 195 Conn. App. 695, 715 (2020) (quoting *Coppola Constr. Co. v. Hoffman Enterprises Ltd. Partnership*, 157 Conn. App. at 169).

Alpha materially breached the Employment Agreement. McMahon, as primary obligor pursuant to the Guaranty, is liable to Mr. Luck for all sums owed under the contract, but has failed to do so.

## CONCLUSION

For all the foregoing reasons as well as those that will be demonstrated at the hearing of this matter, the Court should grant plaintiff Oliver Luck's Application for Prejudgment Remedy and issue an Order allowing him to attach and/or garnish sufficient property of defendant Vincent K. McMahon to secure the sum of $23.8 million, and such other prejudgment remedy as the Court deems appropriate.

Respectfully submitted,

**PLAINTIFF OLIVER LUCK**

*/s/ Andrew M. Zeitlin*
Andrew M. Zeitlin (Fed. Bar No. ct21386)
Joette Katz (Fed Bar No. ct30935)
SHIPMAN & GOODWIN LLP
300 Atlantic Street
Stamford, CT 06901
Telephone: (203) 324-8100
Facsimile: (203) 324-8199
Email: azeitlin@goodwin.com
Email: jkatz@goodwin.com

**AND**

*/s/ Paul J. Dobrowski*
Paul J. Dobrowski  (phv10563)
Vanessa L. Pierce (phv10561)
DOBROWSKI, LARKIN & STAFFORD, L.L.P.
4061 Washington Avenue, Suite 200
Houston, Texas 77007
Telephone: (713) 659-2900
Facsimile: (713) 659-2908
Email: pjd@doblaw.com
Email: vpierce@doblaw.com

***HIS ATTORNEYS***