## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| OLIVER LUCK, | : | CASE NO. 3:20-cv-00516-VAB |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| VINCENT K. MCMAHON, | : | |
| | : | |
| Defendant. | : | MAY 29, 2020 |

## DEFENDANT VINCENT K. MCMAHON'S SURREPLY BRIEF IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR PREJUDGMENT REMEDY

Jerry S. McDevitt
Curtis B. Krasik
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone: (412) 355-6500
Fax: (412) 355-6501
Email: jerry.mcdevitt@klgates.com
Email: curtis.krasik@klgates.com

Jeffrey P. Mueller
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT  06103
Phone: (860) 275-0100
Fax: (860) 275-0343
Email: jmueller@daypitney.com

*Attorneys for Defendant Vincent K. McMahon*

# **TABLE OF CONTENTS**

**Page**

I.    The Court Should Summarily Deny The Application Because Alpha Is An Indispensable Party That Cannot Be Joined In This Action. ...............................................1

    A.    Luck Must Prove That Alpha Breached The Contract To Establish That McMahon Breached The Guaranty. ..........................................................................1

    B.    Alpha Is A Required Party Because It Is A Party To A Contract That Is The Subject Of This Action. ....................................................................................3

    C.    Alpha Is An Indispensable Party Because Both Alpha and McMahon Will Be Prejudiced By Its Absence. ..............................................................................5

II.    Luck Cannot Establish Probable Cause That A Judgment Will Enter In His Favor ...........8

    A.    Luck Improperly Attempts to Rewrite The Contract ...............................................8

    B.    Luck's Hiring of Callaway Violated XFL Policies and Directives .........................9

    C.    Luck's Failure to Terminate Callaway Violated XFL Policies and Directives ................................................................................................................10

    D.    Luck Intentionally Failed To Follow The XFL Technology Policies.....................11

    E.    Luck Was Grossly Negligent In His Duties After March 13, 2020........................12

    F.    Luck Is Not Entitled To $8 Million in Additional Bonus Payments ......................13

III.    The Court Should Summarily Deny The Application Because McMahon Clearly Has The Ability to Pay Any Potential Judgment In This Action........................................14

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*73-75 Main Ave., LLC v. PP Door Enter., Inc.*,
  120 Conn. App. 150 (2010) ...............................................................................................1

*Análisis y Estrategia, S.A. de C.V. v. Andersen*,
  No. 14-CV-8016, 2015 WL 4510772 (S.D.N.Y. July 24, 2015) ................................5

*Cabrini Dev. Council v. LCA-Vision, Inc.*,
  197 F.R.D. 90 (S.D.N.Y. 2000),
    *judgment vacated on other grounds sub nom.,* 292 F.3d 134 (2d Cir. 2002) ..........................6

*Cadle Co. of Conn. v. C.F.D. Dev. Corp.*,
  44 Conn. App. 409 (1997) ................................................................................................1

*CCT Commc'ns, Inc. v. Zone Telecom, Inc.*,
  327 Conn. 114 (2017) .......................................................................................................2

*In re Cenargo Int'l, PLC*,
  294 B.R. 571 (Bankr. S.D.N.Y. 2003) ..............................................................................6

*Chem. Bank v. Geller*,
  727 F.2d 61 (2d Cir. 1984).................................................................................................2

*Commodity Futures Trading Comm'n v. Weintraub*,
  471 U.S. 343 (1985) ..........................................................................................................6

*Connecticut v. Doehr*,
  501 U.S. 1 (1991)..............................................................................................................15

*Eplet, LLC v. DTE Pontiac N., LLC*,
  No. 2:17-CV-11462, 2019 WL 932033 (E.D. Mich. Feb. 26, 2019)........................2

*Errico v. Stryker Corp.*,
  281 F.R.D. 182 (S.D.N.Y. 2012) ......................................................................................6

*Fid. Nat'l Title Ins. Co. v. Wright*,
  No. 3:10-CV-1666, 2011 WL 13290740 (N.D. Tex. Jan. 13, 2011) ........................5

*Gellman v. Paul*,
  85 F.R.D. 357 (S.D.N.Y. 1980) ........................................................................................7

*Herbert S. Newman & Partners, P.C. v. CFC Constr. Ltd. P'ship*,
  236 Conn. 750 (1996) .......................................................................................................8

*MasterCard International Inc. v. Visa International Service Ass'n*,
   471 F.3d 377 (2d Cir. 2006)......................................................................................4

