```
 1                 UNITED STATES DISTRICT COURT

 2                    DISTRICT OF CONNECTICUT

 3   - - - - - - - - - - - - - - x
                                 :  Case No.
 4   OLIVER LUCK,                 :  20CV516(VAB)
                                 :
 5             Plaintiff,         :
          vs.                     :
 6                                :  915 Lafayette Blvd
     VINCENT K. MCMAHON,          :  Bridgeport, CT
 7                                :  June 10, 2020
                  Defendant.      :
 8   - - - - - - - - - - - - - - X

 9             TRANSCRIPT OF MOTIONS HEARING

10   BEFORE:  THE HONORABLE VICTOR A. BOLDEN, U.S.D.J.

11   APPEARANCES:
     FOR THE PLAINTIFF:         PAUL J DOBROWSKI, ESQ.
12                              JARED McHAZLETT, ESQ.
                                VANESSA LEE PIERCE, ESQ.
13                              Dobrowski Larkin & Stafford
                                4601 Washington Ave.
14                              Houston, TX 77007

15                              ANDREW M. ZEITLIN, ESQ.
                                JOETTE KATZ, ESQ.
16                              SARAH GLEASON, ESQ.
                                Shipman & Goodwin
17                              300 Atlantic St.
                                Stamford, CT 06901-3522
18
     FOR THE DEFENDANT:         JERRY S. MCDEVITT, ESQ.
19                              CURTIS B. KRASIK, ESQ.
                                K&L Gates, LLP- Ptsbrg PA
20                              210 Sixth Ave
                                Pittsburgh, PA 15222-2613
21
                                JEFFREY MUELLER, ESQ.
22                              Day Pitney LLP-Htfd-CT
                                242 Trumbull St.
23                              Hartford, CT 06103-1212

24
                      Sharon Montini, RMR, FCRR
25                      Official Court Reporter
```

```
1                    (Proceeding commenced 10:00 via Zoom

2       videoconference.)

3                    THE COURT:  Good morning.  We are here

4       in Luck v. McMahon.  Will counsel please state their

5       appearances for the record.

6                    MR. DOBROWSKI:  Yes, your Honor.  This

7       is Paul Dobrowski on behalf of Oliver Luck.  With me

8       is Vanessa Pierce and Jared McHazlett from the law

9       firm of Dobrowski, Larkin & Stafford.  In

10      Connecticut, I will let Mr. Zeitlin announce their

11      appearances.

12                   MR. ZEITLIN:  Good morning, your Honor.

13      It's Andrew Zeitlin from Shipman & Goodwin, and also

14      here is Joette Katz and Sarah Gleason of Shipman &

15      Goodwin.

16                   THE COURT:  Mr. Zeitlin, you are just

17      going to have to get your voice up a little bit.

18                   MR. ZEITLIN:  Okay.  Sorry about that,

19      your Honor.

20                   THE COURT:  There you go.  Much better.

21      All right, great.

22                   And for defendants?

23                   MR. McDEVITT:  Your Honor, for the

24      defendants, this is Jerry McDevitt from K&L Gates.

25      And my partner Curt Krasik is on, together with Jeff
```

1   Mueller from Day Pitney.

2                    THE COURT:  Great.  All right.  So we

3   have a variety of motions to deal with, I think most

4   particularly this question about the motion for

5   prejudgment remedy and for disclosure of assets.

6                    So why don't I -- I guess what I just

7   want to do is let plaintiffs go ahead and begin.

8                    MR. DOBROWSKI:  Judge, this is Paul

9   Dobrowski.  If I can take a few minutes to discuss

10  the factual background which supports the PJR

11  remedy, if that would be all right with the Court.

12                    THE COURT:  That's fine.

13                    MR. DOBROWSKI:  Yeah.  Judge, the fact

14  of the matter is, Mr. Luck is entitled to a

15  prejudgment remedy under Connecticut law because

16  there is undisputed no -- or it is undisputed that

17  Mr. McMahon signed a guaranty to unconditionally pay

18  Mr. Luck the sums that he is owed.  He did that

19  unconditionally, irrevocably --

20                    (Technical Interference.)

21                    MR. DOBROWSKI:  Your Honor, can you hear

22  me?

23                    THE COURT:  I can hear you now.

24                    MR. DOBROWSKI:  I apologize, your Honor.

25                    So, your Honor, going back to the

1    unconditional nature of the guaranty -- I'm sorry.

2              Ms. Montini, can you hear me?

3              COURT REPORTER:  I can so far, yes.

4              MR. DOBROWSKI:  Okay.  Great.

5              It is undisputed, your Honor, that Mr.

6    McMahon signed this unconditional guaranty, and it

7    is enforceable whether the underlying employment

8    contract is enforceable or even valid.  And, indeed,

9    Mr. McMahon personally and individually waived all

10   defenses, legal or equitable, to enforcement of the

11   amounts owed to Mr. Luck.

12             It is also undisputed that Connecticut

13   law and Second Circuit law enforce waivers of

14   guaranty no matter how onerous because, when you

15   have two sophisticated parties who have negotiated a

16   contract, courts are loathe to change those terms.

17   And that's what Mr. McMahon is trying to do here.

18   He's trying to avoid his obligations under the

19   guaranty and his waiver of defenses.

20             Further, your Honor, it is undisputed

21   that Alpha is not -- has not and is not paying Mr.

22   Luck money.  As we sit here today, they've stopped

23   paying money to him starting when they sent the

24   spurious, I will say, termination letter on 4/9/20.

25             Further, since that time, it is

```
1   undisputed that Alpha has rejected Mr. Luck's

2   contract after taking bankruptcy on April 13th.  So

3   there is no question there is no payment.  There is

4   no question that amounts are owed to Mr. Luck.

5   There is no question that the amounts owed due to

6   nonpayment is $23.8 million.

7             And so our belief, your Honor, is that

8   you will have the opportunity not only to listen to

9   the PJR remedy and that we will -- in terms of

10  evidence, and we will be able to show that probable

11  cause exists for Mr. Luck's success on the merits.

12  In fact, we believe we'll be able to prove to you as

13  a matter of law that Mr. Luck is entitled to

14  judgment against Mr. McMahon.  But I'm getting ahead

15  of myself.

16            Let me just say, your Honor -- let me

17  take the flip side of the argument very quickly.

18  You can believe everything they say, every word.

19  Believe that Mr. Luck was terminated for cause and

20  he committed the alleged acts that they contend that

21  he did.  We dispute that, but for purposes of this

22  argument just assume that.  Assume that they are

23  right and I'm wrong.  It is still undisputed that

24  they breached the contract, that Mr. McMahon

25  repudiated the guaranty by failing -- and Alpha
```

1   breached the agreement by failing to give Mr. Luck

2   the required 30-day notice to cure.

