UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| OLIVER LUCK, | : | CASE NO. 3:20-cv-00516-VAB |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| VINCENT K. MCMAHON and ALPHA ENTERTAINMENT LLC, | : | |
| | : | |
| Defendants. | : | JANUARY 7, 2021 |

**DEFENDANT ALPHA ENTERTAINMENT LLC'S
ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

Defendant and Counterclaimant Alpha Entertainment LLC ("Alpha") submits this Answer, Affirmative Defenses, and Counterclaims to the Amended Complaint filed by Plaintiff and Counterclaim-Defendant Oliver Luck ("Luck") (ECF No. 94).

**ANSWER**

**INTRODUCTION**

1. Alpha denies the allegations in Paragraph 1.

**THE PARTIES**

2. Alpha admits the allegations in Paragraph 2.

3. Alpha admits the allegations in Paragraph 3

4. Alpha admits the allegations in Paragraph 4.

**JURISDICTION AND VENUE**

5. Alpha admits the allegations in Paragraph 5 except denies that there is any amount in controversy with respect to Luck's claim against Alpha.

6. Alpha admits the allegations in Paragraph 6 except denies that Luck performed his employment obligations and denies that Alpha and McMahon breached their obligations.

## BACKGROUND FACTS

7. Alpha admits the allegations in Paragraph 7.

8. Alpha denies the allegations in Paragraph 8 except admits that Vincent McMahon ("McMahon") was the controlling owner of Alpha during the time Luck was employed by Alpha and when Luck was terminated by Alpha. Alpha further responds that the Guaranty dated May 30, 2018 (the "Guaranty") attached as Exhibit 1 to the Employment Contract speaks for itself and refers the Court to the Guaranty for its complete and accurate text.

9. Alpha admits the allegations in Paragraph 9.

10. Alpha denies the allegations in Paragraph 10. Alpha further responds that the Guaranty speaks for itself and refers the Court to the Guaranty for its complete and accurate text.

11. Alpha denies the allegations in Paragraph 11 except admits that Luck was terminated for cause by Alpha pursuant to the termination letter dated April 9, 2020 and attached as Exhibit 2 to the Complaint.

12. Alpha denies the allegations in Paragraph 12.

## CLAIMS FOR RELIEF

### COUNT ONE – DECLARATORY JUDGMENT

13. Alpha repeats and incorporates by reference all preceding paragraphs herein.

14. Alpha denies the allegations in Paragraph 14.

15. Alpha denies the allegations in Paragraph 15.

### COUNT TWO – DECLARATORY JUDGMENT

16. Alpha repeats and incorporates by reference all preceding paragraphs herein.

17. Alpha denies the allegations in Paragraph 17.

18. Alpha denies the allegations in Paragraph 18.

19. Alpha denies the allegations in Paragraph 19.

## COUNT THREE – BREACH OF CONTRACT

20. Alpha repeats and incorporates by reference all preceding paragraphs herein.

21. Alpha denies the allegations in Paragraph 21. Alpha further responds that the Employment Contract expressly granted Alpha the right to terminate Luck's employment at any time with or without cause. Alpha specifically denies that Luck has satisfied the express conditions precedent to receipt of any severance payments set forth in the Employment Contract, including the absence of circumstances that would constitute cause for termination. Alpha also specifically denies that Luck has satisfied the express conditions precedent for receipt of any bonus payments for any Contract Year (as defined by the Employment Contract) for which he was not employed by Alpha on the scheduled payment date.

22. Alpha denies the allegations in Paragraph 22.

23. Alpha denies the allegations in Paragraph 23.

## PRAYER FOR RELIEF

Alpha denies that Luck is entitled to any of the relief requested in the Complaint.

## AFFIRMATIVE DEFENSES

Alpha asserts the following affirmative defenses and reserves all rights to amend or supplement these defenses as appropriate. By asserting these defenses, Alpha does not assume any burden of proof or persuasion that is imposed on Luck under applicable law.

## FIRST DEFENSE

Luck fails to state a claim upon which relief can be granted.

