**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| OLIVER LUCK, | : | CASE NO. 3:20-cv-00516-VAB |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| VINCENT K. MCMAHON and ALPHA | : | |
| ENTERTAINMENT LLC, | : | |
| | : | |
| Defendants. | : | JANUARY 7, 2021 |

**DEFENDANT AND COUNTERCLAIMANT ALPHA ENTERTAINMENT LLC'S**
**MEMORANDUM OF LAW IN SUPPORT OF**
**APPLICATION FOR PREJUDGMENT REMEDY**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 2

    I.    Luck Enters Into the Employment Contract with Alpha ............................................... 2

    II.   Luck Violates XFL Policy and McMahon's Directives by Hiring Antonio
        Callaway ....................................................................................................................... 3

        A.    Luck's Knowledge of the XFL's Policy ............................................................ 3

        B.    McMahon Instructs Luck Not to Hire Players Who Do Not Meet the Policy ....... 5

        C.    Luck Deceives McMahon and Hires Antonio Callaway ...................................... 9

        D.    Luck Files False and Misleading Declarations Regarding Callaway's
            Hiring ............................................................................................................ 13

    II.   Luck Disregards McMahon's Directives by Failing to Terminate Antonio
        Callaway ..................................................................................................................... 14

    III.  Luck Violates the XFL Technology Policies ............................................................. 18

    IV.  Luck Fails to Devote Substantially All of His Business Time To His XFL Duties
        After March 13, 2020 .................................................................................................. 21

        A.    Luck Abandons His XFL Duties After March 13, 2020 .................................... 21

        B.    Luck Files False and Misleading Declarations Regarding His Activities
            After March 13, 2020 ..................................................................................... 22

LEGAL STANDARD ............................................................................................................ 24

ARGUMENT ....................................................................................................................... 25

    I.    Alpha Has Established Probable Cause That A Judgment Will Enter In Its Favor
        On Its Breach of Contract Claim Against Luck. ......................................................... 25

        A.    Formation of an Agreement ............................................................................. 25

        B.    Performance by Alpha ..................................................................................... 25

        C.    Breach of the Agreement by Luck .................................................................... 25

        D.    Damages .......................................................................................................... 28

    II.   Alpha Has Established Probable Cause That A Judgment Will Enter In Its Favor
        On Its Breach of Fiduciary Duty Claim Against Luck. ............................................... 28

        A.    Fiduciary Relationship .................................................................................... 29

        B.    Breach of Fiduciary Duty ................................................................................ 30

        C.    Causation and Damages ................................................................................... 32

    III.  Alpha Has Established Probable Cause That A Judgment Will Enter In Its Favor
        In the Amount of $572,792.10. .................................................................................. 33

CONCLUSION ..................................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amalgamated Bank v. Yahoo! Inc.*,
132 A.3d 752 (Del. Ch. 2016)..............................................................................30

*Beard Research, Inc. v. Kates*,
8 A.3d 573 (Del. Ch. 2010)..................................................................................29

*CCT Communications, Inc. v. Zone Telecom, Inc.*,
327 Conn. 114 (2017) .........................................................................................25

*Columbia Dental, P.C. v. Dombkowski*,
No. HHDCV155038642, 2017 WL 1015438 (Conn. Super. Ct. Feb. 14, 2017)....................32

*Essex Insurance Co. v. William Kramer & Associates, LLC*,
331 Conn. 493 (2019) .........................................................................................29

*Fenn v. Yale University*,
283 F. Supp. 2d 615 (D. Conn. 2003) ..................................................................29

*Gantler v. Stephens*,
965 A.2d 695 (Del. 2009) ....................................................................................29

*Hospital Media Network, LLC v. Henderson*,
187 Conn. App. 40 (2019) .............................................................................31, 32

*Iacurci v. Sax*,
313 Conn. 786 (2014) .........................................................................................29

*Kane v. Neveleff*,
No. CV000439308S, 2002 WL 2031355 (Conn. Super. Ct. July 11, 2002)...........30

*Luck v. McMahon*,
No. 3:20-CV-516, 2020 WL 3481680 (D. Conn. June 26, 2020)  .........................24

*Northwest Mutual Life Insurance Co. v. Tone*,
125 Conn. 183 (1939) .........................................................................................30

*Reilly v. Polychrome Corp.*,
872 F. Supp. 1265 (S.D.N.Y. 1995), *aff'd*, 71 F.3d 405 (2d Cir. 1995) ................26

*Risdon-AMS (USA), Inc. v. Levine*,
No. CV030181029S, 2004 WL 614518 (Conn. Super. Ct. Feb. 10, 2004) ......................31, 32

*Roe v. Hotchkiss School*,
   385 F. Supp. 3d 165 (D. Conn. 2019) ......................................................................28

*Saye v. Old Hill Partners, Inc.*,
   478 F. Supp. 2d 248 (D. Conn. 2007) ................................................................29, 30

*Tourmaline Partners, LLC v. Monaco*,
   No. 3:13-CV-00108, 2016 WL 614361 (D. Conn. Feb. 16, 2016) .........................29

*Wall Systems, Inc. v. Pompa*,
   324 Conn. 718 (2017) .............................................................................29, 30, 32

**Statutes**

Conn. Gen. Stat. § 31-40x ...............................................................................................21

**Other Authorities**

Restatement (Third) of Agency § 8.05 (2006) ...............................................................31

Restatement (Third) of Agency § 8.11 cmt. d (2006) ....................................................30

Defendant and Counterclaimant Alpha Entertainment LLC ("Alpha") respectfully submits this memorandum of law in support of its application for a prejudgment remedy against Plaintiff and Counterclaim Defendant Oliver Luck ("Luck").

## PRELIMINARY STATEMENT

Alpha is entitled to a prejudgment remedy of at least $572,792.10 against Luck because it has established probable cause that a judgment in that amount will enter in its favor on its counterclaims against Luck for breach of contract and breach of fiduciary duty.

Luck entered into an Employment Contract with Alpha to be the CEO and Commissioner of the XFL in which he was paid an annual salary of $5 million and an annual bonus of $2 million if he was still employed on June 30 of each contract year. Luck's Employment Contract required him to (i) devote substantially all of his business time to the performance of his XFL duties and (ii) follow any applicable XFL policies and directives.

The evidence establishes that Luck repeatedly breached the Employment Contract with Alpha. *First*, Luck violated the XFL's policy and Vince McMahon's ("McMahon") directive against hiring players with bad reputations due to their questionable or problematic backgrounds by signing Antonio Callaway, a player who Luck knew had a reputation for multiple types of misconduct, and concealing that information from McMahon. *Second*, Luck violated McMahon's directives to immediately terminate Callaway from the XFL after McMahon learned of Callaway's history and instead allowed Callaway to continue to practice where he suffered a severe knee injury that obligated Alpha to honor Callaway's contract and pay for his medical expenses. *Third*, Luck admittedly violated the XFL technology policies that he promulgated and was responsible for enforcing by regularly using his Alpha-issued phone for non-XFL related matters, including to conduct business for other entities unrelated to the XFL, and then

attempting to conceal the full nature and extent of his violations. **Fourth**, Luck failed to substantially devote all of his business time to the performance of his XFL duties after March 13, 2020 when he returned home and disengaged from the XFL's operations, failed to attend important XFL meetings to determine whether there was a viable path for the XFL in the face of the existential threat to the league caused by the COVID-19 pandemic, and instead chose to spend his time conducting business for other entities unrelated to the XFL. Such evidence also establishes that Luck breached his fiduciary duties to Alpha both as its employee and its senior-most officer.

The evidence further establishes that Alpha incurred damages of at least $572,792.10 as a result of Luck's breaches of contract and breaches of fiduciary duties, including $158,950.63 paid to Antonio Callaway under his contract, $29,226.09 in worker's compensation payments made to Callaway, and $384,615.38 paid to Luck under his Employment Contract for the period from March 14, 2020 through his termination on April 9, 2020. Accordingly, the Court should enter a prejudgment remedy against Luck in the amount of $572,792.10.

