## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

OLIVER LUCK,                 :     CASE NO. 3:20-cv-00516-VAB

          Plaintiff,      :

                     :

v.                        :

VINCENT K. MCMAHON and ALPHA   :
ENTERTAINMENT LLC,         :

          Defendants.    :

### DECLARATION OF CINDY WAGNER

I, Cindy Wagner, hereby declare:

      1.     I am over the age of eighteen (18) years and believe in the obligations of an oath.

      2.     I have personal knowledge of the matters set forth herein and am competent to testify thereto.

      3.     I was hired by Alpha Entertainment, LLC in February 2019 as the Senior Director, People & Culture of the XFL.  In that capacity, I managed various human resources operations, including player onboarding, liaising with payroll regarding player compensation and employment, and processing terminations.

      4.     In connection with my duties and responsibilities as the Senior Director, People & Culture of the XFL, I was involved in various issues relating to Antonio Callaway.

      5.     Attached as Exhibit A is a true and correct copy of the XFL Player Contract of Antonio Callaway.

      6.     Attached as Exhibit B is a true and correct copy of the advanced media audit of Antonio Callaway dated January 11, 2020.

7.    Attached as Exhibit C is a true a correct copy of a report generated from the XFL's ADP payroll system reflecting all payments to Antonio Callaway.  Callaway received a total of $158,950.63 in gross pay from the XFL.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this _6_ day of January, 2021

Cindy Wagner

-2-

# EXHIBIT A

**XFL STANDARD PLAYER CONTRACT**

This XFL Standard Player Contract (the "**Contract**") is by and between Alpha Entertainment LLC, dba XFL (the "**XFL**" or "**League**"), and Antonio Callaway (the "**Player**").

The XFL wishes to employ Player, and Player wishes to serve, as a skilled football player for one or more of the XFL Teams, subject to the terms and conditions of the Contract Documents (as defined below in Section 1).

All capitalized terms not otherwise defined in this Contract shall be defined as set forth in Section 1 of the XFL Standard Terms and Conditions attached hereto as Exhibit 1.

Intending to be legally bound, the XFL and Player agree as follows:

1. **Term**

This Contract, which consists of (a) the XFL Standard Player Contract, (b) the XFL Standard Terms and Conditions attached hereto as Exhibit 1, (c) the Arbitration Agreement, Class Action Waiver, and Acknowledgement Form attached hereto as Exhibit 2, (d) the Pre-Existing Sponsorship and Licensing Contracts attached hereto as Exhibit 3, (e) the Original Intellectual Property attached hereto as Exhibit 4, and (f) the Sports Player Coverage Agreement attached hereto as Exhibit 5 (together, the "**Contract Documents**"), shall cover the portion of the 2020 League Year commencing on December 4, 2019 or the date the Contract Documents are signed by the Player, whichever is later (the "**Effective Date**") and end on May 31, 2020, unless terminated pursuant to the terms of the Contract Documents (hereinafter defined the "**Term**").

2. **Player Services**

(a) During the Term, and subject to the provisions of the XFL Standard Terms and Conditions, the Player shall:

(i) attend and play in all games in which the XFL Team to which the Player has been assigned by the League is scheduled to play (including all exhibition or Pre-Season, Regular Season, and Post-Season games);

(ii) attend and participate in all Pre-Season mini-camps and training camps;

(iii) attend and participate in all practices, training and conditioning sessions (including, but not limited to, weight training sessions), and meetings scheduled by Player's Team;

(iv) attend and play, if selected, in the League's all-star event(s);

(v) attend and play, if invited, in any other tours, exhibitions or activities scheduled by the League;

(vi) attend and participate in all mandatory programs scheduled by the League (e.g., player orientations, life skill programs, player development programs, career development seminars, and any and all other training and development activities as may be set by the League);

(vii) at reasonable times, serve, solely when authorized by the League and/or a Team, as a spokesperson for and promoter of such Team, the XFL, its media and business partners (including, without limitation sponsors and advertisers) and the sport of football and devote reasonable time and efforts to the performance of such duties, including participation in Commercial Appearances and/or Promotional Appearances (as defined in Section 1(c) and 1(m) of Exhibit 1);

(viii) at reasonable times, commit a portion of his time to the creation, capturing, producing or distributing of original content for the XFL and/or its media partners (e.g., electronic imaging for video games) as directed by the League and/or a Team;

(ix) solely when authorized by the League and/or a Team, cooperate with all reasonable requests of the news media, media partners and any XFL media platforms, and upon the request of the XFL and/or a Team, consent to and be available for interviews conducted at reasonable times;

(x) cooperate with all reasonable requests of the XFL and/or Team for content creation and capture, which shall include (A) using Player social channels for cross-promotion of XFL and/or Team initiatives, (B) participating in fan-oriented, in-person activities (e.g., community appearances, pre- and post-game fan, partner and media meet-and-greet opportunities, autograph signings), (C) maintaining an active social media presence through each of the primary social media channels (e.g., Facebook, Twitter, Instagram, Snapchat, YouTube), and (D) working cooperatively with the Team and the League on posting social presence and tracking of performance on social media following Player receipt of training on best practices to satisfy this obligation;

(xi) upon the request of the XFL and/or Team, consent to the wearing of audio-visual devices, wearable technology sensors incorporating the ability to track player movement, biometrics and vital signs of any kind (now known or hereafter devised) during League games and/or practices (and the broadcast of such recording) in each case to the fullest extent permitted under applicable law, with the understanding that further disclosures by the XFL and/or the Player's voluntary consent may in certain cases be required; and

(xii) comply with the terms and conditions of Section 8 (Promotion of Team and League) of the XFL Standard Terms and Conditions.

(b) The Player shall perform his duties and responsibilities at such place or places and such times as may be designated by the XFL (either directly or through a Team). The Player recognizes, understands and agrees that (i) at any time during the Term, his services may be assigned to any Team in the XFL, and (ii) he may be required to relocate in order to satisfactorily fulfill his duties under the Contract Documents. The Player further recognizes, understands and agrees that the League, in the League's sole discretion, may assign the Player to the League's Team 9.

3. **Compensation and Benefits**

(a) As full compensation for all time worked during the period commencing on January 14, 2020 and ending on May 31, 2020, (except as set forth in Section 8(c) of Exhibit 1), the Player shall receive a weekly salary in the gross amount of Two Thousand Six Hundred Thirty-One Dollars and 60/100 ($2,631.60), prorated for the

actual period of employment, for an anticipated aggregate gross amount of Fifty Thousand Dollars and 00/100 ($50,000.00)  (the "**Base Salary**").

(b)   All amounts set forth in subsection 3(a) above and subsection 3(e) below shall be payable less applicable withholding and taxes and in accordance with League policies and all applicable laws.

(c)   For participating in the League's and/or Team's pre-season mini-camps and training camps, the Player will be provided with housing and meals while attending the camps as set forth by the League.

(d)   Player will be provided with housing and meals in connection with Player's travel to fulfill his obligations hereunder including football games outside of Team's home city and shall be provided necessary traveling expenses in accordance with the XFL's travel and entertainment policy to his residence if the Contract Documents are terminated by the League or Team.   Notwithstanding the prior sentence, Player shall be responsible for any traveling expenses to his residence following the end of his Team's respective Season.

(e)   Subject to Player's compliance with all XFL rules, policies, and procedures, Player shall be eligible to receive certain performance bonuses, postseason bonuses, and other bonuses, as determined by the XFL from time to time in its sole discretion.  As of the Effective Date, the Player is eligible for the following bonuses:

(i)   _Signing Bonus_.   Player shall receive a one-time signing bonus of One Hundred Twenty-Five Thousand and 00/100 Dollars ($1250,000.00) upon execution of the Contract and successful passing of a physical examination;

(ii)   _Game Activation Bonus_.  Player shall receive Five Thousand and 00/100 Dollars ($5,000.00) for each game during the Regular Season in which the Player is on the final Active Roster for such game; and

(iii)   _Victory Bonus_.  Player shall receive Two Thousand and 00/100 Dollars ($2,000.00) for each game during the Regular Season in which the Player is on the final Active Roster for such game and the Player's then-assigned Team wins such game.

(f)   Player shall be entitled to participate in the XFL's health insurance plan, subject to and in accordance with the terms and conditions of such plan and the provisions set forth in the XFL Benefits Information Guide, as such terms, conditions and provisions may be amended from time to time in the XFL's sole discretion.

(g)   Neither the Player nor any person or entity acting for or in concert with the Player shall request, accept or otherwise receive any payments or other benefits or things of value from the XFL or any Team for the services hereunder except those provided in the Contract Documents, otherwise as may be required by law, or as otherwise described in any written program or policy that the XFL may in its sole discretion adopt or maintain. The XFL may suspend the Player or terminate the Contract Documents (or any portion thereof) and declare the Contract Documents null and void if the XFL in its sole discretion determines that the Player has violated the provisions of this subsection 3(g).

