**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| OLIVER LUCK | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | CIVIL NO. 3:20-cv-516 (VAB) |
| | § | |
| VINCENT K. MCMAHON and | § | |
| ALPHA ENTERTAINMENT LLC | § | |
| | § | January 29, 2021 |
| *Defendants.* | § | |

**PLAINTIFF/COUNTERCLAIM-DEFENDANT OLIVER LUCK'S**
**ANSWER AND AFFIRMATIVE DEFENSES TO**
**ALPHA ENTERTAINMENT, LLC'S COUNTERCLAIMS**

Plaintiff Oliver Luck ("Mr. Luck") submits this Answer and Affirmative Defenses to defendant Alpha Entertainment, LLC's ("Alpha") Counterclaims, dated January 7, 2021.

## ANSWER

### THE PARTIES

1.  Mr. Luck admits the allegations in Paragraph 1.

2.  Mr. Luck admits the allegations in Paragraph 2.

### JURISDICTION AND VENUE

3.  Mr. Luck admits the allegations in Paragraph 3.

4.  Mr. Luck admits the allegations in Paragraph 4.

5.  Mr. Luck admits the allegations in Paragraph 5.

### BACKGROUND FACTS

6.  Mr. Luck admits the allegations in Paragraph 6.

7.  Mr. Luck admits the allegations in Paragraph 7.

8.     Mr. Luck admits that the allegations in Paragraph 8 contain selected language from the Employment Contract dated May 30, 2018 (the "Employment Contract") except denies that the allegations are complete. More specifically, the Employment Contract provided that Mr. Luck would have "authority, duties and responsibilities consistent with the commissioners of the major U.S. professional sports leagues (including oversight of all football and business-related operations)", would be "the senior-most executive of the XFL", and would have "full authority to hire, dismiss, replace or reassign any employee, consultant or contractor of the XFL, all of whom [would] report, directly or indirectly, to Mr. Luck, subject to Mr. McMahon's preapproval for material business decisions." Mr. Luck respectfully refers the Court to the Employment Contract, ECF 145-1 at 2-13, for its complete and accurate text.

9.     Mr. Luck admits the allegations in Paragraph 9. Mr. Luck refers the Court to the Employment Contract, ECF 145-1 at 2-13, for its complete and accurate text.

10.     Mr. Luck denies the allegations in Paragraph 10 except admits that the Confidentiality, Non-Solicitation, and Non-Competition Agreement ("CNNA"), which is Exhibit B to the Employment Contract, states "[d]uring Employee's employment with Employer, Employee shall devote substantially all of Employee's business efforts and time to Employer and to the performance of his duties to Employer under the Employment Contract." ECF 145-1 at 10. Mr. Luck refers the Court to the Employment Contract, ECF 145-1 at 8-13, for its complete and accurate text.

11.     Mr. Luck admits the allegations in Paragraph 11 that Alpha would pay Mr. Luck a Base Salary of $5,000,000.00 per Contract Year. Mr. Luck admits that the allegations in Paragraph 11 related to the "Guaranteed Annual Bonus" contain selected language from the Employment Contract except denies that the language is complete. More specifically, the Employment Contract

provided that Mr. Luck would "be paid a guaranteed annual bonus of $2,000,000.00 (the "Guaranteed Annual Bonus") on the last day of each Contract Year, subject to his continued employment on the scheduled payment date." Mr. Luck refers the Court to the Employment Contract, ECF 145-1 at 2-13, for its complete and accurate text.

12.     Mr. Luck admits that the allegations in Paragraph 12 contain selected language from the Employment Language except denies that the quoted language is complete. Mr. Luck refers the Court to the Employment Contract, ECF 145-1 at 2-13, for its complete and accurate text.

