# EXHIBIT A

## PLAINTIFF'S COUNTER-STATEMENT OF FACTS

Plaintiff submits the following statement of fact in contravention of Defendants' statement of fact in the DCM:

### Hiring Callaway (pages 3-4 of DCM)

The email dated July 17, 2019 proves that McMahon's approval was not necessary if a player met the Four Criteria during background checks. Ex B. The Four Criteria email dated July 17, 2019 proves that McMahon subsequently agreed to an objective standard instead of his ambiguous "good character" and "bad behavior" standards. Ex. B.

Defendants attempt to mislead the Court because Luck did not "deceive" McMahon, much less "repeatedly," regarding the hiring of Callaway. As Defendants admit, Luck "told McMahon that he had hired Callaway." Under his Employment Contract, Luck had "full authority to hire, dismiss, replace or reassign" Callaway because the hiring of Callaway was not a material business decision. *See* ECF 145-1 at 2. In the context of the XFL's $90 million plus budget, Callaway's contract was immaterial and the financial consequences did not need to be explained to Alpha. *See* ECF 145 ¶13. Because there were over 1,000 potential players that were reviewed, Luck could not bring each player to McMahon's attention. *See* ECF 128-8 at RFA No. 6. Thus, only those players that Luck believed were so well-known that they posed serious reputational issues to the XFL were brought to McMahon's attention. *Id*. Luck did not "repeatedly request McMahon's approval to allow Player A to play in the XFL." *See* ECF 166 ¶22.a.

Luck hired Callaway only after Callaway passed the Four Criteria background check approved by McMahon. *See* ECF 128-3 at 9. McMahon encouraged Luck to upgrade the quality of wide receivers. *See* ECF 145-3 at 3-4. Further, McMahon was made aware of the signing of Callaway in advance and did not object at the time. *Id*.

Luck did not deceive the other XFL executives. The Four Criterial email is proof positive that other XFL executives were aware that McMahon had approved the bases upon which Callaway was signed because the other XFL executives, including Mr. Pollack, are recipients of the Four Criterial email. Ex. B. Indeed, based on the foregoing and with knowledge of Callaway's "character issue", McMahon's senior advisor Mr. DeVito did not object to hiring Callaway. *See* ECF 128-3 at 12.

### Terminating Callaway January 29, 2020 (pages 5-6 of DCM)

Luck began the termination process of Callaway immediately after talking with McMahon at approximately 11:00 pm on January 28, 2020. *See* ECF 166 ¶s 39 and 144. Luck initiated contact with Callaway's coach Mark Trestman at 11:15 p.m. on January 28, 2020. *See* ECF 166 ¶14. The next morning, at 6:30 a.m., Luck told Trestman that Callaway was being terminated, that Luck and Eric Galko, the former XFL Director of Player Personnel, were contacting Callaway's agent to inform him of the termination, and that Luck would contact Trestman again as soon as Callaway's agent was notified. *Id*. That same morning, Luck's subordinate Galko informed Callaway's agent that Callaway was being terminated before Callaway was injured at practice on January 29, 2020.

1

*See* ECF 166 ¶ 46. When Luck contacted Trestman again, Trestman asked if they could terminate Callaway after practice because the players were already at practice and it would have been awkward and bad for team morale to terminate Callaway in front of the other players. *See* ECF 116 ¶14.

Callaway was injured in practice, which mandated that Callaway be placed on Injured Reserve rather than terminated. *See* ECF 166 ¶46. Consequently, Luck had no discretion. Being placed on Injured Reserve is an "effective termination" because Callaway could not play in the XFL. *See* ECF 116 ¶14.

Indeed, even after Callaway's employment was terminated, and after an alleged investigation by Mr. McDevitt on January 30, 2020, Defendants did not terminate Luck much less provide him with thirty (30) days notice and opportunity to cure. *See* ECF 172-6 ¶7. Further, according to Mr. McDevitt's affidavit, he conducted an investigation of the Callaway situation on January 30, 2020 and presumably was made aware of these facts. *Id*. Since McDevitt was the attorney for McMahon and Alpha, McMahon was aware of these facts and could not have been deceived.

**Technology and Confidentiality (pages 7-8 of DCM)**

Again, Defendants' attempt to mislead the Court. Luck has ***not*** admitted his use was a "violation of XFL policy." Alpha relies on page 4 of Luck's Brief Position Statement where he states: "Mr. Luck's proposed stipulation establishes both the nature and extent (regular and routine) of his use of the iPhone for work and non-work purposes, and arguably establishes a technical violation of XFL policy.3*" ECF 106 at 4. Footnote 3 states "Mr. Luck, of course, does **not concede** that regular and routine use of the XFL-issued iPhone constituted "cause" to terminate his employment." *Id*.

Contrary to Defendants' (mis)representation, there was no directive in the Termination Letter to stop using the XFL iPhone. Defendants cite is to Luck's Answer, paragraph 64: "Mr. Luck denies the allegations in Paragraph 64 except that after receiving the Termination Letter, **which did not state** that he was prohibited from further use of the XFL iPhone, Mr. Luck continued to use the Alpha-issued iPhone in the ordinary course, including to receive text messages and telephone calls, until April 17, 2020." See ECF 166 ¶64 (emphasis added).

Despite Defendants' (mis)representation to the contrary, Luck did not delete any XFL data. Defendants cite the proposed Parties Spoliation Stipulation that Defendants refused to sign which said nothing had been deleted except "the deletion of a text message string among members of Plaintiff's immediate family ("Luck Family Chat") and/or "spam," "phishing," unsolicited advertisements, or "pocket dial"-type texts." *See* ECF 113-1 ¶3-4.

Defendants once again mislead the Court by claiming Luck violated the Confidentiality, Non-Solicitation and Non-Competition Agreement ("CNNA") by disclosing information to agent Will Wilson. Under Section 3 of the CNNA, Luck was permitted to "<u>divulge, disseminate, discuss, disclose, lecture upon, or publish any Confidential Information</u>" "in connection with the course of [Luck's] duties to [Alpha]." *See* ECF 145-1 at 9. Consequently and as expressly set forth in

paragraph 3 of the CNNA, Luck did not need McMahon's permission to make the disclosure to Mr. Wilson.

**Post March 13, 2020 (page 9 of DCM)**

Luck was scheduled to leave XFL headquarters in Stamford, Connecticut on Friday, March 13, 2020 to travel to Seattle, Washington for an XFL game that weekend. *See* ECF 145 ¶15. The XFL games for the weekend were cancelled. Luck left the XFL office late Friday afternoon with the intent to return to the XFL offices on Monday, March 16, 2020. *See* ECF 128-8 at RFA No. 54; *see also* ECF 116 ¶16 N.1. Alpha shutdown the XFL office on March 16, 2020, and shortly thereafter Connecticut Governor Lamont issued a stay-at-home order. *See* ECF 145 ¶15; *see also* ECF 128-8 at RFA No. 54. Because of these directives Luck did not return to the XFL offices and he worked remotely. *Id*.

Luck was not in charge of the XFL's business operations. Mr. Pollack handled these activities. Nevertheless, Mr. Luck's subordinate, Sam Schwartzstein, attended the meetings. *See* ECF 166 ¶106 a-c; *see also* ECF 128-2 at 27-31. The only meetings that conflicted were the XFL COVID meeting and the ACC COVID meeting on April 1, 2020. Mr. Luck attended the ACC meeting on April 1, 2020. *See* ECF 172-5 at Interrogatory No. 3.