*ND Props. v. BLRG Rest. Grp., Inc.*,
   649 F. App'x 861 (11th Cir. 2016) ...........................................................................2

*Northbrook PLIC, LLC v. CVS Pharm., Inc.*,
   No. 10 C 0873, 2012 WL 581223 (N.D. Ill. Feb. 17, 2012).....................................2

*People's United Bank, N.A. v. Patterson*,
   No. FBTCV166055720S, 2016 WL 6237654 (Conn. Super. Ct. Sept. 28, 2016)....2

*Provident Tradesmens Bank & Tr. Co. v. Patterson*,
   390 U.S. 102 (1968).................................................................................................7

*Rapoport v. Banco Mexicano Somex, S.A.*,
   706 F. Supp. 207 (S.D.N.Y. 1988) ...........................................................................5

*Ross v. Rossi*,
   No. CV89 0104491 S, 1990 WL 269381 (Conn. Super. Ct. June 29, 1990)...........9

*Simon v. Landau*,
   208 N.Y.S.2d 120 (Sup. Ct. 1960)............................................................................2

*U.S. Bank Nat'l Ass'n v. Karl*,
   128 Conn. App. 805 (2011) .....................................................................................8

*United Illuminating Co. v. Wisvest-Connecticut, LLC*,
   259 Conn. 665 (2002) .......................................................................................3, 13

*United States v. Indoor Cultivation Equip. from High Tech Indoor Garden Supply*,
   55 F.3d 1311 (7th Cir. 1995) ...................................................................................8

*Ursa Minor Ltd. v. Aon Fin. Prods., Inc.*,
   No. 00CIV-2474, 2000 WL 1010278 (S.D.N.Y. July 21, 2000) .............................3

*Vedder Price Kaufman & Kammholz v. First Dynasty Mines, Ltd.*,
   No. 01 CIV. 3970, 2001 WL 1190996 (S.D.N.Y. Oct 9, 2001) ..............................6

*Winchester Bd. of Educ. v. W.L. Gilbert Sch. Corp.*,
   No. CV 970073312, 1997 WL 585763 (Conn. Super. Ct. Sept. 10, 1997) ...........14

Faced with McMahon's demonstration that Luck violated policies well-known to him and filed a deceptive affidavit with this Court, Luck's Reply now seeks to rewrite the Contract and heighten its standards for termination for Cause by imposing additional requirements that are not contained in the Contract. In similar fashion, Luck also attempts to eliminate express provisions of the Contract conditioning his receipt of annual bonuses on his continued employment. And Luck even advances the extreme and frivolous position that McMahon is liable for $23 million in payments to Luck under the Guaranty *regardless* of whether he was properly terminated for Cause. The Court should reject Luck's desperate attempts to avoid the consequences of his termination for Cause and summarily deny his Application.

**I.     The Court Should Summarily Deny The Application Because Alpha Is An Indispensable Party That Cannot Be Joined In This Action.**

   **A.     Luck Must Prove That Alpha Breached The Contract To Establish That McMahon Breached The Guaranty.**

As an initial matter, Luck's argument that Alpha is not an indispensable party because McMahon is liable for payments to Luck under the Guaranty *regardless* of whether Alpha terminated Luck for Cause is frivolous. Reply at 2, 7-9.

Luck must prove that Alpha is liable for unpaid obligations under the Contract in order to establish McMahon's liability under the Guaranty. The Guaranty only applies to Alpha's payment of obligations that are actually owed to Luck under the Contract. Guaranty ¶¶ 1-2 (guaranteeing the "due and punctual payment and performance" of Alpha's obligations under the Contract). Connecticut law similarly requires Luck to prove that payments are owed under the Contract and unpaid by Alpha to establish a breach of the Guaranty. *See Cadle Co. of Conn. v. C.F.D. Dev. Corp.*, 44 Conn. App. 409, 413 (1997) ("[T]here would be no basis for a judgment against the guarantors on the note or the guarantee because the liability of the guarantor is based on the liability of the debtor."); *73-75 Main Ave., LLC v. PP Door Enter., Inc.*, 120 Conn. App.