3         That is undisputed, your Honor.  They

4   could have given him a notice to cure after Mr. Luck

5   supposedly violated XFL policy by hiring Antonio

6   Callaway.  They didn't.  And that was in January of

7   2020, and not until April of 2020, three months

8   later, did they assert that this is somehow grounds

9   for termination for cause.

10        Number two is that they claim that Mr.

11  Luck, his use of the cell phones was improper, which

12  was not something they listed in that termination

13  letter.  But even so, let's assume that was

14  something that violated XFL -- or, I'm sorry, that

15  occurred and violated XFL policy.  They did not give

16  him notice at any time until they terminated him on

17  April 9th.

18        And the same thing with Mr. Luck's

19  alleged failure to -- alleged failure to perform his

20  duties on March -- or after March 13, 2020.  Indeed,

21  your Honor, as they admit in their filings, the

22  reason that XFL went out of business was due to the

23  coronavirus pandemic, not as a result of anything

24  that Mr. Luck did or failed to do.

25        And let me just pick up for a moment,

1   your Honor, and do a little more grandular and

2   deeper dive into the issues that they claim that Mr.

3   Luck failed to perform.  And, for instance --

4            THE COURT:  Mr. Dobrowski, before you go

5   down that road, one of the questions I have is the

6   heart of the issue you addressed earlier, which is

7   the question of what rights does Mr. Luck have under

8   this guaranty and what rights I guess Mr. McMahon as

9   well has under the guaranty.  So is it your position

10  that irrespective of what happened with the

11  employment contract Mr. Luck is entitled to relief

12  under the guaranty?

13            MR. DOBROWSKI:  Yes, your Honor.

14  Absolutely, because, as your Honor knows, the

15  guaranty says that Mr. McMahon guaranteed the amount

16  as a primary obligor, not as a surety.  So he is

17  front and center, first in line, and responsible for

18  the payment.

19            Now, they will argue and tell you, wait

20  a second, Mr. McMahon doesn't have any obligation to

21  pay unless the termination was wrongful.  They are

22  wrong.  The case law -- and I realize, Judge, this

23  may sound onerous, but this is the deal he struck,

24  Mr. McMahon struck with Mr. Luck, and that is he

25  agreed he was going to pay Mr. Luck all sums due

```
1    irrespective of any alleged defenses, which means

2    that the grounds set forth in the termination letter

3    are absolutely irrelevant for your consideration,

4    your Honor, not only on the PJR remedy, but on the

5    required party issue and also on the substantive

6    matter.

7              THE COURT:  On that interpretation of

8    the guaranty, because this Court has to apply

9    Connecticut law, you know, what's the Connecticut

10   law case that sort of best explains that?  I mean,

11   certainly in the filings, and I have had a chance to

12   review the cases, it's clear that there are some --

13   under New York law your position sort of makes

14   considerable sense.  Under Connecticut law it

15   appears that this notion of having to deal with the

16   underlying obligation first, I just want to get a

17   sense, is there some distinction between Connecticut

18   law and New York law, or is it your position that

19   they're essentially the same?

20             MR. DOBROWSKI:  Judge, I think they're

21   actually essentially the same.  I apologize, we did

22   not cite these two cases in our briefing, and that's

23   my mistake, but let me give you two Connecticut

24   Supreme Court opinions, if I may.

25             THE COURT:  Go ahead.
```

1          MR. DOBROWSKI:  Your Honor, the cites

2   are *Friezo v. Friezo*, and that is 9 -- I'm sorry,

3   yeah, 914 A.2d 533, your Honor, at 554.  Do you want

4   the Connecticut cite?

5          THE COURT:  Sure.

6          MR. DOBROWSKI:  It's 281 Conn 166, 198

7   -- I'm sorry.  199, your Honor.

8          THE COURT:  Okay.

9          MR. DOBROWSKI:  And most importantly is

10  the *Jenzack Partners v. Stoneridge Associates* case.

11  And that citation, your Honor, is 222 A.3d 950.  And

12  the Connecticut cite, your Honor -- I'm sorry, your

13  Honor, the pincite is 950 at 956 for that one.  And

14  the Connecticut cite, your Honor, is 334 Conn 374,

15  383.

16          THE COURT:  Okay.

17          MR. DOBROWSKI:  And both of those, your

18  Honor, stand for the position that actually is

19  enumerated in one of the cases that Mr. McMahon

20  cites, that parties are bound by the terms of their

21  agreement.  And one of the terms of the agreement

22  are waivers of defenses in a guaranty.  And so

23  those -- if I may, your Honor, may I read from the

24  *Jenzack Partners* case or do you just want --

25          THE COURT:  Sure.

```
 1              MR. DOBROWSKI:  Just very briefly, your
 2    Honor, in Jenzack, the court, citing the Friezo
 3    case, said "Contracting parties are normally bound
 4    by their agreements, irrespective of whether the
 5    agreements embodied reasonable or good bargains.
 6    This court has stated that, where the guarantee of a
 7    note is unconditional and absolute, default of the
 8    maker or the endorser to pay the note promptly
 9    causes the guarantor to become liable to the holder,
10    and the relation of the debtor and creditor was at
11    once established between the guarantor and the
12    holder of the note."
13              And this is a Connecticut Supreme Court
14    2020 case, your Honor.  So it's recent law.  The
15    Friezo case, your Honor, I failed to mention is a
16    2007 case.
17              But those cases stand for the
18    proposition that your Honor doesn't need to
19    interpret the contract and doesn't need to look at
20    the termination for cause.  And we submit, your
21    Honor, that you should not and it would be error for
22    you to do so.
23              In fact, your Honor, as I mentioned to
24    you, one of the cases cited by Mr. McMahon is this
25    Ursa Minor case, your Honor.  And it's a Southern
```

1   District of New York federal court case.  And I

2   recognize this is New York law, your Honor, and fair

3   enough, but I think it's instructive because it says

4   that, look, we enforce contractual waivers and

5   guarantees where the -- preventing the guarantor

6   from being discharged of its payment obligations by

7   virtue of the principal debtor's release.

8         And so even if the guaranty -- I'm

9   sorry, your Honor, even if the employment contract

10  was fraudulently induced in this case, McMahon would

11  still have his obligation because his obligation

12  says it's irrespective of the enforceability of the

13  underlying employment agreement.  And it is so broad

14  it deals with any circumstance of defense or

15  release, whether eagle -- whether legal or

16  equitable.  Sorry, your Honor, whether legal or

17  equitable.  Those are absolutely enforceable

18  agreements.