**SECOND DEFENSE**

Luck's claim is barred by his prior material breaches of the Employment Contract with Alpha, including (a) his failure to devote substantially all of his business time to the XFL and to the performance of his duties to the XFL; (b) his involvement in other business activities that interfered with his performance of his duties to the XFL; (c) his willful and intentional material misconduct in the performance of his duties to the XFL; (d) his gross negligence in the performance of his duties to the XFL; (e) his intentional failure to follow applicable XFL policies and directives; and (f) his willful disregard of McMahon's lawful instructions concerning his material duties under the Employment Contract.

**RESERVATION OF RIGHTS**

Alpha expressly reserves the right to amend or supplement this Answer and its Affirmative Defenses, including the right to raise any additional defenses not asserted herein that may be revealed during the course of discovery or other investigation or that are otherwise applicable.

WHEREFORE, having answered the Amended Complaint, Alpha prays as follows:

(a) That Luck take nothing by the Amended Complaint;

(b) That the Amended Complaint and the cause of actions described therein be dismissed with prejudice;

(c) That Alpha be awarded its reasonable attorney's fees, expenses, and costs;

(d) That Alpha be granted such other and further relief as this Court deems necessary and appropriate.

## COUNTERCLAIMS

Counterclaimant Alpha Entertainment, LLC ("Alpha") hereby brings the following Counterclaims against Counterclaim-Defendant Oliver Luck ("Luck").

### THE PARTIES

1. Counterclaimant Alpha is a citizen of Connecticut and Delaware because its members are Vincent McMahon ("McMahon"), a citizen of Connecticut, and World Wrestling Entertainment, Inc. ("WWE"), a citizen of Connecticut and Delaware.

2. Counterclaim-Defendant Luck is a citizen of Indiana.

### JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

4. This Court has personal jurisdiction over Luck because he commenced this action in this District and expressly consented to jurisdiction in this District with respect to any dispute or controversy related to, arising under, or in connection with the Employment Contract.

5. Venue is proper in the District of Connecticut under 28 U.S.C. § 1391(b) because Luck expressly consented to venue in this District with respect to any dispute or controversy related to, arising under, or in connection with the Employment Contract and because a substantial part of the events or omissions giving rise to the counterclaims occurred in this District.

### BACKGROUND FACTS

*Alpha's Employment of Luck*

6. On May 30, 2018, Luck entered into an Employment Contract with Alpha.

7. The Employment Contract provided that Luck was to serve as the "Commissioner and CEO" of a new professional football league known as the XFL.

8. The Employment Contract provided that Luck was the "senior-most executive of the XFL" and was responsible for "all football and business-related operations" of the XFL.

9. The Employment Contract required Luck to "devote *substantially all* of his business time to the performance of his duties to the XFL, provided that he may (i) continue to serve as a member of the board of American Campus Communities, Inc. and (ii) serve on not-for-profit boards and participate in other civic and charitable activities, so long as such activities *do not interfere* with the performance of his duties to the XFL" (emphasis added).

10. The Confidentiality, Non-Solicitation, and Non-Competition Agreement ("CNNA") incorporated by reference into the Employment Contract also required Luck to "devote substantially all of Employee's business efforts and time to Employer and to the performance of his duties to Employer under the Employment Contract."

11. The Employment Contract provided that, in exchange for the performance of Luck's obligations under the Employment Contract, Alpha would pay Luck a Base Salary of $5 million per Contract Year and a "Guaranteed Annual Bonus" of $2 million if he was still employed "on the last day of each Contract Year," which was June 30 of each year.

12. The Employment Contract provided that Luck's employment "may be terminated by Alpha *at any time*, with or without cause" (emphasis added).

13. The Employment Contract provided that Alpha had "Cause" to terminate Luck's employment for several reasons, including:

a. "Luck's willful and intentional material misconduct in performance of his duties or gross negligence of his duties (other than due to illness or disability), including an intentional failure to follow any applicable XFL policies or directives."

b. "Luck's willful and intentional material breach of this Contract."

c. "Luck's willful disregard of the lawful instructions of Mr. McMahon concerning Mr. Luck's material duties hereunder."