## STATEMENT OF FACTS

### I.    Luck Enters Into the Employment Contract with Alpha

At all times relevant to this dispute, McMahon was the principal owner of Alpha. McMahon formed Alpha as the vehicle to operate the XFL, a spring professional football league that he largely conceived and financed. (McMahon Decl. ¶ 3.)

On or about May 30, 2018, McMahon hired Luck to be the Commissioner and CEO of the XFL. (McMahon Decl. ¶ 4.) Luck's Employment Contract with Alpha provided that he would be the "senior-most executive of the XFL" responsible for "all football and business-related operations" of the league. (ECF No. 94-1 at 1.) The Employment Contract provided that

Alpha would pay Luck a Base Salary of $5 million per Contract Year and a "Guaranteed Annual Bonus" of $2 million "on the last day of each Contract Year, subject to his continued employment on the scheduled payment date."  (*Id.* at 2.)

The Employment Contract required Luck to "devote ***substantially all of his business time*** to the performance of his duties to the XFL, provided that he may (i) continue to serve as a member of the board of American Campus Communities, Inc. and (ii) serve on not-for-profit boards and participate in other civic and charitable activities, so long as such activities ***do not interfere*** with the performance of his duties to the XFL."  (*Id.* at 1 (emphasis added).)  The Employment Contract also required Luck to "***follow any applicable XFL policies or directives***." (*Id.* at 3 (emphasis added).)

The Employment Contract provided that Luck's employment "may be terminated by Alpha at any time, with or without cause." (*Id.* at 3.)  On April 9, 2020, Alpha notified Luck that his Employment Contract was terminated for cause and provided a non-exclusive list of reasons for his termination.  (ECF No. 94-2.)

## II.   Luck Violates XFL Policy and McMahon's Directives by Hiring Antonio Callaway

### A.   Luck's Knowledge of the XFL's Policy

One of the policies that McMahon considered central to building the XFL brand was hiring quality players with good character who could be marketed.  From the outset, McMahon made clear that players with bad reputations due to issues with drugs, sexual assaults, criminal arrests and other misconduct would not be allowed to play in the XFL.  All of the XFL's senior executives knew of this policy.  (McMahon Decl. ¶ 6; Pollack Decl. ¶ 4, DeVito Decl. ¶ 4.)

McMahon announced this policy at his introductory press conference for the relaunch of the XFL on January 25, 2018.  Specifically, McMahon stated: "In the XFL, the quality of the

human being is going to be as important as the quality of the player." (McMahon Decl. ¶ 7.)

Later in the press conference, in response to a question as to whether certain players would be

allowed to play in the XFL, McMahon further stated:

> [W]hen I said the quality of the human being is very important, and just as important as the quality of the player, what I mean by that is, you want someone who does not have any criminality whatsoever associated with them. And, in the XFL, even if you have a DUI, you will not play in the XFL, so that would probably eliminate some of them, not all of them.

(*Id.*) McMahon also gave an interview to ESPN following the press conference in which he

stated: "We are evaluating a player based on many things, including the quality of human being

they are. If you have any sort of criminal record or commit a crime you aren't playing in this

league." (*Id.* Ex. A.) These comments were widely reported in the media. (*Id.* Exs. B-C.)

As XFL Commissioner and CEO, Luck was acutely aware of this policy. For example, in

a media appearance to promote the launch of the XFL in December 2018, Luck stated:

> Vince has made it pretty clear to me that he not only wants, you know, good football players, but he wants good football players that are good character guys, right. So I think we will have, absolutely, you know, a bright line, and not take guys who are involved in any sort of domestic violence issues. You know, I think we'll be very careful with other folks, you know. I'm not prepared to say, you know, a misdemeanor will keep you out of the XFL, or, you know, it has to be a felony—I'm not sure we're at that point yet. But Vince has made it clear that, you know, he wants players that, you know, can be good role models, that have, you know, good character, and don't have, sort of a rap—you know, a track record of bad behavior.

(McMahon Decl. ¶ 8.) In another media appearance in January 2020, Luck similarly stated:

> Vince has made it clear to me that he not only wants quality football players— that's obvious, right?—but he wants men of good character. All of our players have gone through background checks. We've had a number of guys that didn't qualify because of their background or different things in their background. We think we've got not just good quality players but good quality men in our league. There are always a handful of guys out there who may have an interest, but the interest isn't necessarily mutual.

(McMahon Decl. ¶ 9, Ex. D.)  Luck therefore repeatedly acknowledged the existence of the XFL policy in his public statements.

### B.    McMahon Instructs Luck Not to Hire Players Who Do Not Meet the Policy

Despite being well aware of the XFL's policy on not hiring players with bad reputations because of their questionable or problematic backgrounds, Luck's failure to consistently follow this policy was a recurring issue which he refused to cure.  McMahon repeatedly told Luck that this was a matter of his reputation and the league's reputation when this issue kept recurring. (McMahon Decl. ¶ 10.)  Indeed, in responses to requests for admission, Luck has admitted that "he sought McMahon's approval to hire a few well known individuals that posed potential reputational issues to the XFL prior to hiring Antonio Callaway."  (Ex. 1, RFA 6.)

*First*, in June 2019, Luck failed to rule out Johnny Manziel ("Manziel") playing in the XFL in response to multiple media inquiries.  As a result, McMahon sent Luck a text message that stated: "How long R U going to play this game Oliver?  U know there is NO CHANCE IN HELL for Manziel to play for us.  I will not change my mind.  So what's Ur plan??"  (McMahon Decl. ¶ 11, Ex. E.)  Luck responded: "Vince—we have no intention of signing him, none whatsoever.  We're just milking the story to stay in the news.  I'm happy to categorically rule him out but both Jeffrey and I think it is worthwhile to milk it until the showcases are finished (July 12).  At that point we can say he doesn't fit into our plans."  (*Id.*)

*Second*, on December 5, 2019, XFL officials learned that Player A was banned from the campus on which his XFL team practiced because of a prior sexual assault allegation.[1]

---

[1] Alpha refers to this player as Player A to preserve his privacy because, to its knowledge, the allegation asserted against him has not previously been made public.  Luck, however, is well aware of Player A's identity.  Additionally, unredacted documents will be produced in discovery that disclose Player A's identity.

(McMahon Decl. ¶¶ 12-13; Pollack Decl. ¶ 7.)  On December 9, 2019, XFL officials were advised that Player A had requested a hearing seeking to rescind his campus ban and that he was allowed access to the campus for work related activities while he awaited his hearing.  (Pollack Decl. ¶ 7, Ex. A.)  Luck immediately emailed Pollack and others stating: "My inclination is to allow [Player A] to participate going forward."  (*Id.*)  On December 11, 2019, XFL officials were advised by the campus police department that Player A's denial of access was rescinded at a hearing that day.  (*Id.* Ex. B.)  Luck again emailed stating: "I'm OK with [Player A] joining [Player A's team] at this point.  I see no downside given the decision to rescind."  (*Id.* Ex. C.)  Because this decision did not in any way address the underlying allegation of sexual assault against Player A, Pollack emailed Luck privately stating: "I'd like to raise an issue for you to consider.  Lmk if you want to step out for a minute."  (*Id.*)  Pollack then spoke to Luck and raised concerns about [Player A] continuing to be part of the XFL in light of McMahon's player conduct policy.  After speaking with Pollack, Luck sought McMahon's input regarding the Player A situation.  (Pollack Decl. ¶ 7.)

On December 12, 2020, Luck sent McMahon an email and text message seeking his input regarding whether Player A could play in the XFL.  (McMahon Decl. ¶ 14, Ex. F.)  Luck attached a memo prepared by the XFL's Vice President of Security, ML Henry, explaining the situation involving Player A in detail.  Less than fifteen minutes later, McMahon responded by text message and told Luck: "Don't let him play for us."  (*Id.*)

Despite McMahon's unequivocal response to Luck regarding Player A, Luck sent McMahon another text message on January 13, 2020 asking him to revisit the situation with Player A and allow him to play in the XFL.  (McMahon Decl. ¶ 15, Ex. G.)  On January 16, 2020, before McMahon had responded to that text, Luck yet again sent McMahon a text message

asking if he would approve Player A to play in the XFL.  (*Id.* ¶ 16, Ex. H.)  On or about January 18, 2020, McMahon had a phone call with Luck in which he again told him that Player A could not play in the XFL.  (*Id.* ¶ 17.)  Following up on that call, on January 21, 2020, McMahon sent Luck a text message stating: "What are Ur next steps re [Player A]?"  (*Id.* Ex. I.)  Luck responded: "We've taken care of [Player A], he's off the [team's] roster."  (*Id.*)

In response to requests for admission, Luck has admitted that (i) Player A "was accused of sexually assaulting a female student," (ii) Luck "told McMahon that [Player A] was unable to utilize the [campus] facilities due to the allegation," (iii) "McMahon said to remove [Player A] from the team," and (iv) Player A "did not play in the XFL after McMahon denied [Luck's] request for approval for [Player A] to do so."  (Ex. 1, RFAs 7-13.)