(h)   Player understands and agrees that the Player's position is exempt and not subject to federal or state minimum wage or overtime requirements,, that the above amounts will constitute the full compensation he will be paid under the Contract Documents (except for any additional compensation as expressly set forth in Section 8(c) of Exhibit 1), and that no additional monies or royalties will be paid for the rights granted by Player to the XFL,

_Tier 1_

including, but not limited to, the licensing, merchandising, and promotional rights set forth in Sections 5, 6 and 8 of the XFL Standard Terms and Conditions attached hereto as Exhibit 1.

4. **Termination**

(a)  The Contract Documents (or any portion thereof) may be terminated by the XFL at any time without further obligation on the part of either the XFL or Player, upon written notice to the Player, if the Player: (i) in the sole judgment of a physician designated by the XFL or Team, fails to pass his pre-season physical; (ii) in the sole opinion of League's management, does not satisfactorily pass a background check; (iii) in the sole opinion of League management, fails, refuses or neglects to keep himself in first class physical condition or to obey the League and Team training rules; (iv) in the sole opinion of the League's management, fails to exhibit sufficient skill or competitive ability to qualify or to continue to qualify as a Player for the Team and/or in the XFL; (v) in the sole opinion of League's management, violates the XFL's Substance Abuse and Drug Testing Policy or otherwise uses drugs, alcohol or any other substance in a manner that interferes with or affects the performance of the services required hereunder; (vi) in the sole opinion of League's management, fails, refuses, neglects or is unable, for any reason, to render his services hereunder or in any other manner materially breaches the Contract Documents, including but not limited to all required on- and off-field activities or services during the League Year); (vii) in the sole opinion of League's management, fails, refuses or neglects to conform his personal conduct to standards of good citizenship, good moral character, good sportsmanship or acts in a manner that is not in the best interests of the League and/or Team; (viii) in the sole opinion of League's management, fails to follow any League and/or Team rules, policies or procedures that have been communicated (in written form, verbally or otherwise) to the Player; or (ix) if for any other reason, is not assigned or reassigned to a Team.

(b) Prior to terminating the Contract Documents, the League may, but shall not be required to, offer the Player to the other XFL Teams by assignment, pursuant to the League's player allocation and waiver system to be determined in the League's sole discretion. In the event that the Player is assigned pursuant to those procedures, the Contract Documents shall remain in full force and effect.

(c) If the XFL terminates the Contract Documents, all obligations of the XFL to pay compensation or benefits hereunder shall cease on the date of termination, except that the Player shall be entitled to receive (provided that he has not already received), as full compensation for his services hereunder, a prorated portion of his Base Salary through the date of termination, and any bonus payments, promotional fees or expense reimbursements (if applicable) that the Player had earned prior to the date of termination that were not paid to the Player as of the date of termination.

5. [Intentionally Omitted]

6. **Termination for NFL Opportunity**

If at any time after the conclusion of the 2020 championship game through May 31, 2020, Player receives a written offer to sign a contract with a team in the National Football League ("**NFL**"), the Contract Documents shall be terminated and the Player shall be free to play competitive football for the NFL team, provided Player executes a release in a form provided by the XFL relieving the XFL of all future obligations to the Player, including without limitation all compensation and benefits provided by the XFL.  Should Player be released from the NFL team within the initial six (6) months of signing, Player shall notify the XFL in writing immediately following such

release, in which event the XFL shall have the exclusive right to sign Player to a new XFL Standard Player Contract. Such exclusive right shall continue for thirty (30) days from the date of notification of such release.  If no agreement is reached by the end of such thirty (30) day period, then the XFL shall have a right to match the objective financial terms (i.e., terms that are objectively and readily reducible to an exact dollar amount) of any third party offer for Player's football services.  Player shall notify the XFL in writing immediately following receipt of any such third party offer.  Player shall obtain any such third party offer in a writing signed by the third party, and Player shall deliver such written and signed third party offer to the XFL.  Such matching right shall be exercised by the XFL, if at all, not later than five (5) business days after XFL's receipt of the written and signed third party offer.  For the avoidance of doubt, nothing herein shall restrict Player from signing a contract with the NFL between May 31, 2020 and the time at which Player enters into a new commitment with the XFL, if applicable.

7. **Injury**

Subject to Sections 4 and 5 of the XFL Standard Terms and Conditions attached hereto as <u>Exhibit 1</u>, if Player is unable to render his services hereunder due to an injury that (i) in the sole judgment of a physician designated by the XFL or the Player's assigned Team, resulted directly from his rendering playing services for an XFL Team or the League and does not constitute an aggravation or re-injury of a prior injury suffered by the Player while not performing playing services for the XFL, (ii) occurred while the Player was on an Active Roster of an XFL Team, and (iii) Player provided notice of such injury as required by Section 4(c) of the XFL Standard Terms and Conditions, then the Player shall continue to receive his Base Salary until <u>the sooner of (A) Player passing a physical; and (B)</u> the conclusion of the League Year in which his injury occurred.   The Player shall not be eligible for any bonus payments after the date of injury (except any bonus payments that the Player earned prior to the date of the injury that were not paid to the Player as of the date of injury); provided however, if Player's assigned Team as of the date of injury wins the championship of the League, Player shall be eligible to receive a championship bonus, in an amount to be determined by the League in its sole discretion.

8. **Workers' Compensation**

(a)  Unless prohibited by applicable law, any compensation paid to Player under the Contract Documents for a period during which Player is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, permanent partial disability or any variation thereof, will be deemed an advance payment of workers' compensation benefits due to Player, and the League shall be entitled to be reimbursed the amount of such payment out of any award of workers' compensation to which the Player is, or may become entitled.  This reimbursement shall apply with regard to workers' compensation claims arising out of any injury, whether acute or cumulative, that is the principal basis for the Player's workers' compensation award.

(b)  Player shall execute a copy of the Sports Player Coverage Agreement set forth on <u>Exhibit 5</u> for purposes of workers' compensation, as Player may be assigned, designated or relocated to perform his duties and responsibilities for the XFL in the State of Washington.  In such event, Player agrees that any workers' compensation dispute or cause of action arising out of Player's employment with the XFL shall be subject to the workers' compensation laws of Texas exclusively.

(c)  Player agrees that any workers' compensation dispute or cause of action arising out of Player's employment with the XFL shall be subject to the workers' compensation laws of Connecticut exclusively and not

the workers compensation laws of any other state and shall be brought solely with the Workers Compensation Board (or such other government tribunal or entity that has such jurisdiction) of the State of Connecticut.  .

9. **Off-Season Activities**

As more fully set forth in Section 8 of the XFL Standard Terms and Conditions attached hereto as <u>Exhibit 1</u>, Player shall be required to participate in any and all Off-Season promotional games, events, activities or XFL Content Creation ("**Promotional Activities**") if he is invited by the XFL to participate.  Player shall be paid weekly during any week Player performs services during the Off-Season, in accordance with federal, state and local law.

10. **Exclusivity**

The Player represents and agrees that he has extraordinary and unique skill and ability as a professional football player, that the services to be rendered by him hereunder cannot be replaced, that the loss of such services cannot be estimated with certainty and cannot fairly or adequately be compensated for in money damages, and that any breach by the Player of the Contract Documents will cause irreparable injury to the League and the Team.  Therefore, it is agreed that except as set forth herein, if in the event it is alleged by the League or the Team that the Player is playing, attempting or threatening to play, or negotiating for the purpose of playing football, during the Term of the Contract Documents, for any other person, business, team, company, corporation, or organization, then the League, the Team and their respective assignees (in addition to any other remedies that may be available to them judicially or by way of arbitration) shall have the right to obtain from any court or arbitrator having jurisdiction such equitable relief as may be appropriate, including a decree enjoining the Player from any such further breach of the Contract Documents, and enjoining the Player from playing football for any other person, business, team, company, corporation, or organization or performing other services for any football league or team during the Term. The Player agrees that the Team may at any time assign such right to the League for the enforcement thereof.  In any suit, action, or arbitration proceeding brought to obtain such equitable relief, the Player does hereby waive his right, if any, to trial by jury, and does hereby waive his right, if any, to interpose any counterclaim or set-off for any cause whatever, and acknowledges that any counterclaim or set-off may only be pursued in arbitration as provided in Section 11.