13.     Mr. Luck denies the allegations in Paragraph 13. Mr. Luck refers the Court to the Employment Contract, ECF 145-1 at 2-13, for its complete and accurate text.

    a.      Mr. Luck admits that the allegations in Paragraph 13(a) contain selected language from the Employment Contract except denies that the quoted language is complete. More specifically, Mr. Luck admits that the allegations in Paragraph 13(a) contain the third of six (6) enumerated reasons for which Alpha had "Cause" to terminate Mr. Luck's employment. Mr. Luck refers the Court to the Employment Contract, ECF 145-1 at 2-13, for its complete and accurate text.

    b.      Mr. Luck admits that the allegations in Paragraph 13(b) contain selected language from the Employment Contract except denies that the quoted language is complete. More specifically, Mr. Luck admits that the allegations in Paragraph 13(b) contain the fifth of six (6) enumerated reasons for which Alpha had "Cause" to terminate Mr. Luck's employment. Mr. Luck refers the Court to the Employment Contract, ECF 145-1 at 2-13, for its complete and accurate text.

c.      Mr. Luck admits that the allegations in Paragraph 13(c) contain selected language from the Employment Contract except denies that the quoted language is complete. More specifically, Mr. Luck admits that the allegations contained in Paragraph 13(c) contain the sixth of six (6) enumerated reasons for which Alpha had "Cause" to terminate Mr. Luck's employment. Mr. Luck refers the Court to the Employment Contract, ECF 145-1 at 2-13, for its complete and accurate text.

14.     Mr. Luck denies the allegations in Paragraph 14, except admits that on April 9, 2020, Alpha wrongfully terminated Mr. Luck's employment allegedly for cause, effective immediately, and repudiated the Employment Contract. *See* ECF 145-2 ("Termination Letter"). Mr. Luck denies and rejects the allegations set forth in the Termination Letter and contends they are pretextual and devoid of merit. *See, e.g.*, ECF 145-3 ("Response Letter").[1]

15.     Mr. Luck denies the allegations in Paragraph 15.

16.     Mr. Luck denies the allegations in Paragraph 16.

17.     Mr. Luck denies the allegations in Paragraph 17, except admits that an XFL policy required background checks for all employees, including players.

18.     Mr. Luck denies the allegations in Paragraph 18.

19.     Mr. Luck denies the allegations in Paragraph 19.

a.      Mr. Luck lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 19(a) because Defendant did not provide a copy of the document to which it refers. Consequently, Mr. Luck denies the allegations in Paragraph 19(a).

---

[1] Mr. Luck further denies the allegations in the unnumbered "heading" found between Paragraphs 14 and 15.

      b.     Mr. Luck lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 19(b). Consequently, Mr. Luck denies the allegations in Paragraph 19(b).

20.     Mr. Luck denies the allegations in Paragraph 20.

21.     Mr. Luck denies the allegations in Paragraph 21 except admits that: (a) he sought McMahon's approval to hire a few well known individuals who posed potential reputational issues to the XFL; (b) when Mr. Luck learned Player A[2] was prevented from using university practice facilities due to a sexual assault allegation that did not become known to Mr. Luck until after Player A was already placed on an XFL team, Mr. Luck told McMahon that Player A was unable to use the facilities and McMahon told Mr. Luck to remove Player A from the team; (c) when Mr. Luck learned the university would permit Player A with a letter that Player A's employer required to use the facilities, Mr. Luck took that information to McMahon and McMahon did not allow Player A to re-join the team; and (d) Mr. Luck requested McMahon's approval for Martavis Bryant ("Bryant") to play in the XFL, which McMahon denied so Bryant did not play in the XFL.

22.     Mr. Luck denies the allegations in Paragraph 22.

      a.     Mr. Luck denies the allegations in Paragraph 22(a) except admits that: a sexual assault allegation did not become known to Mr. Luck until Player A had already been placed on an XFL team and had practiced multiple times with the team. Player A's team utilized a certain university's facilities. Player A was prevented from using these facilities, at which point Mr. Luck learned of the sexual assault allegation. Mr. Luck told McMahon that Player A was unable to utilize the facilities due to the allegation, and McMahon said to remove Player A from the

---

[2] Mr. Luck refers to this individual as Player A to preserve his privacy. Defendants are aware of Player A's identity

team. Mr. Luck later learned that the university would permit Player A to use their facilities if Player A provided a letter to the university indicating his employer required him to use the facilities as part of his employment. Mr. Luck took that information to McMahon. McMahon did not allow Player A to re-join the team.

b.      Mr. Luck denies the allegations in Paragraph 22(b) except admits that: he requested McMahon's approval for Bryant to play in the XFL; Mr. Luck informed McMahon that Bryant had "drug issues while in the NFL"; the XFL gave Bryant a drug test and it was clean; McMahon denied Mr. Luck's request for approval that Bryant play in the XFL; and Bryant did not play in the XFL.

23.     Mr. Luck denies the allegations in Paragraph 23 except admits that both he and McMahon expressed concerns about the quality of wide receivers in the XFL.