150, 165 (2010) (stating that a guaranty is a contract in which a party "contracts to fulfill an obligation upon the default of the principal obligor") (internal quotation marks omitted); *People's United Bank, N.A. v. Patterson*, No. FBTCV166055720S, 2016 WL 6237654, at *1 (Conn. Super. Ct. Sept. 28, 2016) ("In order to establish a prima facie claim for breach of a written guaranty plaintiff must prove: (1) plaintiff is owed a debt from a third party, (2) defendant guaranteed payment of the debt and (3) the debt has not been paid."). Because Luck was terminated for Cause under the Contract, Alpha does not owe any further obligations to Luck under the Contract, and McMahon therefore does not owe anything to Luck under the Guaranty.[1]

Luck's claim that McMahon is a "primary obligor" under the Contract does *not* mean that McMahon can be held liable for amounts that are not actually owed by Alpha. A primary obligor is still only liable for the payment of the obligations imposed by the underlying contract. *See Simon v. Landau*, 208 N.Y.S.2d 120, 123–24 (Sup. Ct. 1960) (stating that the use of the words "primary obligors" in guaranty did not change the fact that the defendants "were and remain merely guarantors of the corporation's debt to the plaintiff"). Luck's reliance on the Guaranty's general waiver of defenses also does not broaden the scope of the Guaranty, which is expressly limited to payment for any unpaid obligations of Alpha. *See Chem. Bank v. Geller*, 727 F.2d 61, 63–64 (2d Cir. 1984) ("Although the guarantees are 'unconditional' and without regard to [debtor's] defenses, they do not require the guarantors to pay [plaintiff] without regard to the amount of [debtor's] obligation."); *ND Props. v. BLRG Rest. Grp., Inc.*, 649 F. App'x 861,

---

[1] Connecticut law also provides that termination of a contract generally extinguishes a party's obligations under the contract. *See CCT Commc'ns, Inc. v. Zone Telecom, Inc.*, 327 Conn. 114, 135 n.14 (2017). Courts therefore have held that a guarantor has no further liability under a guaranty when the underlying contract is terminated. *See Eplet, LLC v. DTE Pontiac N., LLC*, No. 2:17-CV-11462, 2019 WL 932033, at *4 (E.D. Mich. Feb. 26, 2019); *Northbrook PLIC, LLC v. CVS Pharm., Inc.*, No. 10 C 0873, 2012 WL 581223, at *6 (N.D. Ill. Feb. 17, 2012) (holding that guarantor was not liable under unconditional guaranty upon termination of lease).

865–66 (11th Cir. 2016) (reversing summary judgment for plaintiff because it failed to establish certain amounts due under lease agreement despite guaranty's waiver of defenses); *Ursa Minor Ltd. v. Aon Fin. Prods., Inc.*, No. 00CIV-2474, 2000 WL 1010278, at *6 (S.D.N.Y. July 21, 2000) (stating that "plaintiffs must demonstrate a prima facie case against the debtor in order to recover under the Credit Default Swap" notwithstanding guaranty's waiver of defenses). Because Alpha paid Luck everything he was owed under the Contract up to the point of his termination for Cause, there is nothing left for McMahon to guarantee.

Luck's contrary interpretation violates several basic canons of contract construction under Connecticut law. *First*, Luck's interpretation renders the specific termination for Cause provisions meaningless verbiage of no legal significance. There would be no reason to include all of the terms in the Contract and the Guaranty or to specify grounds for termination for Cause if McMahon were obligated to pay Luck even if he were terminated for Cause. *See United Illuminating Co. v. Wisvest-Connecticut, LLC*, 259 Conn. 665, 674 (2002) ("The law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous."). *Second*, Luck fails to read the provisions of the Contract and the Guaranty together, which make clear that McMahon is not liable to Luck under the Guaranty if Luck is terminated for Cause under the Contract. *See id.* at 671 ("When there are multiple writings regarding the same transaction, the writings should be considered together in construing the contract.") (internal quotation marks omitted).

### B. Alpha Is A Required Party Because It Is A Party To A Contract That Is The Subject Of This Action.

Although Luck acknowledges the well-established principle that a party to a contract which is the subject of litigation is a required party, he incorrectly contends Alpha is not a necessary party because it is not a party to the Guaranty which is the subject of this litigation.