19        And so when they complain that we have

20  not presented a prima facie case for purposes of the

21  PJR remedy, they're just wrong.  We have presented a

22  prima facie case of there is a valid and existing

23  guaranty, which no one disputes.  There has been a

24  failure and refusal by Mr. McMahon to pay, because

25  in our April 16th letter back to Mr. McDevitt we

1    demanded payment.  Even though we didn't have to

2    make demand, your Honor, we did.  There has been no

3    payment by Mr. McMahon.  And obviously the defenses

4    raised in his lawsuit means that Mr. McMahon will

5    not pay and is refusing to pay; ergo, we have made a

6    prima facie case.

7               It is -- and one of the things, your

8    Honor, that they try and conflate, frankly -- I

9    don't want to say they are trying to mislead the

10   Court, that's not fair at all, but one of the things

11   they conflate in their argument, I submit, is that

12   they essentially say it's our burden to disprove the

13   termination for cause.  That is not what we need to

14   do, your Honor.  That is absolutely not what we need

15   to do.  We only need to present to you the prima

16   facie case for the PJR remedy.

17              Now, on the merits, your Honor, even

18   still we don't need to disprove the termination

19   letter because it's irrelevant when we're talking

20   about the guaranty.  And that's what your Honor

21   needs to really focus on, as the case law says, and

22   that is, can there be complete relief accorded

23   between the parties; that is, Luck and McMahon, not

24   Alpha.

25              That is, with all due respect, your

1   Honor, a red herring.  What matters is the lawsuit

2   that Mr. Luck has brought against Mr. McMahon.  And

3   Alpha is not subject to the judgment, we submit.  We

4   do not seek any relief against Alpha, and so,

5   therefore, they are not necessary.  Mr. Luck's

6   complaint has made that completely clear.  And if

7   not, I am doing so on the record, your Honor.  We do

8   not seek relief against Alpha.  We believe that the

9   complete relief that Mr. Luck seeks can be done

10  without Alpha and just with McMahon, because, look,

11  your Honor, if Mr. Luck is successful, if we are

12  right, then Mr. Luck gets his relief against McMahon

13  only.  If we're wrong and they win, then Mr.

14  McMahon, and frankly Alpha, are going to be relieved

15  of any potential debt.

16          But the fact of the matter is, is that

17  Alpha's presence here is unnecessary.  They contend

18  to you that, oh, we need Alpha because there is so

19  much evidence your Honor needs to see and you need

20  to consider this mountain of evidence and these

21  privileged communications.  Well, I submit to you,

22  your Honor, again, that's a red hearing.

23          Number one, your Honor knows that

24  depositions can happen and do happen in discovery.

25  And even in these unique times people are taking

```
1    depositions by remote video.  They can gather any
2    discovery they need from either a subpoena of Alpha
3    for documents or a subpoena for deposition.  Nothing
4    prevents them from doing that.
5              Then they contend to your Honor, well,
6    wait a second, there are these mysterious bevy of
7    privileged communications that we need from Alpha.
8    Well, your Honor, again, they can take the
9    deposition of Alpha, and if Alpha decides to waive
10   the privilege, Alpha can do that.  But the fact of
11   the matter is that that is an Alpha decision, not a
12   decision amongst these parties.
13             And, frankly, your Honor, here is the
14   other thing that, I submit, is very telling.  One of
15   the grounds that they assert is that, well, your
16   Honor cannot proceed with the PJR remedy because
17   Alpha is an indispensable party.  Well, as you know,
18   your Honor, under Rule 19 one of the tests for
19   whether a non-party is an indispensable party is
20   whether that non-party seeks to assert its interest
21   in the litigation and protect it.
22             Alpha is not on this phone call, your
23   Honor.  Alpha has not sought to intervene in this
24   case.  Alpha has proceeded in its bankruptcy, and
25   that's what it can do.  It is fully capable, if it
```

1   so chooses, to decide whether or not to intervene,

2   and the Court can decide whether or not to grant

3   that intervention.

4           But right now, your Honor, what we are

5   dealing with is a limited in scope guaranty, and

6   that -- and that is not something to which Alpha is

7   party.  Indeed, Mr. McMahon -- if you think about

8   it, Mr. McMahon really pre-decided that there would

9   be a lawsuit between -- a potential lawsuit between

10  he and Mr. Luck where Alpha was not a party if he

11  didn't pay.

12          Why do I say that, your Honor?  Because

13  Alpha -- I'm sorry, the guaranty specifically says

14  that Mr. McMahon's obligations are irrespective of

15  the underlying employment contract.  So he knew that

16  this was a possibility, to be in court with Mr.

17  Luck.

18          Now, they may tell you that, well, gee

19  golly, it's unfair that we don't have Alpha beside

20  us, but, Judge, under the Rule 19 factors, I mean

21  number one is, A, is Alpha going to be adequately

22  protected by McMahon.  In other words, will McMahon

23  posit the same arguments that Alpha would.  And

24  clearly he's trying to.  Second, whether or not Mr.

25  McMahon is represented by competent counsel, and

1    clearly he is.  And, third, whether that counsel

2    will advance the arguments that Alpha would.  Well,

3    Mr. McDevitt, who is Mr. McMahon's counsel, wrote

4    the termination letter upon which they are relying.

5    There could not be a better situation for finding

6    that Alpha is irrelevant and a non-party.

7            And so, your Honor, the other thing that

8    I will note, and then ask if your Honor seeks any

9    questions, is I just wanted to note for your Honor

10   the Second Circuit case law that says no -- or just

11   because a party seeks a non-party's discovery or

12   deposition, that is not grounds for finding them a

13   required party.  And that is the *Johnson v.*

14   *Smithsonian* case, your Honor.  It's 189 F.3d 180.

15   188-'89 is the pincite, Judge.

16           And the other thing, your Honor, is, as

17   you know under 19, Federal Rule 19, there is two

18   parts.  One is join the party if feasible -- or

19   joining a required party if feasible, and then there

20   is the second test, which is joining the required

21   party if it is unfeasible.

22           So even if you find that Alpha is a

23   required party and joinder is unfeasible because

24   they're in bankruptcy, that doesn't mean you need to

25   dismiss this case, Judge.  There is a list of

1  factors in Federal Rule 19(b) which says you -- that

2  you must consider when determining whether or not to

3  dismiss the case, and we would strongly urge the

4  Court to consider those factors and not dismiss this

5  case even if your Honor were to find Alpha a

6  responsible -- or a required party, because the fact

7  of the matter is, and I don't mean to repeat myself,

8  your Honor, McMahon is not going to be prejudiced by

9  Alpha's absence and Alpha is not going to be

10 prejudiced by Alpha's absence.

11          And one of the other factors is that

12 whether Mr. Luck has an adequate remedy, your Honor,

13 and we submit that, your Honor, he would not have an

14 adequate remedy if you were to dismiss this because

15 the fact of the matter is that Mr. Luck is out of a

16 job.  Dismissing this case and putting it in a

17 bankruptcy court means it's going to be delayed for

18 many months, or even years.  And, frankly, your

19 Honor, I know it sounds trite, but I'm going to say

20 it, justice delayed is justice denied in this case.