14. On April 9, 2020, Alpha notified Luck that he was terminated for Cause under the Employment Contract.

*Luck Violates XFL Policy and McMahon's Directives by Hiring Antonio Callaway*

15. From the inception of the XFL, McMahon made clear that the league would only hire quality football players with good character.

16. Luck knew that McMahon's position requiring the hiring of only quality football players with good character was deemed by McMahon to be critically important to the development of the XFL's brand.

17. As a result, the XFL instituted a policy of requiring background checks for all potential players in the league and McMahon's approval for all players with bad reputations due to questionable or problematic backgrounds.

18. Luck knew of the XFL's policy and McMahon's directive not to hire players with bad reputations due to questionable or problematic backgrounds.

19. Luck repeatedly acknowledged the XFL's policy and McMahon's directive not to hire players with bad reputations due to questionable or problematic backgrounds in public statements.

      a.    On or about December 9, 2018, Luck publicly acknowledged that McMahon had made it "clear to me" that he only wanted to hire football players with "good character" and did not want to employ players who had a "track record of bad behavior."

      b.    On or about January 7, 2020, Luck again publicly acknowledged that McMahon had made it "clear to me" that he only wanted football players of "good character" and that all potential players would be required to pass "background checks."

20.    Luck also knew of the XFL's policy and McMahon's directive to obtain McMahon's approval before hiring any players who had bad reputations due to questionable or problematic backgrounds.

21.    On multiple occasions, Luck disclosed to McMahon accusations of misconduct against potential players and sought McMahon's approval to hire those players.

22.    In each case, McMahon did not approve the hiring of such players and told Luck that they could not play in the XFL because they did not meet the XFL's policy.

      a.    Luck repeatedly sought McMahon's approval to hire a wide receiver who had been banned from the campus on which his XFL team practiced because of a prior sexual assault allegation. After Luck provided McMahon with this information about the player's background, McMahon told Luck that he could not play in the XFL.

      b.    Luck also sought McMahon's approval to hire Martavis Bryant, another wide receiver, to play in the XFL. Prior to hiring Martavis Bryant, Luck informed McMahon that Martavis Bryant had drug problems while he was in the NFL. As a result, McMahon told Luck that Martavis Bryant could not play in the XFL.

23. Because Luck was concerned about poor wide receiver play, Luck decided to violate the XFL's policy and McMahon's directive by attempting to hire wide receivers who would not be hired under the XFL's policy and McMahon's directive.

24. Despite his knowledge of the XFL's policy and McMahon's prior directives not to sign players with bad reputations due to questionable or problematic backgrounds, Luck proceeded to sign a contract with Antonio Callaway, a wide receiver with a lengthy history of misconduct allegations, and affirmatively concealed from McMahon the history of Callaway's misconduct known to Luck.

25. Luck was aware of the following information concerning Antonio Callaway before he signed the contract for Antonio Callaway to play in the XFL.

    a. Callaway was reportedly suspended from the University of Florida's team in January 2016 after being accused of sexual assault.

    b. Callaway was reportedly suspended from the University of Florida's football team for the entire 2017 season due to an investigation for felony credit card fraud.

    c. In May 2017, Callaway was cited for possession of marijuana and drug paraphernalia during a traffic stop in Florida.

    d. In April 2018, Callaway tested positive for marijuana at the NFL combine.

    e. In August 2018, Callaway was cited for possession of marijuana and driving with a suspended license. The police also reportedly found bullets and a gun part while searching his vehicle. He was ultimately sentenced to probation for driving with a suspended license.

    f. In August 2019, Callaway was suspended from the first four games of the NFL season for violating the league's drug policy.

    g.  In November 2019, Callaway's contract with the Cleveland Browns was waived following a 10-game suspension for violating the NFL's substance abuse policy.

  26.  Despite his awareness of these issues, Luck approved offering Antonio Callaway a draft contract promising a $125,000 signing bonus not offered to other wide receivers and included him in the pool of players to be drafted by XFL teams before even mentioning him to McMahon.