***Third***, on December 6, 2019, XFL officials were advised that USA Today was working on an investigative news series into how NCAA athletes transfer schools after being found responsible by their schools or in court for sexual misconduct and that the story planned to reference a player named Malik Harris ("Harris"), who at the time was on the XFL's New York Guardians.  Based on further research by their public relations department, XFL officials learned that Harris was dismissed from Illinois State University for sexual misconduct.  On or about December 17, 2019, the XFL's public relations department noted that USA Today had run two separate stories on college athletics and sexual misconduct and that one of them referenced Harris.  After the matter was raised with Luck, on December 19, 2019, Harris was released by the Guardians, and Luck directed that he be taken out of the player pool, meaning that he could not be claimed by any other XFL team.  (Pollack Decl. ¶ 8, Ex. D.)

In response to requests for admission, Luck has admitted that he "learned of a sexual assault allegation against Malik Harris" and that "Malik Harris was released by the New York Guardians." (Ex. 1, RFAs 19, 21.)

**Fourth**, on January 16, 2020, Luck asked if McMahon would approve Martavis Bryant ("Bryant") to play in the XFL. (McMahon Decl. ¶ 16, Ex. H.)  Luck acknowledged that Bryant had "drug issues while in the NFL." (*Id.*)  On January 17, 2020, Pollack spoke with Luck at the NFL's training camp in Houston, and Luck mentioned that he intended to sign Bryant.  Luck told Pollack that Bryant had failed drug tests in the NFL and was suspended for a violation of the NFL's substance abuse policy.  Luck said that he had sought McMahon's approval for Bryant to play in the XFL. (Pollack Decl. ¶ 14.)  On or about January 18, 2020, McMahon had a phone call with Luck in which he told him that Bryant could not play in the XFL. (McMahon Decl. ¶ 17.)  Following up on that call, on January 21, 2020, McMahon sent Luck a text message stating: "[O]f course like U said we're disinviting Martavis." (*Id.* Ex. I.)  Luck responded: "Yes, Martavis is being disinvited, he will not be on one of our teams." (*Id.*)  By asking for McMahon's approval with respect to Bryant, Luck clearly knew that he likewise needed McMahon's approval for Antonio Callaway to play in the XFL. (Pollack Decl. ¶ 14.)

In response to requests for admission, Luck has admitted that (i) "Martavis Bryant was suspended by the NFL for substance abuse," (ii) Luck "requested McMahon's approval for Martavis Bryant to play in the XFL," (iii) "McMahon denied [Luck's] request for approval for Martavis Bryant to play in the XFL," and (iv) "Martavis Bryant did not play in the XFL after McMahon denied [Luck's] request for approval for Bryant to do so." (Ex. 1, RFAs 14-18.)

**Fifth**, in the January 17, 2020 conversation with Pollack, Luck also mentioned Josh Gordon ("Gordon"), another wide receiver who he described as more notorious, having been

suspended by the NFL five times for violation of the NFL's substance abuse policy. Because of his problematic background, Luck said that he had not even spoken to Gordon, let alone asked for McMahon's approval for him to play in the XFL. (Pollack Decl. ¶ 15.)

> **C.     Luck Deceives McMahon and Hires Antonio Callaway**

At the same time that Luck was unsuccessfully seeking McMahon's approval for Player A and Bryant to play in the XFL, Luck decided to circumvent the player conduct policy by deliberately misleading McMahon regarding his signing of Antonio Callaway ("Callaway"). (McMahon Decl. ¶ 18.)

As the start of the XFL season was getting closer, Luck expressed dissatisfaction regarding the quality of wide receiver play in the league. On January 10, 2020, Luck sent McMahon a text message stating: "I've watched every team practice over the past couple of days, the only disappointment to me was the number of dropped passes. QBs were throwing accurately, but WRs and TEs were dropping too many balls." (McMahon Decl. ¶ 19, Ex. J.) McMahon responded to Luck's text message stating: "We will look like shit if receivers can't catch the ball. What can we do about it?" (*Id.*) Luck replied: "Time will help all receivers" and "[w]e also are looking at a couple of ex-NFL receivers who may have an interest in the XFL." (*Id.*) The next day, on January 11, 2020, Luck sent McMahon a similar text message stating: "[S]ome weakness with wide receiver groups in [certain XFL team cities] (all due to having injured guys). We may need to supplement their receivers. We have a couple of potential guys we can bring in." (*Id.* Ex. K.) At no time in this dialogue did Luck mention that Callaway was one of the receivers he was thinking of signing. Without knowing the "potential guys" to whom Luck was referring, McMahon responded: "Then plz bring them in." (*Id.*) McMahon later

learned that, without seeking or receiving his approval, Luck signed Callaway to play in the XFL. (*Id.* ¶ 18.)

On January 13, 2020, the Tampa Bay Vipers chose Antonio Callaway with their first pick in the second supplemental draft for the XFL season. Luck encouraged the Tampa Bay Vipers to select Callaway because he wanted him to play in his home state of Florida. (Trestman ¶¶ 2-3.) On January 13, 2020, Luck sent McMahon a text message stating: "We've been able to bring in Tre McBride and Antonio Callaway, both talented WRs with 3-4 yrs of NFL experience." (McMahon Decl. ¶ 20, Ex. H.)

On January 16, 2020, Pollack learned that Luck had signed Callaway to the XFL's Tampa Bay Vipers. Upon learning that Callaway had been signed, Pollack emailed XFL senior executive, Basil DeVito ("DeVito"), about the signing and asked if McMahon was aware and how this decision was made given that Callaway was then suspended from the NFL for violation of the NFL's substance abuse policy. (Pollack Decl. ¶ 10; DeVito Decl. ¶ 5.)

Based on his own internet research, DeVito became even more concerned in light of media reports he found regarding Callaway's problematic background extending back to his college football career at the University of Florida. (DeVito Decl. ¶ 6.) DeVito then emailed Luck and Doug Whaley ("Whaley"), copying Pollack, stating as follows:

> I am not certain if this is accurate, but I am hearing internally from social media that we are bringing Callaway into the league and allowing him to 'try out' for a specific team. This is confusing to me, and in light of both his background, and the fact that he is currently serving an NFL suspension - I wonder how this makes sense in terms of the positioning and perception of our League. It concerns me, does it concern you?
>
> Additionally, I am unsure how to answer the questions from our partners in regard to 'placement'/ tryout of a player for a specific team - based on our previous statements as to 'process' for player deployment - do we have a specific statement ready that I can use to explain this anomaly?

Not sure why we really need this type of player in our league, and why we feel Tampa - if in fact that is the team --- needs to have this player specifically.

I would appreciate any information and rationale you can provide - so that I am properly promoting the XFL Brand and our positioning as to player character, acquisition, and deployment. I am speaking to both networks over the course of the next 2 days.

Below is what I found on line - which is old, but not out-dated.  I really don't know how to defend this. . . .