11. **Governing Law**

The Contract Documents are made under and shall be governed by the laws of the State of Connecticut. The XFL and the Player agree that, to the fullest extent permitted under the Federal Arbitration Act and other applicable law, the law of Connecticut shall govern any disputes between them, regardless of whether Connecticut choice of law principles would dictate that the law of another state would apply; *provided however* that, (a) if the Player primarily resides and works in California, then either the XFL or the Player may choose to instead have any controversy between them that arises in California governed by California law, and (b) if the Player is Washington-based, then the Player shall be entitled to all applicable protections and benefits of Washington House Bill 1450, signed May 8, 2019, as ultimately codified in Title 49 RCW, in any dispute arising out of Section 10 of the XFL Standard Terms and Conditions. The XFL and Player agree that the the XFL's headquarters is located in Connecticut and is a reasonable basis for this choice of law provision. In the event there is any claim, dispute, or other matter in question arising out of or relating in any way to the Contract Documents or the performance thereunder, it shall be submitted for binding arbitration in accordance with the terms of the Arbitration Agreement, Class Action Waiver and Acknowledgement Form set forth in <u>Exhibit 2</u> attached to this Contract.   This provision of this Section

11 shall be specifically enforceable; and each of the XFL and Player consents to jurisdiction of an arbitrator in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief; *provided however* that, if the Player primarily resides and works in California, then either the XFL or the Player may choose to instead have any claim between them that arises in California adjudicated by an arbitrator in Los Angeles, California. This Section 11 shall survive termination or expiration of the Contract Documents.

12. **Severability**

Any provision hereof found to be void or unenforceable will not affect the validity or enforceability of any other provisions of the Contract Documents.

13. **Execution in Counterparts**

The Contract Documents may be executed by electronic means (e.g. PDF or DocuSign) and in counterparts, which, when signed by both the League and the Player, shall constitute a binding agreement.  Electronic counterparts shall have the same effect as an original in all respects.

14. **Other**

Player acknowledges that before executing the Contract Documents, he read the Contract Documents and was given the opportunity to seek advice from his counsel and/or his representative.

*SIGNATURES ON THE FOLLOWING PAGE*

*Tier 1*

IN WITNESS WHEREOF, the undersigned have executed this Contract as of the last date set forth below.

**Alpha Entertainment LLC**

_(Player Signature)_

Player Signature

Antonio Callaway

Player Name

981 NW 202 St

Miami, FL 33167

Player Address

7866135490

Telephone Number

1/16/2020

Date

Texas

Print the State of Execution

_(League Signature)_

League Signature

Oliver Luck          Commissioner

League Executive Name & Title

XFL
1266 East Main St.
Stamford, CT 06902

(203)

1/23/2020

Date

Connecticut

Print the State of Execution

_Tier 1_

**EXHIBIT 1**

**XFL STANDARD TERMS AND CONDITIONS**

1. Definitions

In this Contract:

(a) "**Active Roster**" means, at a specified time, those Players assigned to a Team who are placed on such Team's active roster list.

(b) "**Affiliate**" means any entity or person that is an investor or shareholder in the XFL.

(c) "**Commercial Appearance**" means an appearance by a Player on behalf of a sponsor, partners, vendors or licensee of the XFL.

(d) "**Content Creation**" means content captured by the XFL and/or a Team media team or League licensees, sponsors or partners, including, but not limited to interviews, workouts, community relations appearances, partner events and/or Player profile features.

(e) "**Injured Reserve List**" means, at a specified time, those Players assigned to a Team who are placed on such Team's injured reserve list.

(f) "**League Year**" means the annual period beginning June 1 of one calendar year through and including May 31 of the following calendar year, and will be designated by the year in which the Season is played (e.g., 2020 League Year shall mean the period June 1, 2019 through May 31, 2020).

(g) "**New Intellectual Property**" means the intellectual property identified in Section 5(g) of the XFL Standard Terms and Conditions.

(h) "**Off-Season**" means the period beginning on the day following the XFL championship game and ending on the first day of training camp for the following Season. For purposes of the 2020 League Year, "Off-Season" shall also include the period of time beginning on the date of execution of the Contract Documents through the first day of the League mini-camps in December 2019.

(i) "**Original Intellectual Property**" means the intellectual property identified in Section 5(f) of the XFL Standard Terms and Conditions.

(j) "**Practice Squad**" means, at a specified time, those Players assigned to a Team's practice squad.

(k) "**Pre-Season**" means the period beginning on the first day of training camp and ending on the day prior to the first day of an XFL Season.

(l) "**Post-Season**" means the period beginning on the first day following the Regular Season and ending the day after the League championship game.

(m) "**Promotional Appearance**" means an appearance by the Player that is intended to promote: (a) a Team or multiple Teams, the XFL, XFL players, Affiliates, XFL and/or Team corporate, community and other civic partners, and/or the sport of football; (b) any XFL Competition or any other game or competition in which a Team or group of XFL players participates; or (c) any telecast or broadcast of such game or competition.

Player Initials

(n) "**Recordings**" means the recordings identified in Section 5(b) of the XFL Standard Terms and Conditions.

(o) "**Regular Season**" or "**XFL Regular Season**" means, with respect to any Season, the period beginning on the first day and ending on the last day of any regularly scheduled (as opposed to Pre-Season or Post-Season) competitions between XFL Teams.

(p) "**Regular Season Roster**" means those Players assigned to a Team who are either on the Team's Active Roster or Injured Reserve List.

(q) "**Season**" or "**XFL Season**" means the period beginning on the first day and ending on the last day of any scheduled competitions between XFL Teams, including the Pre-Season, Regular Season and Post-Season.

(r) "**Team**" means one of the XFL's teams.

(s) "**XFL Competition**" means all XFL games (including Pre-Season, Regular Season and Post-Season games), all-star games, skills competitions, and any tour or exhibition scheduled by the XFL during the Season.

(t) "**XFL Event**" means all XFL Competitions, practices, scrimmages, official Team or League events, press conferences, interviews, and Team, League or Affiliate Promotional Appearances and Commercial Appearances (and events related to such appearances).

(u) "**XFL Substance Abuse and Drug Testing Policy**" means the XFL Substance Abuse and Drug Testing Policy, as may be amended from time to time in the sole discretion of the XFL, and which will be available for review at the XFL League office and at the office of each Team.

2. Player Representations and Warranties

The Player represents, warrants, covenants, and agrees as follows:

(a) that he is not obligated to play football in or for any entity other than the XFL during the Term of the Contract Documents;

(b) that he is free to enter into and perform under the Contract Documents in accordance with their terms and, by doing so, he is not violating (and will not violate) any other agreement to which he is a party or by which he is bound;

(c) that as of the date of his execution of the Contract Documents he is mentally and physically able to perform the services hereunder;

(d) that he has disclosed and submitted all sponsorship and licensing agreements to which he is a party in existence as of the date of his execution of the Contract Documents, and that copies of all such pre-existing agreements (or affidavits executed by the Player or his representative summarizing such pre-existing agreements, including all material terms) to the reasonable satisfaction of the XFL are attached to the Contract Documents as Exhibit 3; and

(e) that the participation and activities required by Player in connection with providing football-related services to the League and Team may be dangerous and may involve the risk of serious bodily injury, including without limitation the risk of head injuries.

Player Initials

3. <u>Player Conduct</u>

(a) The Player agrees that he must at all times conform his conduct to the highest standards of good citizenship, good moral character, and good sportsmanship and must not do anything disrespectful to or otherwise detrimental or prejudicial to the best interests of the XFL, its Affilates, his Team, or the sport of football. Without limiting the foregoing, the Player also agrees that he will (i) at all times comply with all terms and provisions of the Contract Documents, (ii) comply with all policies, rules and regulations promulgated by the League and his Team (whether communicated in writing, verbally or otherwise reasonably communicated to Player), (iii) comply with all applicable federal, state, and local laws, and (iv) be properly attired and present a professional appearance when in public (including, but not limited to, all player appearances, travel days, and travel to and from the stadium).

(b) In addition to any other rights it has under the Contract Documents, the XFL (and/or the Team) may impose discipline on the Player for any act or omission that fails to conform to the requirements set forth in Section 3(a) above. Such discipline may include suspensions and/or the termination of the Contract Documents (or any portion thereof). The findings and decisions of the XFL in this regard are final, binding and unappealable.

(c) Without limiting Section 3(a) and (b) above, the Player specifically acknowledges that if the XFL, in its sole discretion, finds that the Player: (i) has offered, agreed, conspired, aided, been compensated for or attempted to cause any XFL Competition to result or be played otherwise than on its merits; (ii) has failed to disclose to the XFL or a Team official any information that the Player may possess concerning any attempt by any person or entity to give or receive money or anything of value to fix, throw or otherwise affect the outcome, score or any other aspect of any XFL Competition other than on its merits; (iii) has wagered (directly or indirectly), or has offered or attempted to wager, money or anything of value on the outcome, score, or any other aspect of any XFL Competition; (iv) has made statements or engaged in conduct that, in the sole discretion of the XFL, is disrespectful to or otherwise detrimental or prejudical to the best interests of the Team, the XFL, its Affiliates or the sport of football; (v) violates the XFL's Substance Abuse and Drug Testing Policy; or (vi) has entered into or attempted to enter into a contract, understanding, or arrangement of any kind, whether expressed or implied, to share any other compensation received from the XFL, with a player or coach of another XFL Team, or has shared any compensation received from the XFL with a player or coach of another XFL Team, the Player shall, in the sole discretion of the XFL, be subject to suspension, termination of the Contract Documents (or any portion thereof) and/or dismissal and disqualification from any further association with the XFL. The findings and decisions of the XFL in this regard are final, binding and unappealable.