24.     Mr. Luck denies the allegations in Paragraph 24.

25.     Mr. Luck denies the allegations in Paragraph 25.

a.      Mr. Luck denies the allegations in Paragraph 25(a).

b.      Mr. Luck denies the allegations in Paragraph 25(b) except admits that on January 16, 2020, Basil DeVito sent via e-mail to Mr. Luck unattributed information that DeVito had located online stating "[w]hile at Florida, Callaway was suspended for the entire 2017 season for allegedly using stolen credit card information to fund bookstore accounts."

c.      Mr. Luck denies the allegations in Paragraph 25(c) except admits that on January 16, 2020, Basil DeVito sent via e-mail to Mr. Luck unattributed information that DeVito had located online stating Antonio Callaway ("Callaway")

6

"was also cited for misdemeanor marijuana possession and possession of drug equipment during a traffic stop by Gainesville police in May 2017."

d.      Mr. Luck denies the allegations in Paragraph 25(d) except admits that on January 16, 2020, Basil DeVito sent via e-mail to Mr. Luck unattributed information that DeVito had located online stating Callaway "tested positive for marijuana at the 2018 NFL scouting combine."

e.      Mr. Luck denies the allegations in Paragraph 25(e) except admits that on January 16, 2020, Basil DeVito sent via e-mail to Mr. Luck unattributed information that DeVito had located online stating Callaway "was cited for possession of marijuana while driving with a suspended license last August. Police also found bullets and a gun part while searching his vehicle. The possession charge was dropped at a hearing on Jan. 25, and Callaway pleaded guilty to operating without a valid license and speeding."

f.      Mr. Luck denies the allegations in Paragraph 25(f) except admits that on January 16, 2020, Basil DeVito sent via e-mail to Mr. Luck unattributed information that DeVito had located online stating "Callaway was suspended for the first four games of this season for violating the NFL's substance abuse policy."

g.      Mr. Luck admits the allegations in Paragraph 25(g).

26.     Mr. Luck denies the allegations in Paragraph 26.

27.     Mr. Luck denies the allegations in Paragraph 27.

28.     Mr. Luck denies the allegations in Paragraph 28.

29.     Mr. Luck lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 29.

30.     Mr. Luck denies the allegations in Paragraph 30 except admits that on or about January 13, 2020, he informed McMahon that Callaway was claimed by an XFL team, that the university had rescinded its ban on Player A and he was now allowed to participate in any and all activities without restriction, and asked McMahon if they could reconsider Player A.

31.     Mr. Luck denies the allegations in Paragraph 31.

32.     Mr. Luck denies the allegations in Paragraph 32 except admits that on or about January 16, 2020, he requested McMahon's approval for Bryant to play in the XFL, Mr. Luck informed McMahon that Bryant had "drug issues while in the NFL" and that the XFL gave Bryant a drug test and it was clean, and that if McMahon approved, Mr. Luck would like to get both Bryant and Player A in the XFL. Mr. Luck admits that McMahon denied Mr. Luck's request for approval that Bryant play in the XFL and that Bryant did not play in the XFL. Mr. Luck admits that Player A was removed from the XFL.

33.     Mr. Luck admits the allegations in Paragraph 33.

34.     Mr. Luck admits the allegations in Paragraph 34.

35.     Mr. Luck denies the allegations in Paragraph 35 except admits that he countersigned Antonio Callaway's XFL contract, as Mr. Luck countersigned all player contracts.

36.     Mr. Luck denies the allegations in Paragraph 36.

37.     Mr. Luck denies the allegations in Paragraph 37.[3]

38.     Mr. Luck lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 38.

39.     Mr. Luck lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 39 related to what McMahon learned about Callaway and when he

---

[3] Mr. Luck further denies the allegations in the unnumbered "heading" found between Paragraphs 37 and 38.

learned it, except admits that on January 28th at approximately 11:15 p.m., McMahon told Mr. Luck to terminate Callaway as an XFL employee.

40.     Mr. Luck denies the allegations in Paragraph 40.

41.     Mr. Luck denies the allegations in Paragraph 41.

42.     Mr. Luck denies the allegations in Paragraph 42.

43.     Mr. Luck denies the allegations in Paragraph 43 except admits that Callaway hurt his knee on January 29, 2020.

44.     Mr. Luck denies the allegations in Paragraph 44.

45.     Mr. Luck denies the allegations in Paragraph 45.[4]

46.     Mr. Luck denies the allegations in Paragraph 46.

47.     Mr. Luck denies the allegations in Paragraph 47, except admits there were different versions of the XFL Employee Handbook & Code of Business Conduct promulgated.