Reply at 13.  *First*, Luck's argument ignores that the Contract to which the Guaranty applies *is* the subject of this litigation.  The Guaranty was attached to the Contract and the execution of the both the Contract and the Guaranty was required in order for them to become "legally binding and enforceable."  Contract at 1.  Moreover, as set forth above, Luck must prove that Alpha breached the Contract in order to establish that McMahon breached the Guaranty.  Indeed, Luck's own Complaint originally alleged that McMahon was obligated to pay Luck under the Guaranty *because* Alpha "wrongfully terminated and repudiated the Employment Contract without cause."  Compl ¶ 13.  *Second*, Luck fails to address the case law cited by McMahon holding that an absent party is indispensable when the claims in the case are based on its alleged breach of contract.  Opp'n at 16-18 (collecting cases).  *Third*, Luck ignores the extensive case law cited by McMahon holding that an absent party to a contract is indispensable in an action concerning whether that contract was validly terminated.  *Id.* at 16-17 (collecting cases).

Luck's reliance on the Second Circuit's decision in *MasterCard International Inc. v. Visa International Service Ass'n,* 471 F.3d 377 (2d Cir. 2006) is misplaced.  In *MasterCard*, the Second Circuit held that the trial court did not abuse its discretion in finding that VISA was not an indispensable party in an action involving a contract between MasterCard and FIFA because VISA's separate contract with FIFA was "not the contract at issue in MasterCard's lawsuit."  *Id.* at 386.  The Second Circuit expressly distinguished *MasterCard* from a case where "the actual contract involving the absent third party was the basis of the claim" and where the non-party "was faced with the possibility of having its contract terminated in its absence."  *Id.* (citing *Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690, 700-01 (2d Cir. 1980).  Unlike the claim in *MasterCard*, Luck's claim in this case necessarily turns on whether Alpha had Cause to terminate the Contract.

Luck's argument that Alpha is not an indispensable party because it will not be bound by a judgment in this action similarly fails. Reply at 21. Courts have recognized that the interest of an absent party to a contract may be adversely affected even if it is not bound by a judgment in the action. *See Rapoport v. Banco Mexicano Somex, S.A.*, 706 F. Supp. 207, 211–12 (S.D.N.Y. 1988) (stating that "[company] has a plain interest in the result of [plaintiff's] claim against [defendant], an alleged guarantor of obligations of [company] and is thus a necessary party" regardless of whether it is bound under the doctrine of *res judicata*). Here, Alpha plainly has an interest in this Court's determination of whether it had Cause to terminate the Contract regardless of whether it is bound by a judgment.[2]

### C. Alpha Is An Indispensable Party Because Both Alpha and McMahon Will Be Prejudiced By Its Absence.

Luck's argument that Alpha and McMahon will not be prejudiced by the absence of Alpha because their interests are aligned fails for several reasons.

*First*, contrary to Luck's counsel's contention during the conference with the Court, Alpha is a separate legal entity from McMahon. *See Visión en Análisis y Estrategia, S.A. de C.V. v. Andersen*, No. 14-CV-8016, 2015 WL 4510772, at *5 (S.D.N.Y. July 24, 2015) (holding limited liability company was an indispensable party in an action against its officers and

---

[2] Luck's argument that Alpha has no interest in the Contract because of its bankruptcy similarly fails. Reply at 7, 16. Alpha remains a separate legal entity whose rights may be affected by the Contract. *See Fid. Nat'l Title Ins. Co. v. Wright*, No. 3:10-CV-1666, 2011 WL 13290740, at *1 (N.D. Tex. Jan. 13, 2011) (holding that debtor in bankruptcy was an indispensable party in action against its officers claiming that debtor had breached contract with plaintiffs). Luck's claim that Alpha rejected the Contract in the bankruptcy case is inaccurate. As McMahon's Opposition noted, Alpha's motion made clear that "certain of the Rejected Contracts may have terminated" pursuant to their terms prior to the Petition Date. *In re Alpha Entm't LLC,* No. 20-10940 (Bankr. D. Del. Apr. 13, 2020), ECF No. 22 ¶ 6 n.3. Moreover, the Court granted Alpha's motion only to the extent such contracts were "not already terminated in accordance with their applicable terms." *Id.* ECF No. 124 ¶ 2. Luck's Contract was terminated before the Petition Date.

directors for breach of the contracts because the court "cannot ignore the fact that [the company] is a separate legal entity 'whose rights and obligations are at the heart of this case'").