21          Now, Mr. McMahon's lawyers, frankly,

22 show nothing but contempt for that position because

23 they say, well, why should Mr. McMahon be disturbed

24 for -- distracted with this, you know, lawsuit when

25 he's dealing with the sale of the XFL.  Frankly,

1    your Honor, I submit that that is the height of

2    arrogance.  The fact of the matter is that Mr. Luck

3    has a fully enforceable contract that needs quick

4    resolution and your considered judgment.

5         And so, your Honor, I will turn it over

6    now to Mr. Zeitlin who may have a couple of items on

7    the PJR application unless -- specifically, unless

8    you have some questions for me.

9         THE COURT:  I do, Mr. Dobrowski.

10        MR. DOBROWSKI:  Yes, your Honor.

11        THE COURT:  The language of the

12   guaranty, it says, "The obligations of the guarantor

13   hereunder shall be absolute, unconditional,

14   continuing and irrevocable, and shall remain in full

15   force and effect until the full performance by the

16   obligor of all of its agreements and its

17   obligations," blah, blah, blah, and it goes on.

18        MR. DOBROWSKI:  Yes, sir.

19        THE COURT:  What is your understanding

20   of that phrase that the obligations of the guarantor

21   shall remain in full force and effect until the full

22   performance by the obligor?  How do you understand

23   that to mean?

24        MR. DOBROWSKI:  Judge, that means it's a

25   continuing obligation, because, your Honor, for

1    instance, as you may not know, Alpha owes Mr. Luck

2    an indemnity should there be a lawsuit against Mr.

3    Luck by any third party.  And so even if Mr. McMahon

4    pays the $23.8 million, the guaranty doesn't just go

5    away.  It remains in effect for Mr. McMahon to pay

6    Mr. Luck's legal bills and expenses related to that.

7              But here's the other thing where I think

8    you may be going, and correct me if I'm wrong, is

9    that there is no dispute that the principal obligor,

10   that is Alpha, is not currently performing its

11   obligations.  And the obligation is a payment.  And

12   that is specifically recited, as your Honor knows,

13   in the guaranty.  This is an obligation -- Mr.

14   McMahon's obligation is an obligation of payment,

15   not just collection. So I think -- I don't know if

16   I am answering your questions or not, Judge, but --

17             THE COURT:  No, my question -- I just

18   want to make sure.  I just want to understand.  You

19   know, you mentioned that the guaranty is complete,

20   that it'd be enforceable notwithstanding proof of

21   any breach of the employment contract.  I am just

22   trying to make sure I understand how you are reading

23   the language in the guaranty.  That's all.

24             MR. DOBROWSKI:  And I know where you are

25   going with that, Judge, and I'm sure they are going

1    to come back with the argument that, well, wait a

2    second, you have to interpret the employment

3    agreement to get that, but you don't, your Honor.

4    The employment agreement is unambiguous.  It says

5    what Mr. Luck is to be paid.

6              So it doesn't matter whether or not the

7    employment agreement is even enforceable.  You can

8    refer to it in terms of how much does Mr. McMahon

9    owe to limit his obligation, to limit his liability.

10   Certainly you can.  But the fact that the guaranty

11   is an Exhibit A to the employment contract and you

12   are supposed to read those together is not relevant

13   to this and not germane to this particular dispute.

14             I know that it seems a little odd, but

15   the fact of the matter is that courts have in recent

16   years found it to be appropriate for the beneficiary

17   of the guaranty to pursue the guarantor solely.  And

18   the fact that you may end up with the losing end of

19   the bargain is of no moment.  And I believe, your

20   Honor, that's what those Supreme Court cases that I

21   have enumerated to you teaches.

22             May I also point out, your Honor, there

23   is a very interesting discussion in a case cited by

24   Mr. McDevitt in his briefs, and it's the *Ursa Minor*

25   case, your Honor.  I admit it's New York law, but

1   they cite it.  And it's the 2000 WL1010278, at page

2   6, your Honor.  And I encourage you to read that

3   document -- that section that deals with waivers of

4   guaranties.

5            THE COURT:  Okay.  All right.  And so

6   just so I am clear, essentially your position is

7   that because -- as you interpret the guaranty, Mr.

8   Luck can move to enforce that without the presence

9   of Alpha and without proving a breach of the

10  underlying employment contract, all that would need

11  to happen in the prejudgment remedy hearing is proof

12  that the debt was owing and that it has not been

13  paid, and that would be -- that would be sufficient

14  for you to meet your probable cause standard for

15  purposes of that hearing, correct?

16           MR. DOBROWSKI:  Yes, your Honor.  And

17  that the guaranty is an existing, live, enforceable

18  agreement.

19           THE COURT:  Okay.  All right.  Thank

20  you.

21           MR. DOBROWSKI:  Mr. Zeitlin --

22           THE COURT:  Just so you know, and all of

23  the parties know, I will often say "okay," and all

24  that means is I understand the argument, not that I

25  agree or disagree.

```
1                    All right.  So, go ahead, Mr. Zeitlin.
2                    MR. DOBROWSKI:  Wait, Judge, I thought
3       you were telling me I was winning.  Okay, I'm
4       deflated.
5                    Thank you, your Honor.
6                    THE COURT:  All right.  Mr. Zeitlin?
7                    MR. ZEITLIN:  Thank you, your Honor.
8       Can you hear me okay?
9                    THE COURT:  You might want to keep your
10      voice up just a little bit.
11                   MR. ZEITLIN:  Sure.  Sure.  If you can't
12      hear me, just obviously let me know, but I will keep
13      my voice up.  I will just briefly -- Paul, you may
14      want to put yourself on mute.
15                   THE COURT:  He is now.
16                   MR. ZEITLIN:  Your Honor, I just want to
17      briefly address the argument about the PJR,
18      specifically Mr. McMahon's argument that a
19      prejudgment remedy is not warranted because of Mr.
20      McMahon's current ability to pay any judgment and
21      his argument that exigent circumstances don't exist
22      to warrant a prejudgment remedy.
23                    As your Honor is undoubtedly aware,
24      Connecticut law does not require exigent
25      circumstances.  The standard under Connecticut law
```

1    is simply probable cause.  And that is a less

2    demanding standard than preponderance of the

3    evidence, which is necessary at trial, and it's even

4    a less demanding standard than likelihood of

5    success.  All your Honor has to find is probable

6    cause.

7              The law does not -- and the defendant

8    goes to some effort to explain the publicly

9    available information regarding Mr. McMahon's

10   assets, which he claims are substantial.  They may

11   be, your Honor, but, again, the law doesn't talk

12   about whether or not the defendant has substantial

13   assets or not.