  27.  When Luck advised McMahon that he had signed Antonio Callaway, he did not reveal any of the above information to McMahon and acted to conceal it from McMahon.

  28.  Luck also misled other XFL executives who questioned Luck's decision to sign Antonio Callaway into believing that he had told McMahon about Callaway's history.

  29.  Luck also agreed to the terms of a contract with Antonio Callaway before his background check was even completed.

  30.  On January 13, 2020, at the same time that Luck advised McMahon that an XFL team had claimed Antonio Callaway, Luck requested that McMahon revisit his prior decision not to sign the wide receiver who had been banned from campus because of sexual assault allegations.

  31.  When Luck mentioned Antonio Callaway to McMahon again on January 16, 2020, Luck again failed to disclose to McMahon any of the known instances of Callaway's misconduct, including those set forth in Paragraph 25.

  32.  On January 16, 2020, at the same time that Luck concealed Antonio Callaway's history of misconduct from McMahon, Luck asked for McMahon's approval to sign Martavis Bryant and informed McMahon that he had drug issues while in the NFL. As a result, McMahon did not approve the hiring of Martavis Bryant. At the same time, Luck again asked McMahon to revisit his prior decision not to sign the wide receiver who had been banned from campus because of sexual assault allegations, and McMahon refused to reconsider that decision.

33. On January 16, 2020, Antonio Callaway signed his contract to join the XFL and play for the Tampa Bay Vipers.

34. Luck countersigned Antonio Callaway's XFL contract on January 23, 2020.

35. Luck countersigned Antonio Callaway's XFL contract without first advising McMahon of any of the known instances of Callaway's misconduct, including those set forth in Paragraph 25.

36. Luck knew that McMahon would not have approved of Luck's decision to hire Antonio Callaway if Luck had disclosed his lengthy history of misconduct to McMahon as required by the XFL's policy.

37. Although Luck knew that Antonio Callaway should not have been hired under the XFL's policy, he willfully disregarded the XFL's policy and McMahon's directive by hiring him.

*Luck Disregards McMahon's Directives by Failing to Terminate Antonio Callaway*

38. After Antonio Callaway's signing with the XFL became public, news reports surfaced noting Callaway's history of misconduct.

39. After learning of Antonio Callaway's problematic history, McMahon directed Luck to immediately terminate Callaway from the XFL.

40. Luck failed to immediately terminate Antonio Callaway in accordance with McMahon's directive.

41. Despite receiving the directive from McMahon to terminate Antonio Callaway, Luck spoke to the head coach of the Tampa Bay Vipers, Marc Trestman, on January 29, 2020 and told Trestman that Callaway should continue to practice with the team that day.

42. As a result, Antonio Callaway was still practicing with the Tampa Bay Vipers on January 29, 2020 after McMahon had directed Luck to terminate Callaway.

43. While practicing on January 29, 2020, Antonio Callaway sustained a serious knee injury.

44. As a result of this incident, Alpha was required to honor Antonio Callaway's contract, including payment of the $125,000 signing bonus, and pay for the costs of surgery on Callaway's knee.

45. Accordingly, Luck's failure to follow McMahon's directive and promptly terminate Antonio Callaway from the XFL had significant financial consequences for Alpha.

*Luck Violates the XFL Technology Policies*

46. Luck knew that the XFL had policies prohibiting the use of company technology for matters unrelated to the business of the XFL.

47. Luck knew of the XFL Employee Handbook & Code of Business Conduct.

48. The XFL Employee Handbook & Code of Business Conduct was distributed to XFL employees and included a letter to XFL employees signed by Luck himself.

49. Luck also knew of the XFL Technology Acceptable Use Policy.

50. The XFL Technology Acceptable Use Policy was distributed to XFL employees.

51. Both the XFL Employee Handbook & Code of Business Conduct and the XFL Technology Acceptable Use Policy provided: "All XFL Technology is the ***property of the XFL. Use of such XFL Technology is to be used for XFL related business only; users must not store or transmit any non-business-related files, including but not limited to personal data*** such as documents, spreadsheets, reports, presentations, images, videos or music files, databases and application source code" (emphasis added).