*from November:*

*Callaway was suspended for the first four games of this season for violating the NFL's substance abuse policy. He tested positive for marijuana at the 2018 NFL scouting combine, and was cited for possession of marijuana while driving with a suspended license last August. Police also found bullets and a gun part while searching his vehicle. The possession charge was dropped at a hearing on Jan. 25, and Callaway pleaded guilty to operating without a valid license and speeding. But the receiver's troubles began far before that.*

*While at Florida, Callaway was suspended for the entire 2017 season for allegedly using stolen credit card information to fund bookstore accounts. He was also cited for misdemeanor marijuana possession and possession of drug equipment during a traffic stop by Gainesville police in May 2017.*

(Pollack Decl. ¶ 11, Ex. E; DeVito Decl. ¶ 6, Ex. A.)  Whaley then responded to DeVito,

copying Luck and Pollack, and stated:

I'm with Oliver and we wanted to get back to you with the following points that we hope address your concerns: (1) He passed the background check; (2) Ian did an advanced media search; (2) *[sic]* Oliver has talked to VKM [Mr. McMahon] about the need to add more WRs to our league; and (3) *[sic]* We have a waiver system in place which is the mechanism used for him to end up on Tampa.

(Pollack Decl. ¶ 12 Ex. F; DeVito Decl. ¶ 7, Ex. B.)  Unbeknownst to DeVito and Pollack at the

time, this response was deceptive in at least two respects.  First, the advanced media search that

had previously been sent to Luck revealed many of the same off-the-field problems noted in

DeVito's email, none of which were brought to McMahon's attention before Callaway was

signed.    Second,  the  suggestion  that  McMahon  had  approved  Callaway's  signing

notwithstanding his problematic history because of a need to add more wide receivers to the league was false, as Luck never advised McMahon of Callaway's problematic history prior to signing him.  (Pollack Decl. ¶ 13; DeVito Decl. ¶ 8.)

On January 16, 2020, Luck sent McMahon another text message that stated:  "Vince— we have upgraded our overall receiving corp with a couple of very good players: Tre McBride (LA) and Antonio Callaway (TB).  Both have significant pro experience and are already with their respective teams."  (McMahon Decl. ¶ 20, Ex. M.)  Despite telling McMahon on two separate occasions that Callaway was signed to play in the XFL, unbeknownst to McMahon at the time, Luck deliberately misled McMahon by concealing specific information that was brought to Luck's attention that clearly disqualified Callaway under the XFL's player conduct policy.  To begin with, Callaway—like Bryant who McMahon said could not play in the XFL— had been suspended for violation of the NFL substance abuse policy.  Furthermore, public reports that were cited in the advanced media audit conducted on Callaway noted that Callaway had been suspended from the football team at the University of Florida in 2015 related to an allegation of sexual assault—the same allegation for which McMahon told Luck that Player A could not play in the XFL.  Additional public reports brought to Luck's attention by other XFL executives further noted that (i) Callaway was cited for possession of marijuana while driving with a suspended license; (ii) police found bullets and a gun part while searching Callaway's car; (iii) Callaway was suspended from the University of Florida football team for a second time in 2017 for allegedly using stolen credit card information to fund bookstore accounts; and (iv) Callaway was cited for misdemeanor marijuana possession and possession of drug equipment during a traffic stop by police in 2017.  Luck was made aware of all of the above information by

the time of his January 16, 2020 text message to McMahon, but he concealed such information from McMahon and did not disclose any issues with Callaway.  (*Id.* ¶ 21.)

Indeed, in response to requests for admission, Luck has admitted that "when [Luck] advised McMahon that [Luck] had hired Antonio Callaway," Luck (i) "did not advise McMahon of Callaway's history of drug and other legal problems," (ii) "did not advise McMahon that Callaway was accused of sexually assaulting a female student while Callaway was a student at the University of Florida," and (iii) "did not advise McMahon that "Callaway was suspended by the NFL for violating the NFL's substance abuse policy."  (Ex. 1, RFAs 24-26, 28-30.)

### D.    Luck Files False and Misleading Declarations Regarding Callaway's Hiring

Luck has submitted two declarations that contain materially false and misleading statements regarding his hiring of Antonio Callaway.  (ECF No. 59; ECF No. 116.)

***First***, Luck falsely declares that that "the signing of Callaway did not violate XFL policy or McMahon's directives."  (ECF No. 59 ¶ 12; ECF No. 116 ¶ 12.)  Luck's hiring of Callaway violated the XFL's policy and McMahon's directives not to hire players with bad reputations because of questionable or problematic backgrounds.  (McMahon Decl. ¶ 30; Pollack Decl. ¶ 9.)

***Second***, Luck falsely declares that the XFL policy, "also approved by McMahon, was to reject an athlete from a pool of players who could be drafted only if: (a) he had a felony conviction or a conviction for dealing drugs; (b) he had multiple convictions for misdemeanors that established a pattern or habit; or (c) a credible allegation of sexual assault or domestic violence had been made against him."  (ECF No. 59 ¶ 12; ECF No. 116 ¶ 12.)  McMahon never approved such a policy for the XFL.  Indeed, Luck knew full well that the XFL's policy was that McMahon's approval was required before hiring any players with bad reputations due to questionable or problematic behavior.  (McMahon Decl. ¶ 30; Pollack Decl. ¶ 6.)

*Third*, Luck falsely declares that, based on the supposed policy that he claims existed, "Callaway did not fit into any of those categories and was not disqualified under XFL policies that were in place at the time he was signed to play in the XFL." (ECF No. 59 ¶ 13; ECF No. 116 ¶ 13.) Luck knew that Callaway was disqualified under the XFL's policy because he asked McMahon's permission to hire several players who did not meet those criteria, but had questionable or problematic backgrounds similar to Callaway, and McMahon consistently told Luck that they could not play in the XFL. (McMahon Decl. ¶¶ 11-17; Pollack Decl. ¶¶ 6-14; Ex 1, RFAs 6-18.)

*Fourth*, Luck misleadingly states: "McMahon had expressed concern about the poor quality of XFL receivers and *instructed me* to bring in additional receivers to play for the XFL. The signing of Callaway, which I informed McMahon about on January 13, 2020, did just that." (ECF No. 59 ¶ 14 (emphasis in original); ECF No. 116 ¶ 14 (emphasis in original).) Luck was the one who initially raised the concern about improving the quality of the wide receivers, and the suggestion that McMahon approved Callaway's signing notwithstanding his problematic background because of a need to add more receivers is false because Luck never advised McMahon of Callaway's problematic history prior to signing him. (McMahon Decl. ¶¶ 19-21; Pollack Decl. ¶ 13; DeVito Decl. ¶ 8.) Indeed, Luck has now admitted that, contrary to the suggestion in his prior declarations, that he never informed McMahon of Callaway's history of drug problems and sexual assault allegations when he advised McMahon that he had hired Callaway. (Ex. 1, RFAs 28-30.)

## II.   Luck Disregards McMahon's Directives by Failing to Terminate Antonio Callaway

On or about January 17, 2020, McMahon first learned of Antonio Callaway's problematic background when he was shown a media report on Callaway's signing that noted Callaway's

history of off-the-field problems.  After learning of Callaway's history, McMahon directed Luck to immediately terminate Callaway from the XFL.  (McMahon Decl. ¶ 22; Pollack Decl. ¶ 16.)

On or about January 28, 2020, McMahon was surprised to hear that Antonio Callaway was still in the XFL.  (McMahon Decl. ¶ 23.)  On January 28, 2020, Pollack emailed Luck stating: "[Y]ou should know that, with no prompting from me or Basil [DeVito], VKM [McMahon] asked about Antonio Calloway.  You may hear from him on this.  [He] sounded surprised he's in the league."  (Pollack Decl. ¶ 16, Ex. G.)  Upon learning that Luck apparently had not terminated Callaway as McMahon had directed, McMahon sent Luck a text message asking Luck to call him.  When McMahon spoke to Luck, he reiterated his direction to terminate Callaway immediately.  (McMahon Decl. ¶ 23.)

Luck has filed two declarations with the Court that acknowledge that McMahon instructed him to terminate Callaway from the XFL and tacitly admit that Luck knew that he had to carry out McMahon's instruction, but both declarations rely on misrepresentations to falsely suggest that he carried out McMahon's directive.

*First*, Luck's first declaration stated that "[w]hen McMahon told me, during the week of January 26, 2020, that he wanted Callaway terminated, I promptly followed his instruction.  He never played a single down in the XFL."  (ECF No. 59, Luck Decl. ¶ 14.)  Luck's statement was deliberately misleading because, among other things, it falsely suggested that Callaway never played a single down in the XFL because Luck complied McMahon's directive to terminate him immediately.  Luck failed to disclose that the reason Callaway never played a single down in the XFL was because Callaway was injured in practice when Luck failed to comply with McMahon's directive.