(d) If the Player is suspended for any full workweek(s) while on a Regular Season Roster as set forth in the Contract Documents, the suspension shall , to the fullest extent consistent with salary basis requirements of the Fair Labor Standards Act and applicable state law, be unpaid during such full workweek(s).

4. <u>Physical Condition, Medical Examinations, Injuries</u>

(a) Both (i) before performing any job duties under the Contract Documents and (ii) upon the request of the XFL or Team, during the Season, upon the conclusion of the Season, and/or any other time required by the XFL (provided that such request is job-related and consistent with business necessity), the Player shall submit to a complete medical examination by a physician designated by the XFL or the Team (the

Player Initials

"**Physician**") and shall answer completely and truthfully all questions asked of him with respect to his physical and mental condition.

(b) In addition to any other rights it has under the Contract Documents, if the Physician determines that the Player is not (with or without reasonable accommodation) completely and unqualifiedly fit to perform all essential football-related services required of the Player under the Contract Documents (unless such condition in the sole judgment of the Physician results from an injury sustained by the Player as a direct result of participating in any football practice or game for the Team during the Season while on the Team's Active Roster), the XFL shall have the right, in its sole discretion and to the fullest extent permitted under applicable law, to terminate the Contract Documents or suspend the Player (and any suspension covering a full workweek will be without pay during such workweek) until such time as, in the sole judgment of the Physician, the Player is in sufficiently good physical condition to play skilled football.

(c) The Player (or his authorized representative) agrees to notify his Team's coach, trainer or physician of any illness, injury or condition contracted or suffered by him that may impair or otherwise affect his ability to play skilled football no later than twenty-four (24) hours after the Player's first awareness of such illness, injury or condition.

(d) Should the Player suffer an injury or illness that may impair or otherwise affect his ability to play skilled football during the Term of the Contract Documents, he shall submit to a medical examination and treatment by a physician designated and/or approved in writing by the XFL or the Team. Such examination and treatment when made at the request of the XFL or the Team shall be paid for by the XFL or the Team, unless such examination and/or treatment is made necessary by some act, omission or conduct of the Player contrary to the terms of the Contract Documents.

(e) Whenever the Player is examined or treated by a physician or other medical personnel at the request of the XFL or Team, the Player consents to and authorizes the release by such physician or other medical personnel to the XFL and Team of his medical records and any other information to the extent such records and information pertain to his ability to play skilled football, and hereby waives any privilege or confidentiality that may otherwise attach to such records and information. The Player agrees to take whatever steps are necessary (including providing a release or waiver to such physician or other medical personnel) to effectuate the release of his medical information.

(f) The Player agrees that he may be subject to discipline, including, but not limited to, suspensions, or termination of the Contract Documents (or any portion thereof), if, without reasonable justification, he misses any required medical appointment or fails to follow rehabilitation and/or treatment instructions from the Physician or any other physician, trainer or medical personnel designated and/or approved in writing by the XFL or the Team.

(g) If the Player is injured while performing playing services in any XFL Competition or during any Team practice, training or conditioning session and reports that injury to such Team in accordance with Section 4(c) above, the XFL shall pay the Player's reasonable hospitalization and medical expenses necessarily incurred as a direct result of the injury, provided that the hospital and physicians are selected by the XFL (or, if selected by the Player, approved in advance in writing by the XFL). Notwithstanding the foregoing, the Player may seek a second medical opinion consistent with the requirements of the League's Second Medical Opinion Policy (as may be updated from time to time in League's sole discretion). The XFL's obligation under this subsection shall be reduced by any applicable workers' compensation insurance

Player Initials

(which, to the extent permitted by law, shall be deemed as having been assigned to the XFL) and any insurance paid or payable to the Player by reason of such injury.

(h) If, following the commencement of the XFL Season, the Player, in the sole judgment of the Physician, is injured as a direct result of rendering playing services for an XFL Team and rendered unfit to play skilled football, and provided that: (i) the Player was on the Active Roster of an XFL Team at the time of the injury; (i)  notice of such injury was given by the Player as required by Section 4(c) above; and (iii) in the sole judgment of the Physician the injury does not constitute an aggravation or re-injury of a prior injury suffered by the Player while not performing playing services for the XFL during the Season, the Player shall continue to receive his Base Salary, for so long as such unfitness continues, but in no event beyond the conclusion of the League Year in which his injury occurred. For purposes of the immediately preceding sentence, a Player whose disability resulted from an injury occurring while assigned to his Team's Active Roster will be paid his Base Salary as if he remained on the Team's Active Roster. The Player shall not be eligible for any bonus payments after the date the Player is determined unfit to render football-related services (except any bonus payments that the Player had earned prior to the date that he was determined unfit that were not paid by that date) for so long as such unfitness continues.

(i) The Player hereby agrees to cooperate with the XFL regarding all insurance matters, including, but not limited to, required medical evaluations and workers' compensation claim requirements.

(j) The Player hereby agrees to comply with the XFL Substance Abuse and Drug Testing Policy and explicitly agrees to all of the provisions thereof (including, but not limited to, those relating to testing).

5. Intellectual Property

(a) The Player irrevocably grants to the XFL and its Affiliates, representatives, licensees, media partners, sponsors, business partners, successors and assigns the exclusive right to, or to authorize others to, broadcast, cable cast, internet cast, or otherwise distribute, display, perform, or transmit the games, practices, appearances, Promotional Activities, or other activities, including the Player's appearance and performance therein, live or substantially simultaneously with their occurrence via any manner or medium now or hereafter known or devised, including but not limited to radio, television (broadcast, cable, satellite, or otherwise, including without limitation free, cable, pay cable, closed circuit, and pay-per-view television), the internet, digital media, and computer networks.

(b) The Player irrevocably grants to the XFL and its Affiliates, representatives, licensees, media partners, sponsors, business partners, successors and assigns the exclusive right to, or to authorize others to, film, video tape, audio tape, photograph, or otherwise record, by any media now known or hereafter created, the Player, his appearance and performance during and in connection with the games, practices, appearances, XFL Events, Promotional Activities, or at any other time. The recordings identified in this section will herein be referred to individually as a "**Recording**" and collectively as the "**Recordings**."

(c) The Player irrevocably grants to the XFL and its Affiliates, representatives, licensees, media partners, sponsors, business partners, successors and assigns the exclusive right to, or to authorize others to, reproduce, manufacture, sell, distribute, make derivative works from, create compilations and collections containing, display, perform, transmit, cast, publish, republish, copy, print, reprint, or otherwise use or exploit the Recordings any number of times in whole or in part, with the right to edit or modify, in any manner or medium now or hereafter known or developed including but not limited to audio and video

Player Initials

tapes and discs, DVDs, radio, television (broadcast, cable or otherwise, including without limitation free, cable, pay cable, closed circuit, and pay-per-view television), the internet, digital medium, and computer networks, and in advertising and promotion of such uses and for purposes of trade. The XFL shall not be obligated to use any Recording.

(d) The XFL shall solely and exclusively own in perpetuity all worldwide right, title, and interest in and to the Recordings. Included in such ownership rights of the Recordings by the XFL shall be the right of production, manufacture, recordation, reproduction, performance, and exhibition in any manner and by any art, device, or method, now known or hereafter devised, including without limitation radio, television, on the internet, on audio or video tapes or discs, DVDs and the right to add to, subtract from, change, arrange, revise, adapt, rearrange, repackage, create derivative works of, create compilations and collections containing, translate into any and all languages, change the sequence, change the characters and the descriptions thereof, change the title of the same, record and photograph the same with or without sound (including spoken words, dialogue and music synchronously recorded), to vend, copy and publish the same, and to do any other activity consistent with ownership of copyright, trademark, patent, right of publicity, or other proprietary rights, as the XFL may desire in its sole discretion.

(e) The Player hereby agrees that he is an employee of the XFL and that all works, including the Recordings and any of the Player's contributions to the Recordings, that are the subject matter of the Contract Documents are prepared within the scope of his employment and as such are works made for hire under 17 U.S.C. § 101(1), or that the Player's works, including the Recordings and any of the Player's contributions to the Recordings, that are the subject matter of the Contract Documents are specially ordered or commissioned by the XFL and as such are works made for hire under 17 U.S.C. § 101 (2).