48.     Mr. Luck lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 48 related to distribution to XFL employees of the XFL Employee Handbook & Code of Business Conduct. Mr. Luck admits that the XFL Employee Handbook & Code of Business Conduct contained a letter signed by him.

49.     Mr. Luck denies the allegations in Paragraph 49, except admits that there was an XFL Technology Acceptable Use Policy.

50.     Mr. Luck lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 50 related to distribution to XFL employees of the XFL Technology Acceptable Use Policy.

51.     Mr. Luck admits the allegations in Paragraph 51.

---

[4] Mr. Luck further denies the allegations in the unnumbered "heading" found between Paragraphs 45 and 46.

52.     Mr. Luck denies the allegations in Paragraph 52.

53.     Mr. Luck denies the allegations in Paragraph 53 except admits that an iPhone was issued to him by the XFL in late June/early July 2018.

54.     Mr. Luck denies the allegations in Paragraph 54.

55.     Mr. Luck denies the allegations in Paragraph 55.

56.     Mr. Luck admits the allegations in Paragraph 56.

    a.   Mr. Luck admits the allegations in Paragraph 56(a).

    b.   Mr. Luck admits the allegations in Paragraph 56(b).

    c.   Mr. Luck lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 56(c) related to storing documents. Mr. Luck admits the allegations in Paragraph 56(c) related to transmitting documents.

    d.   Mr. Luck denies the allegations in Paragraph 56(d) except admits that he used the Alpha-issued iPhone to perform non-XFL work as a member of the board of directors for American Campus Communities, Inc. ("ACC") and for non-profit entities, both of which were expressly permitted by the Employment Contract.

57.     Mr. Luck denies the allegations in Paragraph 57, except admits that the Termination Letter stated: "[w]e note that you are in possession of a phone which is owned by Alpha which should be returned to the company." ECF 145-2 at 3.

58.     Mr. Luck denies the allegations in Paragraph 58 except that after receiving the Termination Letter, he continued to use the Alpha-issued iPhone in the ordinary course, including to receive text messages and telephone calls.

59.     Mr. Luck denies the allegations in Paragraph 59.

60.     Mr. Luck lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 60.

61.     Mr. Luck denies the allegations in Paragraph 61 except admits that his wife, Kathy Luck, deleted a text string among Mr. Luck's immediate family referred to as the "Mr. Luck Family Chat", which is available on other electronic devices available to Mr. Luck and has been preserved.

62.     Mr. Luck denies the allegations in Paragraph 62.

63.     Mr. Luck objects to responding to the allegations in Paragraph 63 because the information responsive is protected by the attorney-client privilege, joint defense privilege, spousal privilege, common interest doctrine, and work product doctrine. Subject thereto, Mr. Luck denies the allegations in Paragraph 63.

64.     Mr. Luck denies the allegations in Paragraph 64 except admits that his counsel made certain statements to defense counsel, Alpha's bankruptcy counsel, and to the Court that he believed to be true at the time they were made.

65.     Mr. Luck denies the allegations in Paragraph 65 except admits that the iPhone was sent to Alpha's bankruptcy counsel on May 5, 2020.

66.     The allegations in Paragraph 66 contain conclusions of law, which Mr. Luck is not required to admit or deny. For further answer, Mr. Luck denies the allegations in paragraph 66.

67.     Mr. Luck denies the allegations in Paragraph 67.

68.     Mr. Luck denies the allegations in Paragraph 68.

69.     Mr. Luck denies the allegations in Paragraph 69.

70.     The allegations in Paragraph 70 contain conclusions of law, which Mr. Luck is not required to admit or deny. For further answer, Mr. Luck denies the allegations in Paragraph 70.[5]

71.     Mr. Luck denies the allegations in Paragraph 71 except admits that in March 2020, the XFL suspended its first season.