*Second*, Alpha is currently represented by different counsel from McMahon and has unique defenses and counterclaims that McMahon cannot assert. *See Errico v. Stryker Corp.*, 281 F.R.D. 182, 189 (S.D.N.Y. 2012) (holding that absent party's interests were not aligned with plaintiff because it was represented by separate counsel and might prefer to resolve the action on different terms than the plaintiffs); *Vedder Price Kaufman & Kammholz v. First Dynasty Mines, Ltd.*, No. 01 CIV. 3970, 2001 WL 1190996, at *2–3 (S.D.N.Y. Oct 9, 2001) (holding that absent contract party was indispensable because it could assert defense based on payments made to plaintiff); *Cabrini Dev. Council v. LCA-Vision, Inc.*, 197 F.R.D. 90, 95 (S.D.N.Y. 2000) (holding that limited liability company was an indispensable party in an action where certain "claims are unique to [the company] and cannot be asserted by the members in their individual capacities"), *judgment vacated on other grounds sub nom.,* 292 F.3d 134 (2d Cir. 2002).

*Third*, as noted in the Opposition, McMahon would be prejudiced by Alpha's absence because Alpha would not be able to assist in his defense or be present to assert or waive privileges directly relevant to central issues in the case. There are privileged communications that bear directly on the issue of the truthfulness of Luck's statements concerning the XFL's policy for hiring players. McMahon cannot assert or waive the attorney-client privilege over such communications because the privilege belongs to Alpha and can only be asserted or waived by Alpha. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355-58 (1985) (holding that the bankruptcy trustee or the debtor-in-possession "has the power to waive the corporation's attorney-client privilege with respect to prebankruptcy communications"); *In re*

*Cenargo Int'l, PLC*, 294 B.R. 571, 601 (Bankr. S.D.N.Y. 2003) ("[T]he attorney-client privilege for a debtor corporation belongs to the debtor in possession.").

Luck's argument that Alpha will not be prejudiced because he has only sued McMahon and is unlikely to pursue claims against Alpha also lacks merit. Luck has not signed a release or covenant not to sue Alpha. But even if he did, McMahon would still be prejudiced by Alpha's absence. *See Gellman v. Paul*, 85 F.R.D. 357, 358–59 (S.D.N.Y. 1980) (stating that failure to join party might still "unnecessarily prejudice the rights of defendants already present, since the risk of their being held liable may increase in the absence of a necessary party defendant").

Finally, Luck's argument that he would have no adequate remedy if this case were dismissed fails because he could potentially re-file it once Alpha's bankruptcy proceeding is complete. Dismissal or stay of this action until the bankruptcy case has concluded would ensure that the interests of Alpha and McMahon are not prejudiced and that McMahon is not distracted by this litigation and able to focus on Alpha's reorganization.[3] Opp'n at 18-19, n.3 (collecting cases). It also would advance the interest of the courts and the public in a complete and efficient resolution of this dispute. *See Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 111 (1968) (stating that "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies," and the "public stake in settling disputes by wholes, whenever possible" must be considered in evaluating whether a party is indispensable). Because Alpha is an indispensable party and Luck acknowledges that Alpha cannot be joined, this action should be dismissed or stayed pending resolution of the bankruptcy proceeding.

---

[3] Indeed, on May 27, 2020, the Bankruptcy Court set August 6, 2020 as the date the XFL will be sold at auction, an important process to both creditors and to the XFL itself.

## II. Luck Cannot Establish Probable Cause That A Judgment Will Enter In His Favor

### A. Luck Improperly Attempts to Rewrite The Contract

As an initial matter, the Court should reject Luck's attempt to rewrite the Contract and impose additional requirements on Alpha's ability to terminate him for Cause. *See Herbert S. Newman & Partners, P.C. v. CFC Constr. Ltd. P'ship*, 236 Conn. 750, 760 (1996) ("It is axiomatic that courts do not rewrite contracts for the parties.").

*First*, Luck erroneously contends that Alpha must show that his conduct was "materially and demonstrably injurious to the interest, property, operations, business or reputation of Alpha or its affiliates" *in addition to* satisfying one of the enumerated grounds for Cause. Reply at 3, 18. But the very structure of the Contract makes clear that conduct "which is materially and detrimentally injurious to the interest, property, operations, business or reputation of Alpha or its affiliates" *is* any of the six specified grounds for termination for Cause which follow those words. Contract at 3. The clause relied upon by Luck is a non-restrictive clause that does not limit the enumerated grounds for Cause but rather describes those grounds. *See United States v. Indoor Cultivation Equip. from High Tech Indoor Garden Supply*, 55 F.3d 1311, 1315 (7th Cir. 1995) (noting the use of the pronoun "which" evidences a non-restrictive clause).