14             He may very well have substantial assets

15   right now.  We don't know how long this proceeding

16   is going to continue.  We don't know what his assets

17   will be at the conclusion of this matter.  We also

18   don't know the liabilities that Mr. McMahon has.

19   And the court doesn't require -- the law doesn't

20   require either Mr. Luck or this Court to weigh and

21   assess whether Mr. McMahon has sufficient

22   liabilities or whether there -- sufficient assets or

23   whether those assets are encumbered by liens or

24   other encumbrances.  And, frankly, your Honor, there

25   is case law that says we would be arguably

```
1    committing malpractice if we did not seek a

2    prejudgment remedy.

3              So, you know, again, I think,

4    respectfully, the defendant has it wrong on the

5    standard and his current -- Mr. McMahon's current

6    ability to pay doesn't factor into the equation here

7    at all.

8              The other argument I just want to

9    address is that -- the argument that Mr. McMahon

10   makes that the issuance of a prejudgment remedy here

11   would be unconstitutional and the related argument

12   that bond -- in the absence of a bond it would be

13   unconstitutional for the Court to (technical

14   interference) PJR.  That's incorrect, your Honor.

15   There is Second Circuit case law to that effect.

16   Certainly in the Connecticut v. Doehr decision and

17   in its progeny the case law is clear that the

18   hearing, which the Court would need to schedule in

19   this matter, would adequately protect Mr. McMahon's

20   due process rights.

21             So I'm not going to go on too much

22   further unless the Court has questions on that, but

23   it is pretty clear that the standard for prejudgment

24   remedy has nothing to do with Mr. McMahon's current

25   assets.
```

1          THE COURT:  All right.  Thank you very
2   much, Mr. Zeitlin.
3          MR. ZEITLIN:  Thank you.
4          THE COURT:  All right.  Who's speaking
5   for the defense?  Is it Mr. Mueller starting off?
6          MR. McDEVITT:  Your Honor, this is Jerry
7   McDevitt.  Mr. Mueller will be making the argument
8   in the main for Mr. McMahon.  I just wanted to make
9   a preliminary observation about the argument that
10  Mr. Dobrowski sort of laid out for you there.
11         The only remark that he made that I sort
12  of agree with is at the end of his commentary he
13  classified his position as a little odd.  I don't
14  think it's a little odd, I think it's very odd.
15  It's really an argument that I think is borne out of
16  the fact that they now realize that Mr. Luck did
17  commit cause to terminate the contract.  So the
18  argument is borne out of need.
19         If you ever interpreted the guaranty the
20  way they now say to do, it would render the
21  underlying contract to be of no force and effect at
22  all and would be akin to saying Mr. Luck didn't have
23  to do anything to earn that money.  He could have
24  embezzled.  He could have committed acts of fraud.
25  He could have done anything that he agreed would be

1    cause to terminate the contract and any payment

2    obligation and Mr. McMahon would have to pay money

3    anyway.

4           Frankly, that's an absurd position to

5    even take, but, again, it's one borne out of need

6    because they know the evidence now shows that Mr.

7    Luck did exactly what we terminated him for,

8    particularly the Mr. Callaway situation.

9           And with that, your Honor, I will turn

10   it on over to Mr. Mueller to make the arguments

11   he'll make.

12          THE COURT:  Thank you, Mr. McDevitt.

13          Mr. Mueller?

14          MR. MUELLER:  Thank you, your Honor.  As

15   Mr. McDevitt pointed out, because we have

16   established grounds for termination for cause, Mr.

17   Luck has now resorted to an argument that Mr.

18   McMahon is liable under the guaranty regardless of

19   any grounds for termination for cause, and that is a

20   position that is, frankly, not supported by

21   Connecticut law or supported by the language of the

22   guaranty.

23          The language of the guaranty only

24   guarantees the obligations that are owed by Alpha,

25   and because Alpha terminated Mr. Luck for cause, it

1    has no further obligations under the contract, and,

2    therefore, there are no further obligations to

3    guarantee.

4              So under the plain language of the

5    guaranty, Mr. Luck's position fails, but it also

6    fails under Connecticut law and under the numerous

7    cases that we've cited in our sur-reply brief, both

8    the Connecticut appellate court and superior court

9    cases, which hold that as part of his prima facie

10   case he has to establish money owed under the

11   underlying contract as part of the prima facie case

12   of establishing breach of the guaranty.  And we've

13   cited all of those cases in our sur-reply brief.

14             And again, both under Connecticut law

15   and under the language of the guaranty, he has a

16   prima facie burden demonstrating money owed under

17   the underlying contract that he has failed to

18   establish here.

19             And Mr. Luck points to the fact that

20   there is a waiver of defenses in the guaranty, but

21   as we've pointed out, that general waiver of

22   defenses doesn't broaden the scope of the guaranty.

23   And we've cited numerous cases in our sur-reply

24   brief that make that point, that a waiver of

25   defenses does not mean that the guarantor is

1    assuming an obligation to make payment for

2    obligations that are not owed under the underlying

3    contract.  So his position is not supported by the

4    guaranty.  It's not supported by Connecticut -- yes,

5    your Honor?

6              THE COURT:  Would you do me a favor?

7    Would you sort of walk me -- because obviously part

8    of this is there are two different sides reading

9    similar documents entirely differently.  Walk me

10   through the language of the guaranty in terms of how

11   you all see it and see how the language -- and how

12   the language supports your particular position.

13   Obviously the cases are going to be the most

14   fruitful sort of way to view it, but I just want to

15   make sure I understand how you all are reading it,

16   and then how that jives with the case law.

17             MR. MUELLER:  Sure.  Well, under

18   paragraph 1 of the guaranty it explains exactly what

19   is being guaranteed, and what is being guaranteed is

20   the due and punctual payment and performance by the

21   obligor.  So McMahon is only assuming an obligation

22   to guarantee Alpha's obligations under the contract.

23             And secondly, under paragraph 2 of the

24   guaranty, it says that the obligations of the

25   guarantor shall remain in full force and effect

1    until the full performance by the obligor of its

2    agreements and obligations.  Here, Alpha has

3    fulfilled its obligations under the guaranty --

4    under the underlying contract.  There is no more

5    money under the underlying contract that is owed

6    because Mr. Luck was terminated for cause.  So

7    that's the language that I am relying on.

8             And you do have to read these documents

9    together.  If you go back to the underlying contract

10   itself, it says it's legally binding and enforceable

11   upon execution of the contract and the guaranty.

12   Those agreements have to be read together.  And that

13   is why, in addition to the language of the guaranty,

14   you have to look at the canons of contract

15   construction under Connecticut law.