52. XFL Technology included company-issued iPhones that were used to make phone calls, send text messages, and store and transmit emails and documents.

53. Alpha issued Luck a company iPhone.

54. The iPhone owned and issued by Alpha to Luck was XFL Technology within the meaning of the XFL Employee Handbook & Code of Business Conduct and the XFL Technology Acceptable Use Policy.

55. As an employee, and indeed as the CEO of the XFL, Luck was obligated to adhere to all of the above policies.

56. Luck used the iPhone issued to him by Alpha for purposes that were unrelated to the business of the XFL.

    a. Luck used the iPhone issued to him by Alpha to make phone calls and send text messages that were unrelated to the business of the XFL.

    b. Luck used the iPhone issued to him by Alpha to send emails concerning matters that were unrelated to the business of the XFL.

    c. Luck used the iPhone issued to him by Alpha to store and transmit documents concerning matters that were unrelated to the business of the XFL.

    d. Luck used the iPhone issued to him by Alpha to conduct business for persons or entities other than the XFL.

57. In the termination letter Alpha sent to Luck dated April 9, 2020, Alpha directed Luck to return the iPhone issued to him back to Alpha.

58. Luck continued to use the iPhone issued to him by Alpha even after receiving his termination letter and the directive to return the phone.

59. Luck delayed returning the iPhone to Alpha for nearly a month.

60. Before returning the iPhone to Alpha, Luck's counsel asked Alpha's bankruptcy counsel whether Alpha had a policy that prohibited personal use of the iPhone issued by Alpha.

61. After Luck received his termination letter and before he returned the iPhone to Alpha, data was deleted from the iPhone.

62. Luck knew that the data on the iPhone that was deleted proved that he used the iPhone for purposes prohibited by the XFL's technology policies.

63. After such data was deleted from the iPhone, Luck authorized and knew that his lead counsel was representing to defense counsel in this case, Alpha's bankruptcy counsel, and the Court that no data had been deleted from the iPhone.

64. Luck's lead counsel's representations to defense counsel in this case, Alpha's bankruptcy counsel, and the Court that no data had been deleted from the iPhone were false.

65. Luck did not send the iPhone back to Alpha until May 5, 2020.

66. Although Luck was asked to provide the passcode to unlock the iPhone issued by Alpha, Luck refused to provide the passcode as required by Connecticut law. *See* Conn. Gen. Stat. § 31-40x(c)(1).

67. Accordingly, Luck knowingly and repeatedly violated the XFL's technology policies by using XFL Technology for matters unrelated to the XFL's business.

68. Luck's repeated use of XFL Technology for matters unrelated to the XFL's business evidenced his failure to devote substantially all of his business time to the XFL.

69. Luck's repeated use of XFL Technology for matters unrelated to the XFL's business breached his duty not to use Alpha's property for his own benefit.

70. Luck's refusal to provide the passcode for the iPhone issued by Alpha not only violates Connecticut law, but is an act of concealment designed to prevent disclosure of the full nature and extent of his violation of XFL policies.

*Luck's Abandonment of His Duties After March 13, 2020*

71. In March 2020, the XFL was forced to suspend its first season in order to comply with venue restrictions arising from the COVID-19 pandemic.

72. Instead of providing the leadership expected from a CEO during such challenging times, Luck abruptly left the XFL's headquarters in Connecticut and disengaged from the XFL's operations.

73. On March 13, 2020, Luck returned to his home to Indiana and did not return to the XFL's headquarters in Connecticut.

74. Luck did not seek or obtain the approval of McMahon to leave the XFL's headquarters on March 13, 2020 and not return to Connecticut.

75. Between March 13, 2020 and his termination for cause on April 9, 2020, Luck did not personally call McMahon or speak directly with him.

76. After March 13, 2020, Luck did not send McMahon any report regarding his daily activities or his weekly activities.

77. After March 13, 2020, Luck failed to devote substantially all of his business time to the XFL or to the performance of his duties to the XFL.