***Second***, after Defendants pointed out the deception in Luck's initial declaration, Luck filed another declaration with a different story.  Luck's second declaration again admits that "McMahon told me to terminate Callaway as an XFL employee" but resorts to making new misrepresentations to again falsely suggest that he carried out McMahon's directive:

> On the morning of January 29, 2020, I spoke to [Callaway's head coach, Marc] Trestman, and informed him of McMahon's directive to terminate Callaway.  As soon as I received confirmation from [XFL director of player personnel, Eric] Galko, later that morning that Callaway's agent received the news of Callaway's termination, I called Trestman to proceed with terminating Callaway.  Because the team and Callaway had already begun practice, Trestman requested that he be allowed to inform Callaway after the practice regarding his termination. Consequently, Callaway participated in team practice that morning where he hurt his knee and was placed on the Injured Reserve list.

(ECF No. 116, Luck Decl. ¶ 14.)  Luck's statements are false because Trestman did not receive a call from Luck after practice began, Trestman did not request that he be allowed to inform Callaway after practice regarding his termination, and Callaway did not participate in team practice that morning as a result of Trestman's request that he be allowed to practice.  (Trestman Decl. ¶ 10.)  Rather, Trestman spoke to Luck before practice on January 29, 2020.  During that conversation, Luck told Trestman that McMahon had decided that Callaway should not play in the league and that Callaway's contract was going to be terminated.  Trestman then asked Luck whether Callaway should be removed from their team immediately because he was scheduled to practice that morning.  Luck told Trestman that Callaway should continue to practice with the team that day and that he would get back to Trestman with details on when and how Callaway would be terminated.  Trestman followed Luck's direction.  Callaway therefore participated in practice on January 29, 2020 because Luck, the XFL Commissioner, told him that Callaway

should continue to practice until the details of his termination could be worked out.  (*Id.* ¶¶ 5-6, 10.) [2]

On January 29, 2020, Callaway suffered a serious leg injury in practice and therefore no longer could be terminated without financial consequences.  (Trestman Decl. ¶ 7; Pollack Decl. ¶ 17.)  After Callaway was injured, the Tampa Bay Vipers staff immediately called the XFL league office to notify them.  (Trestman Decl. ¶ 7.)

On January 29, 2020 at 6:37 p.m., Luck sent McMahon a text message stating that "we are in the process of removing Callaway from TB.  Everything should be finalized by end of week."  (McMahon Decl. ¶ 24, Ex. L.)  Once again, Luck's communication to McMahon was deliberately deceptive because it concealed that Luck again had not immediately terminated Callaway as McMahon had directed and instead allowed Callaway to practice that day during which he sustained a serious knee injury.  Because Callaway was injured in practice, Luck knew full well that he no longer could be terminated without financial consequences.  Therefore, Luck's statement to McMahon that "we are in the process of removing Callaway from TB" sent six hours after Callaway was injured in practice was knowingly and deliberately false.  (*Id.*)

Luck's failure to follow the XFL's policy and McMahon's directives by first hiring Antonio Callaway and then failing to terminate immediately terminate Callaway had financial consequences for Alpha.  Alpha was required to honor Callaway's contract and pay a total of $158,950.63 to Callaway under that contract, including payment of a $125,000 signing bonus

---

[2] Even if Luck's version of events were true, Luck still violated McMahon's directive. Luck admits that he decided not to terminate Callaway until after Callaway's agent was informed of the decision because he claims it is "standard practice in professional sports to inform a player's agent prior to releasing him" and because he wanted to "mitigate negative press for the XFL."  (Luck Decl. ¶ 14.)  Luck should not have allowed Callaway's termination to be delayed when McMahon had instructed Luck to terminate Callaway immediately.

that was not provided to other wide receivers.  (Wagner Decl. ¶ 7.)  Alpha also was required pay $29,226.09 in worker's compensation expenses after Callaway suffered his knee injury in practice.  (Falls Decl. ¶ 6.)  Accordingly, Alpha has incurred a total of $188,176.72 in costs and expenses relating to Callaway as a result of Luck's actions.[3]

## III.    Luck Violates the XFL Technology Policies

Luck violated the XFL's technology policies that he promulgated and was responsible for enforcing by repeatedly using company technology for matters unrelated to the XFL's business.

Both the XFL Employee Handbook & Code of Conduct, which includes a letter from Luck himself, and the XFL Technology Acceptable Use Policy provided:

> All XFL Technology is the property of the XFL.  ***Use of such XFL Technology is to be used for XFL related business only; users must not store or transmit any non-business-related files, including but not limited to personal data*** such as documents, spreadsheets, reports, presentations, images, videos or music files, databases and application source code.

(ECF No. 107-1 at 15 (emphasis added); ECF No. 107-2 at 1 (emphasis added); Ex. 1, RFAs 38-39, 40.)  XFL Technology included company-issued iPhones that were used to make phone calls, send text messages, and store and transmit emails and documents.  (*Id.*)

Luck was issued an iPhone by Alpha solely for use on XFL-related business.  In filings with this Court, Luck has admitted using his Alpha-issued iPhone "regularly and routinely, both

---

[3] Luck has argued that he was not properly terminated for cause under the Employment Contract because he was not provided with notice and an opportunity to cure his violations. Among other reasons, Luck's argument fails with respect to his failure to follow the XFL's policy and McMahon's directives regarding Callaway.  First, McMahon provided Luck with prior notice not to sign players who had similar questionable or problematic backgrounds.  Luck therefore knew to cure that violation but instead resorted to deceiving McMahon about Callaway in order to continue violating the XFL's policy and McMahon's directives.  Second, because Callaway was injured in practice after Luck failed to immediately terminate him in accordance with McMahon's directives, Alpha was obligated to honor Callaway's contract and make payments for Callaway's worker's compensation claim.  As a result, Luck's violations of the XFL's policy and McMahon's directives could not be cured.

for personal and work-related purposes" in "violation of XFL policy."  (ECF No. 101 at 2; ECF No. 106 at 4.)  In responses to requests for admissions, Luck specifically admitted that he (i) "used [the] iPhone to send emails concerning matters unrelated to the XFL's business," (ii) "used [the] iPhone for both business and personal purposes," (iii) "used [the] iPhone to transmit files containing documents concerning matters unrelated to the XFL's business," (iv) "used [the] iPhone to perform work for other persons or entities while [he was] employed by Alpha," (v) "used [the] iPhone to send emails concerning work for other persons or entities while [he] was employed by Alpha," and (vi) "used [the] iPhone to transmit files containing documents concerning work for other persons or entities while [he] was employed by Alpha."  (Ex. 1, RFAs 47-52.)  Luck has further admitted that he "does not have any documents in his possession, custody, or control by which he notified Vince McMahon that [Luck] was using the iPhone issued to him by Alpha for non-XFL business purposes."  (Ex. 2, RFP 28.)

On April 9, 2020, Alpha directed Luck to return the iPhone to Alpha in its termination letter.  (ECF No. 94-2.)  Despite this directive, Luck admitted that he continued to use Alpha's iPhone "in the ordinary course, including to receive text messages and telephone calls" even after he was terminated for cause in violation of XFL policy.  (ECF No. 114-2.)

Luck also has attempted to conceal the full nature and extent of his violations of the XFL's technology policies in several ways.

*First,* Luck delayed returning the iPhone to Alpha for nearly a month.  Before returning the iPhone to Alpha, Luck's counsel asked Alpha's bankruptcy counsel whether Alpha had a policy that prohibited personal use of the iPhone issued by Alpha.  Although Luck should have been aware of the policy that he established and was responsible for enforcing, Alpha's counsel

provided Luck's counsel with the portions of the policy that made clear that personal use of Alpha's iPhone was prohibited.  (ECF No. 107-3.)