(f) The Player acknowledges and agrees that, as of the date of the Contract Documents, all service marks, trademarks and any and all other distinctive and identifying features under which the Player claims any rights, including but not limited to the Player's legal name, nickname, likeness, personality, voice, signature, trade dress, gimmicks, gestures, routines, themes, tattoos or other discernible physical attributes which are owned by the Player or in which the Player has any rights anywhere in the world (collectively, the "**Original Intellectual Property**") have been identified and described in Exhibit 4 of the Contract Documents. Except as specifically set forth in Exhibit 4, the Player represents and warrants that as of the date of execution of the Contract Documents, the Player owns solely and exclusively any and all rights to the Original Intellectual Property and shall indemnify the XFL, its Teams, Affiliates, employees, representatives, licensees, media partners, sponsors, business partners, successors and assigns against any and all liabilities, costs and expenses resulting from a claim of ownership of the Original Intellectual Property by any person or entity and/or the breach of any of the representations or warranties made by the Player under the Contract Documents. The Player hereby assigns to the XFL, for the Term of the Contract Documents, all worldwide right, title and interest in and to the Player's Original Intellectual Property, including, but not limited to, the right to license, reproduce, manipulate, promote, expose, exploit and otherwise use the Original Intellectual Property anywhere in the world in any commercial manner, media, art form, method or device now known or hereinafter discovered. Upon the termination or expiration of the Contract Documents, all rights in and to the Original Intellectual Property shall revert to the Player, except that the XFL, its Teams, Affiliates, licensees, sublicensees, media partners, sponsors, business partners, successors and assigns may continue to exploit any and all materials, products, goods, merchandise and other items incorporating the Original Intellectual Property made before such termination or expiration, until all such materials, products, goods and merchandise are sold off, and shall

Player Initials

have fair use rights with respect to the use of Player's Original Intellectual Property in connection with the XFL's exploitation of the Recordings and other copyrighted works depicting Player or any of his performances.

(g) Except the Original Intellectual Property described in Section 5(f) above, the XFL shall solely and exclusively own in perpetuity all worldwide right, title and interest in and to any products, results, proceeds, service marks, trademarks, copyrights, patent rights, right of publicity, character rights, Player attributes and identifying features (including, but not limited to, nicknames, character names, likeness, personality, persona, sayings, expressions, quotes, character, caricature, voice, signature, statistics, performance, props, trade dress, gestures, routines, themes, incidents, dialogue, actions, gags, accessories, domain names and inventions), data collected from all wearable technology sensors and other items of tangible or intangible property (whether written, composed, submitted, added, improvised, created and/or used by or associated with the Player) that arise out of or are associated with the performance of services under the Contract Documents (collectively the "**New Intellectual Property**").

(h) The Player hereby sells, assigns, and transfers over to the XFL, its successors, and assigns, all right, title, and interest in and to the Recordings, the New Intellectual Property, and any other results, products, and proceeds arising out of the Player's services rendered hereunder, throughout the universe, in perpetuity, for all uses and purposes whether now known or hereafter created, without reservation, conditions or limitations, and no right of any kind, nature or description is reserved by the Player. The XFL's acquisition hereunder shall also include a waiver by the Player of any and all rights generally known as the "moral rights of authors" in any Recordings or other works. All of the rights granted or agreed to be granted hereunder shall vest in the XFL immediately and shall survive termination or expiration of the Contract Documents, and the XFL shall have the exclusive right, even to the exclusion of the Player, to assign, license, sublicense, reproduce, promote, expose, exploit and otherwise use the rights in any commercial manner, whether now known or hereinafter discovered, regardless of whether such rights are exercised during or after the Term of the Contract Documents, and notwithstanding the expiration or termination of the Contract Documents for any reason. The Player acknowledges receipt of the following statutory limitations on provisions requiring the Player to assign inventions to the XFL if the Player is employed by the XFL in California or Washington.

(1) California – In accordance with Section 2872 of the California Labor Code, the Contract Documents do not apply to inventions that the Player developed entirely on his own time without using the League's or Team's equipment, supplies, facilities, or trade secret information except for those inventions that either (a) relate at the time of conception or reduction to practice of the invention to the League's or Team's business, or actual or demonstrably anticipated research or development of the League or Team; or (b) result from any work performed by the Player for the League or Team.

(2) Washington – In accordance with RCW 49.44.140, the Contract Documents do not apply to an invention for which no equipment, supplies, facility, or trade secret information of the League or Team was used and which was developed entirely on the Player's own time, unless (a) the invention relates (i) directly to the business of the League or Team, (ii) to the League's or Team's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the Player for the League or Team.

Player Initials

DocuSign Envelope ID: 19DA3604-EBC5-48B5-9916-B929EA9E15D6

(i) The Player agrees to cooperate fully and in good faith with the XFL for the purpose of securing and preserving the XFL's rights in and to the Recordings, Original Intellectual Property and New Intellectual Property. The Player acknowledges and hereby grants to the XFL the exclusive worldwide right during the Term of the Contract Documents (with respect to Original Intellectual Property) and in perpetuity (with respect to New Intellectual Property and Recordings) to apply for and obtain trademarks, service marks, copyrights and other registrations throughout the world in the XFL's name and/or on behalf of the XFL's designee. At the XFL's expense and request, the XFL and Player shall take such steps, as the XFL deems necessary, for any registration, litigation or other proceeding, to protect the XFL's rights in the Original Intellectual Property, New Intellectual Property, Recordings, or any derivatives or uses thereof.

(j) The Player and the XFL agree wherever in the Contract Documents the term "Recording" or terms of similar tenor are used, such terms shall be conclusively deemed and construed to include the present and future developments of the sports, motion picture, television, radio, internet, video tape, videodisc, computer, electronics, telephone, and recording industries, including but not limited to motion pictures, video tape, audio tape, television, radio, internet, any and all kinds of electronic and other interactive uses, audio or video discs, CD-ROMs, DVDs, interactive multimedia devices, computer discs, and similar uses, whether now known or unknown or hereafter invented, and their accompanying devices which reproduce visual images and words, music and/or other sounds in synchronization with, in accompaniment of, or supplementary to visual images.

(k) The XFL and its Teams, Affiliates, representatives, licensees, media partners, sponsors, business partners, successors and assigns shall have the right in perpetuity to use and display the Original Intellectual Property and New Intellectual Property and/or other identifying features of the Player for and in connection with the sale, use, advertising, publicity, and exploitation of the Recordings. The exhibition of the Recording by any media, even though a part of or in connection with a commercially sponsored program, shall not be deemed an endorsement of any nature.

(l) The Player expressly releases the XFL from and against any and all claims that the Player has or may have for invasion of privacy or publicity, defamation, trademark, service mark, or trade dress infringement or dilution, unfair competition, copyright infringement, unjust enrichment, quantum meruit, or any other state law or federal right, or any other cause of action arising out of the use of the Recordings, Original Intellectual Property, or New Intellectual Property by the XFL or its Teams, Affiliates, representatives, licensees, media partners, sponsors, business partners, successors and assigns under the Contract Documents.

6. Merchandising

(a) The Player hereby grants exclusively during the Term of the Contract Documents to the XFL the worldwide right to solicit, negotiate, and enter into contracts for and on behalf of the Player for the exploitation of publicity, merchandising, commercial tie-up, publishing, personal appearance, performing in non-football events, and endorsement rights of the Player. The Player hereby grants to the XFL the exclusive worldwide right and license to use, and to license others to use, the Recordings and to use and simulate, and license others to use and simulate, the Original Intellectual Property and New Intellectual Property and/or other identifying features of the Player on or in connection with products or services produced by the XFL or its licensees or in and in connection with any merchandising, licensing programs, publishing endeavors, or commercial activities whatsoever in which the XFL or its licensees may be or become engaged. The Player hereby agrees that the XFL shall have the exclusive right (i) during the Term

Player Initials

of the Contract Documents and thereafter, as provided in Section 5(f) above, to use the Original Intellectual Property and (ii) in perpetuity, to use the New Intellectual Property, in connection with the manufacture, production, reproduction, reissuance, manipulation, reconfiguration, broadcast, rebroadcast, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of any and all materials, goods, merchandise and other items incorporating the Original Intellectual Property or New Intellectual Property. As to all such materials, goods, merchandise or items created, developed, produced and/or distributed during the Term of the Contract Documents using the Original Intellectual Property, subject to Section 5(f) above, the XFL shall have the exclusive right to sell and exploit such materials, goods and merchandise until the sell-off of same. As to all such materials, goods, merchandise or items using the New Intellectual Property, the XFL shall have the exclusive right, in perpetuity, to sell and exploit same forever.

(b) The Player agrees that the grant of rights set forth in Section 6(a) above is exclusive to the XFL, even to the exclusion of the Player, and that such grant is a condition of the XFL's employment of the Player and is necessary for the XFL to operate as a viable football league. The XFL shall own all copyrights and trademarks in any and all such materials, goods, merchandise and items and shall be entitled to obtain copyright, trademark, service mark or other registrations in the XFL's name or on behalf of its designee. The Player agrees to provide all reasonable assistance to the XFL in obtaining such copyright, trademark, service mark or other registrations.