72.     Mr. Luck denies the allegations in Paragraph 72.

73.     Mr. Luck admits the allegations in Paragraph 73.

74.     Mr. Luck denies the allegations in Paragraph 74.

75.     Mr. Luck denies the allegations in Paragraph 75.

76.     Mr. Luck denies the allegations in Paragraph 76.

77.     Mr. Luck denies the allegations in Paragraph 77.

78.     Mr. Luck denies the allegations in Paragraph 78.

79.     Mr. Luck denies the allegations in Paragraph 79.

    a.   Mr. Luck lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 79(a).

    b.   Mr. Luck lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 79(b).

    c.   Mr. Luck lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 79(c).

    d.   Mr. Luck lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 79(d).

    e.   Mr. Luck lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 79(e).

---

[5] Mr. Luck further denies the allegations in the unnumbered "heading" found between Paragraphs 70 and 71.

80.    Mr. Luck denies the allegations in Paragraph 80.

a.    Mr. Luck denies the allegations in Paragraph 80(a) except admits he was not personally in attendance because the XFL business operations meetings had already been delegated to his subordinate, Sam Schwartzstein, who attended the meetings as Mr. Luck's representative.

b.    Mr. Luck denies the allegations in Paragraph 80(b) except admits he was not personally in attendance because the XFL business operations meetings had already been delegated to his subordinate, Sam Schwartzstein, who attended the meetings as Mr. Luck's representative.

c.    Mr. Luck denies the allegations in Paragraph 80(c) except admits he was not personally in attendance because he had already delegated the XFL business operations meetings to his subordinate, Sam Schwartzstein, who attended the meetings as Mr. Luck's representative.

81.    Mr. Luck denies the allegations in Paragraph 81.

82.    Mr. Luck denies the allegations in Paragraph 82.

83.    Mr. Luck denies the allegations in Paragraph 83.

## COUNT ONE – BREACH OF CONTRACT

84.    Mr. Luck incorporates herein by reference all preceding paragraphs.

85.    Mr. Luck admits that the Employment Contract was a legally binding and enforceable contract.

86.    Mr. Luck denies the allegations in Paragraph 86.

87.    Mr. Luck denies the allegations in Paragraph 87.

88.    Mr. Luck denies the allegations in Paragraph 88.

## COUNT TWO – BREACH OF FIDUCIARY DUTY

89.     The allegations in Paragraph 89 are conclusions of law that Mr. Luck is not required to admit or deny.

90.     The allegations in Paragraph 90 are conclusions of law that Mr. Luck is not required to admit or deny. For further answer, Mr. Luck denies the allegations in Paragraph 90.

91.     Mr. Luck denies the allegations in Paragraph 91.

92.     Mr. Luck denies the allegations in Paragraph 92.

93.     Mr. Luck denies the allegations in Paragraph 93.

94.     Mr. Luck denies the allegations in Paragraph 94.

## PRAYER FOR RELIEF

95.     Mr. Luck denies that Alpha is entitled to any of the relief requested.

## AFFIRMATIVE DEFENSES

96.     Mr. Luck is not liable to Alpha and Mr. Luck asserts the following affirmative defenses.

## FAILURE TO PROVIDE NOTICE AND OPPORTUNITY TO CURE

97.     Alpha failed to comply with the required notice and cure provisions prior to terminating Mr. Luck. Specifically, the Employment Contract expressly states that when an act or omission "that would ***otherwise* constitute** 'Cause' hereunder is reasonably susceptible to cure, Mr. Luck shall have 30 days from his receipt of written notice from Alpha describing such act or omission to effect the ***cure of such circumstances*.**" ECF 145-1 at 3 (emphasis added). Only when the act or omission that "would ***otherwise* constitute** 'Cause' hereunder is ***not reasonably susceptible*** to cure, ***or*** such circumstances ***have not been cured*** within such 30-day cure period, such act or omission will ***thereupon* constitute 'Cause'** hereunder." *Id.* (emphasis added).

98.     Thus, "Cause" only exists if the act or omission, accompanied by willfulness or gross negligence, is one of six (6) enumerated reasons *and* is not reasonably susceptible to cure **_or_** the circumstances otherwise constituting cause have not been cured within the 30-day period.

99.     Alpha did not provide Mr. Luck with any notice that any of his actions or omissions constituted "Cause" for his termination; Alpha did not provide Mr. Luck with any opportunity to cure any circumstances that would otherwise constitute "Cause" for his termination. Instead, Alpha wrongfully terminated Mr. Luck's employment effective immediately on April 9, 2020. ECF 145-2.