*Second*, Luck incorrectly claims that the clause providing that he could be terminated for Cause for "willful and intentional material misconduct in the performance of his duties *or* gross negligence of his duties, including an intentional failure to follow any applicable XFL policies and directives" required Alpha to show *both* willful misconduct *and* gross negligence. Reply at 18-19; Contract at 3 (emphasis added) (parenthetical omitted). But the use of the word "or" indicates that this clause is disjunctive and that Luck could be terminated for Cause for *either* willful misconduct *or* gross negligence in his duties. *See U.S. Bank Nat'l Ass'n v. Karl*, 128

Conn. App. 805, 810, n.4 (2011) (stating that Connecticut courts have construed "the word 'or' to be disjunctive, synonymous with 'in the alternative'").

*Third*, Luck wrongly claims that his conduct had to satisfy the common law definition of gross negligence in order for Alpha to terminate him for Cause.  Reply at 19.  But the Contract specifically defines gross negligence as "including an intentional failure to follow any applicable XFL policies or directives" and therefore Luck's conduct did not have to also satisfy the common law definition in order to provide grounds to terminate him for Cause.[4]  Contract at 3.

### B. Luck's Hiring of Callaway Violated XFL Policies and Directives

In his Reply, Luck does not dispute that (i) he made public statements indicating his knowledge of the directive to employ only players with good character, (ii) he previously acted in accordance with this policy by seeking McMahon's approval for other players who had problematic backgrounds (including a history of drug use and sexual assault allegations) and that McMahon rejected those players, and (iii) he proceeded to hire Callaway without disclosing Callaway's history of misconduct to McMahon or obtaining his approval.  Luck's claims that Callaway's hiring did not violate XFL policy despite these undisputed facts lack merit.

*First*, in an attempt to now maintain that he did not have to adhere to the real policy and directive of McMahon, Luck argues he had "authority to hire, dismiss, replace, or reassign any employee, consultant, or contractor of the XFL" subject to "McMahon's approval for material business decisions" and claims that the hiring of Callaway was not a material business decision.  Reply at 1-2; Contract at 1.  But the Contract clearly provides that Luck can be terminated for

---

[4] Luck also incorrectly attempts to equate the common law standard for gross negligence under Connecticut law with recklessness.  *See Ross v. Rossi*, No. CV89 0104491 S, 1990 WL 269381, at *2 (Conn. Super. Ct. June 29, 1990) ("[M]ost courts consider that gross negligence falls short of a reckless disregard of the consequences, and differs from ordinary negligence only in degree, and not in kind.") (internal quotation marks and citation omitted).

Cause for "an intentional failure to follow any applicable XFL policies or directives" and therefore his failure to follow the policy and directive regarding hiring players with problematic backgrounds constitutes grounds for termination for Cause. Contract at 3. In any event, Luck knew that the policy and directive regarding player character was a material business decision because McMahon had made clear that hiring players with good character was critically important to the branding of the XFL, and Luck does not dispute that he previously sought and failed to obtain McMahon's approval to hire other players with backgrounds similar to Callaway.

*Second*, Luck erroneously claims that the XFL's policy was to disqualify players only for certain criminal convictions or credible sexual or domestic assault allegations and that Callaway was not disqualified under these criteria. Reply at 4. But Luck now admits that there is no written evidence that McMahon ever approved these criteria and does not dispute that McMahon had previously directed Luck not to hire players who were not disqualified under these criteria.

*Third*, Luck argues that the actual policy against hiring players with questionable or problematic backgrounds with McMahon's approval was vague and ambiguous. Reply at 4. But there is and will be mountains of evidence, including Luck's public statements and his own actions in seeking and failing to obtain McMahon's approval for players with backgrounds similar to Callaway, that conclusively proves that Luck fully understood the policy, knew that Callaway should not have been hired under the policy, and attempted to deceive McMahon and others about Callaway.

### C. Luck's Failure to Terminate Callaway Violated XFL Policies and Directives

In his Reply, Luck does not dispute that (i) McMahon directed him to terminate Callaway, (ii) he failed to terminate Callaway, and (iii) the only reason that Callaway never played in the XFL was because Callaway was injured after he failed to terminate him.

Although Luck previously stated in his declaration that McMahon's directive to terminate Callaway came "during the week of January 26," he now claims McMahon did not instruct Luck to terminate Callaway until late in the evening of January 28. Decl. ¶ 14; Reply at 4-5. Although Luck now contends he immediately contacted Callaway's head coach, he offers precisely no explanation for why Callaway was then permitted to practice thereafter and injure himself if Luck in fact had told the head coach that Callaway was terminated.