16            And Mr. McDevitt alluded to this

17   earlier.  Mr. Luck's interpretation would render the

18   contract entirely superfluous; none of that language

19   would matter and Mr. McMahon would be obligated to

20   pay Mr. Luck no matter what.  The language about the

21   termination for cause and all of the specified

22   grounds and provisions in the contract are

23   completely superfluous under his interpretation.

24   And it also violates the canons of construction that

25   you have to read these documents together.  And when

```
1    you read them together, that's the only way to

2    logically harmonize those positions.

3              In addition to that, it results in

4    absurd and unreasonable results.  As we've pointed

5    out, Mr. Luck could engage in all sorts of conduct

6    that would provide grounds for termination,

7    including criminal acts, but under their

8    interpretation Mr. McMahon would still be liable.

9    That is an absurd and unreasonable interpretation of

10   the contract.  It's not supported by the language

11   and not supported by Connecticut law.  So I think

12   you do have to get into -- I'm sorry, is your Honor

13   --

14              THE COURT:  Go ahead.  Finish your

15   thought.  Sorry.

16              MR. MUELLER:  No, I --

17              THE COURT:  Okay.  I mean there are

18   these cases, and obviously albeit under New York

19   law, which suggests that they can sue the guarantor

20   directly, and presumably if one follows the line of

21   reasoning from those New York cases, albeit what

22   they've submitted are two district court cases, but

23   they are applying New York law, it suggests that

24   they can go directly up to the guarantor, they don't

25   need to worry about bringing in the other party.
```

```
 1              Is it your position that even in that

 2    context, even if this was under New York law, you

 3    would still be in the same position that they would

 4    still have to deal with the obligations, or is your

 5    argument really based on that Connecticut law has

 6    different expectations of the parties?

 7              MR. MUELLER:  Well, I think under both

 8    states' law you have to go by -- you have to look at

 9    what is actually being guaranteed, and the waiver of

10    defenses doesn't broaden the scope of the guaranty.

11    So what is being guaranteed are only the obligations

12    that are owed by Alpha.  And so a waiver of defenses

13    doesn't mean that Mr. McMahon has to pay more than

14    what Alpha agreed to pay under the underlying

15    contract.

16              So those cases really don't affect the

17    result in this particular case.  Those cases are

18    talking about a situation where -- whether or not a

19    waiver of defenses is applicable, but that's not the

20    issue here.  And in a lot of those cases the issue

21    is not really whether there was an underlying breach

22    of the contract.  In most cases in which the parties

23    are going after the guarantor there is no issue

24    about whether there is a breach of the underlying

25    contract.  There is a clear -- it's clear in those
```

1    cases that the primary obligor defaulted on a debt

2    and didn't make any payment, so there is no question

3    of whether there was a breach of the underlying

4    contract.

5             Here, the central question in the case

6    is whether there is a breach of the underlying

7    contract and whether Mr. Luck was terminated for

8    cause, because that question must be resolved in

9    order to determine whether Alpha owes any

10   obligations under the underlying contract.  And if

11   Alpha doesn't owe any obligations under the

12   underlying contract, there is nothing left for Mr.

13   McMahon to guarantee under the clear language of the

14   guaranty.  So that's how that issue is resolved.

15            That also is the principal reason why

16   Alpha is an indispensable party to the case, because

17   the question in this case necessarily turns on

18   potentially being adjudged in breach of a contract

19   when it has no involvement in the litigation or no

20   opportunity to defend.  And that's the situation

21   under numerous cases that we've cited where the

22   question is whether the absent party is in breach of

23   the contract and (technical interference)

24   interpretation of the contract.  That makes the

25   absent party indispensable, particularly here where

the question was whether that underlying contract

was validly terminated for cause.  And we've cited

numerous cases to Mr. Luck that, frankly, it's clear

that in those situations the absent party is an

indispensable party.

        But we have more in this particular

case, because, as Mr. Luck pointed out, he keeps

relying on this waiver of defenses and waiver of

counterclaims.  Well, Alpha in this case would have

unique defenses and counterclaims that it could

assert that it would not be able to assert if it's

not a party in the case.

        And I also want to respond to one of the

key issues in the case.  And Mr. Dobrowski alluded

to this earlier.  What was the XFL policy regarding

hiring of players?  What was the XFL personnel

policy?  Mr. Luck makes numerous statements in his

affidavit about what that policy was.  Well, we

believe that there are privileged communications

that would bear on the veracity of Mr. Luck's

statements regarding what that policy was.

        That's a central issue in the case.  And

that is Alpha's privilege to waive or assert.  And

without Alpha being a party in the case, there is no

way to -- without Alpha being present and being able

1  to participate in any prejudgment remedy hearing

2  that the Court may schedule here, there is no way to

3  compel Alpha to make a decision regarding waiver of

4  the privilege on that very central issue in the

5  case.

6        So for all of those reasons, Alpha is an

7  indispensable party, both because it's going to be

8  affected and prejudiced by any determination about

9  whether or not it was in breach of the contract or

10  whether or not the contract was validly terminated;

11  because it has got unique counterclaims and

12  defenses; because Mr. McMahon is going to be

13  prejudiced by the absence of Alpha in the case

14  because critical evidence may not come to light in

15  the event that Alpha is not a party to the case and

16  doesn't make a decision as to whether or not to

17  waive the privilege.  So Alpha is indispensable.

18        And, your Honor, a case that we cited is

19  the *Niagara Mohawk* case, which is out of the Western

20  District of New York, affirmed by the Second

21  Circuit.  And in that case the question was the

22  determination of an Indian tribe's rights.  The

23  Indian tribe was a party to the contract, and the

24  case involved a determination of that tribe's rights

25  under the contract.  In that case, the Indian tribe

1    could not be sued because it was subject to

2    sovereign immunity.  It could never be sued, but yet

3    the court held that because there was going to be a

4    determination of its rights under the contract,

5    whether or not it breached the contract, it was an

6    indispensable party, and without it the case had to

7    be dismissed.  So that is very important to

8    recognize.

9            Now, Mr. Dobrowski again pointed out,

10   well, you know, Alpha's interests are adequately

11   represented by McMahon, but as we've pointed out in

12   our sur-reply brief, Alpha is a separate interest

13   from Mr. McMahon.  Yes, Mr. McDevitt was

14   representing Alpha at a prior point in time, but

15   Alpha is now a debtor in possession in bankruptcy.

16   It has separate counsel.  It has separate interests

17   given that it is a debtor in possession in

18   bankruptcy.  And as we've pointed out earlier, it

19   has got unique counterclaims and defenses and unique

20   privilege rights that Mr. McMahon cannot assert on

21   its behalf.

22           So Alpha is differently situated from

23   Mr. McMahon.  And for all of those reasons, Alpha is

24   an indispensable party in the case.  So that's a

25   threshold issue that the Court has to resolve before

1    a prejudgment remedy hearing must take place.