78. After March 13, 2020, Luck allowed other business activities to interfere with his business obligations to the XFL.

79. After March 13, 2020, Luck failed to attend important meetings of the XFL's COVID-19 Working Group that were held by videoconference.

   a. Luck did not participate in the XFL's COVID-19 Working Group meeting held by videoconference on the evening of March 15, 2020.

    b.  Luck did not participate in the XFL's COVID-19 Working Group meeting held by videoconference on March 18, 2020.

    c.  Luck did not participate in the XFL's COVID-19 Working Group meeting held by videoconference on March 20, 2020.

    d.  Luck did not participate in the XFL's COVID-19 Working Group meeting held by videoconference on March 27, 2020.

    e.  Luck did not participate in the XFL's COVID-19 Working Group meeting held by videoconference on April 1, 2020.

  80.  After March 13, 2020, Luck failed to attend important weekly XFL business operations meetings that were held by Zoom.

    a.  Luck did not participate in the XFL's weekly operations meeting held by Zoom on March 16, 2020.

    b.  Luck did not participate in the XFL's weekly operations meeting held by Zoom on March 23, 2020.

    c.  Luck did not participate in the XFL's weekly operations meeting held by Zoom on March 30, 2020.

  81.  Luck failed to attend these important meetings to determine whether there was a viable path forward for the XFL in the face of the threat presented by the COVID-19 pandemic.

  82.  Luck failed to demonstrate the work ethic expected of a CEO of a start-up league in the face of the threat presented by the COVID-19 pandemic.

  83.  Instead, Luck prioritized other business ventures over his obligations as Commissioner and CEO of the XFL.

## COUNT ONE – BREACH OF CONTRACT

84. Alpha repeats and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

85. The Employment Contract was a legally binding and enforceable contract.

86. Alpha performed all of its obligations under the Employment Contract.

87. Luck's actions and omissions described herein breached the Employment Contract.

88. Luck's breaches of the Employment Contract caused monetary damages to Alpha in an amount to be proven at trial.

## COUNT TWO - BREACH OF FIDUCIARY DUTY

89. As Commissioner and CEO and the most senior employee and agent of the XFL, Luck had a fiduciary relationship with Alpha.

90. Luck owed fiduciary duties to Alpha, including a duty of loyalty, a duty of good faith and honesty, a duty to disclose material facts, a duty of obedience, and duties of care, competence, and skill.

91. Luck's actions and omissions described herein breached his fiduciary duties to Alpha and advanced his own interests at Alpha's expense.

92. Alpha suffered monetary damages as a result of Luck's breaches of fiduciary duty in an amount to be proven at trial.

93. Alpha is further entitled to the equitable remedy of an accounting for Luck's use of XFL property and any benefits obtained from his work on other activities during company time.

94. Alpha is further entitled to the equitable remedies of disgorgement and forfeiture of compensation paid to Luck as a result of his breaches of fiduciary duties.

**PRAYER FOR RELIEF**

WHEREFORE, Alpha requests that the Court enter judgment in favor of Alpha and against Luck and award the following relief to Alpha:

(a) Monetary damages;

(b) An accounting;

(c) Disgorgement of profits and forfeiture of compensation previously paid to Luck;

(d) Prejudgment and post-judgment interest;

(e) Reasonable attorney's fees, expenses, and costs;

(f) Such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Alpha requests a trial by jury on all issues so triable.

DEFENDANT ALPHA ENTERTAINMENT LLC

By: */s/ Jerry S. McDevitt*
Jerry S. McDevitt
Curtis B. Krasik
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone: (412) 355-6500
Fax: (412) 355-6501
Email: jerry.mcdevitt@klgates.com
Email: curtis.krasik@klgates.com

Jeffrey P. Mueller (ct27870)
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
Phone: (860) 275-0100
Fax: (860) 275-0343
Email: jmueller@daypitney.com

-19-

## CERTIFICATION OF SERVICE

I hereby certify that, on January 7, 2021, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jeffrey P. Mueller*
Jeffrey P. Mueller (ct27870)