Luck's counsel also delayed return of Alpha's iPhone based on vague and unsubstantiated claims that Luck had a privacy interest in the contents of the phone based on case law he had read.  (*Id.*)  However, Luck's counsel provided no such case law, and the applicable XFL technology policies make clear that Alpha could monitor the use of XFL devices and that employees had *no expectation of privacy* in the use of those devices:

> All XFL Technology and the information, materials, and data produced, stored, transmitted or processed thereon are the property of the XFL**.  Employees should have no expectation of privacy in their use of these systems.**
>
> All users of XFL Technology which include all employees, temporary staffing, freelancers and consultants are subject to auditing and monitoring by authorized personnel.  Monitoring of such services include, but is not limited to usage of computer, network and systems, Internet usage, email, instant messaging, voice and video services, data access, storage and transmission, databases, applications and 3rd party cloud service providers.

(ECF No. 107-1 at 15 (emphasis added); ECF No. 107-2 at 3 (emphasis added).)  As a result of the delay in returning Alpha's iPhone, Alpha did not receive it until May 7, 2020—nearly a month after the directive to return it in the termination letter.  (ECF No. 107-3.)

*Second*, contents of Alpha's iPhone establishing Luck's violation of the XFL's technology policy were deleted after Luck received the termination letter and before he returned the phone to Alpha.  As set forth in detail in Alpha's forthcoming memorandum regarding discovery issues, from the inception of this case, Luck's counsel has repeatedly falsely represented to Defendants' counsel, Alpha's bankruptcy counsel, and the Court that Luck had preserved all of the phone's contents and that none of the data on the phone had been deleted after receiving the termination letter from Alpha.  Contrary to those representations, Luck has now admitted that data was in fact deleted from the iPhone after receiving Alpha's termination

letter at a time when he was under an obligation to preserve it and that the deleted data included text messages sent in violation of the XFL's technology policy.  (ECF No. 114-2.)

*Third*, Luck has further attempted to conceal the nature and extent of his violations of the XFL technology policy by refusing to provide the passcode to the iPhone as required by Connecticut law, which requires employees to provide the passwords of employer-issued devices to their employers, and seeking to prevent Alpha from accessing and reviewing the contents of its own property.  *See* Conn. Gen. Stat. § 31-40x(c)(1).  The full nature and extent of Luck's violations of the XFL technology policies will not be known until Alpha's expert is able to conduct a full forensic examination and analysis of the phone.

## IV.  Luck Fails to Devote Substantially All of His Business Time To His XFL Duties After March 13, 2020

### A.  Luck Abandons His XFL Duties After March 13, 2020

In March 2020, the COVID pandemic forced the cancellation of the XFL's schedule midway through its inaugural season.  (McMahon Decl. ¶ 26; Pollack Decl. ¶ 18).  As a result, the league's major sources of revenue—ticket sales and merchandise sales at games—were eliminated.  Despite this sudden loss of revenue, Alpha remained responsible to pay the continued costs of operation, including player and coach salaries, stadium lease costs, and the substantial amounts still payable to Luck to guide the league through the pandemic which was a threat to the very existence of the XFL.  (McMahon Decl. ¶ 26.)

McMahon expected Luck to demonstrate leadership during this unprecedented crisis.  But on March 13, 2020, Luck left town without ever advising McMahon that he was doing so and never returned in the ensuing weeks while the other XFL executives and McMahon worked to deal with the crisis.  (McMahon ¶ 27; Pollack Decl. ¶ 18.)  Among other things, other XFL executives focused on monitoring the pandemic and understanding its implications, winding

down the XFL's shortened season in an orderly manner, preparing budgets and forecasts looking forward, and determining if there was a viable path forward for the league.  (Pollack Decl. ¶ 18.) Luck, however, never called McMahon after leaving town and was largely disengaged from the ongoing activities of the XFL.  (McMahon ¶ 27; Pollack Decl. ¶ 18.)

For example, after March 13, 2020, Luck did not attend the weekly XFL business operations meetings among senior XFL executives that were held by Zoom on March 16, 2020, March 23, 2020, and March 30, 2020.  (Pollack Decl. ¶ 19, Exs. H-J.)  After March 13, 2020, Luck also did not attend the meetings of the XFL's COVID-19 Working Group that were held by videoconference in the evening of March 15, 2020, on March 18, 2020, on March 20, 2020, on March 27, 2020, and on April 1, 2020.  (Pollack Decl. ¶ 20, Exs. K-O.)  Luck has admitted that he only "participated in some, but not all, of the XFL's COVID-19 Working Group meetings." (Ex. 1, RFAs 57-62.)  Instead, during this time period, Luck conducted business with other entities rather than performing his duties to the XFL.

Luck's actions during the crisis caused by the COVID pandemic did not meet McMahon's expectations for a Commissioner and CEO of a sports league charged with devoting substantially all of his business time to the performance of his duties to the XFL at a time of existential threat.  (McMahon Decl. ¶ 28.)  Despite Luck's failure to perform his obligations from March 14, 2020 through his termination on April 9, 2020, Luck received a total of $384,615.38 in salary payments during this time period.  (Wagner Decl. ¶ 6.)

### B.    Luck Files False and Misleading Declarations Regarding His Activities After March 13, 2020

Luck does not claim in his declarations that he devoted substantially all of his business time to the performance of his duties to the XFL after March 13, 2020.  Rather, he admits that he

returned home in Indiana and performed only minimal work.  (ECF No. 59 ¶ 17, n.1; ECF No. 116 ¶ 17, n.1.)

Luck claims in his declarations to have been "part of the XFL's COVID-19 working group to monitor the impact of COVID-19 on the XFL's operations."  (ECF No. 59 ¶ 17; ECF No. 116 ¶ 17).  As noted above, however, Luck now admits that he failed to attend all of the meetings of the XFL's COVID-19 working group.  (Ex. 1, RFAs 57-62; *see also* Pollack Decl. ¶ 20.)  The fact that Luck was a part of that group but failed to attend its meetings actually proves that he did not perform his duties to the XFL.

Luck also claims in his declaration to have "worked with other XFL staff members to finalize the 2021 football budget."  (Luck Decl. ¶ 17.)  Luck only had nominal substantive involvement in the preparation of that budget.  After Chirag Mithani ("Mithani") of XFL's Finance Department sent the football operations budget to Thomas Van Wazer and Pollack on March 26, 2020, Pollack asked Luck if his budget included "any staffing cuts."  (Pollack Decl. ¶ 21, Ex. P.)  Demonstrating that he did not even know the budget, Luck responded that it did reflect staffing cuts.  (*Id.* Ex. Q.)  But Mithani quickly corrected Luck stating that "there was no assumption for any reductions to staffing."  (*Id.* Ex. R.)

Luck also claims in his declaration that he "prepared a video at McMahon's request thanking XFL fans for their support."  (Luck Decl. ¶ 17.)  Luck's statement overstates what he did.  In reality, McMahon initially asked Luck himself to create a thank you video from the XFL Commissioner to its fans, but Luck told Pollack that he did not want to do it.  Instead, a compilation video was created by the league's production department that included Luck among many others for which Luck was merely asked merely to create a 15-20 second selfie video with his phone.  (Pollack Decl. ¶ 22.)

## LEGAL STANDARD

This Court set forth the legal standard governing applications for prejudgment remedies in its prior decision in this case. "Rule 64 of the Federal Rules of Civil Procedure provides that, in a federal court, 'every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment.'" *Luck v. McMahon*, No. 3:20-CV-516, 2020 WL 3481680, at *4 (D. Conn. June 26, 2020) (Bolden, J.) (quoting Fed. R. Civ. P. 64). "[A] prejudgment remedy is intended to secure the satisfaction of a judgment should the plaintiff prevail." *Id.* (internal quotation marks and citation omitted). "Connecticut law provides for an expansive prejudgment remedy, and it is under Connecticut law that [a plaintiff's prejudgment remedy] application must be reviewed." *Id.* (internal quotation marks and citation omitted). "Under Connecticut law, a prejudgment remedy shall be granted if a court 'finds that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought.'" *Id.* (quoting Conn. Gen. Stat. § 52-278d(a)).

> Proof of probable cause as a condition of obtaining a prejudgment remedy is not as demanding as proof by a fair preponderance of the evidence. The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false. Under this standard, the trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits.