7. Uniforms and Equipment

Except as otherwise set forth by the League, the Player agrees that he will only wear footwear, apparel and equipment (including, without limitation, helmets, jerseys, pants, socks, arm and wristbands, headbands, bandanas, athletic shoes, jackets and pads) supplied by the Team or League for all XFL Events and shall not alter the appearance of such apparel, footwear or equipment, or cover any name, logo, symbol or emblem on such apparel, footwear or equipment. The Player may not wear or display the logo, name, color, marks, design, or other identification of any commercial, promotional, charitable company, product or service at XFL Events other than those contained on the footwear, apparel and equipment supplied by the Team or League, including, but not limited to on his body, in his hair or otherwise.

8. Promotion of Team and League

(a) The Player agrees that in order for the XFL to operate a viable football league, it may be necessary to promote the Player and the XFL in an amount and to an extent that may be considered greater than the promotion of players, teams, and leagues in other sports or sport leagues. The Player agrees that his participation in such heightened promotion of the Player and the XFL and/or Team(s) is a condition of the XFL's employment of the Player and that the necessity of such heightened promotion will be taken into account when considering what is reasonable under the Contract Documents.

(b) The Player agrees to make himself available for Content Creation and Promotional Appearances for the XFL, the Team, their respective partners, sponsors and Affiliates during the Season as reasonably requested by the League or Team in their sole discretion. These Promotional Appearances may include, but shall not be limited to, award shows, public service, community relation or charitable announcements, clinics, autograph signing sessions, meet-and-greet sessions, retail and/or restaurant appearances, or hospitality or promotional events involving or relating to XFL Competitions.  The Promotional Appearances may be in the Player's Team market or another location designated by the League or Team and may be

Player Initials

combined to include multiple appearances in one request. Any such Content Creation and/or Promotional Appearances will be upon reasonable notice to the Player. There shall be no additional compensation for such Content Creation or Promotional Appearances.

(c) The Player agrees to make himself available for Content Creation and up to six (6) Promotional Appearances for the XFL, Player's Team, their respective partners, sponsors and Affiliates during the Off-Season when Player is not earning a weekly salary from the XFL. Any such Off-Season Promotional Appearances will be upon reasonable notice to the Player and will be at times and locations as determined by the League and/or the Team; provided, that should the Player have a bonafide conflict and/or extenuating circumstances that inhibit his ability to participate in such Off-Season Promotional Appearance, the Player shall provide the League and/or Team with information related to such conflict or circumstances and if in the reasonable determination of the League and/or Team the Player has a genuine conflict for the Off-Season Promotional Appearance(s), then the parties will work in good faith to resolve such conflict. The Off-Season Promotional Appearances may be in the Player's Team market or another location designated by the League or Team and may be combined to include multiple Off-Season Promotional Appearances in one request. For each such Off-Season Promotional Appearance requested by the League or Team, the Player shall be paid a gross amount of One Thousand Forty Dollars and 00/100 ($1,040.00), payable less applicable withholding and taxes and in accordance with League policies and applicable laws. The League or Player's Team shall pay for travel to and from the location of each Promotional Appearance subject to the League's travel and entertainment policy, as may be amended from time to time at the League's sole discretion. The League or Player's Team may request Player to attend Off-Season Promotional Appearances above the six (6) allotted above, in which case Player may decide to participate in such additional Off-Season Promotional Appearance(s) at his sole discretion, and the fee for participation shall be the same as stated above in this subsection (c).

(d) The Player hereby authorizes the XFL, the Teams, their respective partners, any of the League's Affiliates, licensees, media partners, sponsors, business partners or assignees to use the Old Intellectual Property and New Intellectual Property and/or other identifying features of the Player, and to use the Recordings and any pictures, images, drawings, and/or sound recordings of the Player, no matter by whom taken, in any manner for publicity, advertising, or promotion of the XFL or any of its Teams, including but not limited to in newspapers, magazines, trading cards, game programs and roster manuals, posters and handbills, television and radio, video games, on the internet, motion pictures and any other publicity and advertising media. The rights in any Recordings, pictures, images, drawings and sound recordings shall belong to the XFL in perpetuity.

(e) During the Term of the Contract Documents the Player will not make public appearances, participate in radio or television programs, write or sponsor digital, newspaper or magazine articles, sponsor commercial products, or engage in any promotional, advertising, sponsorship or related activity for any entity or purpose that would in the sole opinion of the XFL be detrimental to the reputation, integrity or image of the XFL, its Teams, media partners, sponsors, business partners, licensees or Affiliates. The Player may not use any logo, trademark and/or copyright of the XFL for any purpose without the prior written consent of the XFL.

9. <u>Hazardous Activity and Other Sports</u>

The Player and the XFL acknowledge and agree that the Player's participation in other sports or hazardous activities may impair or destroy his ability and skill as a football player. Accordingly, the Player agrees that

Player Initials

DocuSign Envelope ID: 19DA3604-EBC5-48B5-9816-B929EA9E1FD6

he will not, without the written consent of the League and the Team, engage in any sport or activity that may endanger his health and safety (including, but not limited to, motorcycling, auto racing, sky-diving, bungee-jumping, hang-gliding, skateboarding, in-line skating, skiing, snowboarding, boxing, wrestling, soccer, baseball, basketball, field or ice hockey, extreme sports, football (other than pursuant to the Contract Documents) or lacrosse).

10. <u>Unique Skills</u>

The Player represents and agrees that he has extraordinary and unique skill and ability as a football player, that the services to be rendered by him under the Contract Documents cannot be replaced or the loss thereof adequately compensated for in money damages, and that any breach by the Player of the Contract Documents will cause irreparable injury to the XFL and to its Teams and assignees. Therefore, except as otherwise provided in the Contract Documents, if it is alleged by the XFL that: (i) the Player is playing, attempting or threatening to play, or negotiating for the purpose of playing football for any other person, firm or organization (a "**Third Party**") during the Term of the Contract Documents; (ii) negotiating or attempting to negotiate a contract that may preclude the Player from playing for the XFL during the Term of the Contract Documents; or (iii) the Player has agreed or has entered into a contract that may preclude Player from playing for the XFL during the Term of the Contract Documents, then, in each case to the fullest extent allowed under applicable law, the XFL, its representatives, successors or its assignees (in addition to any other remedies that may be available to them under the Contract Documents or applicable law) shall have the right to obtain from any court or arbitrator having jurisdiction such equitable relief as may be appropriate, including a decree enjoining the Player from playing football for any third party during the Term of the Contract Documents, without the necessity of posting a bond or other security or proving actual damages. In any suit, action, or arbitration proceeding brought to obtain such relief, the Player hereby waives his right, if any, to trial by jury, and, to the maximum extent permitted by applicable law, waives his right, if any, to interpose any counterclaim or set-off for any cause whatsoever.

11. <u>Dispute Resolution</u>

The XFL and Player agree that all disputes, claims or controversies between the Player and the XFL relating to or arising out of the Player's employment or termination of employment (including, but not limited to, disputes relating to compensation, benefits, bonuses, discipline, or the termination of the Contract Documents) that either the XFL or the League otherwise could have attempted to resolve in state or federal court or in another governmental dispute resolution forum shall be resolved solely and exclusively in accordance with the terms of the Arbitration Agreement, Class Action Waiver and Acknowledgment Form set forth in <u>Exhibit 2</u>. In the event of an alleged default by the League in the payments to the Player provided for in the Contract Documents, or in the event of an alleged failure by the League to perform any other material obligation that it has agreed to perform hereunder, the Player shall notify the League in writing of the facts constituting such alleged default or alleged failure. If the League shall not cause such alleged default or alleged failure to be remedied within ten (10) business days after receipt of such written notice, the Player shall have the right to submit the dispute to arbitration in accordance with the provisions of the Arbitration Agreement, Class Action Waiver and Acknowledgement Form. If, as a result of such arbitration, an award issues in favor of the Player, and if the League does not comply with such award within ten (10) business days of its receipt (unless such award has been stayed or reversed by appropriate legal process), the Player shall have the right, by a further written notice to the League, to terminate the Contract Documents.

Player Initials

12. Notices

All notices, consents, approvals, requests and other communications given or required to be given pursuant to the Contract Documents (the "**Notices**") shall be given in writing by (a) hand, (b) first-class certified mail, return receipt requested, postage prepaid, or (c) nationally recognized overnight delivery service, fee prepaid (provided that a copy of such notice is also given by certified mail return receipt requested on the same day). Notices shall be deemed given upon actual receipt (or when delivery is refused). Changes of address for Notices shall be provided in compliance with this Section 12.

(i) Notices to the League shall be sent to:

XFL
1266 East Main St.
Stamford, CT 06902
Attention: Player Contract Notice
Email: ContractNotice@xfl.com

(ii) Notices to the Player shall be sent to the address and/or the facsimile number of the Player as set forth herein in the Contract Documents.