100.    The Termination Letter set forth pretextual and meritless allegations related to Mr. Luck's acts or omissions as Commissioner and CEO of the XFL. *Id*. The Termination Letter falsely accused Mr. Luck of "gross negligence," "willful disregard of the lawful instructions of McMahon concerning [his] material duties," and "not devot[ing] all of [his] business time to the performance of [his XFL] duties since March 13th." *Id*.

101.    Thus, Alpha wrongfully terminated and breached the Employment Contract.

### BREACH AND REPUDIATION

102.    Defendants' Termination Letter, whereby it wrongfully terminated Mr. Luck's employment—purportedly for Cause—effective immediately, also constituted a breach and repudiation of the Employment Contract.

103.    The Termination Letter set forth pretextual and meritless allegations related to Mr. Luck's acts or omissions as Commissioner and CEO of the XFL. *Id.* The Termination Letter falsely accused Mr. Luck of "gross negligence," "willful disregard of the lawful instructions of McMahon concerning [his] material duties," and "not devot[ing] all of [his] business time to the performance of [his XFL] duties since March 13th." *Id*.

104.     However, Alpha failed to provide any written notice that any of his actions constituted "Cause" for termination or any opportunity to cure such alleged circumstances.

105.     When Alpha failed to provide the required written notice and summarily terminated Mr. Luck's employment, Alpha wrongfully breached and repudiated the Employment Contract.

## BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

106.     In the Termination Letter dated April 9, 2020, ECF 145-2, Alpha wrongfully terminated Mr. Luck's employment—purportedly for Cause—effective immediately. Alpha's alleged termination for cause was done with a dishonest purpose, i.e., it was done to avoid payment of the sums owed to Mr. Luck for salary and bonuses.

107.     The Termination Letter set forth pretextual and meritless allegations related to Mr. Luck's acts or omissions as Commissioner and CEO of the XFL. *Id.* The Termination Letter falsely accused Mr. Luck of "gross negligence," "willful disregard of the lawful instructions of McMahon concerning [his] material duties," and "not devot[ing] all of [his] business time to the performance of [his XFL] duties since March 13th." *Id.*

108.     Alpha wrongfully terminated, materially breached, and/or repudiated the Employment Contract in an effort to avoid paying Mr. Luck the amounts owed to him under the Employment Contract and Guaranty.

109.     Such actions violated Alpha's implied duty of good faith and fair dealing.

## ALPHA REJECTED AND BREACHED THE EMPLOYMENT CONTRACT

110.     On April 13, 2020, Alpha filed its petition for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 20-10940 (LSS).

111.    At or about the same time, Alpha filed its Eleventh Omnibus Motion for Entry of an Order Authorizing the Debtor to Reject Certain Executory Contracts Effective as of the Petition Date, by which Alpha requested an order of the Bankruptcy Court authorizing it to reject, *inter alia*, the Employment Contract under 11 U.S.C. § 365(a), effective as of the date of the filing of the bankruptcy on April 13, 2020.  (*In re Alpha Entertainment LLC*, Case No. 20-10940, ECF No. 22 (Bankr. D. Del.)).

112.    At Alpha's request, the presiding bankruptcy judge approved Alpha's rejection of the Employment Contract on May 11, 2020 (*In re Alpha Entertainment LLC*, Case No. 20-10940, ECF No. 124).

113.    Under 11 U.S.C. § 365(g)(1), the rejection of an executory contract "constitutes a breach of such contract . . . immediately before the date of the filing of the petition." This rejection is a further breach and repudiation of the Employment Contract by Alpha, which prevents it from any recovery.

## WAIVER, RATIFICATION, AND ESTOPPEL - CALLAWAY

114.    The Termination Letter falsely states that Mr. Luck violated XFL policy and directives issued by McMahon when Mr. Luck signed Callaway. ECF 145-2. Contrary to the claim in the Termination Letter, the XFL had no policy in place at the time that would have disqualified Callaway when he signed to play in the XFL. *See* ECF 145-3.

115.    Moreover, under the express terms of the Employment Contract, Luck had full authority to hire any XFL employee such as Callaway. ECF 145-1 at 2.

116.    Further, McMahon was made aware of the signing of Callaway in advance and did not object at the time. ECF 145-3 at 3-4. In fact, McMahon had instructed Mr. Luck to upgrade the quality of receivers in the XFL, and the signing of Callaway accomplished that goal. *Id*.