Luck also argues that he was not provided with notice or an opportunity to cure his violation of the XFL's policies and directives with respect to Callaway. Luck does not dispute, however, that McMahon previously instructed Luck not to hire other players with backgrounds similar to Callaway on several prior occasions and that Luck proceeded to hire Callaway anyway while hiding his background from McMahon. Moreover, Luck's violations could not be cured because once Callaway was injured, Alpha was obligated to honor his contract and incur the significant costs of his resulting surgery and potential exposure to liability for worker's compensation payments.

### D. Luck Intentionally Failed To Follow The XFL Technology Policies

In his Reply, Luck attempts to conceal the significance of his violations of the very policy that he signed, established, and was responsible for enforcing by falsely suggesting that he only used his iPhone for some personal calls. Reply at 6. To be clear, Luck's violations extend far beyond the occasional personal call to a family member—the evidence will demonstrate that Luck used his XFL-issued iPhone as a computer to store and transmit documents completely unrelated to the business of XFL and will show that he did not devote substantially all of his business time to the XFL. The full extent of Luck's violations will become known once the device is accessed and forensically examined.

Having artificially minimized his violations, Luck then argues that the very policy that he established for all other XFL employees did not apply to him and that compliance with it was discretionary. But the XFL Technology policy expressly provides that (i) "XFL Technology is to be used for XFL related business only," (ii) "users must not store or transmit any non-business related files" on XFL Technology, and (iii) "[t]he XFL prohibits the use of computers for any non-business-related reason." Handbook at 7, 16. It further states that "[i]ndividuals found to have violated this policy and/or any other corporate policy" may be subject to "disciplinary action up to and including termination of employment." *Id.* at 17. Simply put, Luck does not deny that he used XFL Technology for activities that were unrelated to the XFL's business.

Luck also inexplicably claims that he should have been provided with notice and an opportunity to cure his violation of the XFL Technology policies. As the CEO and Commissioner of the XFL, Luck was entrusted with enforcing its standards and policies and ensuring that all of its employees complied with them. Luck cannot credibly claim that he needed to be told that he was violating the very policy that he established and was expected to enforce. In any event, Alpha was not aware of Luck's repeated violations of the XFL Technology policy until after they had already occurred and could not be undone.[5]

### E. Luck Was Grossly Negligent In His Duties After March 13, 2020

Luck only offers a feeble response to the evidence showing that he was grossly negligent in the performance of his duties after March 13. Luck does not dispute that he was the Commissioner and CEO of a startup league that faced an existential threat to its business after

---

[5] As noted in McMahon's Opposition, Luck's counsel recently asked Alpha's bankruptcy counsel whether there was a policy prohibiting personal use of his XFL cell phone. The fact that Luck apparently was unaware that such a policy even existed despite having promulgated it is only further evidence of his gross negligence.

March 13.  Luck also does not dispute that he did not make a single phone call to McMahon during this period or attend critical meetings to address the challenges faced by the league.  Luck only claims to have performed minimal tasks that did not remotely approach his obligation to devote substantially all of his business time to the XFL.  Additional evidence of Luck's gross negligence after March 13 would be offered at any hearing of this matter.

Luck also contends that he was not provided with notice and an opportunity to cure the gross neglect of his duties after March 13.  But Alpha simply did not have 30 days to wait for Luck to attempt do his job before it was forced to suspend its operations less than a month later.

### F. Luck Is Not Entitled To $8 Million in Additional Bonus Payments

Luck is not entitled to $8 million in additional bonus payments under any circumstances—an argument to which Luck offers no meaningful response other than to claim again that the Contract should be rewritten.

Luck does not dispute that the Contract clearly and unequivocally permits Alpha to terminate his employment "at any time" and that his entitlement to a bonus at the end of each Contract Year was expressly "subject to his continued employment on the scheduled payment date."  Contract at 2-3.  Luck instead argues that this provision should simply be read out of the Contract and that Contract's distinction between the Base Salary and Bonus provisions should be eliminated—contrary to Connecticut law.  *See United Illuminating Co.*, 259 Conn. at 671 ("The contract must be viewed in its entirety, with each provision read in light of the other provisions; and every provision must be given effect if it is possible to do so.") (internal citation omitted).