2              And another threshold issue, this was

3    the issue addressed by Mr. Zeitlin, is should a

4    prejudgment remedy hearing even proceed under the

5    circumstances of this case where it's clear that Mr.

6    McMahon has the clear ability to pay any judgment

7    that may be entered.

8              Now, we've cited numerous Connecticut

9    cases for the proposition that the entire purpose of

10   a prejudgment remedy is to ensure that there are

11   sufficient assets available to satisfy any judgment

12   that may be entered in the case.  Here, there is no

13   purpose for a prejudgment remedy because Mr. McMahon

14   has more than sufficient assets to satisfy any

15   prejudgment remedy.  We've pointed out he's got over

16   50 times the amount that Mr. Luck is claiming in the

17   case.  He's got significant --

18              (Technical interference.)

19              THE COURT:  Mr. Mueller, you are

20   freezing up some.

21              MR. MUELLER:  I'm sorry, your Honor.

22   Can you hear me?

23              THE COURT:  I can hear you now.

24              Mr. Luck's position that the Court can't

25   consider Mr. McMahon's ability to pay is just,

1   frankly, contradicted by Connecticut law.  It's

2   contradicted by the numerous cases that discuss what

3   the purpose of the prejudgment remedy hearing is,

4   it's contradicted by the (technical interference) of

5   cases the courts considered and denied prejudgment

6   remedies because the defendant had the clear ability

7   to pay.  So the Court can consider that, and it's

8   appropriate to consider that in this particular

9   case.

10          Now -- and now Mr. Zeitlin pointed out,

11  well, we don't know about Mr. McMahon's liabilities.

12  Well, the fact of the matter is, the notion -- and

13  he doesn't put forward any evidence.  The notion

14  that Mr. McMahon would have over $1.2 billion in

15  liabilities is fanciful.  And, in any event, if Mr.

16  McMahon had to sell assets in order to satisfy

17  liabilities, they would be able to monitor that.

18  Any time that there is a change in Mr. McMahon's

19  stockholdings in WWE by more than 5 percent, there

20  has to be a disclosure.  That's the Amended Schedule

21  13D that we attached to our filing.  So Mr.

22  McMahon's assets are readily monitored, and in the

23  event they do change, such that the ability to pay a

24  judgment in this case is jeopardized, they would

25  certainly know that.  So there is no reason to

```
 1    proceed with a hearing under those circumstances.

 2                I'd also like to address the due process

 3    argument and the decision in Connecticut v. Doehr,

 4    which I think the reasoning of it is controlling

 5    here.  Now, Mr. Luck tries to distinguish that

 6    saying, well, Connecticut v. Doehr involved a case

 7    that was a -- that involved a deprivation prior to a

 8    hearing and the fact that there is going to be a

 9    hearing in the case cures any due process concern.

10    That is simply not the case if you look at the

11    factors.

12                Under Connecticut v. Doehr, the first

13    factor:  Is there a deprivation of a property

14    interest here?  Yes, that's clear.  That's

15    uncontested.

16                The second factor:  Is there a risk of

17    erroneous deprivation?  Now, he says the risk of

18    erroneous deprivation is cured by a hearing, but he

19    just pointed out in his argument that the standard

20    is probable cause, which the court in Connecticut v.

21    Doehr pointed out is a vague and ambiguous standard

22    under Connecticut law and much more difficult to

23    apply in circumstances like this where it's not just

24    nonpayment of a debt at issue, but a determination

25    that the Court must make about whether or not Mr.
```

```
 1   Luck was terminated for cause.  So that's a much

 2   different situation.

 3              And in addition to that, he says we

 4   don't have to show preponderance of the evidence.

 5   So we could be in a situation where it is more

 6   likely than not that Mr. Luck loses on the merits of

 7   the case and Mr. McMahon's property interests are

 8   restrained during the entire pendency of this

 9   action.  That serious risk --

10              (Technical interference.)

11              THE COURT:  Go ahead.  Mr. Mueller, you

12   started fading again.

13              MR. MUELLER:  I apologize your Honor.  I

14   guess I'm not able to control whether or not I'm

15   able to be heard, but I hope you can hear me now.

16              THE COURT:  Yep.

17              MR. MUELLER:  Okay.

18              THE COURT:  Your essential point was

19   that you still believe that there could be a due

20   process issue that results if there was a

21   prejudgment remedy in Mr. Luck's favor.

22              MR. MUELLER:  Yes.  And the court

23   basically in *Connecticut v. Doehr* said if there is

24   going to be an erroneous risk of deprivation, and

25   that risk certainly persists after any hearing on
```

1    the threshold prejudgment remedy, you need a reason.

2    You don't have a reason here because, number one, he

3    hasn't any existing interest in Mr. McMahon's

4    property.  He hasn't presented any evidence that

5    there is going to be risk of transfer or dissipation

6    of assets.  And if there were, he would certainly

7    know about it because it would have to be publicly

8    disclosed.  And, number three, he hasn't shown that

9    there is a need for a prejudgment remedy because

10   there is a risk of nonpayment of any judgment.

11              And without those reasons, without any

12   need for a prejudgment remedy, any deprivation of

13   property under those circumstances would violate due

14   process under *Connecticut v. Doehr*.

15                   So for all of those threshold issues

16   that the Court must address, both on indispensable

17   party and Mr. McMahon's clear ability to pay, that

18   renders any prejudgment remedy hearing completely

19   unnecessary in this case, and the application for

20   prejudgment remedy should be summarily denied for

21   those reasons.

22              THE COURT:  Thank you.

23              MR. DOBROWSKI:  Your Honor, may I

24   briefly respond?

25              THE COURT:  Yeah, briefly.  Go ahead.

1          MR. DOBROWSKI:   Judge, a couple of

2     points.   Number one is that Mr. McDevitt's comment

3     right at the beginning that this is out of need

4     because we can't prove that the termination for

5     cause grounds were illegitimate is just flat wrong.

6     If you read the briefs, as I know you have, Mr.

7     Luck's actions were absolutely at all times

8     consistent with XFL policy despite what -- the

9     hyperbole that Mr. McMahon uses.

10          In addition, your Honor, Mr. Mueller

11     conveniently attempts to read out of the agreement

12     the language that is the waiver language for the

13     contract.   In other words, your Honor, if you go to

14     -- and you were asking him about this.   If you go to

15     the contract itself, the guaranty language -- sorry,

16     your Honor -- it says that -- again in paragraph 2,

17     that "the obligations of the guarantor hereunder

18     shall be absolute, unconditional, continuing and

19     irrevocable, and shall remain in full force and

20     effect until the full performance by the obligor of

21     all agreements and its obligations under the

22     transaction document."

23          Here's the language that he ignores.

24     "Irrespective of the validity, regularity or

25     enforceability of the transaction document, any

1    amendment or other modification."