*Id.* (internal quotation marks and citation omitted). "[T]he statute requires a trial court make a probable cause determination as to both the validity of the plaintiff's claim and the amount of the remedy sought." *Id.* (internal quotation marks and citations omitted).

## ARGUMENT

**I.      Alpha Has Established Probable Cause That A Judgment Will Enter In Its Favor
On Its Breach of Contract Claim Against Luck.**

Alpha has established probable cause that a judgment will enter in its favor on its breach
of contract counterclaim against Luck.   "The elements of a breach of contract claim are the
formation of an agreement, performance by one party, breach of the agreement by the other
party, and damages."   *CCT Commc'ns, Inc. v. Zone Telecom, Inc.*, 327 Conn. 114, 133 (2017)
(internal quotation marks and citation omitted).  Each of those elements is satisfied here.

### A.      Formation of an Agreement

The   Employment   Contract   between   Alpha   and   Luck   was   a   legally   binding   and
enforceable agreement between the parties.  (ECF No. 94-1.)

### B.      Performance by Alpha

Alpha performed its obligations under the Employment Contract, including payment of
the compensation to which Luck was entitled under the contract.

### C.      Breach of the Agreement by Luck

Luck breached the Employment Contract by (i) failing to devote substantially all of his
business time to the performance of his XFL duties and (ii) failing to follow applicable XFL
policies and directives.  (ECF No. 94-1 at 1, 3.)

*First*, Luck violated the XFL's player personnel policy and McMahon's directives by
hiring Antonio Callaway.  Luck knew that the XFL's policy was not to hire any players who had
bad reputations due to questionable or problematic backgrounds as evidenced by his own public
statements and McMahon's prior rejection of his attempts to hire players with such backgrounds.
Luck also knew that Antonio Callaway should not have been hired under the XFL's policy
because he knew that Callaway had a lengthy history of misconduct that included drug problems

and sexual assault allegations and that McMahon had instructed Luck not to hire other players with similar allegations of misconduct.  Luck nevertheless decided to hire Callaway in violation of the XFL's policy, concealed Callaway's lengthy history of misconduct from McMahon, and misled other XFL executives who questioned Luck's decisions.  Luck's actions in hiring Callaway therefore violated an "applicable XFL polic[y] or directive" in breach of the Employment Contract.  (ECF No. 94-1 at 3.)

*Second*, Luck disregarded McMahon's directives by failing to immediately terminate Antonio Callaway.  When McMahon was shown a news report on Callaway's signing with the XFL that noted Callaway's history of misconduct, McMahon instructed Luck to immediately terminate Callaway.  More than a week later, McMahon was surprised to learn that Callaway was still in the league and directed Luck to immediately terminate Callaway again.  Luck disregarded McMahon's directives and instead told Callaway's head coach to allow Callaway to continue to practice.  As a result, Callaway suffered a severe knee injury in practice that prevented his contract from being terminated and obligated Alpha to make payments to Callaway under his contract and for his medical expenses.  Indeed, Luck has admitted in declarations filed with this Court that McMahon directed him to terminate Callaway and that he did not terminate Callaway before his was injured in practice.  (ECF No. 59 ¶ 14; ECF No. 116 ¶ 14.)  Luck's admitted failure to terminate Callaway violated an XFL "directive" in breach of the Employment Contract.  (ECF No. 94-1 at 3.); *Reilly v. Polychrome Corp.*, 872 F. Supp. 1265, 1268–69 (S.D.N.Y. 1995), *aff'd*, 71 F.3d 405 (2d Cir. 1995) (holding that a senior executive's refusal to obey his superior's instructions was a material breach of his employment contract that justified his termination).

***Third***, Luck repeatedly violated the very XFL technology policy that he signed, promulgated, and was responsible for enforcing as the Commissioner and CEO. The XFL technology policy provided that "XFL Technology is to be used for XFL related business only" and that "users must not store or transmit any non-business-related files, including but not limited to personal data." (ECF No. 107-1 at 15; ECF No. 107-2 at 1.) Luck has admitted using his Alpha-issued iPhone "regularly and routinely, both for personal and work-related purposes" in "violation of XFL policy." (ECF No. 101 at 2; ECF No. 106 at 4.) Luck also has admitted using his Alpha-issued iPhone to conduct other business for other entities that was unrelated to the XFL in violation of the technology policy. (Ex. 1, RFAs 47-52.) Luck has further admitted that he continued to use his Alpha-issued iPhone even after he was terminated for cause in violation of the policy. (ECF No. 114-2.) In addition, Luck has attempted to conceal the full nature and extent of his violations by delaying return of the phone to Alpha contrary to the directive in his termination letter, allowing contents from the phone that show his violations to be deleted, and refusing to disclose the passcode to the phone to Alpha in contravention of Connecticut law. Accordingly, Luck's conduct violated an "applicable XFL polic[y] or directive" in breach of the Employment Contract. (ECF No. 94-1 at 3.)

***Fourth***, Luck failed to devote substantially all of his time to the performance of his duties to the XFL after March 13, 2020. After March 13, 2020, Luck effectively abandoned his responsibilities as XFL Commissioner and CEO in the face of the existential threat to the league posed by the COVID-19 pandemic. Luck has admitted leaving the XFL's headquarters and returning home to Indiana, and he did not even make a single phone call to McMahon during this critical time period. Luck largely disengaged from the XFL's operations, missed important meetings held by videoconference to determine whether there was a viable path forward for the

league, and instead prioritized other business activities for other entities over his obligations to the XFL.  Accordingly, Luck's actions after March 13, 2020 breached his obligations under his Employment Contract to "devote substantially all of his business time to the performance of his duties to the XFL" and not to allow other activities to "interfere with the performance of his duties to the XFL."  (ECF No. 94-1 at 1.)

### D.    Damages

Luck's breaches of the Employment Contract caused monetary damages to Alpha. Luck's failure to follow XFL policies by hiring Antonio Callaway and his disregard of McMahon's directive to immediately terminate Callaway caused Alpha to suffer a total of $188,176.72 in damages, including $158,950.63 in payments made to Callaway under his contract and $29,226.09 in worker's compensation payments to Callaway after he suffered his knee injury in practice.  In addition, Alpha suffered $384,615.38 in damages for the salary payments made to Luck under the Employment Contract after March 13, 2020 when he effectively abandoned the performance of his duties as the Commissioner and CEO of the XFL.

## II.    Alpha Has Established Probable Cause That A Judgment Will Enter In Its Favor On Its Breach of Fiduciary Duty Claim Against Luck.

Alpha has established probable cause that a judgment will enter in its favor on its breach of fiduciary duty counterclaim against Luck.  The elements of a breach of fiduciary duty claim under Connecticut law are:  "[1] [t]hat a fiduciary relationship existed which gave rise to a duty of loyalty, an obligation to act in the best interests of the plaintiff, and an obligation to act in good faith in any matter relating to the plaintiff; [2] [t]hat the defendant advanced his or her own interests to the detriment of the plaintiff; [3] [t]hat the plaintiff sustained damages; [and] [4] [t]hat the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty." *Roe v. Hotchkiss Sch.*, 385 F. Supp. 3d 165, 172 (D. Conn. 2019) (Bolden J.) (internal

quotation marks, citations, and alterations omitted); *see also Beard Research, Inc. v. Kates*, 8 A.3d 573, 601-02 (Del. Ch. 2010) ("A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."). Each of those elements is satisfied here.

### A.       Fiduciary Relationship

Luck had a fiduciary relationship with Alpha because he was the Commissioner and CEO of the XFL and its most senior employee and agent. *See Saye v. Old Hill Partners, Inc.*, 478 F. Supp. 2d 248, 271 (D. Conn. 2007) ("officers and directors have a fiduciary relationship to the corporation and its investors") (internal quotation marks and citation omitted); *Wall Sys., Inc. v. Pompa*, 324 Conn. 718, 722-32 (2017) (holding that a company employee owed a fiduciary duty to his employer); *Iacurci v. Sax*, 313 Conn. 786, 800 (2014) (noting that an "agent" is an example of a "*per se* fiduciary"); *Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009) ("officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty").