13. General Matters

(a)  The Contract Documents constitute the sole and entire contract among the parties and supersede all prior contracts, negotiations and discussions between the parties to the Contract Documents and/or their representatives. Any amendment to the Contract Documents must be in writing specifically referring to the Contract Documents and signed by the parties. The Player expressly acknowledges that no promises or commitments have been made other than those set forth in the Contract Documents.

(b) The Player and the XFL hereby understand, acknowledge and agree that, under the Contract Documents, the Player is employed by the XFL and that no Team shall be deemed to be the employer of the Player for any reason whatsoever. Any claim that the Player may have in connection with his employment shall be made against the XFL only, and the Player understands, acknowledges and agrees that neither the Team nor any other party (other than the XFL) shall be made the subject of any such claim by the Player except to the extent that such claim arises out of events unrelated to the Player's performance of his services under the Contract Documents.

Player Initials

**Exhibit 2**

**ARBITRATION AGREEMENT, CLASS ACTION WAIVER, AND ACKNOWLEDGEMENT FORM**

As a condition of my employment, I, _Antonio Callaway_____, ("**Employee**") agree
and acknowledge through this Arbitration Agreement, Class Action Waiver, and Acknowledgment
Form ("**Arbitration Agreement**") that Alpha Entertainment LLC (the "**Company**") and Employee
(collectively, the "**Parties**") will utilize binding arbitration to resolve all disputes arising out of or
relating to the Employee's employment with the Company.  The Employee expressly waives any
right he or she may have to bring a class action, be a member of a class, or pursue a claim through
arbitration or litigation against the Company on behalf of similarly-situated persons other than
the Employee.

1. Both the Company and Employee mutually agree that any claim, dispute and/or
   controversy that either Employee may have against the Company (or its owners,
   directors, officers, managers, employees, or agents) or the Company (or its owners,
   directors, officers, managers, employees, or agents) may have against Employee,
   arising from, related to, or having any relationship or connection whatsoever with the
   Employee's seeking employment with, employment by, or other association with the
   Company, shall be submitted to and determined exclusively by binding arbitration to
   the broadest extent allowed under the Federal Arbitration Act ("**FAA**"), or Connecticut
   Revised Uniform Arbitration Act (H.B. 5258; PA 18-94, not yet codified).  Included
   within the scope of this Arbitration Agreement are all disputes, whether based in tort,
   contract, statute, equitable law, or otherwise.

2. Excluded from this Arbitration Agreement are claims that are not arbitrable pursuant
   to federal or Connecticut law including workers' compensation claims, unemployment
   compensation claims, or the right to file an administrative charge before a
   governmental agency, such as the Equal Employment Opportunity Commission
   ("**EEOC**"), National Labor Relations Board ("**NLRB**"), or the Department of Labor
   ("**DOL**"), or other claims that are found to be non-arbitrable as a matter of law despite
   the FAA's strong policy in favor of arbitration.

3. The Parties agree that the terms below will apply to any arbitration pursuant to this
   Arbitration Agreement:

   a. The Parties agree that any arbitration pursuant to this Arbitration Agreement
      shall take place in Connecticut, unless (i) otherwise agreed in writing by the
      Parties, (ii) otherwise directed by the Arbitrator in order to avoid a finding of
      substantive or procedural unconscionability, or (iii) Employee primarily resides
      and works in California, in which case either the Company or Employee may
      choose to instead have any claim between them that arises in California
      adjudicated by an arbitrator in Los Angeles, California.

b. Any relief that would otherwise be available in a court action in Connecticut is equally available to the Parties in connection with the arbitration proceedings;

c. In addition to any other requirements imposed by law, disputes shall be settled by binding arbitration administered by the American Arbitration Association ("**AAA**") before a qualified individual, to whom the Parties mutually agree pursuant to AAA's Employment Arbitration Rules and Mediation Procedures (found at https://www.adr.org, as amended from time to time, the "**AAA Employment Rules**");

d. Except as provided in this Arbitration Agreement, the rules and procedures of the arbitration shall be governed by the AAA Employment Rules, except that the AAA Class Action Rules shall not be incorporated into the Employment Rules or followed in any matter and the Employment Rules shall never override the express terms of this Arbitration Agreement.  To the extent that the AAA Employment Rules do not address a particular matter, the arbitrator should apply and be guided by the Connecticut Revised Uniform Arbitration Act and Connecticut Practice Book.

e. The Arbitrator shall have the authority to allow for appropriate discovery and exchange of information before a hearing, including, but not limited to: interrogatories, requests for production of documents, requests for admission, depositions, and the issuance of subpoenas.  The Parties shall be permitted enough discovery to gather necessary evidence in order to prove their claims or defenses;

f. Awards shall include the Arbitrator's written opinion(s) and reasoning.  The Arbitrator shall issue a written opinion and award, in conformance with the following requirements: (i) the opinion and award must be signed and dated by the Arbitrator; (ii) the Arbitrator's opinion(s) and award shall decide all issues submitted; (iii) the Arbitrator's opinion and award shall set forth the legal principals supporting each part of the opinion(s); and (iv) the Arbitrator shall have the same authority to award remedies and damages as provided to a judge and/or jury under parallel circumstances in a civil action;

g. The Company shall pay the costs of the arbitrator as well as any filing fees required to be paid to AAA.  Each Party shall otherwise be responsible for his or its own costs and fees, including attorneys' fees, except when the Arbitrator awards attorneys' fees to the prevailing party consistent with applicable state or federal law; and

h. Judgment upon the award rendered by the Arbitrator may be entered as a judgment in any court having jurisdiction thereof; and

  i. Each arbitration proceeding will be individualized with claims pertaining to different employees brought and heard in separate arbitration proceedings; the arbitrator is not permitted to consolidate proceedings without the written agreement of the Parties.

4. THE COMPANY AND EMPLOYEE AGREE THAT EACH OF US WILL BRING CLAIMS AGAINST THE OTHER ONLY IN OUR INDIVIDUAL CAPACITIES AND NOT AS A PLAINTIFF, CLASS REPRESENTATIVE, OR MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.

5. The parties agree that, to the fullest extent permitted under the FAA and other applicable law, the law of Connecticut shall govern any disputes between them, regardless of whether Connecticut choice of law principles would dictate that the law of another state would apply; *provided however* that, (a) if Employee primarily resides and works in California, then either the Company or Employee may chose to instead have any controversy between them that arises in California governed by California law, and (b) if Employee is Washington-based, then Employee shall be entitled to all applicable protections and benefits of Washington House Bill 1450, signed May 8, 2019, as ultimately codified in Title 49 RCW, in any dispute arising out of Paragraph 10 of the XFL Standard Terms and Conditions.  The Parties agree that the Employer's headquarters is located in Connecticut and is a reasonable basis for this choice of law provision.  This Arbitration Agreement survives the termination of Employee's employment.  It can only be revoked or modified in writing signed by both Parties that specifically states the intent to revoke or modify this Arbitration Agreement and is signed by the Commissioner and/or Owner of the Company.  If any term, provision, or portion of this Arbitration Agreement is declared void or unenforceable by a Court of competent jurisdiction or arbitrator, that term, provision, or portion shall be severed and the remainder of this Arbitration Agreement shall be enforceable.

6. The Parties understand and agree to this binding Arbitration Agreement, and the Parties give up any right they have to trial by jury or in court of any claim the Parties may have against each other. My signature below indicates my choice to agree to the alternative dispute resolution processes described herein and my waiver of the right to participate in or bring a class action or representative claim.

**MY SIGNATURE BELOW CERTIFIES THAT I HAVE READ, I UNDERSTAND, AND I AGREE TO BE LEGALLY BOUND TO ALL OF THE ABOVE TERMS; MY SIGNATURE ALSO CERTIFIES THAT I HAVE BEEN PROVIDED THE OPPORTUNITY TO HAVE THIS ARBITRATION AGREEMENT REVIEWED BY LEGAL COUNSEL OF MY CHOICE.**

**DO NOT SIGN UNTIL YOU HAVE READ THE ABOVE ARBITRATION AGREEMENT, CLASS ACTION WAIVER, AND ACKNOWLEDGMENT.**

**ALPHA ENTERTAINMENT LLC**

Antonio Callaway
_____
Employee Name

Oliver Luck
_____
Name of Company Representative and Title

_____
Signature

_____
Signature

1/16/2020
_____
Date

1/23/2020
_____
Date

**EXHIBIT 3**

**PRE-EXISTING SPONSORSHIP AND LICENSING CONTRACTS**

Contracts with the following entities are attached:

N/a

**EXHIBIT 4**

**ORIGINAL INTELLECTUAL PROPERTY**

<u>Player</u>:

Pursuant to Paragraph 5(f) of the XFL Standard Terms and Conditions, the Player claims the following service marks, trademarks, and other rights identified in that paragraph. Unless expressly set forth herein, the Player represents that he is the sole and exclusive owner of such rights.