117.    When McMahon told Mr. Luck on or about January 28, 2020 that he wanted Callaway terminated, Mr. Luck promptly followed McMahon's directive. *Id*.

118.    At no time did Mr. Luck intentionally violate an XFL policy or directive.

119.    However, Defendants now allege that Mr. Luck violated XFL policy and McMahon's alleged directives regarding the hiring and firing of Callaway on two separate occasions in January 2020. Yet, it is uncontroverted that Defendants never provided Mr. Luck with the requisite written notice that he had violated any XFL policy or directive and a thirty (30) day opportunity to cure.

120.    Even after Callaway was effectively terminated by being placed on the XFL's Injured Reserve list, Defendants did not provide a written notice to Mr. Luck that he had failed to follow a McMahon directive or any XFL policy. In fact, the first official written notice that Luck had allegedly violated an XFL policy or directive was not provided until Defendants terminated Mr. Luck two and one-half months after the "Callaway situation" was resolved.

121.    Thus, Alpha failed to take any action at the time of (or for two and one-half months after) Mr. Luck's alleged violation of XFL policy and McMahon's alleged directives related to Callaway, despite knowing of its rights under the Employment Contract.[6] Instead, Alpha knowingly chose not to exercise any of its purported rights under the Employment Contract (or as Mr. Luck's employer). Alpha waived Mr. Luck's alleged actions or omissions with respect to Callaway as a ground for terminating Mr. Luck or maintaining any claims against him.

122.    Likewise, by failing to take any action at the time of (or for two and one-half months after) Mr. Luck's alleged violation of XFL policy and McMahon's alleged directives, Alpha affirmed Mr. Luck's prior acts with full and complete knowledge of such acts. Thus, Alpha ratified

---

[6] Mr. Luck disputes that any of his alleged actions or omissions related to Callaway granted Alpha any rights to terminate him with Cause under the Employment Contract.

Mr. Luck's actions related to Callaway and those actions cannot be a ground for terminating Mr. Luck or maintaining any claims against him.

123.    Finally, because Alpha failed to take any action at the time of (or for two and one-half months after) Mr. Luck's alleged violation of XFL policy and McMahon's alleged directives related to Callaway, but instead chose to remain silent to prevent Mr. Luck from curing any alleged violations to his detriment, Alpha is estopped from now asserting it as a ground for terminating Mr. Luck for cause or maintaining any claims against him.

### WAIVER, RATIFICATION, AND ESTOPPEL – MR. LUCK'S WORK FROM MARCH 13 TO APRIL 9, 2020

124.    The Termination Letter falsely states that Mr. Luck was not devoting substantially all of his business time to his XFL duties from March 13 to April 9, 2020. ECF 145-2 at 3.

125.    Such alleged non-performance could easily have been cured following written notice. Yet, Alpha never provided Mr. Luck with *any* notice and the first time Mr. Luck was informed that his conduct constituted cause for termination under the Employment Contract was when he received the Termination Letter.

126.    By failing to take any action at the time of (or for nearly one month) Mr. Luck's alleged non-performance, Alpha knowingly chose not to exercise any of its purported rights under the Employment Contract (or as Mr. Luck's employer). Thus, Alpha waived it as a ground for terminating Mr. Luck or maintaining any claims against him.

127.    Likewise, by failing to take any action at the time of (or for nearly one month) Mr. Luck's alleged non-performance, Alpha affirmed Mr. Luck's performance of his work with full and complete knowledge of his performance. Thus, Alpha ratified Mr. Luck's performance and cannot use it as a ground for terminating Mr. Luck or maintaining any claims against him.

128.    Finally, because Alpha failed to take any action at the time of (or for nearly one month) Mr. Luck's alleged non-performance, but instead chose to remain silent to prevent Mr. Luck from curing an alleged non-performance to his detriment, Alpha is estopped from now asserting it as a ground for terminating Mr. Luck or maintaining any claims against him.

**WAIVER, RATIFICATION, AND ESTOPPEL – PERSONAL USE OF iPHONE**

129.    Alpha was well aware that Mr. Luck transferred data pre-dating his employment to the iPhone because its own IT consultant assisted Mr. Luck in the transfer of data, at the start of Mr. Luck's employment with Alpha, from his prior iPhone.