Luck further argues that the result is unfair because it means that Alpha could terminate him "one day prior to the end of the contract year—and thus be relieved (and also relieve McMahon) of the obligations to pay Luck his guaranteed annual bonus because he would no longer be employed on the scheduled payment date."  Reply at 22.  But there is nothing unfair or

unusual about this provision—it reasonably provides Alpha with an opportunity to evaluate Luck's performance over the past Contract Year and determine whether his performance warrants a bonus or conclude that he is not entitled to a bonus and his employment should be terminated. To the contrary, it would be unfair if Alpha were required to pay Luck bonuses despite terminating his employment for Cause.

### III. The Court Should Summarily Deny The Application Because McMahon Clearly Has The Ability to Pay Any Potential Judgment In This Action.

Luck's Application also should be summarily denied because McMahon clearly has the ability to pay any judgment that could be entered in Luck's favor. Luck wrongly contends that McMahon's argument is not supported by Connecticut law. Reply at 22-23. But Luck does not dispute that the entire purpose of a prejudgment remedy under Connecticut law is to protect the plaintiff against the risk that the defendant will be unable to pay a judgment that may be entered in the plaintiff's favor. Opp'n at 11-12 (collecting cases). And Luck disregards the case law holding that "a prejudgment attachment is unnecessary where the applicant has not shown that it needed additional security to safeguard its 'probable judgment' or that its interest is not already adequately secured." *Winchester Bd. of Educ. v. W.L. Gilbert Sch. Corp.*, No. CV 970073312, 1997 WL 585763, at *3 & n.2 (Conn. Super. Ct. Sept. 10, 1997) (citing *Blakeslee Arpaia Chapman v. EI Constructors, Inc.*, 32 Conn. App. 118, 131 (1993)).

Luck also preposterously claims that any judgment he may obtain may not be adequately secured by the over $1.3 billion in publicly disclosed assets owned by McMahon—more than 50 times the amount of the judgment that he seeks. Reply at 23. Luck claims that he lacks knowledge regarding encumbrances on McMahon's stock holdings, but the Amended Schedule D provided to Luck discloses the relatively small number of McMahon's pledged shares—which would have no impact on his ability to satisfy any judgment in this case. Opp'n Ex. 6. Luck

next claims that the value of McMahon's stock holdings could change before the entry of judgment, but Luck has the ability to monitor changes in McMahon's stock holdings because they are publicly disclosed, and he could seek a prejudgment remedy should there ever be a reason to believe that the value of such holdings have declined to the point where McMahon's ability to satisfy any judgment in this case would be jeopardized. Finally, Luck claims that he has no knowledge of McMahon's liabilities, but his suggestion that McMahon may have over $1.3 billion in liabilities is fanciful. In any event, the amount of McMahon's liabilities is not relevant to whether he has sufficient *assets* to satisfy a judgment. Indeed, Luck does not even seek information regarding McMahon's liabilities in his motion for disclosure of assets and would not be entitled to discovery of such information.

Luck also does not meaningfully respond to McMahon's argument that issuing a prejudgment remedy despite his clear ability to pay any potential judgment in this action would constitute an unconstitutional violation of due process. Luck's sole response is that McMahon's reliance on the United States Supreme Court's decision in *Connecticut v. Doehr*, 501 U.S. 1 (1991) is inapposite because that case addressed whether a prejudgment remedy could be issued without prior notice and a hearing. But Luck fails to recognize that the *reasoning* of *Doehr* compels the conclusion that issuance of a prejudgment remedy under the circumstances of this case would be unconstitutional. As *Doehr* recognized, where there is a substantial risk of an erroneous deprivation of the defendant's property rights, the plaintiff must demonstrate a need for a prejudgment remedy. Because there is a substantial risk that McMahon's property rights would be impaired even after a hearing and because Luck has not offered any legitimate reason to deprive McMahon of the full use of his property during the pendency of this action, the issuance of a prejudgment remedy in this case would violate due process.

DEFENDANT VINCENT K. MCMAHON

By: */s/ Jerry S. McDevitt*
Jerry S. McDevitt *(pro hac vice)*
Curtis B. Krasik *(pro hac vice)*
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone: (412) 355-6500
Fax: (412) 355-6501
Email: jerry.mcdevitt@klgates.com
Email: curtis.krasik@klgates.com

Jeffrey P. Mueller (ct27870)
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
Phone: (860) 275-0100
Fax: (860) 275-0343
Email: jmueller@daypitney.com

## CERTIFICATION OF SERVICE

I hereby certify that, on May 29, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

 */s/ Jeffrey P. Mueller*
Jeffrey P. Mueller (ct27870)