2              And so, Judge, their argument that

3    they've got to be able to show that Mr. Luck was

4    terminated for cause is a red herring because he

5    wants to read out of existence the validity -- I'm

6    sorry, the waiver of the defenses that are -- that

7    is set forth in the guaranty.  And that waiver

8    specifically says it doesn't matter whether the

9    transaction documents are valid or not.  So even if

10   the -- even if Mr. Luck were terminated for cause

11   and the agreement was invalid, Mr. McMahon would

12   still be liable for the entire amount owed.

13             As to Mr. Miller's -- Mueller's argument

14   that, well, what happens if Mr. Luck were to commit

15   a crime and he would be able to seek enforcement, as

16   your Honor knows, there are public policy reasons

17   where you can't enforce an agreement for heinous

18   acts, such as -- to use a really extreme argument,

19   if Mr. Luck killed somebody, your Honor has the

20   authority under public policy not to enforce the

21   agreement.

22             And let me say, your Honor, I do want to

23   emphasize that we absolutely disagree and will

24   controvert and prove that in fact Mr. McMahon's

25   argument that Mr. Luck was terminated for cause is

1    wrongful, and we -- if we are required to do so.

2    Our point is simply that for your Honor's purposes

3    today, and frankly at summary judgment and at the

4    PJR hearing, you don't need to consider them.  None

5    of that is relevant, your Honor.

6             The last thing is that he mentioned the

7    prejudgment remedy which he contends will deprive

8    Mr. McMahon of his rights.  That is not correct,

9    your Honor.  That's exactly what *Doehr* was about.

10   And the Connecticut case -- that Connecticut case

11   was one that fixed the statute and encouraged the

12   Connecticut legislature to fix the statute.  We are

13   operating in the post-*Doehr* world, and, therefore,

14   that adds the protections for Mr. McMahon's

15   constitutional rights.

16            Lastly, I'd like to point out that Mr.

17   Miller -- Mr. Mueller relies on, excuse me, and

18   cited to you the *Niagara Mohawk Power* case.  That

19   case was decided by the Western District of New York

20   in 1994.  That is a pre-*MasterCard v. Visa* case,

21   which is a Second Circuit case, which is what this

22   Court is effectively required to follow because

23   *MasterCard v. Visa* was a 2006 Second Circuit case.

24            So they're relying on old law.  And I

25   admit there is old law that says, look, when you've

```
1    got parties to an agreement, that you need to bring
2    one in -- or you need to bring both in as
3    indispensable parties.  But the clear distinction,
4    and what MasterCard teaches us, Judge, is you don't
5    have to do that anymore.  You can sue separately on
6    the guaranty.  And that is what Mr. McMahon agreed
7    to in this guaranty.  And so the fact of the matter
8    is that, I submit, they're leading you down a rabbit
9    trial that you should not go on.
10             And, your Honor, I guess the only other
11   thing that I would add is that, you know, on this
12   idea that there -- you know, that the Antonio
13   Callaway was such a big deal, they didn't notify Mr.
14   Luck for two and a half months.  And I don't want to
15   not address the telephone issue and the
16   post-March 13th activities that Mr. Luck clearly
17   engaged in to meet his duties, but unless your Honor
18   really wants me to go through that, I will beg off
19   at this point, your Honor.
20             So thank you.  I thank you very much.
21             THE COURT:  All right.
22             MR. McDEVITT:  Your Honor, may I make
23   one suggestion, having heard all of this, for the
24   Court to consider?
25             THE COURT:  Sure.
```

1              MR. McDEVITT:  Trying to simplify this,

2    because I do think it's a fairly simple case, I

3    think Mr. Dobrowski would agree that the contract

4    does say that Mr. Luck was subject to being

5    terminated at any time.  So there can't be anything

6    on wrongful termination, it's just the question

7    whether it was for cause or not.  If he's so

8    confident in the position that whether there was

9    cause or not is irrelevant for purposes of what he's

10   trying to do at the PJR or the case as a whole, it

11   seems to me an issue could be presented to the Court

12   where it's stipulated for purposes of argument that

13   Alpha did have cause to terminate Mr. Luck, and then

14   his argument can be presented that that doesn't

15   really matter.  And there is two issues that go with

16   that, your Honor --

17             THE COURT:  I've got enough.  I

18   appreciate the suggestion.  I think I've got enough

19   briefing before me on the issues there.

20             Here's what is going to happen.  I do

21   want to deal with this threshold issue first with

22   respect to whether or not -- the sort of Rule 19

23   issue as to whether or not Alpha is a necessary

24   party or what needs to happen in the context of this

25   proceeding.  Once I address that issue, I will then

1    turn to the issue with respect to the prejudgment

2    remedy.  And to the extent that a hearing is

3    necessary and so forth, we'll probably get back

4    together.  But I am going to try to address this

5    threshold issue first, and try to do so fairly

6    expeditiously.

7              I do appreciate you all and all of the

8    arguments.  They've been helpful to the Court, and I

9    will take it all under consideration.

10             Unless there is anything further

11   pressing -- yes, Mr. Dobrowski?

12             MR. DOBROWSKI:  Yes, your Honor.  I'm

13   sorry to interrupt, but because we didn't have a

14   chance to address the cases regarding the waiver of

15   defenses, may we submit either a short brief or just

16   a list of the cases that say -- that deal with

17   waiver, and in particular waiver of defenses for a

18   guaranty, without argument?

19             THE COURT:  Sure, that's fine.  How long

20   do you need?

21             MR. DOBROWSKI:  How long I do need?

22   Probable five pages.

23             THE COURT:  No.  No, I'm sorry.  How

24   long for you to file the brief?  Sorry.

25             MR. DOBROWSKI:  I'm sorry, Judge.  How

```
1    long do we need to file that brief?  Your Honor, we

2    can have it to you -- what is today, Wednesday?

3              THE COURT:  Yeah.

4              MR. DOBROWSKI:  We can have it to you on

5    Monday at the latest.

6              THE COURT:  That's fine.

7              MR. DOBROWSKI:  If that would be okay.

8              THE COURT:  That's fine.

9              MR. DOBROWSKI:  Okay.

10             THE COURT:  Let me do this.  To the

11   extent that anything is filed there, if someone else

12   wants to respond to it, I will give the defense

13   until Wednesday.  But after that, whatever is

14   submitted will be submitted.

15             All right.  Thank you all very much.

16   You all have a good day and be safe during this time

17   of pandemic and other things.

18             Thank you.

19             (Proceeding concluded 11:10.)

20

21

22

23

24

25
```

48

1

2          I certify that the foregoing is a correct

3     transcript from the record of proceedings in the

4     above-entitled matter.

5

6                              6/18/20

7                               Date

8

9                    /S/   Sharon Montini

10                      Official Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25