Luck therefore owed fiduciary duties to Alpha, including a duty of loyalty, a duty of good faith and honesty, a duty to disclose material facts, a duty of obedience, and a duty of care. *See Saye*, 478 F. Supp. 2d at 271 (stating that a fiduciary duty encompasses "a duty of care, and a duty of loyalty"); *Tourmaline Partners, LLC v. Monaco*, No. 3:13-CV-00108, 2016 WL 614361, at *7 (D. Conn. Feb. 16, 2016) (Bolden, J.) (stating that an "agent is obligated to exercise the utmost good faith, loyalty, and honesty toward his principal or employer") (internal quotation marks and citation omitted); *Fenn v. Yale Univ.*, 283 F. Supp. 2d 615, 632 (D. Conn. 2003) (stating that the duties of a fiduciary include "the duties to make full disclosures and maintain an undivided loyalty"); *Essex Ins. Co. v. William Kramer & Assocs., LLC*, 331 Conn. 493, 523 (2019) (noting "an agent's duty to use reasonable efforts to give his principal information that is

relevant to the affairs entrusted to him"); *Nw. Mut. Life Ins. Co. v. Tone*, 125 Conn. 183, 195 (1939) (noting that an agent owes "fiduciary duties of loyalty and obedience to the wishes of the principal"); *Kane v. Neveleff*, No. CV000439308S, 2002 WL 2031355, at *2 (Conn. Super. Ct. July 11, 2002) (stating that an agent owes "undivided fiduciary obligations" of "loyalty, reasonable care, disclosure, obedience to lawful instruction, confidentiality and accountability") (internal quotation marks and citation omitted).

### B.      Breach of Fiduciary Duty

Luck repeatedly breached his fiduciary duties to Alpha and advanced his own interests at Alpha's expense.  *See Wall Sys.*, 324 Conn. at 731 (stating "the general fiduciary principle requires that the agent subordinate the agent's interests to those of the principal and place the principal's interests first as to matters connected with the agency relationship" and requires that "the agent must act solely for the benefit of the principal in matters connected with the agency") (internal quotation marks and citations omitted).

*First*, Luck's hiring of Antonio Callaway in knowing violation of the XFL's policy, deliberate failure to disclose the material facts about his hiring to McMahon, and failure to terminate Callaway immediately in accordance with McMahon's directives breached his fiduciary duties of care and loyalty, duty to disclose material facts, and duty to obey directives. *See Saye*, 478 F. Supp. 2d at 271 (stating that evidence that employee "intentionally ignored" company's policies could provide basis for breach of fiduciary duty claim); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 780-82 (Del. Ch. 2016) (stating that officer's failure to disclose material information or provision of inaccurate information in connection with hiring of an employee could provide basis for breach of fiduciary duty claim); Restatement (Third) of Agency § 8.11 cmt. d (2006) ("When an agent deliberately withholds material information from

the principal to further the agent's own purposes, the agent's conduct is inconsistent with the agent's fiduciary duty to act loyally for the principal's benefit.").

*Second,* Luck's improper use of Alpha's iPhone for personal reasons and to conduct business for other entities unrelated to the XFL in violation of the company's technology policy, his continued use of Alpha's iPhone after his termination in violation of the directive in his termination letter, and his concealment of the full nature and extent of his violations by refusing to disclose the passcode to the phone and attempting to block Alpha's access to its contents breached his fiduciary duty of loyalty, which includes the obligation not to use company property for his own benefit. *See Hosp. Media Network, LLC v. Henderson*, 187 Conn. App. 40, 43 (2019) (stating that plaintiff alleged breach of fiduciary duty claim where defendant "used the plaintiff's computers and infrastructure to conduct business for those other digital media companies without the plaintiff's permission or knowledge"); *Risdon-AMS (USA), Inc. v. Levine*, No. CV030181029S, 2004 WL 614518, at *3 (Conn. Super. Ct. Feb. 10, 2004) (holding that employee breached duty of loyalty where "[employee] also made some use of his [company] telephone credit card, his [company] computer, and his work time to further his personal business venture.  While this misuse of time did not have a significant cost impact on [the company], and [the employee] did do [company] work at home and on his home computer, his misuse of [company] property nonetheless illustrates that [employee] did not maintain the high standards and complete loyalty expected of fiduciaries of large corporations"); Restatement (Third) of Agency § 8.05(1) (2006) (stating the duty of loyalty includes the obligation "not to use property of the principal for the agent's own purposes or those of a third party").

*Third*, Luck's abandonment of his XFL duties after March 13, 2020 in the face of the existential threat to the league presented by the COVID-19 pandemic and his transaction of

business for other entities instead of performing his duties to the XFL also constituted a breach of his fiduciary duties of care and loyalty. *See Hosp. Media Network,* 187 Conn. App. at 43 (stating that plaintiff alleged a breach of fiduciary duty claim where "the defendant played golf on a social basis and otherwise took time off during regular business hours without the plaintiff's permission"); *Columbia Dental, P.C. v. Dombkowski*, No. HHDCV155038642, 2017 WL 1015438, at *5 (Conn. Super. Ct. Feb. 14, 2017) (holding that "the use of employer time to pursue the defendant's business pursuits is clearly a violation of that duty" of "good faith, loyalty, and honesty toward his employer").

### C.   Causation and Damages

As discussed above, Alpha suffered monetary damages as a result of Luck's breaches of his fiduciary duties, including the payments made under Antonio Callaway's contract and his worker's compensation payments.  In addition, Alpha is entitled to the equitable remedies of disgorgement and forfeiture of compensation to Luck for his breach of the fiduciary duty of loyalty even in the absence of specific evidence of damages. *See Wall Sys.,* 324 Conn. at 733 ("[A]n employee who breaches the fiduciary duty of loyalty may be required to disgorge any profit or benefit he received as a result of his disloyal activities, regardless of whether the employer has suffered a corresponding loss.  Additionally, an employer may seek forfeiture of its employee's compensation.") (internal quotation marks and citations omitted); *Risdon-AMS*, 2004 WL 614518, at *3 (stating that "[t]here is authority in Connecticut and elsewhere for the forfeiture of the entire salary of an employee who has proven radically unfaithful to his trust or willfully breached his fiduciary duty of loyalty, even without proof of specific damages to the employer" and awarding employee's "salary and company benefits" as damages).  Forfeiture of compensation is apportioned to the period in which Luck engaged in disloyal conduct. *See Wall*

*Sys.,* 324 Conn. at 734 (providing for apportionment of the forfeiture to the "period of time during which the employee engaged in disloyal activity").  Accordingly, Alpha is at least entitled to disgorgement and forfeiture of Luck's salary payments of $384,615.38 for the period of March 14, 2020 through his termination on April 9, 2020 when Luck failed to perform his XFL duties and instead conducted business for other entities unrelated to the XFL.

III. **Alpha Has Established Probable Cause That A Judgment Will Enter In Its Favor In the Amount of $572,792.10.**

Alpha therefore has established probable cause that a judgment will enter against Luck on its counterclaims for breach of contract and breach of fiduciary duty in the amount of $572,792.10, consisting of the $158,950.63 paid to Antonio Callaway under his contract, the $29,226.09 in worker's compensation payments made to Callaway, and the $384,615.38 in salary payments to Luck for the period from March 14, 2020 to April 9, 2020.

## CONCLUSION

For the reasons set forth above, the Court should grant Alpha's application for a prejudgment remedy against Luck in the amount of $572,792.10.

DEFENDANT AND COUNTERCLAIMANT
ALPHA ENTERTAINMENT LLC

By: */s/ Jerry S. McDevitt*_____
Jerry S. McDevitt *(pro hac vice)*
Curtis B. Krasik *(pro hac vice)*
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone: (412) 355-6500
Fax: (412) 355-6501
Email: jerry.mcdevitt@klgates.com
Email: curtis.krasik@klgates.com

Jeffrey P. Mueller (ct27870)
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
Phone: (860) 275-0100
Fax: (860) 275-0343
Email: jmueller@daypitney.com

## **CERTIFICATE OF SERVICE**

I hereby certify that, on January 7, 2021, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Jeffrey P. Mueller*_____
Jeffrey P. Mueller (ct27870)

-34-