N/a

**EXHIBIT 5**

**SPORTS PLAYER COVERAGE AGREEMENT**

Department of Labor and Industries
Employer Services Section
PO Box 44140
Olympia, WA 98504-4140
**(**360) 902-5775
FAX: (360) 902-4988



**SPORT PLAYER COVERAGE AGREEMENT**

| This agreement is made on (date):<br>1/16/2020 | Between Player<br><br>Antonio Callaway | and  Employer (athletic  team or league)<br>XFL |
| --- | --- | --- |

**Subsection 51.12.120(6) of the Revised Code of Washington provides:**

"A worker whose duties require him or her to travel regularly in the service of his or her employer in this and one or more other states may agree in writing with his or her employer that his or her employment is principally localized in this or another state and, unless the other state refuses jurisdiction, the agreement shall govern as to any injury occurring after the effective date of the agreement."

**Subsection 296-17-35203(1) of the Washington Administrative Code further provides**:

Washington-domiciled professional and semiprofessional sports teams under contract with a parent team domiciled outside of Washington may cover their Washington players under the laws of another state when the players and team agree in writing that the player's employment is principally localized in another state.

The above-named parties (player and athletic team or league) agree that for the purpose of workers' compensation coverage, the employment of the above named player is principally localized in the state of __TEXAS_____.

The parties further agree that it is the intent of this agreement to comply with Subsection 51.12.120(6) of the Revised Code of Washington and Subsection 296-17-35203(1) of the Washington Administrative Code.

This agreement will be in force for the period of employment and as long as the workers' compensation insurance policy coverage is in effect.

**Each of the signatories should retain a copy of this agreement for their records. Please see additional rules and requirements for these agreements on the back side of this form.**

| Athletic Team or League<br>XFL Seattle Dragons | Player's name (please print)<br><br>Antonio Callaway |
| --- | --- |
| By (authorized signature)<br>*Oliver Luck* | Players signature<br> |
| Official position<br>XFL Commissioner | Team's Washington State UBI number<br>604368930 |
| Insurance provider<br>Tri-State Insurance Company of Minnesota | Insurance Policy ID number<br>WCA 7503224-12 |

**The following rules apply to this agreement:**

- ➢ A separate agreement must be completed for each player.

- ➢ The agreement must be signed by the employer and the individual athlete to be valid.

- ➢ The agreement must designate the state where workers' compensation coverage is provided and the state must be one in which the team will play a regularly scheduled athletic event during the course of the season.

- ➢ The agreement is not effective until signed and dated. The date is the day the last required signature is attached to the agreement by either the employer or player (whoever signs last).

- ➢ The agreement must be kept as part of the employer's records for a minimum of at least three years after the player is no longer with the team.

- ➢ **The workers' compensation policy must provide continuous coverage. Any break in coverage will invalidate this agreement.**
  Until a new agreement is signed by both parties and a new sport team coverage agreement (form F212-196-000) is submitted to the Department of Labor & Industries along with a copy of the employer's current workers' compensation insurance policy, the player is a Washington worker and the employer is subject to all Washington State workers' compensation laws under Title 51.

- ➢ A copy of this agreement must be provided by the employer to the Department of Labor and Industries upon request along with a copy of the employer's current and valid workers' compensation insurance policy or the employer will be subject to all premiums, interest, and penalties allowed by Washington statute or regulation.

- ➢ If a workers' compensation insurer rejects an injury claim by reason the player is a Washington worker, this agreement is void, and the employer is subject to all premiums, interest, and penalties allowed by Washington statute or regulation.

**For additional information about these coverage agreements or to request additional forms, please call (360) 902-4985.**

# EXHIBIT B



>>>>>>> **CONFIDENTIAL** <<<<<<<

# Antonio Callaway

## Social Media Audit

January 11, 2020



# EXECUTIVE SUMMARY

## MEDIUM
**Digital Vulnerability**

## ESTABLISHED
**Social Footprint**

## NEGATIVE
**Search Engine Standing**

## SEARCH/FACEBOOK
**Most Concerning Platform**

# NEWS ARTICLES

>>>>>>> **Red Flags** <<<<<<<

# 🖥 SOCIAL PLATFORMS

Antonio Callaway maintains active social media accounts and while much of the content flirts a line with inappropriate, most of it does not rise to red flag status. The content, however, is largely unnecessary and opens him up to potential criticism in the future should any be misinterpreted or not "age" well.

One issue to note is that his Facebook is set to public, so anyone can view not only his own posts, but posts that family and fans have tagged him in. Some of this content could be interpreted as controversial, as some pertains to his suspension from the team in college for sexual assault allegations.

a5callaway

Antonio Callaway

Ripbobby_G

Callaway81_



# TWITTER ANALYSIS

>>>>>>>







**Controversial:**
NONE



**Vulgarity:**
Cursing
Cursing #2
Cursing #3



**Political:**
NONE



**#MeToo:**
Girl on bed
Girls on a boat
Talking about a girl



**Equality:**
Cheating



**Flagged Conversation:**
Twerking
Referencing "jits"



**Controversial Likes:**
NONE



**Flagged Followers/Following:**
NONE



**Private Information:**
NONE



#  FAKE ACCOUNTS



We were unable to find any accounts impersonating Antonio Callaway on any social platforms.



# DIGITAL REPUTATION PLATFORMS

>>>>>>

Search engines are split between general sports coverage (stats, highlights, etc.) and negative press coverage.

Top results include video where he was witness to a shooting in December, and commentary about being cut from the Browns. Other general links also include news about his arrest for marijuana possession.

While not ideal, these articles can eventually be buried by positive news and time to distance himself from the situations. For instance, he was suspended In 2018 from the team while playing at Florida for sexual assault allegations, but none of this appears near the top of search rankings due to more timely news.

## Google

- Cut from Browns
- Miami shooting
- Miami shooting video
- Second Suspension

## YouTube

- **Interviews and talk show:**
- ESPN News
- Rizzuto Show
- Big EZ Network

- **Negative videos:**
- Traffic stop
- Parking lot fight

## WIKIPEDIA

- Mention of drug and sexual assault issues

## reddit

- Multiple threads on suspension and being waived by the Browns.



# ANALYSIS

>>>>>>





Antonio Callaway has an established social media footprint that he uses extensively.

While Twitter has some flagged conversations, none are too out of line and can be fixed by merely cleaning his tweets. We suggest deleting any older tweets (prior to mid-2018) as a precautionary measure to protect against future vulnerabilities.

His Facebook's privacy settings should be increased, as currently it is set to public. That means anyone can view his posts, and posts where he is tagged are also viewable to the public.

# EXHIBIT C

# Pay Summaries - Rollup Totals

**Name** Callaway, Antonio

| | YEAR & WEEK | PAY DATE | PERIOD END DATE | GROSS | NET | CHECK / VOUCHER # | CO / FILE # |
|---|---|---|---|---|---|---|---|
| 🏛 | 2020 - 15 - 1 | 04/10/2020 | 04/05/2020 | $7,997.97 | $0.00 | 00150589 | Z6E/101335 |
| 🏛 | 2020 - 13 - 1 | 03/27/2020 | 03/22/2020 | $5,266.37 | $0.00 | 00130621 | Z6E/101335 |
| 🏛 | 2020 - 11 - 1 | 03/13/2020 | 03/08/2020 | $5,266.37 | $0.00 | 00110808 | Z6E/101335 |
| 🏛 | 2020 - 09 - 1 | 02/28/2020 | 02/23/2020 | $5,266.37 | $0.00 | 00090794 | Z6E/101335 |
| 🧾 | 2020 - 07 - 1 | 02/14/2020 | 02/09/2020 | $125,000.00 | $87,937.50 | 05214226 | Z6E/101335 |
| 🧾 | 2020 - 07 - 1 | 02/14/2020 | 02/09/2020 | $10,153.55 | $6,956.09 | 05214225 | Z6E/101335 |

Earnings Summary

| Gross Pay | | $ 158,950.63 |
|---|---|---|
| Regular | Hours: 514.17 | $ 33,834.78 |
| L.T.D (field 3) | | $ 15.85 |
| SIGNING BONUS (field 3) | | $ 125,000.00 |
| Travel Reimb (field 3) | | $ 100.00 |

| Taxes | $ 44,905.86 |
|---|---|
| Federal Income Tax | $ 34,064.97 |
| Social Security | $ 8,537.40 |
| Medicare | $ 2,303.49 |

| Deductions | $ 15.85 |
|---|---|
| LTD - LTD | $ 15.85 |

| Take Home | $ 114,028.92 |
|---|---|
| CHECKING 1 | $ 19,135.33 |
| Net Pay | $ 94,893.59 |

Other Details

Memos

| Group Term Life | 11.00 |
|---|---|