130.    Mr. Luck's personal use of the iPhone issued to him by Alpha could easily have been cured following notice. However, Alpha never complained to Mr. Luck about his personal use of the iPhone.

131.    Instead, Alpha waited until after this lawsuit was pending to assert that Mr. Luck's personal use of the iPhone was a ground for termination with Cause.

132.    By failing to take any action regarding Mr. Luck's personal use of the iPhone at any time during Mr. Luck's nearly two years of employment, and assisting Mr. Luck in transferring his pre-existing data onto the iPhone at the beginning of his employment, Alpha knowingly chose not to exercise any of its purported rights under the Employment Contract (or as Mr. Luck's employer) to prevent Mr. Luck from using the iPhone for non-XFL matters. Alpha waived it as a ground for terminating Mr. Luck or maintaining any claims against him.

133.    Likewise, Alpha affirmed Mr. Luck's personal use of the iPhone with full and complete knowledge of such use by assisting Mr. Luck in the initial transfer of his personal phone number and pre-existing data to the iPhone and thereafter permitting him to make personal use of the iPhone for the entirety of his employment. Thus, Alpha ratified Mr. Luck's personal use of the

iPhone and cannot use it as a ground for terminating Mr. Luck or maintaining any claims against him.

134.    Finally, because Alpha permitted Mr. Luck to make personal use of the iPhone for the entirety of his employment, assisted in the transfer of data from Mr. Luck's prior iPhone, and chose to remain silent to prevent Mr. Luck from curing any purported violations of XFL policy to his detriment, Alpha is estopped from now asserting it as a ground for terminating Mr. Luck or maintaining any claims against him.

**SET-OFF**

135.    Alpha wrongfully terminated, materially breached, and/or repudiated the Employment Contract in violation of the implied duty of good faith and fair dealing, all in an effort to avoid paying Mr. Luck the amounts owed under the Guaranty.

136.    As a result of Alpha's wrongful termination, material breach, and/or repudiation of the Employment Contract, Mr. Luck has suffered damages.

137.    If Alpha is awarded any of its alleged damages against Mr. Luck, Mr. Luck is entitled to a set-off in the amount of damages Mr. Luck suffered from Alpha's wrongful termination, material breach, and/or repudiation of the Employment Contract, up to the amount of damages awarded to Alpha.

**RECOUPMENT**

138.    Alpha wrongfully terminated, materially breached, and/or repudiated the Employment Contract in violation of the implied duty of good faith and fair dealing in an effort to avoid paying Mr. Luck the amounts owed under the Guaranty.

139.    As a result of Alpha's wrongful termination, material breach, and/or repudiation of the Employment Contract, Mr. Luck has suffered damages.

140.    If Alpha is awarded any of its alleged damages against Mr. Luck, recoupment should be applied against such recovery, up to the amount of any damages awarded to Alpha.

## **PRAYER**

WHEREFORE, based on the foregoing, Mr. Luck asks that this Court enter judgment in his favor, and against Alpha, and do the following:

a.   Render judgment that Alpha take nothing by its Counterclaims;

b.   Dismiss Alpha's Counterclaims with prejudice; and

c.   Grant Mr. Luck all other relief to which he may be entitled.

*Signature of counsel on following page.*

**PLAINTIFF OLIVER LUCK**

*/s/ Paul J. Dobrowski*

Paul J. Dobrowski (phv10563)
Vanessa L. Pierce (phv10561)
Jared A. McHazlett (phv10650)
DOBROWSKI, LARKIN & STAFFORD, L.L.P.
4601 Washington Avenue, Suite 300
Houston, Texas 77007
Telephone: (713) 659-2900
Facsimile: (713) 659-2908
Email:  pjd@doblaw.com
Email:  vpierce@doblaw.com
Email : jmchazlett@doblaw.com

AND

*/s/ Andrew M. Zeitlin*

Andrew M. Zeitlin (Fed. Bar No. ct21386)
Joette Katz (Fed. Bar No. ct30935)
Sarah E. Gleason (ct30906)
SHIPMAN & GOODWIN LLP
300 Atlantic Street
Stamford, Connecticut 06901
Tel.: (203) 324-8100
Fax: (203) 324-8199
Email: azeitlin@goodwin.com
Email: jkatz@goodwin.com

**HIS ATTORNEYS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2021, a copy of the foregoing was filed electronically and served on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system, or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Paul J. Dobrowski*

9466469v1