# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

OLIVER LUCK,
    *Plaintiff*,

    v.

VINCENT K. MCMAHON and ALPHA
ENTERTAINMENT, LLC,
    *Defendants*.

No. 3:20-cv-00516 (VAB)

## RULING AND ORDER ON MOTION TO STRIKE, MOTIONS FOR SANCTIONS, MOTION FOR PARTIAL SUMMARY JUDGMENT, AND CROSS-MOTIONS FOR SUMMARY JUDGMENT

Oliver Luck ("Plaintiff") has filed this action against Vincent K. McMahon and Alpha Entertainment LLC (together, "Defendants") to recover salary and bonuses allegedly owed from Mr. Luck's employment contract as Commissioner and CEO of the XFL ("Employment Contract") with Alpha Entertainment ("Alpha"), which Mr. McMahon allegedly personally guaranteed, arising from Mr. Luck's alleged wrongful termination. Second Am. Compl., ECF No. 145 (Jan. 22, 2021) ("Second Am. Compl.").

Pending before the Court are Mr. Luck's motion for partial summary judgment [ECF No. 207], motion for summary judgment [ECF No. 380], motion for sanctions [ECF No. 366], and motion to strike [ECF No. 363], as well as Defendants' motion for summary judgment [ECF No. 374] and motion for sanctions [ECF No. 382].

For the following reasons, Mr. Luck's motion for partial summary judgment is **GRANTED**.

Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

Mr. Luck's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

Mr. Luck's motion to strike and motion for sanctions are **DENIED**.

Defendants' motion for sanctions is **GRANTED**.

In sum, as a matter of law, the purported disclosure of confidential information, the alleged failure of Mr. Luck to perform his duties, and his alleged misuse of the Alpha-issued iPhone do not provide a basis for terminating Mr. Luck for cause without providing notice and an opportunity to cure under the Employment Contract. As to whether Defendants had cause within the meaning of the Employment Contract to terminate Mr. Luck for his hiring and termination of Mr. Callaway, however, there are genuine issues of material fact as to: (1) whether the hiring and termination of Mr. Callaway was a permissible, enumerated reason for terminating Mr. Luck for cause; and (2) even it was, whether Mr. Luck's hiring of and failure to terminate Mr. Callaway could have been reasonably susceptible to cure.

As a result, a trial will be held addressing those two issues, as they relate to Mr. Luck's breach of contract claim and—to the extent Mr. Luck seeks "a declaration that Alpha wrongfully terminated, materially breached and/or repudiated the Employment Contract without Cause," Second Am. Compl. ¶ 28—related declaratory judgment claim, and Defendants' related counterclaims. If a jury finds that Defendants lacked cause within the meaning of the Employment Contract to fire Mr. Luck, *i.e.*, the hiring and termination of Mr. Callaway was not a permissible, enumerated reason for firing Mr. Luck, or even if it was, Mr. Luck's hiring of and failure to terminate Mr. Callaway could have been reasonably susceptible to cure, any alleged misuse of the Alpha-issued iPhone cannot be used as evidence to limit the scope of any damages allegedly owed to Mr. Luck, as a matter of law.

Finally, while both Mr. Luck's motion to strike and motion for sanctions have been denied, Defendants are entitled to sanctions for Mr. Luck's spoliation of evidence. This case will not be dismissed as a sanction, and the sanctions will only be monetary and shall not exceed $25,000 in total, given the limited role this evidence ultimately played in this case. Any motion for an award of monetary sanctions shall be due fourteen (14) days after the jury renders its verdict.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

<u>The Employment Contract</u>

On or about May 30, 2018, Mr. Luck and Alpha Entertainment LLC ("Alpha") entered into a contract ("Employment Contract") to employ Mr. Luck as Commissioner and Chief Executive Officer ("CEO") of the XFL. Pl. Oliver Luck's Local R. 56(a)(1) Statement of Undisputed Material Facts ¶ 1, ECF No. 381 (Nov. 12, 2021) ("Pl.'s Second Local R. 56(a)(1)"). The Employment Contract provided:

> Mr. Luck will have authority, duties and responsibilities consistent with the commissioners of the major U.S. professional sports leagues . . . and will be the senior-most executive of the XFL. Mr. Luck will have full authority to hire, dismiss, replace, or reassign any employee, consultant or contractor of the XFL, all of whom will report, directly or indirectly, to Mr. Luck, subject to Mr. McMahon's preapproval for material business decisions. Mr. Luck will report exclusively and directly to Mr. McMahon.
>
> Mr. Luck will devote substantially all of his business time to the performance of his duties to the XFL, provided that he may (i) continue to serve as a member of the board of American Campus Communities, Inc. and (ii) serve on not-for-profit boards and participate in other civic and charitable activities, so long as such activities do not interfere with the performance of his duties to the XFL.

Ex. 1 to Pl. Oliver Luck's Local R. 56(a)(1) Statement of Undisputed Material Facts at 1, ECF

No. 381-1 (Nov. 12, 2021) ("Employment Contract"); Local R. 56(a)(2) Statement of Facts in

Opp'n to Pl.'s Mot. for Summ. J. by Defs. Alpha Entertainment LLC and Vincent K. McMahon

¶¶ 3–4, ECF No. 401 (Dec. 3, 2021) ("Defs.' Second Local R. 56(a)(2)") (admitting but stating

that "[Mr.] Luck admitted that he reported to [Mr.] McMahon and that it was [Mr.] McMahon's

prerogative to issue directives to [Mr.] Luck regarding the development of the XFL brand and

the criteria he wanted [Mr.] Luck to follow in deciding whether certain players would not be

permitted to play in the XFL").

    Under the Employment Contract, Alpha could terminate Mr. Luck's employment "at any

time, with or without Cause." Employment Contract at 3. As relevant here, the Employment

Contract stated:

> Alpha shall have "Cause" to terminate Mr. Luck's employment
> hereunder by reason of any of the following which is materially and
> demonstrably injurious to the interest, property, operations, business
> or reputation of Alpha or its affiliates: . . . (iii) Mr. Luck's willful
> and intentional material misconduct in performance of his duties or
> gross negligence of his duties (other than due to any illness or
> disability), including an intentional failure to follow any applicable
> XFL policies or directives . . . .

*Id*.

    The Employment Contract further provided, "If the act or omission would otherwise

constitute 'Cause' hereunder is reasonably susceptible to cure, Mr. Luck shall have 30 days from

his receipt of written notice from Alpha describing such act or omission to effect the cure of such

circumstances." *Id.* If, however, "the act or omission that would otherwise constitute 'Cause'

hereunder is not reasonably susceptible to cure, or such circumstances have not been cured

within such 30-day period, such act or omission will thereupon constitute 'Cause' hereunder." *Id.*

Upon termination for cause, Mr. Luck was entitled under the Employment Contract only "to be paid for previously accrued salary and any vested employee benefits," *i.e.*, "Accrued Obligations." *Id.* Upon termination without cause, Mr. Luck was entitled "to receive a lump sum cash amount, payable to him within 60 days of such termination, which shall be equal to[, *inter alia*,] (i) the aggregate amount of Base Salary and Guaranteed Annual Bonuses that would otherwise be payable to him during the remaining scheduled term of this Contract . . . plus (ii) all Accrued Obligations . . . ." *Id.*

In addition, the Employment Contract provided that "[a]ll severance payments under this section (other than the Accrued Obligations) are conditioned upon [, *inter alia*,] . . . the absence of circumstances that would constitute Cause." *Id.* at 3–4.

Guaranty and Confidentiality Agreement

On or about May 30, 2018, Mr. McMahon signed a Guaranty to the Employment Contract, under which Mr. McMahon was the Guarantor, Mr. Luck was the Executive, Alpha was the Obligor, and the Employment Contract and Equity Agreements together were the Transaction Documents. Pl.'s Second Local R. 56(a)(1) ¶ 9; Defs.' Second Local R. 56(a)(2) ¶ 9. Under the Guaranty, Mr. McMahon guaranteed "as primary obligor and not merely as a surety, the due and punctual payment ad [*sic*] performance by the Obligor of all of its agreements and obligations under the Transaction Documents." Pl.'s Second Local R. 56(a)(1) ¶ 11 (citing Ex. A to Ex. 1 to Pl. Oliver Luck's Local R. 56(a)(1) Statement of Undisputed Material Fact, ECF No. 381-1 (Nov. 12, 2021)).

On or about the same day, Mr. Luck and Alpha signed the Confidentiality, Non-Solicitation, and Non-Competition Agreement ("Confidentiality Agreement" or "CNNA"), under which Alpha was the Employer and Mr. Luck was the Employee. *Id.* ¶ 14 (citing Ex. B to Ex. 1

to Pl. Oliver Luck's Local R. 56(a)(1) Statement of Undisputed Material Fact, ECF No. 181-1 (Nov. 12, 2021) ("Confidentiality Agreement")). The Confidentiality Agreement provided that, "[e]xcept in connection with the course of Employee's duties to Employer, or as otherwise required by any applicable law, rule or regulation, Employee shall not, during his employment by Employer or at any time thereafter, directly or indirectly use, divulge, disseminate, discuss, disclose, lecture upon, or publish any Confidential Information without having first obtained the prior written consent from Employer to do so." *Id.* ¶ 16 (citing Confidentiality Agreement ¶ 3).

While serving as XFL's Commissioner and CEO, Mr. Luck sent XFL information to his personal e-mail account and to his wife's personal e-mail account. Pl.'s Local R. 56(a)(1) ¶ 33. Mr. Luck also disclosed XFL information to William Wilson, his brother-in-law and an employee of Wasserman Media Group ("Wasserman"), a sports agency that represented professional athletes and coaches, in connection with work Wasserman was performing for the XFL and "to further Mr. Luck's job performance with the XFL by seeking Mr. Wilson's knowledge of the sport's industry." *Id.* ¶¶ 34–35; *but see* Defs.' Second Local R. 56(a)(2) ¶ 35 ("[Mr.] Luck disclosed to Mr. Wilson confidential information of the XFL that was not in connection with work Wasserman was performing for the XFL regarding potential XFL opportunities in Mexico or to further Mr. Luck's job performance with the XFL by seeking Mr. Wilson's knowledge of the industry.").

<u>The Employee Handbook</u>

In October 2018, Alpha issued the XFL Employee Handbook & Code of Business Conduct ("Employee Handbook"). Local R. 56(a)(1) Statement of Undisputed Material Facts in Support of Defs.' Mot. for Summ. J. ¶¶ 68–69, ECF No. 375 (Nov. 12, 2021) ("Defs.' Local R. 56(a)(1)); Local Rule 56(a)(2) Statement of Facts in Opp'n to Defs.' Mot. for Summ. J. ¶ 68,

ECF No. 402 (Dec. 3, 2021) ("Pl.'s Local R. 56(a)(2)") (denying that "the referenced citations

establish[] that Mr. Luck was subject to the Employee Handbook"). Under the Employee

Handbook, XFL technology was "to be used for XFL related business only; users must not store

or transmit any non-business-related files, including but not limited to personal data such as

documents, spreadsheets, reports, [and] presentations." Defs.' Local R. 56(a)(1) ¶ 74 (citing Ex.

37 to Local R. 56(a)(1) Statement of Undisputed Material Facts in Support of Defs.' Mot. for

Summ. J. at 16, ECF No. 375-37 (Nov. 12, 2021) ("Employee Handbook")); Pl.'s Local R.

56(a)(2) ¶ 74 (stating that "[t]he October 2018 version of the Employee Handbook reflected the

language set forth in Paragraph 74 and Defs.' Ex. 37," but alleging that "as of March 13, 2020,

the XFL circulated a revised technology acceptable use policy which provided that "[b]rief and

occasional personal use of XFL Technology is acceptable as long as" such use satisfied certain

criteria (citing Ex. 17 to Local Rule 56(a)(2) Statement of Facts in Opp'n to Defs.' Mot. for

Summ. J. at 1, ECF No 402-39 (Dec. 3, 2021) ("Technology Acceptable Use Policy")).

        Mr. Callaway's Signing to the XFL

        The XFL consisted of eight active teams across eight cities, as well as a ninth team and

players who attended training camps but did not play for the XFL. Pl.'s Local R. 56(a)(1) ¶¶ 17–

18. At least thirty-one players in the XFL received signing bonuses ranging from $5,000 to

$200,000. *Id.* ¶ 24.

        In an e-mail to XFL personnel dated July 17, 2019, Mr. Luck stated that Mr. McMahon

"[was] on board with the following criteria [for] disqualifying a player" from the XFL: "(1) any

felony charge or conviction[,] (2) any credible allegation of domestic violence[,] (3) any repeat

misdemeanor, ie [*sic*] 2x or more[,] (4) any conviction of distributing illegal drugs." Ex. 8 to

Local R. 56(a)(1) Statement of Undisputed Material Facts in Support of Defs.' Mot. for Summ.

J., ECF No. 375-8 (Nov. 12, 2021); Defs.' Local R. 56(a)(1)" ¶ 18; Pl.'s Local R. 56(a)(2) ¶ 18

(admitting that Mr. McMahon "agreed with those four criteria").

On January 13, 2020, Mr. Luck received a copy of a Social Media Audit for prospective

XFL player Antonio Callaway, which stated that (1) "some content on [Mr.] Callaway's social

media 'pertains to his suspension from the team in college for sexual assault allegations'"; (2)

"search engines are split between general spots coverage (stats, highlights, etc.) and negative

press coverage"; (3) "[o]ther general links also include news about his arrest for marijuana

possession"; (4) "[Mr. Callaway] was suspended in 2018 from the team while playing at Florida

for sexual assault allegations"; and (5) "[Mr.] Callaway's Wikipedia entry includes 'mention of

drug and sexual assault issues.'" Defs.' Local R. 56(a)(1) ¶ 28 (citing Ex. 19 to Local R. 56(a)(1)

Statement of Undisputed Material Facts in Support of Defs.' Mot. for Summ. J., ECF No. 375-19

(Nov. 12, 2021)); *but see* "Pl.'s Local R. 56(a)(2) ¶ 28 ("Callaway passed the background check

and met the four criteria that had been set for playing in the XFL").

After receiving Mr. Callaway's Social Media Audit, Mr. Luck sent a text to Mr.

McMahon that same day to inform him that an XFL team had claimed Mr. Callaway, "but did

not disclose to [Mr.] McMahon any of the negative information regarding [Mr.] Callaway's

background." Defs.' Local R. 56(a)(1) ¶ 29; *see also* Pl.'s Local R. 56(a)(2) ¶ 29 (objecting on

the grounds that "Mr. Luck did not include any other details about Mr. Callaway's background

because Mr. Callaway passed the background check and met the four criteria").

Mr. Callaway signed an XFL player contract on January 16, 2020. Defs.' Local R.

56(a)(1) ¶ 30. That same day, Mr. Luck received an e-mail from a senior XFL executive, Basil

DeVito, which "question[ed] the decision to sign [Mr.] Callaway and inform[ed] [Mr.] Luck that

[Mr.] Callaway had a history of criminal charges, including credit card fraud." *Id.* ¶ 31; *see also*

Pl.'s Local R. 56(a)(2) ¶ 31 ("Mr. DeVito had no responsibility or role in recruiting XFL players.").

On January 16, 2020, Mr. Luck sent a text to Mr. McMahon that "we have upgraded our overall receiving corp with a couple of very good players: Tre McBride (LA) and Antonio Callaway (TB). Both have significant pro experience and are already with their respective teams." Pl.'s Local R. 56(a)(2) ¶ 34 (citing Ex. 12 to Local R. 56(a)(1) Statement of Undisputed Material Facts in Support of Defs.' Mot. for Summ. J. at 3, ECF No. 375-12 (Nov. 12, 2021)). Mr. Luck did not include additional details regarding Mr. Callaway's background in his text message or during his subsequent conversation with Mr. McMahon on January 18, 2020. Defs.' Local R. 56(a)(1) ¶ 34; Pl.'s Local R. 56(a)(2) ¶ 48. Before speaking with Mr. McMahon on January 18th, Mr. Luck was aware that Mr. Callaway had been accused of sexually assaulting a female student while Mr. Callaway was a student at the University of Florida. Defs.' Local R. 56(a)(1) ¶ 42; Pl.'s Local R. 56(a)(2) ¶ 42 ("Mr. Luck was 'aware of sexual assault allegations and the fact that [Mr. Callaway] was cleared of that allegation.'" (quoting Ex. 2 to Local R. 56(a)(1) Statement of Undisputed Material Facts in Support of Defs.' Mot. for Summ. J. at 124:23–25, ECF No. 375-2 (Nov. 12, 2021) ("Luck Dep."))).

Mr. Luck, on behalf of Alpha, countersigned the XFL Standard Player Contract between Antonio Callaway and Alpha on January 23, 2020. Pl.'s Second Local R. 56(a)(1) ¶ 20; Defs.' Local R. 56(a)(1) ¶ 50. Under the XFL Standard Player Contact, Mr. Callaway would receive a one-time signing bonus of $125,000 upon execution of the contract and the successful passing of a physical examination. Pl.'s Second Local R. 56(a)(1) ¶ 21. At the time the contract was signed, the total projected signing bonuses, including Mr. Callaway's bonus, "was less than half of the $4.4 million Commissioner Discretion Budget" from which Mr. Luck paid signing bonuses. *Id.*

¶¶ 22–23; *but see* Defs.' Second Local R. 56(a)(2) ¶ 23 (stating that "an additional $1,500,000 was projected to be removed from the pool[,] leaving $825,500 remaining in the pool").

On the evening of January 28, 2020, Mr. McMahon instructed Mr. Luck to terminate Mr. Callaway. Pl.'s Second Local R. 56(a)(1) ¶ 25; Defs.' Local R. 56(a)(1) ¶ 52.

After Mr. McMahon told Mr. Luck to terminate Mr. Callaway, Mr. Luck spoke with Mr. Callaway's head coach, Marc Trestman, regarding Mr. Callaway's termination, and, on January 29, 2020, permitted Mr. Callaway to participate in a practice session that day. Defs.' Local R. 56(a)(1) ¶¶ 53–55; *but see* Pl.'s Local R. 56(a)(2) ¶¶ 54 ("Mr. Luck testified that . . . [he] told [Mr. Trestman] to 'sit tight until we heard back from the agent, but at that point, that Antonio Callaway would be out of the league. He would be cut, terminated, etc.'" and informed Mr. Trestman "you've got to cut [Mr. Callaway] immediately after practice" (quoting Luck Dep. at 233:3–234:3)).

While participating in the practice session on January 29th, Mr. Callaway "suffered a serious injury" that required him to be placed on injured reserve. Defs.' Local R. 56(a)(1) ¶ 56. In a text message to Mr. McMahon later that day, Mr. Luck did not inform Mr. McMahon of Mr. Callaway's injury. *Id.* ¶ 57.

Following Mr. Callaway's injury, "the XFL was required to pay him all sums that were due under his contract plus any workers compensation benefits to which he was entitled." *Id.* ¶ 59; *but see* Pl.'s Local R. 56(a)(2) ¶ 61 (denying that "the XFL was required to pay the worker's compensation payments").

Termination of Mr. Luck

On March 15, 2020, Alpha instructed its employees to work from home beginning on March 16, 2020 due to the COVID-19 pandemic. Pl.'s Second Local R. 56(a)(1) ¶ 30. Mr. Luck worked remotely on matters related to the XFL beginning on March 16, 2020. *Id.* ¶ 31.

On April 9, 2020, Alpha terminated Mr. Luck by a letter ("Termination Letter") signed by Jerry McDevitt, counsel for Alpha. Pl.'s Second Local R. 56(a)(1) ¶ 37 (citing Ex. 14 to Pl. Oliver Luck's Local R. 56(a)(1) Statement of Undisputed Material Fact, ECF No. 381-34 (Nov. 12, 2021) ("Termination Letter")). The Termination Letter ended Mr. Luck's Employment Contract "effectively immediately, for cause, including for gross negligence of [his] duties." *Id.* ¶ 45 (citing Termination Letter at 2).

The letter stated:

> During your tenure at XFL, there were numerous instances of gross negligence in the performance of your duties including, but not limited to, the manners and methods used by you in obtaining venues for the XFL to locate teams and in connection with the negotiation of term sheets and venue agreements. Additionally, you disregarded the lawful directives of Mr. McMahon not to sign or employ players with questionable backgrounds. In one prominent example of your failure to abide by the known policy of not signing players with problematic backgrounds and history, you not only . . . enter[ed] into a contract with Antonio Callaway but also . . . g[ave] him a very substantial signing bonus of $125,000.

Termination Letter at 1. According to the Termination Letter, following the onset of the COVID-19 pandemic and cancellation of the XFL season on March 13, 2020, Mr. Luck also became "disengaged from the XFL and its efforts to deal with the complications of the Covid-19 pandemic and . . . to determine if there was a viable path forward for the XFL," and "[did] not devote[] substantially all of [his] business time to the performance of [his] duties since March 13ᵗʰ." *Id.* at 3. The letter further stated, "this letter is not intended to be, nor is it, an exhaustive

and comprehensive statement of all facts justifying Alpha's decision to terminate your contract for cause." *Id.*

Before terminating Mr. Luck, Alpha did not provide Mr. Luck with notice or a thirty-day opportunity to cure any violation of XFL policies or alleged deficiencies in his job performance. Pl.'s Second Local R. 56(a)(1) ¶¶ 46–47; *but see* Defs.' Second Local R. 56(a)(2) ¶ 47 (denying that Mr. Luck "was not provided with notice and an opportunity to cure the Callaway hiring and firing" but admitting that Mr. Luck was not provided with notice and an opportunity to cure the other grounds for termination for cause "because it was not required and the circumstances were not reasonably susceptible to cure").

Alpha filed for bankruptcy on April 13, 2020. Pl.'s Second Local R. 56(a)(1) ¶ 50; Defs.' Second Local R. 56(a)(2) ¶ 50.

Alpha-Issued iPhone

During his employment at the XFL, Mr. Luck used his Alpha-issued iPhone "regularly and routinely for both work and personal matters." Pl.'s Local R. 56(a)(2) ¶ 81. Between March 14, 2020 and April 9, 2020, Mr. Luck used his iPhone to send or receive at least 1,031 text messages and 887 e-mails "that were not related to XFL business." Defs.' Local R. 56(a)(1) ¶ 82. During this same time period, Mr. Luck also used his Alpha-issued iPhone to make "hundreds of calls totaling over twenty-one (21) hours that were not related to XFL business." *Id.* ¶ 83.

In addition to listing the reasons for Mr. Luck's termination, the Termination Letter requested that Mr. Luck return his Alpha-issued iPhone to Alpha. Termination Letter at 3.

On April 9, 2020, after receiving the Termination Letter, Mr. Luck deleted his Alpha-issued iPhone's browser history, in part "because there was some embarrassing information in the browser history." Pl.'s Local R. 56(a)(2) ¶ 95.

12

Mr. Luck returned the iPhone to Alpha's bankruptcy counsel on May 5, 2020. *Id.* ¶ 103.

### B.  Procedural History

Given the significant length of this litigation, the Court assumes familiarity with the procedural history of the case and only includes events relevant to the various pending motions. *See* Ruling and Order on Pending Mots., ECF No. 326 (Sept. 17, 2021) ("Ruling and Order"); Ruling and Order on Disc. Disputes, ECF No. 152 (Feb. 5, 2021); Ruling and Order on Mot. for Pre J. Remedy and Mot. for Disclosure of Assets, ECF No. 79 (June 26, 2020) ("June 26, 2020 Ruling and Order").

On June 9, 2021, Mr. Luck filed a motion for partial summary judgment. Pl. Oliver Luck's Mot. for Partial Summ. J. Regarding Personal Use of XFL-Issued iPhone, ECF No. 207 (June 9, 2021); Pl. Oliver Luck's Mem. of Law in Supp. of Mot. for Partial Summ. J. Regarding Personal Use of XFL-Issued iPhone, ECF No. 208 (June 9, 2021) ("Pl.'s Mot. for Partial Summ. J."); Pl. Oliver Luck's Local R. 56(a)(1) Statement of Undisputed Material Facts, ECF No. 209 (June 9, 2021) ("Pl.'s First Local R. 56(a)(1)").

On July 14, 2021, Defendants filed their opposition to Mr. Luck's motion for partial summary judgment. Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Partial Summ. J. Regarding Personal Use of XFL-Issued iPhone, ECF No. 238 (July 14, 2021) ("Defs.' Opp'n to Mot. for Partial Summ. J."); Local R. 56(a)(2) Statement of Facts in Opp'n to Pl.'s Mot. for Partial Summ J. Regarding Personal Use of XFL-Issued iPhone, ECF No. 239 (July 14, 2021) ("Defs.' First Local R. 56(a)(2)").

On August 2, 2021, Mr. Luck filed a reply in support of his motion for partial summary judgment. Pl. Oliver Luck's Reply in Support of Mot. for Summ. J. Regarding Personal Use of XFL Issued iPhone, ECF No. 269 (Aug. 2, 2021).

On September 17, 2021, the Court issued a Ruling and Order granting in part and denying in part Defendants' motion to dismiss, as well as disposing of the parties' various pending discovery motions. Ruling and Order.

Following the Court's issuance of the Ruling and Order, the Court ordered the parties to file dispositive motions by November 12, 2021, with any responses to dispositive motions due by December 3, 2021, and any replies to any response due by December 17, 2021. Am. Scheduling Order, ECF No. 328 (Sept. 17, 2021).

On September 24, 2021, Mr. Luck requested clarification of the portion of the Court's Ruling and Order that addressed Defendants' motion to dismiss Mr. Luck's claim against Mr. McMahon for breach of the implied duty of good faith. Pl.'s Mot. for Clarification, and, in the Alternative, Mot. for Recons., ECF No. 332 (Sept. 24, 2021). On September 27, 2021, the Court denied Mr. Luck's request, stating:

> Mr. Luck's Motion for Clarification, and, in the Alternative, Motion for Reconsideration is **DENIED**. The Court's ruling and order is clear. *See* Ruling and Order on Pending Mots., ECF No. 326 at 23 ("Because Mr. McMahon is not a signatory to the Employment Contract, he cannot be held liable for breach of the implied duty of good faith with respect to that agreement.").

Order, ECF No. 333 (Sept. 27, 2021).

On September 28, 2021, Mr. Luck filed a renewed motion to compel the deposition of Alpha under Rule 30(b)(6). Pl.'s Renewed Mot. to Compel Rule 30(b)(6) Dep. of Def. Alpha Entertainment, LLC, ECF No. 334 (Sept. 28, 2021).

In accordance with the Court's order, *see* Order, ECF No. 336 (Sept. 29, 2021), Defendants opposed the motion on October 4, 2021, Alpha Entertainment LLC's Mem. in Opp'n to Pl.'s Renewed Mot. to Compel Rule 30(b)(6) Dep., ECF No. 344 (Oct. 4, 2021).

14

On October 8, 2021, the Court granted Mr. Luck's motion to compel Alpha's Rule 30(b)(6) deposition to the extent provided in the Order. Order, ECF No. 349 (Oct. 8, 2021).

On October 20, 2021, Mr. Luck moved to strike certain allegations from Defendants' Answers to Mr. Luck's Second Amended Complaint. Pl.'s Mot. to Strike Limited Portions of Defs.' Answers, ECF No. 363 (Oct. 20, 2021); Pl.'s Mem. of Law in Supp. of Mot. to Strike Limited Portions of Defs.' Answers, ECF No. 363-1 (Oct. 20, 2021) ("Pl.'s Mot. to Strike").

On October 26, 2021, Mr. Luck moved for sanctions against Alpha for allegedly failing to prepare its corporate representative for the Rule 30(b)(6) deposition. Pl.'s Mot. for Sanctions, ECF No. 366 (Oct. 26, 2021); Pl.'s Mem. of Law in Supp. of Mot. for Sanctions, ECF No. 366-1 (Oct. 26, 2021) ("Pl.'s Mot. for Sanctions").

On November 10, 2021, Defendants filed their opposition to Mr. Luck's motion to strike. Defs.' Mem. in Opp'n to Pl.'s Mot. to Strike Limited Portions of Defs.' Answers, ECF No. 369 (Nov. 10, 2021) ("Defs.' Opp'n to Mot. to Strike").

On November 12, 2021, Defendants filed a motion for summary judgment and accompanying statement of undisputed material facts. Defs.' Mot. for Summ. J., ECF No. 374 (Nov. 12, 2021); Defs.' Mem. of Law in Support of Mot. for Summ. J., ECF No. 374-1 (Nov. 12, 2021) ("Defs.' Mot."); Defs.' Local R. 56(a)(1).

Defendants also filed a motion for sanctions for the alleged spoliation of evidence against Mr. Luck. Defs.' Mot. for Sanctions for Spoliation of Evidence and Vexatious Litigation Misconduct Against Pl. Oliver Luck and His Lead Counsel Paul Dobrowski, ECF No. 382 (Nov. 12, 2021); Defs.' Mem. of Law in Supp. of Their Mot. for Sanctions for Spoliation of Evidence and Vexatious Litigation Misconduct Against Pl. Oliver Luck and His Lead Counsel Paul Dobrowski, ECF No. 382-1 (Nov. 12, 2021) ("Defs.' Mot. for Sanctions").

On the same day, Alpha filed an opposition to Mr. Luck's motion for sanctions. Alpha Entertainment LLC's Mem. in Opp'n to Pl.'s Mot. for Sanctions, ECF No. 378 (Nov. 12, 2021) ("Alpha's Opp'n to Mot. for Sanctions").

Also, on that same day, Mr. Luck filed a motion for summary judgment and accompanying statement of undisputed material facts. Pl. Oliver Luck's Mot. for Summ. J., ECF No. 380 (Nov. 12, 2021); Pl.'s Mem. of Law in Supp. of Mot. for Summ. J., ECF No. 380-1 (Nov. 12, 2021) ("Pl.'s Mot."); Pl.'s Second Local R. 56(a)(1).

On November 23, 2021, Mr. Luck filed replies in support of his motion for sanctions, *see* Pl.'s Reply in Support of Mot. for Sanctions, ECF No. 385 (Nov. 23, 2021), and motion to strike, *see* Pl.'s Reply in Supp. of Mot. to Strike Limited Portions of Defs.' Answers, ECF No. 384 (Nov. 23, 2021).

On December 2, 2021, Mr. Luck filed an amended memorandum in response to Defendants' motion for sanctions. Am. Mem. in Resp. to Defs.' Mot. for Sanctions, ECF No. 395 (Dec. 2, 2021) ("Pl.'s Opp'n to Mot. for Sanctions").

On December 3, 2021, Defendants filed their opposition to Mr. Luck's motion for summary judgment. Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J., ECF No. 398 (Dec. 3, 2021) ("Defs.' Opp'n"); Defs.' Second Local R. 56(a)(2).

The same day, Mr. Luck filed his opposition to Defendants' motion for summary judgment. Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J., ECF No. 400 (Dec. 3, 2021) ("Pl.'s Opp'n"); Pl.'s Local R. 56(a)(2).

On December 15, 2021, Mr. Luck filed a reply in support of his motion for summary judgment. Pl. Oliver Luck's Reply in Supp. of Mot. for Summ J., ECF No. 409 (Dec. 15, 2021) ("Pl.'s Reply").

On the same day, Alpha filed a reply in support of its motion for sanctions. Defs.' Reply Mem. in Supp. of Mot. for Sanctions for Spoliation of Evidence and Vexatious Litigation Misconduct, ECF No. 411 (Dec. 15, 2021).

On December 17, 2021, Defendants filed a reply in support of their motion for summary judgment. Defs.' Reply Mem. in Support of Mot. for Summ. J., ECF No. 416 (Dec. 17, 2021) ("Defs.' Reply").

On January 26, 2022, the Court held a motion hearing by videoconference on the currently pending motions. Min. Entry, ECF No. 420 (Jan. 26, 2022).

## II.     STANDARD OF REVIEW

### A.  Motion to Strike

Under Rule 12(f) of the Federal Rules of Civil Procedure, "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike under Rule 12(f) "are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute." *Corr. Officers Benevolent Ass'n of Rockland Cnty. v. Kralik*, 226 F.R.D. 175, 177 (S.D.N.Y. 2005); *see also Gierlinger v. Town of Brant*, No. 13-CV-00370 AM, 2015 WL 3441125, at *1 (W.D.N.Y. May 28, 2015) ("Because striking a [part] of a pleading is a drastic remedy . . . motions under Rule 12(f) are viewed with disfavor by the federal courts and are infrequently granted" (quotation marks and citation omitted)).

"Whether to grant or deny a motion to strike is vested in the trial court's sound discretion." *Tucker v. Am. Int'l Grp., Inc.*, 936 F. Supp. 2d 1, 15 (D. Conn. 2013) (citing *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), *abrogated on other grounds,*

*Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000)); *Impulsive Music v. Pomodoro Grill, Inc.*, No. 08-CV-6293, 2008 WL 4998474, at *2 (W.D.N.Y. Nov. 19, 2008)).

### B.  Motion for Summary Judgment

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some

18

unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-CV-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III.   DISCUSSION

### A.  Cross-Motions for Summary Judgment

Mr. Luck moves for summary judgment on all claims in the Second Amended Complaint and on Alpha's counterclaims for breach of contract and breach of fiduciary duty. Pl.'s Mot.

Defendants cross-move for summary judgment on the Second Amended Complaint, as well as
Alpha's counterclaim for breach of contract. Defs.' Mot.

As the parties advance competing interpretations of the Employment Contract, the Court
first addresses the terms and conditions of the Employment Contract's termination clause before
considering the merits of the parties' claims.

### 1. The Employment Contract's Termination Clause

"Interpretation of the written terms of a contract and the degree of compliance by the
parties are questions of fact to be determined by the trier of fact." *Burns v. Quinnipiac Univ.*, 120
Conn. App. 311, 322 (2010). However, "[w]here there is definitive contract language, the
determination of what the parties intended by their contractual commitments is a question of
law[.]" *Issler v. Issler*, 250 Conn. 226, 235 (1999); *accord Niehaus v. Cowles Bus. Media, Inc.*,
263 Conn. 178, 188 (2003).

"In determining a motion for summary judgment involving the construction of
contractual language, a court should accord that language its plain meaning giving due
consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought
to accomplish.'" *Cable Sci. Corp. v. Rochdale Vill., Inc.*, 920 F.2d 147, 151 (2d Cir. 1990)
(quoting *William C. Atwater Co. v. Pan. R.R. Co.*, 246 N.Y. 519, 524 (1927)); *see also Nat'l
Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 205 (2d Cir. 1989) ("Questions of intent, we note,
are usually inappropriate for disposition on summary judgment."). "[A] party cannot create an
ambiguity in any otherwise plain agreement merely by 'urging different interpretations in the
litigation.'" *Lee v. BSB Greenwich Mortg. Ltd. P'ship*, 267 F.3d 172, 178 (2d Cir. 2001)
(quotation marks omitted) (quoting *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d
481, 484 (2d Cir. 1999)); *Barnard v. Barnard*, 214 Conn. 99, 110 (1990) ("A court will not

torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous simply because lawyers or laymen contend for different meanings." (quotation marks omitted)). "If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." *Red Ball*, 173 F.3d at 484.

The Employment Contract provides,

> Mr. Luck's employment may be terminated by Alpha at any time, with or without Cause. For purposes of this Contract, Alpha shall have "<u>Cause</u>" to terminate Mr. Luck's employment hereunder by reason of any of the following which is materially and demonstrably injurious to the interest, property, operations, business or reputation of Alpha or its affiliates: . . . (iii) Mr. Luck's willful and intentional material misconduct in performance of his duties or gross negligence of his duties (other than due to any illness or disability), including an intentional failure to follow any applicable XFL policies or directives . . . .

> Upon a termination for Cause, Mr. Luck will only be entitled to be paid for previously accrued salary and any vested employee benefits ("<u>Accrued Obligations</u>"). . . .

Employment Contract at 3.

"If the act or omission that would otherwise constitute 'Cause' . . . is reasonably susceptible to cure," then "Mr. Luck shall have 30 days from receipt of written notice from Alpha describing such act or omission to effect the cure of such circumstances." *Id.* If, however, "the act or omission that would otherwise constitute 'Cause' . . . is not reasonably susceptible to cure, or such circumstances have not been cured within such 30-day cure period, such act or omission will thereupon constitute 'Cause' hereunder." *Id.*

The final provision of the Employment Contract's termination clause states that "[a]ll severance payments under this section (other than the Accrued Obligations) are conditioned

upon" several enumerated conditions, including "the absence of circumstances that would constitute Cause." *Id.* at 3–4.

The plain language of this Employment Contract provides specific circumstances—the enumerated conditions as well as notice and opportunity to cure—under which Mr. Luck may be terminated for cause. In determining whether either party is entitled to summary judgment in whole or in part, the Court first must determine whether there is a genuine issue of fact as to whether the enumerated conditions constituting cause have been met, as well as whether the Employment Contract's notice and opportunity to cure provision has been satisfied.

The Court will address each of these issues in turn.

### a. Termination "For Cause"

Mr. Luck argues that Defendants may terminate Mr. Luck for cause based on any of the six enumerated grounds for termination only if the acts alleged are "materially or demonstrably injurious to Alpha's interest, property, operations or business." Pl.'s Mot. at 1–2. He further argues that Defendants "misrepresent the contract language" by maintaining, with respect to the third ground for termination for cause under subsection three, that "gross negligence" of Mr. Luck's duties is one of the six enumerated grounds for cause. Pl.'s Opp'n at 7. According to Mr. Luck, the Employment Contract provides that Mr. Luck may be terminated for cause only if his behavior is "willful and intentional," not merely grossly negligent. Pl.'s Mot. at 2; Pl.'s Opp'n at 5–6.

In addition, Mr. Luck argues that the termination clause's final provision, which conditions his receipt of post-termination payments apart from the Accrued Obligations on "the absence of circumstances that would constitute Cause," "applies only to 'a termination without Cause' and, therefore, has no application" to this case. Pl.'s Opp'n at 23. He argues that by

terminating him for cause without providing notice and an opportunity to cure, "Defendants assumed the burden to prove that Mr. Luck's alleged act or omission was 'not reasonably susceptible to cure.'" *Id.* at 23.

In response, Defendants argue that the Employment Contract "makes clear that any of the six specified circumstances constituting Cause" enumerated in the contract "are themselves materially and demonstrably injurious to Alpha." Defs.' Opp'n at 10. In Defendants' view, "[t]he Employment Contract provides that [Mr.] Luck could be terminated for Cause for 'willful and intentional material misconduct in the performance of his duties or gross negligence of his duties, including an intentional failure to follow any applicable XFL policies or directives.'" *Id.* at 11 n.3 (emphasis omitted) (citation omitted). Therefore, "Cause exists for either willful misconduct or gross negligence, which was specifically defined to include a failure to follow any applicable XFL policies or directives." *Id.* (emphasis omitted).

Defendants further argue that the Employment Contract "expressly conditions [Mr.] Luck's receipt of any post-termination payments on his ability to demonstrate 'the absence of circumstances that would constitute Cause' without any notice and cure requirement." *Id.* at 19–20 (emphasis omitted). To Defendants, Mr. Luck bears the burden of establishing the absence of circumstances that would constitute cause because this provision "specifically applies to 'all severance payments *under this section*,' which is the section of the Employment Contract applicable to termination by the employer *with or without Cause*." *Id.* at 20. Defendants assert that, in any event, Mr. Luck "contends that Alpha terminated him 'without Cause' and therefore concedes that his receipt of any severance payments is conditioned on demonstrating the absence of circumstances that would constitute Cause." *Id.*

The Court agrees, in part.

Connecticut courts "have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Lee*, 267 F.3d at 179 (quotation marks omitted) (quoting *Barnard*, 214 Conn. at 110). Under such an approach, the phrase "which is materially and demonstrably injurious to the interest, property, operations, business or reputation of Alpha or its affiliates" is a nonrestrictive clause that describes the six enumerated grounds for which Alpha may terminate Mr. Luck for cause. *See Gravatt v. Gen. Star Indem. Co*., No. 98-CV-6670 (RWS), 1998 WL 842351, at *4 n.5 (S.D.N.Y. Dec. 2, 1998) ("Nonrestrictive clauses do not limit or define, but merely expand upon the meaning of the words to which they relate." (citing William Strunk Jr. and E.B. White, The Elements of Style at 3–5 (Third Ed. 1979)).

Mr. Luck argues that this interpretation would require "additional language," namely the inclusion of "by reason of any of the following which is [*deemed*] materially and demonstrably injurious" in the contract. Pl.'s Opp'n at 6 (alteration in original). But it is Mr. Luck's, and not Defendants', interpretation that would import additional qualifying language into the termination clause. Under Mr. Luck's reading, Alpha may terminate him "to the extent" that any of the six enumerated grounds are materially and demonstrably injurious to Alpha.

Mr. Luck further argues that the Employment Contract's third ground for termination for cause specifies that he may be terminated only if he engages in "willful and intentional material misconduct," and, as a result, he may not be terminated for "gross negligence" alone. Pl.'s Reply at 2. The Employment Contract provides that Mr. Luck may be terminated for cause for "Mr. Luck's willful and intentional material misconduct in performance of his duties or gross negligence of his duties . . . , including an intentional failure to follow any applicable XFL policy

24

or directives." Employment Contract at 3. Under Mr. Luck's interpretation, subsection three of the Employment Contract provides for his termination for cause only if he engages in conduct that is both "willful and intentional" and "grossly negligent," thereby rendering the clause's reference to "gross negligence" superfluous.[1]

The more natural reading of this clause provides for termination for cause either upon Mr. Luck's "willful and intentional material misconduct in performance of his duties," or Mr. Luck's "gross negligence of his duties." *See Sparveri v. Town of Rocky Hill*, 656 F. Supp. 2d 297, 309 (D. Conn. 2009) ("The law of contract interpretation militates against interpreting a contract in a manner that renders a provision superfluous." (citing *United Illuminating Co. v. Wisvest–Connecticut, LLC*, 259 Conn. 665, 674 (2002))); *R.T. Vanderbilt Co. v. Cont'l Cas. Co.,* 273 Conn. 448, 462 (2005) ("When interpreting a contract, [the Court] must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result.").

Thus, under the Employment Contract, Mr. Luck may be terminated for cause for "gross negligence of his duties . . . , including an intentional failure to follow any applicable XFL policies or directives."[2]

---

[1] While "gross negligence" has no definition in Connecticut tort law, *see Mafco Elec. Contractors, Inc. v. Turner Const. Co.*, No. 3:07-CV-00114 (VLB), 2009 WL 807469, at *4 (D. Conn. Mar. 26, 2009), the Connecticut Supreme Court has recognized that "wanton, reckless, willful, intentional[,] and malicious conduct" is "more than gross negligence," as the former "tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent," *Martin v. Brady*, 261 Conn. 372, 379 (2002) (quotation marks and citation omitted); *Glorioso v. Police Dep't of Town of Burlington*, 48 Conn. Supp. 10, 16 (Conn. Super. Ct. 2003) (concluding, based on review of Connecticut appellate authority, that "[g]ross negligence is merely a heightened form of negligence").

[2] In addition, Mr. Luck argues that he may terminated for "intentional[ly] fail[ing] to follow any applicable XFL policies or directives" only if his conduct is "willful," which the Employment Contract defines as "bad faith," or "without a reasonable belief that the act or omission was in the best interests of the XFL." Pl.'s Reply at 3. The Employment Contract defines "willful," but does not provide a definition of "intentional." In enumerating the grounds for termination for cause, however, the contract specifies conduct that is "willful," "intentional," and "willful and intentional." *See, e.g.*, Employment Contract at 3 (providing that Alpha may terminate Mr. Luck for cause for his "willful disregard of the lawful instructions of Mr. McMahon concerning Mr. Luck's material duties,"

### b.  Notice and Opportunity to Cure

But even if Defendants can terminate Mr. Luck for cause under one of the enumerated conditions in the Employment Contract, Defendants still must comply with the Employment Contract's notice and opportunity to cure provision. And the parties disagree about the meaning and applicability of this provision.

Defendants argue that the notice and opportunity to cure provision "expressly conditions [Mr.] Luck's receipt of any post-termination payments on his ability to demonstrate 'the absence of circumstances that would constitute Cause' without requiring Alpha to provide notice and an opportunity to cure." Defs.' Mot. at 23.

Mr. Luck maintains that this provision only applies to a termination without cause and, as a result, he is not obligated to demonstrate the absence of circumstances that would constitute cause. Pl.'s Opp'n at 23. He argues that even if he bears the burden of proving the absence of circumstances that would constitute cause, "Defendants' own actions relieved Mr. Luck of any obligation [to do so]" because "Defendants breached and repudiated the Employment Contract by terminating Mr. Luck for Cause without providing notice and an opportunity to cure[,]" and "Defendants have failed to prove that Mr. Luck would not have cured if first provided with notice and opportunity to cure." *Id.* at 24.

As an initial matter, the Court need not decide whether the final provision of the termination clause applies only to a termination without cause, as Mr. Luck argues that Defendants did not validly terminate Mr. Luck "for Cause" and, therefore, his termination was in

---

but stating that Mr. Luck also may be terminated for Cause for the "intentional perpetration or attempted perpetration of fraud . . . on the XFL or its affiliates"). Connecticut law "is clear that a contract includes not only what is expressly stated therein, but also what is necessarily implied from the language used." *Foley v. Huntington Co.*, 42 Conn. App. 712, 729 (1996), *cert denied*, 239 Conn. 931 (1996). Because the Employment Contract refers both to "willful" and "intentional" conduct as a basis for termination for cause, these terms are separate and distinct for purposes of termination under the Employment Contract.

effect "without Cause" under the Employment Contract. Pl.'s Opp'n at 22; *see Semac Elec. Co., Inc. v. Skanska USA Bldg., Inc.*, 195 Conn. App. 695, 723 (2020), *cert. denied*, 335 Conn. 944 (2020) (invalid termination for cause "transformed" employer's termination for cause "into a termination for convenience"). This determination, however, does not resolve the Court's inquiry, as Mr. Luck argues that Defendants materially breached the Employment Contract by failing to provide him with notice and an opportunity to cure. Under Connecticut law, "it is generally accepted that contracting parties may reserve the right to terminate a contract for convenience or cause upon a specified period of notice." *Coppola Constr. Co. v. Hoffman Ents. Ltd. P'ship*, 157 Conn. App. 139, 169 (2015). However, "[o]ne who deviates from the terms and the circumstances specified in the agreement for giving notice . . . may be regarded as having repudiated the contract, with all the effects of repudiation including giving the injured party a right to damages." *Id.* (quotation marks and citations omitted). "[A] party's failure to comply with the notice provision in a termination clause . . . amounts to a material breach of the contract." *Semac Elec. Co.*, 195 Conn. App. at 715 (quotation marks and citation omitted).

"[I]t is well settled that a material breach by one party discharges the other party's subsequent duty to perform on the contract." *Weiss v. Smulders*, 313 Conn. 227, 263 (2014); Restatement (Second) of Contracts § 237 and cmt. b (1981) (a party is relieved of continued performance under a contract if a "material failure" in performance goes uncured). "To hold otherwise would excuse the defendant's nonperformance of a contractual obligation[], and would create a new and different agreement, which courts cannot do." *Coppola Constr. Co.*, 157 Conn. App. at 171 (citing *Collins v. Sears, Roebuck & Co.*, 164 Conn. 369, 374 (1973)).

The Termination Letter terminated Mr. Luck for cause. Therefore, Defendants were obligated to provide Mr. Luck with written notice and thirty (30) days' opportunity to cure,

unless the alleged grounds for termination were not reasonably susceptible to cure. If Defendants did not comply with these requirements, then Defendants materially breached the Employment Contract's termination clause, thereby discharging any subsequent obligation by Mr. Luck to demonstrate the absence of circumstances that would constitute cause. *Id.* at 172; *Semac Elec. Co.*, 195 Conn. App. at 714–15 (defendant materially breached contract by failing to provide plaintiff with full forty-eight hour cure period before terminating the contract, as required under the contract's provision providing for termination for cause).

Therefore, in order to prevail on their summary judgment motion, as discussed below, Defendants must show that there is no genuine issue of material fact as to whether Mr. Luck was provided with notice and an opportunity to cure the alleged violations, or that these violations were not otherwise reasonably susceptible to cure.

### 2.  Counts 1 and 3: Breach of Contract and Declaratory Judgment

Both Defendants and Mr. Luck move for summary judgment on Mr. Luck's breach of contract and related declaratory judgment claims. Defs.' Mot.; Pl.'s Mot. Because Defendants may rely on Mr. Luck's use of his Alpha-issued iPhone only as to the issue of damages, as discussed below, the Court will first address the summary judgment motions as they relate to each of Alpha's other alleged grounds for termination for cause.[3]

### a. Disclosure of Confidential Information

Mr. Luck moves for summary judgment on the grounds that his "alleged disclosure of confidential information was not material," as "Defendants bargained for the disclosures made by Mr. Luck" in the Confidentiality Agreement. Pl.'s Mot. at 8. According to Mr. Luck,

---

[3] Defendants move for summary judgment only with respect to Mr. Luck's hiring and termination of Mr. Callaway and his alleged misuse of his Alpha-issued iPhone. *See* Defs.' Mot. at 17–23.

Defendants "expressly agreed and anticipated" in the Confidentiality Agreement that "Mr. Luck could make limited disclosures of XFL information" in accordance with his duties as the XFL's Commissioner and CEO. *Id.*

In addition, Mr. Luck argues that "in connection with and in the course of [his] duties to Alpha as permitted by the CNNA, Mr. Luck made limited disclosures to Wasserman personnel (including [his brother-in-law,] Mr. Wilson) pursuant to a written agreement between Wasserman and the XFL dated July 10, 2018." *Id.* at 9 (citations omitted). According to Mr. Luck, "Wasserman confirmed its understanding that any information was being shared in confidence by including in its proposed scope of work a provision agreeing not to disclose confidential information to third parties." *Id.* (citation omitted). Thus, Mr. Luck argues that he "was well within the bounds of his Employment Contract (and fiduciary duties), and [that] his actions were authorized by the CNNA." *Id.*

Mr. Luck further argues that even if he disclosed information to third parties in violation of the Confidentiality Agreement, "any such disclosure . . . could have been cured" by a confidentiality agreement, or by instructing Mr. Luck not to share XFL information outside of the organization. *Id.* at 22.

Defendants argue that Mr. Luck's "repeated disclosures of XFL confidential information to third parties in violation of the CNNA and XFL policies [were] material." Defs.' Opp'n at 17. They allege that Mr. Luck disclosed, among other information, "confidential information regarding the negotiations and draft terms of the XFL's television distribution deals." *Id.* (citation omitted). According to Defendants, these "disclosures were not within the scope of his XFL duties because neither [Mr.] Wilson nor Wasserman was involved in the negotiation of the XFL's television deals." *Id.* at 18. (citation omitted).

Defendants argue that Mr. Luck's alleged violation of the Confidentiality Agreement was not reasonably susceptible to cure because "once [Mr.] Luck disclosed the confidential information to third parties, it was no longer confidential and his breach could not be remedied." *Id.* at 27.

The Court disagrees.

As an initial matter, for the reasons described above, Alpha may terminate Mr. Luck for cause for any of the six enumerated grounds for termination in the Employment Contract, each of which is "materially and demonstrably injurious" to Alpha. Thus, contrary to Mr. Luck's assertions, Defendants are not required to establish that Mr. Luck's alleged violations were "material" to the company separate and apart from the Employment Contract's enumerated grounds for termination for cause.

On the present record, there is a genuine issue of material fact as to whether Mr. Luck intentionally disclosed the XFL's confidential information to third parties in violation of the Confidentiality Agreement. *See, e.g.*, Defs.' Second Local R. 56(a)(2) ¶ 35 (alleging that Mr. Luck "disclosed to Mr. Wilson confidential information of the XFL that was not in connection with work Wasserman was performing for the XFL . . . or to further Mr. Luck's job performance").

But, even if Defendants had grounds within the meaning of the Employment Contract to terminate Mr. Luck for violating the Confidentiality Agreement, Defendants had to follow the notice and opportunity to cure provisions of the Employment Contract, or explain why such provisions did not apply in this instance.

Defendants, however, have not created a genuine issue of material fact as to why the notice and opportunity to cure provision should have not applied to Mr. Luck's alleged violations

of the Confidentiality Agreement, *see* Pl.'s Mot. at 22 (arguing that upon discovering the alleged

disclosure of information, Defendants could have "instruct[ed] Mr. Luck not to share XFL

information outside the organization"), providing a basis for relief for Mr. Luck under this

provision of the Employment Contract.

Instead, on this record, a jury could only speculate as to what Defendants would have

done, rather than rely on evidence that any such action would be consistent with what

Defendants have done with respect to issues relating to the alleged misuse of confidential

information. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("[A] party may not 'rely

on mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment.'"); *Microban Prods. Co. v. API Indus., Inc.*, No. 14-CV-41 (KPF), 2014 WL

1856471, at *18 (S.D.N.Y. May 8, 2014) ("Conclusory allegations, conjecture,

and speculation are insufficient to create a genuine issue of fact." (quotation marks omitted)

(quoting *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998))). Accordingly, because on this

record, no reasonable jury could find that the termination of Mr. Luck on the basis of his failure

to comply with the Confidentiality Agreement could be for cause, Mr. Luck's motion for

summary judgment with respect to his alleged disclosure of confidential information will be

granted.

### b. Performance of Duties After March 13, 2020

Mr. Luck argues that his "alleged lack of work between March 13 and April 9, 2020[]

was not a material breach [of the Employment Contract] and did not deprive Defendants of a

substantial benefit for which they had clearly bargained and had every reason to expect." Pl.'s

Mot. at 7. According to Mr. Luck, he acted in accordance with Alpha's directive to begin

working remotely as of March 16, 2020, and in that capacity, continued to work on matters

"related to the future of XFL football, including communicating with college athletic administrators regarding the possibility of moving college football to Spring 2021, and with XFL employees and representatives regarding the shutdown of operations, signing of certain XFL players for the 2021 season, and working on future XFL budgets." *Id.* at 7–8 (citation omitted).

Mr. Luck further argues that even if he did not perform his duties, "this omission was reasonably susceptible to cure," as he could have attended meetings and otherwise fulfilled his duties if notice had been given. *Id.* at 22.

Defendants argue that summary judgment is improper, as "[t]here are many contested issues of fact as to whether [Mr.] Luck failed to devote 'substantially all of his business time to the performance of his XFL duties' during this time as required by his Employment Contract and as to [Mr.] Luck's credibility, which are not proper to resolve on summary judgment." Defs.' Opp'n at 19 (citation omitted). Defendants contend that, among other acts, Mr. Luck left the XFL headquarters on March 13, 2020 "without advising [Mr.] McMahon and never returned"; "failed to attend the XFL's COVID Working Group meetings and instead participated in the COVID meetings held by other business entities"; "failed to attend weekly XFL business operations meetings"; and "[f]or more than half of the days between March 14, 2020 and April 9, 2020, . . . sent [three] or fewer emails that were related to XFL business." *Id.* at 18 (citations omitted).

In addition, Defendants argue that Mr. Luck's alleged neglect of his duties was not reasonably susceptible to cure "because he effectively abandoned his duties as Commissioner and CEO at a time when the league was facing an existential crisis." *Id.* at 27.

The Court disagrees.

There are disputed issues of material fact as to whether, following March 13, 2020, Mr. Luck devoted substantially all of his business time to the performance of his duties to the XFL.

But again, even if Defendants had grounds within the meaning of the Employment Contract to terminate Luck for failing to devote substantially all of his business time to the performance of his duties to the XFL, the Defendants had to follow the notice and opportunity to cure provisions of the Employment Contract, or explain why such provisions did not apply in this instance. Defendants, however, have not created a genuine issue of material fact as to why the notice and opportunity to cure provision should have not applied to this alleged violation. Assuming Mr. Luck did not devote substantially all of his business time to his duties to the XFL, Mr. Luck might have, upon receiving notice, resumed performing his XFL obligations. *See Wifiland, LLP v. Hudson*, No. FSTCV116010553S, 2012 WL 1959074, at *4 (Conn. Super. Ct. May 7, 2012), *aff'd*, 153 Conn. App. 87 (2014) (notice and opportunity to cure operational defect would not have been futile where "the system was operational at least to some extent" and "[a] 45-day cure period might well have resulted in more effort on the part of the plaintiff to finally address and resolve the issue"). Once again, rather than offer admissible evidence on this issue, Defendants wish for a jury to speculate as to what Defendants would have done, which no reasonable jury would be permitted to do. *Fletcher*, 68 F.3d at 1456 ("[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'"); *Microban Prods. Co.*, 2014 WL 1856471, at *18 ("Conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact." (quotation marks omitted) (quoting *Kerzer,* 156 F.3d at 400)).

Accordingly, Mr. Luck's motion for summary judgment with respect to Mr. Luck's performance of his XFL duties will be granted.

### a.  Hiring and Termination of Mr. Callaway

Both Mr. Luck and Defendants move for summary judgment with respect to Mr. Luck's hiring and termination of Mr. Callaway from the XFL.

Defendants argue that Mr. Luck "intentionally failed to follow applicable XFL policies and directives" by hiring Mr. Callaway to the XFL and failing to immediately terminate him from the league in accordance with Mr. McMahon's directives. Defs.' Mot. at 17–23 (emphasis omitted). They assert that at the time Mr. Luck hired Mr. Callaway to the XFL, Mr. Luck "knew of [Mr.] McMahon's directive not to hire any players who had bad reputations due to questionable or problematic backgrounds[,] both from [Mr.] McMahon's own statements and [Mr.] McMahon's repeated instructions to [Mr.] Luck not to hire players with such backgrounds." *Id.* at 18 (citations omitted).

In addition, Defendants argue that Mr. Luck "admitted that a player was disqualified from playing in the XFL for any of the four following criteria set forth in an [e-mail] dated July 17, 2019": "(1) any felony charge or conviction[,] (2) any credible allegation of domestic violence[,] (3) any repeat misdemeanor, i.e. 2x or more[, or] (4) any conviction of distributing illegal drugs." *Id.* at 5 (citing Defs.' Local R. 56(a)(1) ¶ 18). According to Defendants, "these four criteria were not the only criteria that would disqualify a player from the XFL," which "continued to 'evolv[e]' and 'got refined' after [Mr.] Luck's July 17, 2019 [e-mail]." *Id.* (citing Defs.' Local R. 56(a)(1) ¶ 20).

Defendants contend that before Mr. Luck spoke with Mr. McMahon regarding the hiring of two XFL players on January 18, 2020, Mr. Luck was aware that Mr. Callaway had been accused of sexually assaulting a female student while he was a student at the University of Florida; had been suspended from the 2017 college football season allegedly for using stolen

credit card information; reportedly had been cited for misdemeanor marijuana possession and possession of drug equipment during a traffic stop in May 2017; reportedly was cited for possession of marijuana while driving with a suspended license in 2018; and was suspended by the NFL for violating the NFL's substance abuse policy. *Id.* at 7–8 (citing Defs.' Local R. 56(a)(1) ¶¶ 25, 37). According to Defendants, "[t]he credit card fraud allegations resulted in [Mr.] Callaway being charged with a felony, which [Mr.] Luck has admitted was one of the criteria that disqualified players from being in the XFL." *Id.* at 18–19 (citations omitted).

Defendants also argue that XFL personnel and senior executives "specifically questioned [Mr.] Luck [as to] why he was bringing [Mr.] Callaway into the XFL given [Mr.] Callaway's problematic background." *Id.* at 19 (citations omitted). Mr. Luck, however, did not inform Mr. McMahon of Mr. Callaway's background before hiring him to the XFL. *Id.* (citations omitted).

With respect to Mr. Callaway's termination, Defendants argue that, on January 28, 2020, after a meeting with XFL executives in which Mr. McMahon learned that Mr. Callaway had been signed to the XFL league, Mr. McMahon "directed [Mr.] Luck to terminate [Mr.] Callaway immediately." *Id.* at 20 (citation omitted). Defendants argue that rather than terminate Mr. Callaway immediately, Mr. Luck permitted Mr. Callaway to practice with his team on the following day, January 29, 2020. *Id.* (citations omitted). During the practice, Mr. Callaway suffered a "severe injury" that required him to be placed on injured reserve and "prevented him from being terminated" from the league. *Id.* (citations omitted). Although Mr. Luck was aware of Mr. Callaway's injury, he did not inform Mr. McMahon of the injury when he sent him a text later that day. *Id.*

Defendants argue that Mr. Luck's alleged violations of Mr. McMahon's directives were not reasonably susceptible to cure, as Mr. Luck could not have cured Alpha's obligation to pay

Mr. Callaway his $125,000 signing bonus upon the execution of his contract. *Id.* at 27. They argue that Mr. Luck also could not have cured his alleged failure to terminate Mr. Callaway because Mr. Callaway was injured in practice, thereby obligating Alpha to pay out Mr. Callaway's contract, as well as worker's compensation benefits. *Id.*

Mr. Luck argues that Defendants present no evidence that the XFL adhered to a "character" policy for hiring XFL players that was "fundamental to the XFL brand." Pl.'s Opp'n at 29. He argues that he confirmed the criteria for disqualifying an XFL player in an e-mail to the XFL's human resources department in July 2019 and that Cindy Wagner, Senior Director of People and Culture for the XFL, "confirmed in writing that the XFL would 'keep [the four criteria] internally for background checks as our guideline.'" *Id.* at 30 (citing Ex. 20 to Local Rule 56(a)(2) Statement of Facts in Opp'n to Defs.' Mot. for Summ. J., ECF No. 402-42 (Dec. 3, 2021)). Mr. Luck also contends that Ms. Wagner "testified . . . that the XFL did not have any automatic disqualifiers" for hiring players based on their background checks. *Id.* at 32 (emphasis omitted) (citing Ex. 21 to Local Rule 56(a)(2) Statement of Facts in Opp'n to Defs.' Mot. for Summ. J. at 23:16–20, ECF No. 402-43 (Dec. 3, 2021)).

Mr. Luck further argues that there is "at best . . . an issue of fact" as to whether he intentionally failed to follow Mr. McMahon's directive to immediately terminate Mr. Callaway from the XFL. *Id.* According to Mr. Luck, Marc Trestman, Mr. Callaway's head coach, "had made the decision to allow [Mr.] Callaway to practice because he was already ready to go to practice very soon or [was] already in practice." *Id.* at 33 (citation omitted).

In addition, Mr. Luck argues that his hiring and termination of Mr. Callaway were reasonably susceptible to cure because he "could have adequately compensated Alpha by paying for any damages incurred." *Id.* at 27.

36

The Court agrees with Mr. Luck, in part.

The parties do not dispute that, in July 2019, Mr. Luck set forth in an e-mail to XFL personnel four criteria for reviewing prospective players' background checks and disqualifying players from the XFL. These criteria included "any felony charge or conviction" and "any repeat misdemeanor, ie 2x or more." Defs.' Local R. 56(a)(1) ¶ 18. Mr. Luck testified that before Mr. Callaway was hired, he "believe[d]" that Mr. Callaway's background check indicated that Mr. Callaway had been charged with a felony. Luck Dep. at 131:24–132:3; Defs.' Local R. 56(a)(1) ¶ 49; Pl.'s Local R. 56(a)(2) ¶ 49 ("Luck admitted that Callaway was charged with felonies in his past. Response: Admitted." (internal citations omitted)).

Mr. Luck has repeatedly stated, however, that Mr. Callaway passed his background check and met the four criteria for disqualifying a player from the XFL. Pl.'s Local R. 56(a)(2) ¶ 28 ("[Mr.] Callaway passed the background check and met the four criteria that had been set for playing in the XFL."); *id.* ¶ 48 ("Mr. Luck did not reference [Mr.] Callaway's background to [Mr.] McMahon because [Mr.] Callaway had passed the background check.").

Moreover, the parties disagree as to the XFL policies and directives applicable to hiring XFL players, including whether the four criteria outlined by Mr. Luck were the only or primary criteria for disqualifying players from the XFL and the extent to which Mr. McMahon instructed Mr. Luck not to hire players similar to Mr. Callaway. *See, e.g.*, Pl.'s Local R. 56(a)(2) ¶ 19 ("Mr. Luck admitted that [Mr.] McMahon did not want [certain players] to play in the XFL for reasons other than those stated in the four criteria, but Mr. Luck testified that 'I had no indication or belief that those four criteria had changed or been added to.'" (citations omitted)). These disputes present issues of material fact as to whether Mr. Luck intentionally hired Mr. Callaway in violation of applicable XFL policies and directives.

With respect to Mr. Callaway's termination, the parties agree that Mr. Luck countersigned Mr. Callaway's contract with the XFL on January 23, 2020, and, on January 28, 2020, Mr. McMahon directed Mr. Luck to terminate Mr. Callaway from the league.[4] Pl's Local R. 56(a)(2) ¶ 52. There is a genuine dispute on issues of material fact, however, as to whether, in contacting Mr. Trestman the following day, Mr. Luck failed to terminate Mr. Callaway in accordance with Mr. McMahon's instructions, and did so intentionally.[5]

As a result, there are triable issues of fact as to whether Mr. Luck intentionally violated applicable XFL policies or directives through his hiring and termination of Mr. Callaway from the XFL.

There also is a genuine issue of material fact as to whether Mr. Luck's alleged violations of Mr. McMahon's directives were reasonably susceptible to cure. As an initial matter, the evidence establishes that Alpha did not provide Mr. Luck with notice and an opportunity to cure his hiring of Mr. Callaway to the XFL. Defendants argue that Mr. McMahon provided Mr. Luck with prior notice in writing not to hire players with questionable or problematic backgrounds, Defs.' Opp'n at 28–29, but these directives related to other players and did not directly concern Mr. Callaway. *See* Defs.' Second Local R. 56(a)(2) ¶¶ 64–67 (alleging that before hiring Mr.

---

[4] In their opposition to Mr. Luck's summary judgment motion, Defendants argue that Mr. Luck conceded for purposes of his motion that Mr. McMahon also directed Mr. Luck to terminate Mr. Callaway on January 18, 2020. Defs.' Opp'n at 1, 13. Mr. Luck conceded this fact, however, only for purposes of his argument that his hiring and termination of Mr. Callaway were reasonably susceptible to cure. Pl.'s Mot. at 19 ("[F]or purposes of this motion **only** in arguing that the hiring and firing of [Mr.] Callaway was reasonably susceptible to cure, [Mr.] Luck does not dispute the following facts as alleged by Defendants . . . . On or about January 17, 2020, . . . [Mr.] McMahon told [Mr.] Luck to fire [Mr.] Callaway.").

[5] Mr. Luck also argues that by depositing "nearly $120,000 into Mr. Luck's bank accounts" following Mr. Luck's hiring and termination of Mr. Callaway, Defendants "ratified Mr. Luck's actions and confirmed they were in the best interests of the XFL." Pl.'s Opp'n at 15. This conclusion does not follow, however, from Defendants' actions, as "[r]atification is defined as the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account." *Il Giardino, LLC v. Belle Haven Land Co.*, 254 Conn. 502, 530 (2000) (quotation marks omitted) (quoting *Russell v. Dean Winter Reynolds, Inc.*, 200 Conn. 172, 185 (1986)). As there is no dispute that Mr. Luck's hiring and termination of Mr. Callaway were binding upon Alpha, the doctrine of ratification is inapplicable to this claim.

Callaway, Mr. McMahon "specifically directed" Mr. Luck not to hire Levern Jacobs and Martavis Bryant). Defendants also did not provide Mr. Luck with notice and an opportunity to cure his alleged violations by directing him to terminate Mr. Luck immediately from the league. Although Mr. McMahon orally instructed Mr. Luck to terminate Mr. Callaway, Mr. McMahon did not provide Mr. Luck with written notice, as required under the Employment Contract.[6]

Although Mr. Luck was not provided with notice and an opportunity to cure, there is a genuine dispute of material fact as to whether Mr. Luck's hiring and termination of Mr. Callaway were reasonably susceptible to cure. Although Mr. Luck argues that he could have paid for any damages resulting from his alleged violations, Defendants have presented sufficient evidence to raise a triable issue of fact as to whether his hiring of and alleged failure to immediately terminate Mr. Callaway caused monetary or non-monetary harm to Alpha, and so fundamentally undermined the parties' relationship, that notice and an opportunity to cure would have been futile. *Cf. Grocery Haulers, Inc. v. C & S Wholesale Grocers, Inc.*, No. 11-CV-3130 DLC, 2012 WL 4049955, at *15 (S.D.N.Y. Sept. 14, 2012) (holding, applying New York law, that "[w]here a breach involves deceptive conduct that goes to the essence of the contract and fundamentally destroys the parties' relationship, it may not be subject to cure").

Accordingly, the parties' cross-motions for summary judgment on Count Three with respect to Mr. Luck's hiring and termination of Mr. Callaway will be denied. As to Count One, to the extent Mr. Luck seeks "a declaration that Alpha wrongfully terminated, materially

---

[6] Defendants argue that although the Employment Contract requires written notice to terminate for cause, Mr. McMahon's provision of oral notice of the requested termination was sufficient under Connecticut law. Defs.' Mot. at 31; Defs.' Opp'n at 29–30. The evidence does not "unequivocally establish[]," however, that Mr. Luck received oral notice of his alleged violation of XFL policies. *Timex Licensing Corp. v. Advance Watch Co. Ltd.*, No. 3:07-CV-01731 (VLB), 2009 WL 807472, at *4 (D. Conn. Mar. 27, 2009) (quotation marks and citation omitted); *cf. Mortg. Elec. Registration Sys., Inc. v. Goduto*, 110 Conn. App. 367, 375 (2008) (concluding that "literal enforcement of the relevant notice provision would serve no purpose because the defendant had actual notice of his right to cure" (quotation marks and citation omitted)).

breached and/or repudiated the Employment Contract without Cause," Second Am. Compl. ¶ 28, summary judgment on this claim also will be denied, because there is a genuine issue of fact relating to the hiring and termination of Mr. Callaway.

### b. Use of Alpha-Issued iPhone

Both Defendants and Mr. Luck move for summary judgment with respect to Mr. Luck's alleged misuse of his Alpha-issued iPhone.

Defendants argue that, as CEO of XFL, Mr. Luck was required to comply with the XFL Employee Handbook and Technology Acceptable Use Policy, which "prohibited the use of XFL Technology, including the Alpha-issued iPhone, for non-XFL related business." Defs.' Mot. at 21 (citations omitted). They argue that, in violation of these policies, Mr. Luck "regularly and routinely used the iPhone for purposes unrelated to XFL business, including to conduct business for other entities when he should have been working for the XFL." *Id.* (emphasis omitted) (citations omitted). For example, Defendants note that from March 14, 2020 to April 9, 2020, Mr. Luck used his iPhone to send or receive "at least 1031 text messages and at least 887 [e-mails]" and to "make hundreds of phone calls," all of which "were not related to XFL business." *Id.* (citations omitted).

Mr. Luck asserts that "[n]one of the [Defendants'] referenced citations establishes that Mr. Luck was subject to the Employee Handbook or Technology [Acceptable Use] Policy." Pl.'s Local R. 56(a)(2) ¶ 68. He argues that "the terms of his Employment Contract supersede[d] XFL workplace policy" and, as a result, Mr. Luck was not subject to the Employee Handbook and Technology Acceptable Use Policy. *Id.* ¶¶ 72–73.

In addition, Mr. Luck argues that there was no policy in place prohibiting the personal use of XFL technology when he received his XFL-issued iPhone. *Id.* ¶ 73. According to Mr.

Luck, "[p]ersonal use of XFL technology in general was not material to the XFL," as demonstrated by Alpha's distribution in March 2020 of a revised technology acceptable use policy to be signed by all team staff, which provided that "[b]rief and occasional personal use of XFL Technology is acceptable" under certain circumstances. Pl.'s Opp'n at 11 (citing Ex. 17 to Local Rule 56(a)(2) Statement of Facts in Opp'n to Defs.' Mot. for Summ. J. at 3, ECF No. 402-39 (Dec. 3, 2021)).

Mr. Luck further argues that he is entitled to summary judgment on this issue because his alleged misuse of the iPhone was reasonably susceptible to cure, as he could have "refrain[ed] from using his iPhone for personal use going forward and reimburs[ed] Alpha for additional costs incurred [from the personal use], if any." Pl.'s Mot. at 18–19.

The Court agrees, in part.

The Employee Handbook and Technology Acceptable Use Policy provide that "XFL Technology"[7] "is to be used for XFL related business only; users must not store or transmit any non-business-related files, including but not limited to personal data such as documents, spreadsheets, reports, [and] presentations." Employee Handbook at 16.

The parties do not dispute that the Employee Handbook was issued in October 2018, and that Mr. Luck used his iPhone for non-XFL business in November 2019. There also is no dispute that between March 2020 and April 2020, Mr. Luck also used his company iPhone for personal reasons. Even assuming, as Mr. Luck argues, that a revised XFL technology acceptable use policy took effect in March 2020, the evidence does not suggest that Mr. Luck used his iPhone,

---

[7] The Employee Handbook defines XFL Technology as "hardware and software technology and information resources" provided by the XFL, "including without limitation, computer devices, networks, collaboration tools, communication tools, storage media, and other electronic information systems." Employee Handbook at 16.

as specified in the revised technology acceptable use policy, only for "brief and occasional [personal] use." Pl.'s Opp'n at 11.

On the present record, however, there is no genuine issue of material fact as to whether Alpha would have terminated Mr. Luck had it discovered, before his termination, his alleged misuse of the iPhone.

As an initial matter, it is not clear that Mr. Luck was subject to the Employee Handbook or Technology Acceptable Use Policy. Defendants assert that the "on-boarding requirements for new employees of the XFL required them to acknowledge compliance with the Employee Handbook and Technology [Acceptable Use] Policy," Defs.' Local R. 56(a)(1) ¶ 72 (citing Luck Dep. at 45:15–23, 348:5–349:15; Ex. 41 to Local R. 56(a)(1) Statement of Undisputed Material Facts in Support of Defs.' Mot. for Summ. J., ECF No. 375-41 (Nov. 12, 2021)), but the parties dispute whether these requirements applied to Mr. Luck.

Even assuming that Mr. Luck was subject to an XFL policy prohibiting this misuse of his company-issued phone, there is no evidence that, had Alpha discovered the misuse before Mr. Luck's termination, Alpha would have terminated Mr. Luck on this basis alone. The record does not reflect that Alpha attempted to enforce the prohibition on employees' personal use of their company phones or other XFL Technology.[8] And there is no evidence that Alpha or Mr. McDevitt ever requested Mr. Luck's iPhone during Mr. McDevitt's investigation of Mr. Luck before his termination, undercutting the notion that the iPhone and any potential misuse of the phone was a matter of concern for the company.[9] *See* Ex. 3 to Local Rule 56(a)(2) Statement of

---

[8] Indeed, Cindy Wagner, then Senior Director of People and Culture for the XFL, testified that after declaring bankruptcy, Alpha permitted employees to purchase their Alpha-issued iPhones. Ex. 11 to Local Rule 56(a)(2) Statement of Facts in Opp'n to Defs.' Mot. for Summ. J. at 180:22–181:13, ECF No. 402-12 (Dec. 3, 2021).

[9] Defendants argue that Mr. McMahon has testified that had he been made aware of Mr. Luck's misuse of the iPhone, he would have terminated Mr. Luck. *See* Defs.' Second Local R. 56(a)(2) ¶¶ 94–95. In the absence of evidence probative of Defendants' enforcement of the XFL's prohibition on personal use of XFL technology,

Facts in Opp'n to Defs.' Mot. for Summ. J. ¶ 8, ECF No. 402-3 (Dec. 3, 2021) ("[N]either

Alpha, [Mr.] McMahon, nor [Mr.] McDevitt ever conducted any inspection, audit, or other

review of my use of the Alpha-issued iPhone, including its contents[,] during my time as

Commissioner and CEO of the XFL"); *see also* Ex. F to Defs.' Combined Mem. in Opp'n to

Pl.'s Mot. to Compel Documents, Reply Mem. in Support of Defs.' Mot. to Dismiss Pl.'s Breach

of Implied Covenant of Good Faith Claim, and Mem. in Opp'n to Pl.'s Mot. for Leave to File

Third Am. Compl. ¶ 9, ECF No. 172-6 (Mar. 26, 2021) ("In order to provide legal advice to

Alpha regarding [Mr.] Luck's termination and in anticipation of potential litigation with [Mr.]

Luck, I conducted an investigation and requested certain information and documents from other

XFL executives, including Jeffrey Pollack and Basil DeVito.").

Accordingly, in the absence of a genuine issue of material fact as to Defendants' efforts

to enforce the XFL technology policies or otherwise address the misuse of XFL technology—

Indeed, there is no such evidence in this record—Mr. Luck's motion for summary judgment as to

his use of the Alpha-issued iPhone will be granted.[10]

---

however, Mr. McMahon's testimony, made in hindsight, is speculative and an insufficient basis on which to find a genuine issue of material fact. *See Weiss*, 313 Conn. at 254 ("Evidence is considered speculative when there is no documentation or detail in support of it and when the parties on subjective opinion." (internal quotation marks and citations omitted)).

[10] The parties raise two further arguments relating to Mr. Luck's breach of contract claim. First, Mr. Luck argues that regardless of whether Defendants validly terminated him for cause, Mr. McMahon is liable for Mr. Luck's full severance payment because Mr. McMahon waived all defenses as primary obligor under the Guaranty. Pl.'s Mot. at 25–32. This argument is unavailing. As the Court previously held, "[t]o prevail against Mr. McMahon as guarantor, Mr. Luck . . . would have to establish that Alpha still had an obligation to him and breached that obligation under the Employment Contract." June 26, 2020 Ruling and Order at 13. This ruling is consistent with well-established caselaw in Connecticut holding that the guarantor's liability "is ordinarily measured by that of the principal," *Murphy v. Schwaner*, 80 A. 295, 297 (Conn. 1911), and Mr. Luck has not presented any additional arguments to the contrary. Accordingly, Mr. McMahon's obligations under the Guaranty arise only in the event that Defendants have breached the underlying obligations of the Employment Contract being guaranteed, and Count Two of the Second Amended Complaint—to the extent Mr. Luck seeks "a declaration that McMahon has waived all defenses and discharges, legal or equitable, to Mr. Luck's enforcement of the Guaranty," Second Am. Compl. ¶ 32—will be dismissed.

Second, Defendants assert that Mr. Luck is not entitled to the claimed $8 million in bonus payments because the Employment Contract provides that Mr. Luck will be paid a Guaranteed Annual Bonus "on the last day of each

As to the related issue of the motion for summary judgment on the use of after-acquired evidence, as discussed below, while such evidence could be used to limit damages, it could not be used to limit liability. In this case, however, given the absence of a genuine issue of material fact as to whether this misuse of the Alpha-issued iPhone would have resulted in Mr. Luck's termination for cause—because there is no evidence that any such violation would not be reasonably susceptible to cure—this after-acquired evidence cannot be used to limit Mr. Luck's damages, if a jury finds liability for him.

"In the federal system, as a general rule, after acquired evidence is relevant to the relief due a successful plaintiff in an employment discrimination discharge case." *Preston v. Phelps Dodge Copper Prods. Co.*, 35 Conn. App. 850, 858 (1994). "If the after acquired evidence, in and of itself, would have caused the employer to discharge the employee, it would be inappropriate to order reinstatement of employment or front pay." *Id.*; *see McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352 (1995) (holding, in employment discrimination case, that an employee's relief can be limited by evidence of wrongdoing discovered after his or her termination that would have provided a legitimate basis for such termination).

In *Preston*, the Connecticut Appellate Court reasoned that with respect to wrongful termination claims, "[p]ublic policy would seem to disfavor compensating an employee for the loss of future wages, even though he was wrongfully discharged, when the employer proves by a

---

Contract Year, subject to his continued employment on the scheduled payment date," Employment Contract at 2, and Mr. Luck was terminated before that date, Defs.' Mot. at 32. The Employment Contract states, however, that upon termination without Cause, Mr. Luck "will be entitled to receive . . . the aggregate amount of Base Salary and Guaranteed Annual Bonuses that would otherwise be payable to him during the remaining scheduled term of this Contract (i.e., through June 30, 2023 or, if applicable, any Renewal Periods)." Employment Contract at 3. Thus, Mr. Luck may be entitled to receive the Guaranteed Annual Bonuses through the remaining scheduled term of the contract, even if he is not employed on the scheduled payment date. In any event, the Court need not decide the question at this stage, as Mr. Luck is entitled to the Base Salary and Guaranteed Annual Bonuses, only if Defendants did not validly terminate Mr. Luck for cause, a disputed issue of material fact, as it relates to the Callaway termination issue discussed above.

fair preponderance of the evidence that it subsequently discovered evidence of employee misconduct that would have justified the termination of employment." *Preston*, 35 Conn. App. at 858.

Applying this principle, the court concluded that "although the [after-acquired evidence of misconduct] could not have affected the employment relationship at the time of the discharge and[] therefore the legality of that discharge, it could have affected the amount of future wages the plaintiff can recover." *Id.* at 858–59. "[T]he key to the proper use of after-acquired evidence . . . is a finding that the subsequently discovered evidence of employee misconduct would have justified the termination of the employment at the time of the misconduct." *Stone Key Grp, LLC v. Taradash*, X08FSTCV166029872S, 2018 WL 6314667, at *17 (Conn. Super. Ct. Nov. 2, 2018).

Mr. Luck seeks to preclude Defendants from relying on his personal use of his Alpha-issued iPhone as a defense to Mr. Luck's breach of contract claim or as a basis for Alpha's counterclaims. Pl.'s Mot. for Partial Summ. J. at 1. He argues that under Connecticut law, "Defendants are prohibited from utilizing after-acquired evidence of [his] Personal Use of the iPhone to bar Alpha's liability for breach of the Employment [Contract] and [Mr.] McMahon's liability for breach of his Guaranty." *Id.* at 8. Mr. Luck further argues that even assuming after-acquired evidence is admissible, the evidence "can only serve as a limit on a claim for future lost wages," which Mr. Luck does not seek in this case, "as he had continued working as an Alpha employee." *Id.* at 9.

Defendants assert that the after-acquired evidence doctrine does not preclude them from relying on Mr. Luck's personal use of his Alpha-issued iPhone in support of their termination for cause. Defs.' Opp'n to Partial Mot. for Summ. J. at 12. They argue that, under Connecticut law,

"after-acquired evidence does operate as a bar to liability in cases alleging common law breach of contract claims and [ ] a party sued for breach of contract may justify termination of the contract by relying on evidence that was not discovered until later." *Id.* at 28 (emphasis omitted). They further argue that after-acquired evidence is "relevant to the issue of damages," as Mr. Luck seeks lost future wages, or the payment of his "base salary and guaranteed annual bonuses that would otherwise be payable throughout the remaining duration of the Employment Contract." *Id.* at 33 (quotation marks and citation omitted).

The Court agrees, in part.

First, the Court addresses Mr. Luck's argument that after-acquired evidence cannot bar Defendants' liability for breach of contract.[11]

Connecticut courts interpreting *Preston* have held, in cases outside the employment discrimination context, that after-acquired evidence is "relevant only to the issue of future earnings the employee would have earned under the contract, . . . not to the basic cause of action for wrongful termination or claim for past damages." *Olson v. Accessory Controls & Equip. Corp.*, No. CV 93 0525839S, 1994 WL 705092, at *1 (Conn. Super. Ct. Dec. 7, 1994). The policy articulated in *Preston*, moreover, has been described as "identical" to the "federal policy established by the U.S. Supreme Court in *McKennon*," *City of Torrington v. AFSCME Council 4, Local 1579*, No. CV 000083909S, 2002 WL 1840808, at *9 (Conn. Super. Ct. July 11, 2002), in which the Supreme Court held that after-acquired evidence "does not function as a bar to the assertion of an employment discrimination claim," but "limits damages when an employer discovers evidence of prior employee misconduct after the employee's actual or constructive

---

[11] The parties do not dispute that Connecticut law applies under the terms of the Employment Contract. *See* Employment Contract at 4 ("The Contract shall be governed by and construed in accordance with the laws of the State of Connecticut without regard to its choice of law rules.").

discharge," *Blake-McIntosh v. Cadbury Beverages, Inc.*, No. 3:96-CV-2554 (EBB), 1999 WL 643661, at *16 (D. Conn. Aug. 10, 1999) (citing *McKennon*, 513 U.S. at 362–63).

Defendants argue that Mr. Luck's reliance on the Supreme Court's decision in *McKennon* is "misplaced," as *McKennon* "held only that after-acquired evidence could not bar liability in an action alleging discrimination under the federal Age Discrimination in Employment Act," not in cases alleging breach-of-contract claims. Defs' Opp'n to Pl's Mot. for Partial Summ J. at 30. But Defendants rely principally on New York law, which makes a distinction between the use of after-acquired evidence in employment discrimination cases under *McKennon*, and in cases involving an alleged breach of contract. *See, e.g.*, *Fitzpatrick v. Am. Int'l Grp.*, No. 10 Civ. 142 (MHD), 2013 WL 709048, at *26 (S.D.N.Y. Feb. 26, 2013) (holding, under New York law, that "an employer may seek to justify its termination of an employee for cause based on information obtained after the termination," and distinguishing this rule "from the principle, followed in both federal and New York courts, that an employer may not use after-acquired evidence to defend against liability on a statutory discrimination-termination claim, a legal theory premised on the employer's alleged wrongful intent"). But *Preston* and subsequent caselaw do not similarly apply this distinction under Connecticut law. Thus, Defendants may not rely on after-acquired evidence as a defense to liability or as a basis for their counterclaims.

With respect to damages, after-acquired evidence may be used to calculate "[w]ages one 'would have earned' under the contract," or "future wage loss, often called 'front pay.'" *Preston*, 35 Conn. App. at 861. In other contexts, Connecticut's wage claim statute defines "wages" as "compensation for labor or services rendered by an employee." *Justin v. Ama, LTD*, No. CV 92293360, 1993 WL 213707, at *2 (Conn. Super. Ct. June 8, 1993) (quoting Conn. Gen. Stat. § 31-72a(3)). In contrast to wages, severance pay is often "defined as a kind of accumulated

compensation for past services and a material recognition of their past value," or as "a form of compensation for the termination of the employment relation . . . primarily to alleviate the consequent need for economic readjustment but also to recompense [the employee] for certain losses attributable to the dismissed." *Drybrough v. Acxiom Corp.*, 172 F. Supp. 2d 366, 371 (D. Conn. 2001) (internal quotation marks and citations omitted).

The Employment Contract provides that, upon termination without cause, Mr. Luck is entitled to receive (1) "the aggregate amount of Base Salary and Guaranteed Annual Bonuses that would otherwise be payable to him during the remaining scheduled term of this Contract," (2) Accrued Obligations, *i.e.*, "previously accrued salary and any vested employee benefits," and (3) "the aggregate amount of premiums for coverage for Mr. Luck and his dependents under the health, accident, life and other insurance benefits that he was receiving immediately prior to such termination for a period of 24 months following such termination." Employment Contract at 3.

Mr. Luck argues that the "amounts that [he] seeks to recover under the Employment [Contract] . . . are not future wages," but "severance payments" as "expressly defined in the [Employment Contract]." Pl.'s Reply in Supp. of Mot. for Partial Summ J. at 6.

The Court agrees that with respect to the aggregate amount of premiums, this payment constitutes a severance payment, as it is not compensation for services rendered or that would have been rendered under the contract, but rather calculated based on a fixed period of twenty-four months.

The Employment Contract specifies, however, that Mr. Luck also is entitled to receive the aggregate amount of Base Salary and Guaranteed Annual Bonuses that "would otherwise be payable to him" during the remaining scheduled term of the contract. Employment Contract at 3. Because this payment is determined according to the compensation Mr. Luck would have

received if he had not been terminated, these payments constitute "future wage loss." *Cf. Cook v. Alexander & Alexander of Conn.*, 40 Conn. Supp. 246, 248 (Conn. Super. Ct. 1985) (plaintiff's "alleged unpaid bonuses and vested thrift plan constitute unpaid wages" where plaintiff alleged that he "was discharged in order to avoid payment of bonuses and the vesting of thrift plan benefits"); *see also Pelton v. Olin Corp.*, No. CV 880092063S, 1991 WL 149540, at *2 (Conn. Super. Ct. July 30, 1991) (denying summary judgment because "whether the [ ] bonus promised to the plaintiff . . . was compensation for labor or services rendered . . . is a genuine issue of material fact in dispute"). As a result, as a matter of law, Defendants are not precluded from seeking to use after-acquired evidence as a defense with respect to these types of damages under the Employment Contract.

But, under the analysis of the Employment Contract above, any use of after-acquired evidence would only limit the scope of Mr. Luck's damages—if the jury found in his favor on liability—if this evidence would have resulted in his termination for cause. And, as discussed above, there is no admissible evidence that, had Alpha discovered the misuse of Mr. Luck's Alpha-issued iPhone, Alpha would have terminated Mr. Luck on this basis alone, or that such misuse would not be reasonably susceptible to cure. As a result, there is no admissible after-acquired evidence that Alpha would have been able to terminate Mr. Luck for cause under the Employment Contract for the misuse of his Alpha-issued iPhone.

To hold otherwise would allow Defendants not to be responsible for their failure to comply with the notice and opportunity to cure provisions of the Employment Contract. *See Semac Elec. Co.*, 195 Conn. App. at 717–18 ("Skanska should be held to the words of the contract, just as Semac had been, and was thus not excused from affording Semac a forty-eight hour cure period. To hold otherwise would excuse Skanska's noncompliance with a contractual

49

requirement, and would create a new and different agreement, which courts cannot do." (internal quotation marks and citations omitted)).

Accordingly, Mr. Luck's motion for partial summary judgment will be granted. Defendants may not rely upon after-acquired evidence of Mr. Luck's alleged misuse use of his Alpha-issued iPhone as a defense to liability for Mr. Luck's claims or as a basis for Alpha's counterclaims. And while, if there had been admissible evidence to create a genuine issue of fact as to whether the after-acquired evidence of Mr. Luck's misuse of the Alpha-issued iPhone would limit any "future wages," that is, the aggregate amount of Base Salary and Guaranteed Annual Bonuses that "would otherwise be payable to him" during the remaining scheduled term of the Employment Contract, beyond the date of his termination, the absence of such admissible evidence results in Mr. Luck prevailing on this issue as a matter of law.

### 3.   Counts 1 and 4: Breach of the Implied Duty of Good Faith and Declaratory Judgment

All contracts carry "an implied covenant of good faith and fair dealing," which requires both parties to refrain from doing "anything that will injure the right of the other to receive the benefits of the agreement." *Hudson United Bank v. Cinnamon Ridge Corp.*, 81 Conn. App. 557, 576 (2004). "The covenant . . . presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Neiditz v. Hous. Auth of the City of Hartford.*, 43 Conn. Supp. 283, 294 (Conn. Super. Ct. 1994); *see also De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2005) (same). To fulfill its duty, a party may not "do anything that will injure the right of the other to receive the benefits of the agreement." *De La Concha of Hartford, Inc.*, 269 Conn. at 432 (internal quotation marks and citation omitted).

Before asserting bad faith or fair dealing, a plaintiff "must prove three elements: 'first, that the plaintiff and defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; second, that the defendant engaged in conduct that injured the plaintiff's right to receive all or some of those benefits; and third, that when committing the acts by which it injured the plaintiff's right to receive benefits he reasonably expected to receive under the contract, the defendant was acting in bad faith.'" *Bagley v. Yale Univ.*, 42 F. Supp. 3d 332, 359–60 (D. Conn. 2014) (quoting *Franco v. Yale*, 238 F. Supp. 2d 449, 455 (D. Conn. 2002)). "Most courts decline to find a breach of the covenant apart from a breach of an express contract term." *Landry v. Spitz*, 102 Conn. App. 34, 46 (2007).

Defendants argue that they are entitled to summary judgment on Mr. Luck's breach of the implied duty of good faith claim because Mr. Luck "seeks to achieve a result that is contrary to the express terms of the Employment Contract and the Guaranty." Defs.' Mot. at 34. In Defendants' view, "[b]ecause Cause exists under the Employment Contract, Defendants do not owe any money to [Mr.] Luck, and [Mr.] Luck cannot seek to impose liability on Defendants under an implied covenant theory because that would achieve a result that is contrary to the express terms of the contracts." *Id.* at 35. According to Defendants, Mr. Luck also "cannot avoid summary judgment on his breach of implied covenant claim by claiming that his termination was pretextual or motivated by a desire to avoid paying him because a party's motive for terminating a contract is legally irrelevant if the party has the legal right to terminate the contract." *Id.* (emphasis omitted).

In addition, Defendants argue that "[Mr.] Luck cannot assert a breach of the implied covenant claim because there is no evidence that Defendants acted in bad faith." *Id.* at 37. Defendants contend that Mr. Luck cannot establish bad faith by arguing that Defendants

51

wrongfully terminated the Employment Contract for cause. *Id.* at 37–38. Defendants argue that "it is [also] not bad faith for Defendants to act in their own interests by terminating any payment obligations under the contract," including in order to "avoid making payments to [Mr.] Luck." *Id.* at 39.

In response, Mr. Luck argues that the breach of implied covenant claim "does not seek to achieve a result contrary to the express terms of the Employment Contract and Guaranty," as Defendants have not established, "as a matter of law, that Cause [for termination] existed under the Employment Contract" or that his "alleged acts or omissions were not reasonably susceptible to cure." Pl.'s Opp'n at 36. In addition, Mr. Luck asserts that "Defendants' argument that [their] motivation [for terminating the Employment Contract] is irrelevant is misguided and the cases cited by Defendants in support have no precedential value to the instant case." *Id.* at 37. He argues that based on the evidence, "Defendants have not met their burden to show there is no genuine dispute as to any material fact" with respect to bad faith. *Id.* at 38.

The Court disagrees.

To constitute a breach of the implied covenant, "the acts by which a defendant allegedly impede[d] the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *De La Concha*, 269 Conn. at 433. Bad faith implies "actual or constructive fraud," a "design to mislead or deceive another," or "a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Habetz v. Condon*, 224 Conn. 231, 237 (1992) (citation omitted). "Bad faith means more than mere negligence; it involves a dishonest purpose." *Id*.

Regardless of whether Mr. Luck's implied covenant claim seeks a result contrary to the Employment Contract's express terms, Mr. Luck has not presented evidence or set forth any factual allegations that Defendants terminated the Employment Contract in bad faith. In contending that Defendants acted in bad faith, Mr. Luck refers to evidence which allegedly shows that Defendants (1) hired Mr. McDevitt to investigate Mr. Callaway's hiring and termination on January 30, 2020 and, following the investigation, "made the business decision not to terminate Mr. Luck"; (2) "have no evidence that anyone ever reviewed Mr. Luck's emails from the time period March 14, 2020 through March 30, 2020"; and (3) "never gave Mr. Luck notice or thirty days['] opportunity to cure any alleged acts or omissions." Pl.'s Opp'n at 38–39.

At most, these allegations suggest that Defendants terminated Mr. Luck without cause or failed to provide him with notice and an opportunity to cure; they do not suggest that Defendants, in terminating Mr. Luck, "committed a fraud, sought to mislead or deceive the plaintiff, acted with an improper motive, or . . . [acted] with a dishonest purpose." *Blumberg Assocs. Worldwide, Inc. v. Brown & Brown of Conn., Inc.*, 132 Conn. App. 85, 100–01 (2011), *aff'd sub nom. Blumberg Assocs. Worldwide, Inc. v. Brown & Brown of Conn.*, 311 Conn. 123 (2014); *see also Sidorova v. East Lime Bd. of Educ.*, 158 Conn. App. 872, 892–93 (2015) (affirming trial court's grant of summary judgment to defendants where plaintiff alleged that defendants "dismiss[ed] the plaintiff without first giving her notice that her contract was under consideration for termination and affording her the right to a hearing . . . as required by contract between the parties"); *Rafalko v. Univ. of New Haven*, 129 Conn. App. 44, 51–52 (2011) (affirming denial of summary judgment where the plaintiff "failed to point to any evidence of bad faith by the university" and instead advanced arguments that "primarily relate[] to his claim that the court improperly rendered summary judgment on his breach of contract count").

In essence, Mr. Luck "does nothing more than make a bare assertion that [Defendants] acted in bad faith" in terminating Mr. Luck from the XFL. *Halkiotis v. WMC Mortg. Corp.*, 144 F. Supp. 3d 341, 359 (D. Conn. 2015). "Such assertions are insufficient to survive summary judgment." *Id*. (citing *Pride Acquisitions, LLC v. Osagie*, No. 12-CV-639 (JCH), 2014 WL 4843688, at *13 (D. Conn. Sept. 29, 2014) ("Although intent is generally an issue for the jury to decide, a plaintiff is not entitled to have a claim go to the jury [on a claim of violation of the implied covenant of good faith and fair dealing] where his only support for the intent element is a bare assertion of bad faith.")).

Accordingly, the Court will grant summary judgment to Defendants with respect to Mr. Luck's breach of the implied covenant of good faith claim in Count Four. As to Count One, to the extent Mr. Luck seeks "a declaration that, in violation of the implied duty of good faith and fair dealing, Alpha wrongfully terminated, materially breached and/or repudiated the Employment Contract without Cause," Second Am. Compl. ¶ 29, for the reasons described above, this claim also will be dismissed.

### 4. Counterclaims 1 and 2: Breach of Contract and Breach of Fiduciary Duty

Alpha counterclaims against Mr. Luck for breach of contract and breach of fiduciary duty. Alpha Am. Countercls., ECF No. 153 (Feb. 18, 2021). In its amended counterclaims, Alpha alleges that Mr. Luck breached the Employment Contract and his fiduciary duties to Alpha by (1) hiring and failing to immediately terminate Mr. Callaway, *id.* at ¶¶ 15–49; (2) using his Alpha-issued iPhone for "matters unrelated to the business of the XFL," *id.* ¶ 50; (3) disclosing confidential information of the XFL in violation of the Confidentiality Agreement, *id.* ¶¶ 82–96; and (4) "abandon[ing]" his XFL duties, *id.* at 15, and "fail[ing] to devote substantially all of his

54

business time to the XFL or to the performance of his duties to the XFL" after March 13, 2020, *id.* ¶ 103.

As these counterclaims are mirror-images of Mr. Luck's claims for relief, and given that there are no factual disputes with respect to Mr. Luck's alleged misuse of his Alpha-issued iPhone, disclosure of confidential information, and neglect of his XFL duties, as discussed above, the counterclaims will be dismissed as to these issues.

Because there are triable issues of fact with respect to Mr. Luck's hiring and termination of Mr. Callaway, however, the parties' cross-motions for summary judgment on Alpha's breach of contract counterclaim, as well as Mr. Luck's motion on Alpha's counterclaim for breach of fiduciary duty, will be denied as to this ground only. *Cf. Layout, Inc. v. Heavy Metal Corp.*, No. 16-CV-2531, 2018 WL 2244684, at *5 (E.D.N.Y. Apr. 17, 2018) (denying motion to dismiss breach of contract counterclaim, the "mirror image of [plaintiff's] claims," as "[t]here are factual disputes that prevent the court from deciding [both claims] short of trial").

### B.  Mr. Luck's Motion to Strike Portions of Defendants' Answers

Mr. Luck moves to strike from the Answers filed by Mr. McMahon and Alpha, respectively, the following allegations: (1) "McMahon further responds that the Court has dismissed the breach of the implied covenant of good faith and fair dealing claim against him," Def. Vincent K. McMahon's Answer to Pl.'s Second Am. Compl. ¶¶ 25, 39–40, ECF No. 338 (Oct. 1, 2021) ("McMahon's Answer"); and (2) "Alpha further responds that the Court has dismissed the breach of the implied covenant of good faith and fair dealing claim against McMahon," Def. Alpha Entertainment LLC's Answer and Affirmative Defenses to Pl.'s Second Am. Compl. ¶¶ 25, 39–40, ECF No. 339 (Oct. 1, 2021) ("Alpha's Answer"). Pl.'s Mot. to Strike

at 1. Mr. Luck argues that, under the Court's previous Ruling and Oder, "[t]here is no admissible evidence to support these assertions." *Id.*

Mr. Luck also moves to strike certain references to Mr. Luck's use of his XFL-issued iPhone on the grounds that these allegations are "scandalous, set forth in needless detail, . . . unnecessarily reflect on [Mr. Luck's] private, personal affairs[,] and are intended to unduly prejudice him." *Id.* at 2 (citing McMahon's Answer ¶ 20; Alpha's Answer ¶ 20).

In response, Defendants argue that "the Court properly dismissed [Mr.] Luck's breach of the implied covenant and good faith and fair dealing claim as to [Mr.] McMahon because (1) there could be no such claim with respect to the Guaranty since it could not be bad faith for Mr. McMahon not to pay the Guaranty unless and until Alpha has first been adjudged to be liable under the Employment Contract; and (2) there could be no such claim with respect to the Employment Contract since [Mr.] McMahon was not a party to that agreement." Defs.' Opp'n to Mot. to Strike at 9.

Defendants further contend that, with respect to the Answers' references to Mr. Luck's use of his iPhone, "[t]here is no basis for a motion to strike when the allegedly scandalous material is filed under seal." *Id.* at 10. They argue that these allegations are not scandalous because Mr. Luck's use of his XFL-issued iPhone is relevant to his alleged violations of XFL policies, and Defendants did not set forth these allegations in "needless detail." *Id.* at 10–13.

The Court agrees, at least as to the conclusion.

In the Court's Ruling and Order, the Court dismissed Mr. Luck's claim of breach of the implied covenant of good faith and fair dealing as to Mr. McMahon, concluding that "[b]ecause Mr. McMahon is not a signatory to the Employment Contract, he cannot be held liable for breach of the implied duty of good faith with respect to that agreement." Ruling and Order at 23. The

56

Court noted that "Mr. Luck does not dispute that Mr. McMahon is not a party to the Employment

Contract," but contends that Mr. McMahon "breached the implied covenant of good faith and

fair dealing based on the Guaranty." *Id.* (quotation marks and citation omitted).

Contrary to the Court's previous ruling, Mr. Luck's breach of implied covenant claim

implicates both the Employment Contract and, as to Mr. McMahon, the Guaranty. *See MBC*

*Ventures, LLC v. Miniventures of NY, Inc.*, No. 3:20-CV-362 (CSH), 2021 WL 3709808, at *7

(D. Conn. Aug. 20, 2021) ("a guarantee agreement is a separate and distinct obligation from that

of the note or other obligation," as the "guarantor's liability arises from what he or she agreed to

in the guaranty" (quotation marks omitted) (citing *JP Morgan Chase Bank v. Winthrop Props.*,

312 Conn. 662, 675–76 (2014))).

But, contrary to Mr. Luck's assertions, Mr. Luck does not plausibly allege how, apart

from failing to pay him the amounts allegedly due under the Employment Contract, Mr.

McMahon has violated an implied covenant of good faith in the Guaranty. Mr. Luck alleges, for

example, that Mr. McMahon "directed and assisted Alpha" in terminating Mr. Luck in order "to

avoid paying Mr. Luck the amounts owed under the Guaranty," Am. Compl. ¶ 39, but bases this

allegation solely on Defendants' alleged improper termination of Mr. Luck for cause.

In essence, the allegations supporting Mr. Luck's implied covenant of good faith claim

are "identical to those relied upon for his breach of contract" claim, thereby rendering the claim

"duplicative and highlighting the lack of allegations rising to the level of bad faith." *Arch Ins.*

*Co. v. Centerplan Constr. Co.*, No. 3:16-CV-01891 (VLB), 2018 WL 6519063, at *16 (D. Conn.

Dec. 11, 2018).

In any event, "[w]hether to grant or deny a motion to strike is vested in the trial court's

sound discretion," *Tucker*, 936 F. Supp. 2d  at 15, and motions to strike under Rule 12(f) are

"generally disfavored and will not be granted unless the matter asserted clearly has no bearing on

the issue in dispute," *Corr. Officers Benevolent Ass'n of Rockland Cnty.*, 226 F.R.D. at 177. As

the Court has dismissed Mr. Luck's implied covenant of good faith claim as to Mr. McMahon,

and this dismissal directly bears on Mr. Luck's claims in the Second Amended Complaint, Mr.

Luck's motion to strike references to the Court's Ruling and Order on this point will be denied.

As to Mr. Luck's motion to strike certain references to Mr. Luck's personal use of his

Alpha-issued iPhone, the motion also will be denied. "'[A] scandalous allegation' has been

described as 'one that reflects unnecessarily on the defendant's moral character, or uses repulsive

language that detracts from the dignity of the court.'" *Tucker*, 936 F. Supp. 2d at 16 (quoting

*Cabble v. Rollieson*, No. 04-CV-9413, 2006 WL 464078, at *11 (S.D.N.Y. Feb. 27, 2006)).

"Even where matter in a pleading is relevant to the controversy, it nonetheless may be stricken if

it is scandalous or set out in 'needless detail.'" *Cabble*, 2006 WL 464078, at *11

(quoting *Gleason v. Chain Serv. Rest*., 300 F. Supp. 1241, 1257 (S.D.N.Y. 1969)).

As the Court has previously held, Mr. Luck's use of his Alpha-issued iPhone is "directly

relevant to, at the very least, his alleged violation of the XFL's technology policy and, thus, the

Alpha-issued iPhone is relevant to Defendants' defenses and claims." Ruling and Order on Disc.

Disputes at 9–10, ECF No. 152 (Feb. 5, 2021). As detailed above, Defendants contend that Mr.

Luck breached the Employment Contract by intentionally violating XFL policies and directives,

including through use of his Alpha-issued iPhone. Moreover, Defendants have not alleged Mr.

Luck's personal use of his Alpha-issued iPhone in unnecessary detail. Rather, Defendants'

allegations refer to a single category of activity, and do not include specific examples or details

regarding its use. *See Chigirinskiy v. Panchenkova*, No. 14-CV-4410 (JPO), 2015 WL 1454646,

at *19 (S.D.N.Y. Mar. 31, 2015) (denying motion to strike where allegations that parties had an

extramarital affair and their first child out of wedlock "are not necessarily immaterial, and do not warrant the extraordinary remedy that [defendant] seeks").

Accordingly, Mr. Luck's motion to strike the challenged allegations in Defendants' Answers will be denied.

### C.  Mr. Luck's Motion for Sanctions

Under Rule 30(b)(6) of the Federal Rules of Civil Procedure, when a party seeking to depose a corporation announces the subject matter of the proposed deposition, the corporation must produce someone familiar with that subject. *See* Fed. R. Civ. P. 30(b)(6); *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 268 (2d Cir. 1999). To satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available "such number of persons as will" be able "to give complete, knowledgeable and binding answers" on its behalf. *SEC v. Morelli*, 143 F.R.D. 42, 45 (S.D.N.Y. 1992) (quotation marks and citation omitted).

When a party fails to comply with Rule 30(b)(6), Rule 37 allows courts to impose various sanctions, including the preclusion of evidence. *See* Fed. R. Civ. P. 37(d). Sanctions in connection with a Rule 30(b)(6) deposition, however, are appropriate only where "the inadequacies in a deponent's testimony [are] egregious and not merely lacking in desired specificity in discrete areas." *Kyoei Fire & Marine Ins. Co. Ltd. v. M/V Mar. Antalya*, 248 F.R.D. 126, 152 (S.D.N.Y. 2007) (quotation marks and citation omitted); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 261 F.R.D. 34, 39 (S.D.N.Y. 2009) (same).

Mr. Luck asserts that sanctions should be imposed on Alpha for its "failure to prepare its [corporate] representative to provide complete and knowledgeable answers" during Alpha's Rule 30(b)(6) deposition. Pl.'s Mot. for Sanctions at 6.

59

According to Mr. Luck, "Alpha's representative was unable to answer even the most basic questions about the topics [permitted] in the [Court's] Order." *Id.* at 2. In addition, apart from a "one minute phone call with . . . [Mr.] McMahon, Alpha's representative spoke to no one other than counsel about these topics and did not make any attempts to contact the former Alpha and/or XFL employees whom he and Alpha believed to have knowledge about the topics." *Id.* Mr. Luck argues that Alpha's representative also "failed to review documents sufficient to answer the questions on the topics ordered by the Court," and that "counsel for Alpha continuously interfered with the deposition and instructed Alpha's representative not to answer questions that were clearly within the scope of the Order." *Id.*

 As a result of Alpha's alleged failure to adequately prepare its corporate representative, Mr. Luck requests that the Court impose the following sanctions: (1) an order precluding Alpha "from relying on or using the Employee Handbook to support its defenses or counter-claims" and (2) an order establishing that, "for purposes of this action[,] Alpha did not review Mr. Luck's e-mail correspondences dated March 13, 2020 to March 30, 2020 prior to terminating him." *Id.* at 14.

In response, Alpha argues that Mr. Luck "takes issue with [its corporate representative, Jeffrey Pollack's] preparation for the deposition [ ] but . . . cannot point to any question in the Court's [October 8, 2021] Order that Mr. Pollack did not answer." Alpha's Opp'n to Mot. for Sanctions at 10. Alpha contends, for example, that Mr. Pollack "gave specific answers to the three questions that the Court said he could be asked" in relation to the second topic identified in Mr. Luck's deposition notice. *Id.* at 9.

Furthermore, Alpha argues that Mr. Pollack "testified that the review of [Mr.] Luck's [e-mail] correspondence occurred between March 30 or March 31, 2020 through April 9, 2020" and

that "[e-mails] from outside of that period were [also] reviewed." *Id.* at 15 (citing Ex. 2 to Alpha Entertainment LLC's Mem. in Opp'n to Pl.'s Mot. for Sanctions at 81:17–82:12, ECF No. 378-2 (Nov. 12, 2021) ("Pollack Dep.")). In Alpha's view, Mr. Luck "badgered" Mr. Pollack regarding "whether [e-mails] from March 13, 2020 to March 30, 2020, in particular, were reviewed," in response to which Alpha's counsel instructed Mr. Pollack not to answer "because the identification of what specific [e-mails] counsel chose to review or not review is subject to [the] work product [privilege]." *Id.* at 15–16 (citations omitted).

As to Mr. Luck's requested sanctions, Alpha asserts that "[t]here simply is no connection between any questions that Mr. Pollack answered and a preclusion on Alpha's use of the Employee Handbook to support its defenses or counter-claims." *Id.* at 14. As a result, Mr. Luck "cannot identify [ ] any prejudice from not knowing who drafted specific pages or paragraphs of the Employee Handbook." *Id.*

The Court agrees.

In his motion to compel the 30(b)(6) deposition of Alpha's corporate representative, Mr. Luck identified three topics for examination: (1) "the date when Alpha decided to terminate Luck's employment"; (2) "the drafting, creation[,] and circulation of the XFL Employee Handbook & Code of Business Conduct, and its effective date"; and (3) "any review of Luck's computer and/or [e-mail] correspondence for the March 13, 2020-April 9, 2020 period." Pl.'s Renewed Mot. to Compel Rule 30(b)(6) Dep. of Def. Alpha Entertainment, LLC at 2, ECF No. 334 (Sept. 28, 2021).

On October 8, 2021, the Court granted Mr. Luck's motion to depose Alpha's corporate representative "to the extent permitted under this Order." Order, ECF No. 349 (Oct. 8, 2021). The Order provided that, with respect to topic three, "Mr. Luck may not seek privileged

information regarding Alpha's review of his computer and e-mail communications." *Id.* As to the second topic, the Court concluded that "there is no reason to have a deposition" regarding the Employee Handbook's effective date, but permitted Mr. Luck to "ask the corporation representative information regarding who drafted any specific policy in the Employee Handbook related to this case, at whose direction any such drafting was done, and when the company began circulating the Employee Handbook." *Id.*

With respect to topic two, based on Mr. Pollack's deposition transcript, Mr. Pollack adequately addressed the three issues permitted by the Court. Mr. Pollack testified that Barry Marshall was responsible for drafting or compiling the Employee Handbook, *see* Pollack Dep. at 49:19–25; that the drafting of the Employee Handbook was completed under Mr. Luck's direction, *see id.* at 51:12–15, 53:9–11; and that the Employee Handbook became effective no later than August 6, 2018, *see id.* at 48:17–20.

As to the third topic, Mr. Pollack declined, based on objections from counsel, to respond to "whether all e-mails of Mr. Luck's for the time period March 13[, 2020] to March 30[, 2020] were reviewed." *Id.* at 87:9–89:4. Mr. Pollack confirmed, however, that Alpha or counsel on behalf of Alpha reviewed Mr. Luck's e-mails from March 30, 2020 or March 31, 2020 through the date of Mr. Luck's termination on April 9, 2020. *Id.* at 81:17–82:2, 82:15–17 ("[I]t's my understanding that e-mails were reviewed from within the period of March 31st to April 9th but also outside of that period.").

While the Court agrees that Mr. Pollack should have been better prepared to address any review of Mr. Luck's e-mails for the entirety of the March 13, 2020 through April 9, 2020 period, Mr. Pollack's testimony on topic three cannot be called "egregious." At best, the deposition transcript reveals that Mr. Pollack's testimony was "lacking in desired specificity in

discrete areas," which is insufficient to warrant the imposition of sanctions. *Kyoei Fire & Marine Ins. Co. Ltd.*, 248 F.R.D. at 152 (quotation marks and citation omitted); *Leidig v. Buzzfeed, Inc.*, No. 16-CV-542 (VM) (GWG), 2017 WL 6512353, at *6 (S.D.N.Y. Dec. 19, 2017) (denying motion for sanctions where plaintiff "offered substantial information within [the disputed] topic, such as testimony concerning the destruction of metadata, the preservation of documents in anticipation of litigation . . ., the disabling of plaintiffs' websites, and the deletion of employee emails" (internal citations omitted).

Accordingly, Mr. Luck's motion for sanctions will be denied.

### D. Defendants' Motion for Sanctions

Rule 37(e) of the Federal Rules of Civil Procedure governs sanctions for the failure to preserve Electronically Stored Information ("ESI") and provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) Upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) Only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> (A) presume that the lost information was unfavorable to the party;
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

To obtain sanctions for the spoliation of evidence, the movant must show "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the

63

destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of

fact could find that it would support that claim or defense." *Klipsch Grp., Inc. v. ePRO E-Com.

Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018) (quotation marks and citation omitted). However, "even

where a party has shown that its opponent had an obligation to preserve certain evidence and

willfully failed to do so, sanctions need not automatically follow; instead, [the Second Circuit

has] simply held that such conduct *may* provide sufficient circumstantial evidence that relevant

and prejudicial data was lost." *Id.* at 630.

Defendants argue that the Court should impose sanctions on Mr. Luck and his counsel,

Mr. Dobrowski, for Mr. Luck's alleged spoliation of evidence on his Alpha-issued iPhone, as

well as for certain alleged misrepresentations during his depositions and to the Court. In

Defendants' view, Mr. Luck "had a duty to preserve the evidence on the phone after receiving

the termination letter because he knew or should have known it contained evidence that could be

relevant in future litigation over his termination." Defs.' Mot. for Sanctions at 18. According to

Defendants, Mr. Luck, however, "intentionally destroyed evidence on the iPhone after receiving

the termination letter," including the iPhone's Internet browser history and "a total [of] 14,391

text messages . . . , although it could not be precisely determined when all of those messages

were deleted." *Id.* at 20–21 (citations omitted). "[Mr.] Luck and both experts agreed that the

evidence destroyed . . . cannot be restored or replaced with additional discovery." *Id.* at 21

(citing Ex. 1 to Defs.' Mot. for Sanctions for Spoliation of Evidence and Vexatious Litigation

Misconduct Against Pl. Oliver Luck and His Lead Counsel Paul Dobrowski at 80:20–81:2, ECF

No. 382-2 (Nov. 12, 2021) ("Luck May 11, 2021 Dep.")).

Defendants assert that Mr. Luck's deletion of the browser history and text messages

prejudiced Defendants because it "dramatically increas[ed] the cost of this litigation," and the

deleted evidence "would have supported Defendants' claims and defenses in this case." *Id.* at 22–23. In addition, they argue that Mr. Luck deleted information from his Alpha-issued iPhone with an "inten[t] to deprive Defendants of the information's use in litigation." *Id.* at 24 (emphasis omitted). According to Defendants, Mr. Luck and his counsel, Mr. Dobrowski, engaged in "persistent efforts . . . to prevent Defendants from accessing and examining the phone to conceal [Mr.] Luck's spoliation of evidence on the phone," thereby "establish[ing] a clear intent to deprive." *Id.* at 25.

Furthermore, Defendants argue that Mr. Luck and Mr. Dobrowski "have committed a fraud on the court through [Mr.] Luck's perjury and repeated misrepresentations" during his depositions and to the Court. *Id.* at 29. Defendants argue that these alleged misrepresentations, in combination with Mr. Luck's alleged spoliation of evidence, warrant dismissal of the case with prejudice, *id.* at 35, as well as an award of attorney's fees and the imposition of sanctions on Mr. Dobrowski, who allegedly "was complicit in [Mr.] Luck's misconduct to perpetrate a fraud on the Court," *id.* at 38.

In response, Mr. Luck argues that he did not have a duty to preserve the deleted browser history because "on April 9, 2020[,] within one hour of receiving the Termination Letter, Mr. Luck did not know (nor was there a reasonable basis for him to know) that the browser history would be relevant to future litigation." Pl.'s Opp'n to Mot. for Sanctions at 2. Thus, Mr. Luck argues that he did not "spoliate[] the iPhone's browser history with the specific intent to deprive Defendants of its use in future litigation." *Id.* at 21.

Mr. Luck emphasizes that apart from requesting the return of Mr. Luck's Alpha-issued iPhone, the Termination Letter does not state that Mr. Luck's personal use of his Alpha-issued iPhone is a ground for termination. *Id.* at 3. He asserts that "[before] . . . terminating Mr. Luck on

April 9, 2020, Defendants recognized that the contents from Mr. Luck's iPhone [were] irrelevant because Mr. McMahon, Alpha and Attorney McDevitt never sought to review the iPhone's contents." *Id.* at 28–29 (emphasis omitted).

In addition, Mr. Luck argues that Defendants have not been prejudiced by the deletion of the iPhone's browser history. He contends that "the retained bookmarks reflect certain websites visited by Mr. Luck," "Defendants did not terminate Mr. Luck for cause based on his internet use," "Mr. Luck owed no contractual duty to either Defendant to preserve the browser history," and Mr. Luck "has stipulated that he regularly and routinely utilized his iPhone for Personal Use." *Id.* at 5. Moreover, Mr. Luck argues that "Defendants were able to confirm [Mr. Luck's] Personal Use [of his Alpha-issued iPhone] . . . immediately upon review of the iPhone's contents and its bookmarks in February 2020." *Id.* at 26.

With respect to the deleted text messages, Mr. Luck asserts that "for the month of April 2020 when a written litigation hold was put into effect, 97.9% of the total text messages were available." *Id.* at 6 (citation omitted). He further argues that he "does not recall deleting any text messages from the iPhone after receiving the Termination Letter . . . , other than text messages relating to phishing, unsolicited advertisements, or messages that were accidentally sent from his iPhone while it was in his pocket." *Id.* at 10. Thus, "Mr. Luck's texts that existed as of April 9, 2020 relating to his work performance and Personal Use have been preserved and produced to Defendants[.]" *Id.*

Finally, Mr. Luck asserts that he did not commit perjury or fraud on the Court because he did not "willfully intend[] to provide false testimony about a material matter with the specific intent to obstruct justice." *Id.* at 34. To Mr. Luck, his deposition testimony that he did not recall deleting the iPhone's browser history and that he did not delete the browser history in an effort to

conceal information was truthful because "he did not recall, at [the time of his deposition], deleting the browser history on April 9, 2020" and he "erased the browser history out of habit and embarrassment," rather than "with the willful intent to conceal a material matter for future litigation." *Id.* (citations omitted).

The Court agrees with the Defendants, in part.

### 1. Duty to Preserve

"The first element of the traditional spoliation test requires the moving party to demonstrate that 'the party having control over the evidence . . . had an obligation to preserve it at the time it was destroyed." *Cruz v. G-Star Inc.*, No. 17-CV-7685 (PGG), 2019 WL 4805765, at *9 (S.D.N.Y. Sept. 30, 2019) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001)). This obligation "arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). "While a litigant is under no duty to keep or retain every document in its possession[,] . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in this action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (quotation marks and citation omitted).

In addition, "[t]he duty to preserve arises, not when litigation is certain, but rather when it is 'reasonably foreseeable.'" *Fed. Deposit Ins. Corp. v. Horn*, No. CV 23-5958 (DRH) (AKT), 2015 WL 1529824, at *5 (E.D.N.Y. Mar. 31, 2015) (citation omitted). "Although the inquiry is necessarily a fact specific one, . . . several other courts have found that the duty to preserve

attaches prior to the initiation of formal proceedings." *Id.* at *7; *see Schwarz v. FedEx Kinko's Off. & Print Servs., Inc.*, No. 08-CV-6486, 2009 WL 3459217, at *6 (S.D.N.Y. Oct. 27, 2009) (holding that duty to preserve evidence arose when party received letter that gave it "good reason to anticipate imminent litigation").

Here, Mr. Luck had a duty to preserve the contents of his Alpha-issued iPhone, including its browser history and text messages, upon receiving the Termination Letter on April 9, 2020. While the Termination Letter does not initiate legal action, it states that Alpha is terminating Mr. Luck "immediately, for Cause," including "for gross negligence" of his duties and "willful disregard of the lawful instructions of Mr. McMahon." Termination Letter at 1, 3. In addition, the letter states that it "is not intended to be, nor is it, an exhaustive and comprehensive statement of all facts justifying Alpha's decision to terminate [the] contract for cause," and expressly reserves the right to "offer all evidence demonstrating cause to terminate" should Mr. Luck "decide to challenge or contest this termination as lacking cause." *Id.* at 3.

The receipt of notice of termination for cause, in combination with Alpha's express reservation of rights, "should have raised enough of a red flag for [Mr. Luck] to undertake some precautions" to preserve potentially relevant information in anticipation of future litigation. *Horn*, 2015 WL 1529824, at *7 (quotation marks and citation omitted); *see Distefano v. L. Offs. of Barbara H. Katsos, PC*, No. CV 11-2893, 2013 WL 1339548, at *5 (E.D.N.Y. Mar. 29, 2013) (duty to preserve arose when attorney received letter from client terminating her representation "for some reasons not yet fully defined"). Furthermore, "[i]n assessing whether litigation was reasonably foreseeable in these circumstances," the Court "cannot ignore the fact that [Mr. Luck] is an attorney and should have been attuned to the prospect of litigation." *Distefano*, 2013 WL 1339548, at *5. Indeed, the evidence suggests that Mr. Luck anticipated initiating litigation

against Alpha shortly after receiving the Termination Letter. Upon receiving the letter, Mr. Luck retained counsel regarding his termination the following day, *see* Ex. 3 to Defs.' Mot. for Sanctions for Spoliation of Evidence and Vexatious Litigation Misconduct Against Pl. Oliver Luck and His Lead Counsel Paul Dobrowski ¶ 8, ECF No. 382-4 (Nov. 12, 2021), and initiated this action one week later, on April 16, 2020, *see* Compl., ECF No. 1 (Apr. 16, 2020).

Moreover, while Mr. Luck was not required to retain every document in his possession, Mr. Luck was under a duty to preserve evidence that he knew, or reasonably should have known, to be relevant to future litigation. *Horn*, 2015 WL 1529824, at *8. Mr. Luck argues that he could not have concluded from the Termination Letter that the contents of his Alpha-issued iPhone were potentially relevant, as the letter did not include his personal use of his Alpha-issued iPhone as a basis for termination for cause.

The Termination Letter states, however, that Mr. Luck had been "disengaged from the XFL and its efforts to deal with the complications of the Covid-19 pandemic" based in part on the alleged infrequency of Mr. Luck's e-mails, as well as his alleged failure to place any calls to Mr. McMahon. Termination Letter at 3. In addition, the letter requests that Mr. Luck return his Alpha-issued iPhone to the company. *Id.*

Accordingly, upon receiving the Termination Letter, Mr. Luck knew or should have known that the contents of the iPhone were potentially relevant to litigation concerning Alpha's grounds for termination for cause, including his alleged failure to substantially devote all of his business time to the performance of his duties.

### 2.  Intent to Deprive

"Rule 37(e) permits sanctions such as an adverse inference instruction or dismissal only in instances in which the spoliating party acted with 'intent to deprive another party of the

69

information's use in the litigation." *Cruz*, 2019 WL 4805765, at *12 (quoting *Leidig*, 2017 WL 6512353, at *10 (quoting Fed. R. Civ. P. 37(e)(2)(A)–(C)). "[T]he intent contemplated by Rule 37 is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence." *Leidig*, 2017 WL 6512353, at *11; *see also Lokai Holdings*, 2018 WL 1512055, at *16 (declining to find an intent to deprive "on the basis of suspicion alone," where spoliating party intentionally deleted relevant e-mails, but the record did not indicate that the spoliating party deleted such e-mails to intentionally deprive its adversary of their use in litigation).

As the movant, Defendants bear the burden of demonstrating that Mr. Luck acted with the intent to deprive by "clear and convincing evidence." *Bourdreau v. Smith*, No. 3:17-CV-589 (SRU), 2020 WL 1532277, at *11 (D. Conn. Mar. 31, 2020) (citing *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 499 (S.D.N.Y. 2016) (finding "clear and convincing" the proper standard for analyzing an intent to deprive under Rule 37(e)(2))).

Defendants ask the Court to impose Rule 37's "particularly harsh" sanction of dismissal with prejudice based upon Mr. Luck's alleged intent to deprive Defendants of the use of the deleted information in this litigation. *Charleston Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 60 (S.D.N.Y. 2020) (quotation marks omitted). Although Mr. Luck had an obligation to preserve the contents of his Alpha-issued iPhone upon receiving the Termination Letter, Defendants have not established by clear and convincing evidence that Mr. Luck deleted the iPhone's browser history and text messages with the intent to deprive Defendants of this information's use.

Mr. Luck concedes that within one hour of receiving the Termination Letter, he intentionally deleted the browser history from his Alpha-issued iPhone. Pl.'s Opp'n to Mot. for

Sanctions at 24. He argues, however, that he deleted this information "out of habit and embarrassment," and not to "conceal a material matter for future litigation." *Id.* at 34. Given the deleted information at issue, the Court finds it plausible that Mr. Luck erased his iPhone's browser history due to personal embarrassment and in an effort to avoid "third parties," including Alpha, from discovering his misuse. *Id.* at 3.

Defendants argue that circumstantial evidence, including the timing of the deletion, Mr. Luck's efforts to withhold the iPhone's passcode from Defendants, and his alleged misrepresentations regarding the preservation of the iPhone's contents, demonstrate that Mr. Luck intended to deprive Defendants of use of the browser history in this litigation. While a court "may infer that a party acted with an intent to deprive on the basis of circumstantial evidence," here, "the presented evidence is capable of more than one interpretation," and the Court therefore will refrain from finding intent to deprive "on the basis of suspicion alone." *Lokai Holdings*, 2018 WL 1512055, at *16 (citations omitted); *see Karsch v. Blink Health Ltd.*, No. 17-CV-3880 (VM) (BCM), 2019 WL 2708125, at *22 (S.D.N.Y. June 20, 2019) (declining to find intentionality under Rule 37(e) where, after sending a letter threatening litigation, a party "took down" an e-mail server and failed to make or preserve an adequate backup, but provided a plausible business reason for the takedown).

As to the deleted text messages, the parties dispute the number of text messages that were deleted following Mr. Luck's receipt of a litigation hold.  The parties agree, however, that Mr. Luck deleted at least twenty text messages consisting of "junk, spam or phishing" messages after he received the Termination Letter on April 9th.  Pl.'s Opp'n to Mot. for Sanctions at 1, 13, 31; Defs.' Mot. for Sanctions at 20. In the absence of further evidence as to the number and nature of the text messages deleted, and given these messages' apparent irrelevance to the claims at issue,

it is not clear that Mr. Luck deleted these messages with an intent to deprive Defendants of their use.

Accordingly, the Court will not impose sanctions under Rule 37(e)(2).

### 3. Prejudice

Where, as here, a party acts negligently and not with intent to deprive, Rule 37(e)(1) "permits the imposition of sanctions only when there is 'prejudice to another party from loss of the information.'" *Leidig*, 2017 WL 6512353, at *12 (quoting Fed. R. Civ. P. 37(e)(1)). "An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." *Cruz*, 2019 WL 4805765, at *14 (quotation marks omitted) (quoting Fed. R. Civ. P. 37(e)(1) advisory committee's notes to 2015 amendment). "To show it has been prejudiced, a discovering party typically needs to show that [the] destroyed evidence would have not only been probative, but also would affirmatively support that party's claim." *Coan v. Dunne*, 602 B.R. 429, 439 (D. Conn. 2019) (citing *Ungar v. City of New York*, 329 F.R.D. 8, 15 (E.D.N.Y. 2018)).

As noted above, the Court previously concluded that the contents of Mr. Luck's Alpha-issued iPhone are relevant to Defendants' defenses and claims as they relate to Mr. Luck's use of his phone. *See* Ruling and Order on Disc. Disputes at 9–10, ECF No. 152 (Feb. 5, 2021). Defendants have determined, based on a forensic analysis of Mr. Luck's iPhone, that Mr. Luck used the iPhone for reasons unrelated to the XFL. *See* Ex. 18 to Defs.' Mem. of Law in Supp. of Their Mot. for Sanctions for Spoliation of Evidence and Vexatious Litigation Misconduct Against Pl. Oliver Luck and His Lead Counsel Paul Dobrowski ¶ 19, ECF No. 382-19 (Nov. 12, 2021). This evidence suggests that, had the iPhone's browser history before April 9, 2020 been available to Defendants, it would have tended to support Defendants' allegations that Mr. Luck

72

engaged in the personal use of his Alpha-issued iPhone. *See Coan*, 602 B.R. at 439 (holding that "partial evidence" from defendant's e-mail accounts "suggests that the contents of [defendant's] email accounts would support the Trustee's efforts to show that [the defendant] controlled and directed the transfer of Walford").

Mr. Luck argues that Defendants have not been prejudiced by the deletion of this evidence because a browser history "does not show the length of time spent visiting a particular website," and "Alpha has had possession of all of Mr. Luck's emails relating to his work performance" that were retained on Alpha's server. Pl.'s Opp'n to Mot. for Sanctions at 26 (emphasis omitted). Regardless of whether the iPhone's browser history reveals the length of time spent visiting a website, Mr. Luck does not dispute that the browser history contains information relating to Mr. Luck's use of his iPhone. Mr. Luck's contention that Alpha had possession of Mr. Luck's e-mails on its server, furthermore, does not address Defendants' claims and defenses as they relate to Mr. Luck's personal use of his Alpha-issued iPhone.

Accordingly, the Court concludes that Defendants have been prejudiced by Mr. Luck's intentional deletion of his Alpha-issued iPhone's browser history and text messages, and will consider what measures are necessary under Rule 37(e)(1) to cure this prejudice.[12]

Rule 37(e)(1) provides that "[u]pon finding prejudice to another party from loss of the information, [the court] may order measures no greater than necessary to cure the prejudice."

---

[12] In addition, Mr. Luck argues that Defendants are precluded from using after-acquired evidence of Mr. Luck's Alpha-issued iPhone as a defense to liability, and therefore cannot be prejudiced by Mr. Luck's deletion of the iPhone's browser history and text messages. Pl.'s Opp'n to Mot. for Sanctions at 27–28. As the Court explained above, as a matter of law, the after-acquired doctrine does not prohibit Defendants from using evidence of the iPhone to limit any damages arising from liability, even though, ultimately, the issue of Mr. Luck's personal use of the iPhone will no longer be in this case, and as discussed above, there will be no such limitation to Mr. Luck's damages if he prevails on his breach of contract claim. In any event, the Court agrees with Defendants that Mr. Luck's spoliation of evidence on the iPhone has prejudiced Defendants by "making it both difficult and unnecessarily expensive for [them] to prosecute [this] case." *Ryan v. Rock Grp., N.Y. Corp.*, No. 18-CV-2600, 2019 WL 6841874, at *5 (S.D.N.Y. Dec. 16, 2019).

Fed. R. Civ. P. 37(e)(1). Because Mr. Luck's intentional deletion of information from the iPhone has prejudiced Defendants by depriving them of information relating to Mr. Luck's personal use of his Alpha-issued iPhone, the Court will impose monetary sanctions against Mr. Luck and Mr. Luck shall pay the attorney's fees and costs of the litigation attributable to Defendants' efforts to investigate, confirm, and obtain sanctions for the spoliation of evidence, including Defendants' imaging of Mr. Luck's Alpha-issued iPhone and the cost of litigating this motion, not to exceed $25,000 in total. *See Man Zhang v. City of New York*, No. 17-CV-5415 (JFK) (OTW), 2019 WL 3936767, at *5 (S.D.N.Y. Aug. 20, 2019) (awarding attorney's fees and costs under Rule 37(e)(1)); *Coan*, 602 B.R. at 444 (permitting the plaintiff, "[i]nsofar as the [plaintiff] was economically prejudiced by the need to litigate this motion in response to [defendant's] negligent destruction of electronic records," to recover from the defendant the plaintiff's attorney's fees and costs "attributable to his renewed motion for further contempt and subsequent related filings" and awarding attorney's fees and costs for spoliation "not to exceed $10,000 in total").

#### 4. Sanctions Under the Court's Inherent Authority

"[I]t is well-established that courts have the inherent power to sanction litigants for conduct which abuses the judicial process." *Taylor v. N.Y. State Off. for People with Dev. Disabilities*, No. 1:13-CV-740 (NAM/CFH), 2017 WL 5201611, at *9 (N.D.N.Y. Nov. 9, 2017). This conduct includes perjured deposition testimony. *Id.* (citing *Ryber v. Cannon Design, Inc.*, No. 95-CV-0279, 1996 WL 470668, at *3 (S.D.N.Y. Aug. 20, 1996) (Sotomayor, J.)). In addition, "[s]anctions for fraud [on the court] are warranted if it is established by clear and convincing evidence that [a party] has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate the action." *Knox v. United States*, No. 3:12-CV-01741 (SALM), 2016 WL 4033086, at *4 (D. Conn. July

27, 2016) (quotation marks omitted) (citing *N.Y. Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 F. App'x 25 (2d Cir. 2011) (summary order)). In both cases, however, "[t]he sanction of dismissal . . . is only appropriate in rare, extreme cases." *Taylor*, 2017 WL 5201611, at *9 (citing *Rybner*, 2016 WL 4033086, at *7–8). "Before applying this harsh remedy, the Court must consider the severity of the litigant's conduct, its effect on the case, and the suitability of lesser sanctions, among other factors." *Id.*

    In addition to seeking sanctions under Rule 37, Defendants argue that this case should be dismissed with prejudice under the Court's inherent authority because (1) Mr. Luck committed perjury during his May 11, 2021 deposition and in his interrogatory responses by stating that he did not recall deleting the browser history on his iPhone after receiving the Termination Letter, and (2) Mr. Luck and Mr. Dobrowski "made at least 18 misrepresentations concerning whether [Mr.] Luck had any data or information from the phone without any factual basis, including multiple ones to the Court, . . . in an effort to conceal his spoliation of evidence and misuse of the iPhone in violation of XFL policies." Defs.' Mot. for Sanctions at 29–33.

    First, as to Mr. Luck's deposition testimony, Mr. Luck argues that his prior testimony and responses to Defendants' interrogatories are truthful because he did not recall erasing the iPhone's browser history until after his deposition on May 11, 2021. Based on the present record, the Court cannot conclude that Mr. Luck testified as to the deletion of this information "with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Radecki v. GlaxoSmithKline*, 375 F. App'x 46, 47 (2d Cir. 2010) (summary order) (quotation marks omitted) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). While the timing of Mr. Luck's recollection may be suspect, Defendants have not shown by clear and convincing evidence that this testimony was false or that Mr. Luck testified that he did not recall

deleting his iPhone's browser history "with the specific purpose of obstructing justice" in this case. *Id.* (quoting *United States v. Ben–Shimon,* 249 F.3d 98, 102 (2d Cir. 2001)).

The Court is troubled, however, by Mr. Luck's representations to the Court regarding the extent to which he, through his counsel, Mr. Dobrowski, understood that the contents of the Alpha-issued iPhone had been preserved. During the December 17, 2020 discovery conference regarding Defendants' access to Mr. Luck's Alpha-issued iPhone, Mr. Dobrowski repeatedly stated or implied that nothing had been deleted from the iPhone. *See, e.g.*, Ex. 14 to Defs.' Mot. for Sanctions for Spoliation of Evidence and Vexatious Litigation Misconduct Against Pl. Oliver Luck and His Lead Counsel Paul Dobrowski at 12:7–10, ECF No. 382-15 (Nov. 12, 2021) ("I have told opposing counsel since April that we have done a forensic image by a third-party expert and that all of the material has been maintained with no deletions."); *id.* at 19:2–3 ("[W]e have imaged the phone. We have done nothing with the contents."); *id.* at 20:6–9 ("We will further agree that we did nothing to delete any emails or contents or texts. So the Court and opposing counsel can rest easy.").

Following the conference, Mr. Dobrowski informed the Court that he had "erroneously represented to the Court that nothing had been deleted from Mr. Luck's iPhone prior to sending it to Alpha Entertainment, LLC's bankruptcy counsel on May 6, 2020." Ex. 15 to Defs.' Mot. for Sanctions for Spoliation of Evidence and Vexatious Litigation Misconduct Against Pl. Oliver Luck and His Lead Counsel Paul Dobrowski at 2, ECF No. 382-16 (Nov. 12, 2021). According to Mr. Dobrowski, "[f]ollowing the discovery conference, [he] learned [from Mr. Luck] that a private text message string among Mr. Luck's immediate family members . . . had been deleted from Mr. Luck's iPhone after Mr. Luck received his letter of termination from Alpha. . . . It is

also possible that 'junk'-type emails or texts may have been deleted from the iPhone after receipt of the termination letter and prior to May 6, 2020 . . . ." *Id.*

Mr. Luck has testified that, during their conversation following the discovery conference, Mr. Dobrowski did not ask Mr. Luck whether any additional information apart from the text message thread had been deleted from the iPhone between April 9 and May 6, 2020. Defs.' Mot. for Sanctions at 11–12 (citing Luck May 11, 2021 Dep. at 544:19–545:9). Mr. Luck further testified that he did not recall if Mr. Dobrowski had ever asked him if he had deleted information from his iPhone, and indicated that he first spoke with his Connecticut counsel regarding the deletion of information from the iPhone after the December 17, 2020 discovery conference. Luck May 11, 2021 Dep. at 473:15–20, 474:2–7, 475:16–20.

Even assuming that, at the time of the discovery hearing, Mr. Dobrowski was not aware that Mr. Luck had deleted information from the iPhone, he was obligated before making any representations to the Court to conduct due diligence and to confirm that the contents of the iPhone had been preserved. *Cf. Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16-CV-1318 (GBD) (BCM), 2019 WL 4727537, at *26 (S.D.N.Y. Sept. 26, 2019) ("Even if not perjurious, [plaintiffs' counsel's] statements were made so cavalierly, with so little regard for counsel's duties of candor and diligence, 'as to rise to the level of bad faith.'" (quoting *Metro. Opera Ass'n v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 224 (S.D.N.Y. 2003)); *DeCastro v. Kavadia*, 309 F.R.D. 167, 184–85 (S.D.N.Y. 2015) (finding bad faith where attorney "made multiple incomplete or misleading submissions" about his client's discovery compliance and failed to correct them, "even after the inconsistencies and apparent errors in his submissions were drawn to his attention").

Accordingly, the Court will grant Defendants' motion for sanctions on the additional ground that Mr. Luck, through his counsel, misrepresented to the Court the extent to which he understood that the contents of his Alpha-issued iPhone had been preserved.

As to the type of sanction that will be imposed, dismissal is not appropriate because "a less drastic sanction" is available under Rule 37(e)(1). *Taylor*, 2017 WL 5201611, at *10; *see also Knox*, 2016 WL 4033086, at *7 (declining to impose sanctions by dismissing with prejudice, "particularly in light of other available sanctions under [Rule 37]"). Therefore, the Court will impose the same monetary sanctions against Mr. Luck, as described with respect to Rule 37(e)(1) above, of no more than $25,000 in total attorney's fees and costs, although any such motion shall not be filed until fourteen days after the jury reaches its verdict.[13] *See Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases.").

## IV.    CONCLUSION

For the foregoing reasons, Mr. Luck's motion for partial summary judgment is **GRANTED**.

Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

Mr. Luck's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

---

[13] The Court seriously considered, but ultimately decided not to impose these sanctions jointly and severally against both Mr. Luck and Mr. Dombrowski, Mr. Luck's primary counsel. Mr. Dombrowski, however, should not consider the Court's decision not to impose sanctions against him as exoneration for his role in the spoliation of evidence and associated misrepresentations to the Court, but rather as an indication that Mr. Luck's actions ultimately were responsible.

Mr. Luck's motion to strike and motion for sanctions are **DENIED**.

Defendants' motion for sanctions is **GRANTED**.

In sum, as a matter of law, the purported disclosure of confidential information, the alleged failure of Mr. Luck to perform his duties, and his alleged misuse of the Alpha-issued iPhone do not provide a basis for terminating Mr. Luck for cause without providing notice and an opportunity to cure under the Employment Contract. As to whether Defendants had cause within the meaning of the Employment Contract to terminate Mr. Luck for his hiring and termination of Mr. Callaway, however, there are genuine issues of material fact as to: (1) whether the hiring and termination of Mr. Callaway was a permissible, enumerated reason for terminating Mr. Luck for cause; and (2) even it was, whether Mr. Luck's hiring of and failure to terminate Mr. Callaway could have been reasonably susceptible to cure.

As a result, a trial will be held addressing those two issues, as they relate to Mr. Luck's breach of contract claim and—to the extent Mr. Luck seeks "a declaration that Alpha wrongfully terminated, materially breached and/or repudiated the Employment Contract without Cause," Second Am. Compl. ¶ 28—related declaratory judgment claim, and Defendants' related counterclaims. If a jury finds that Defendants lacked cause within the meaning of the Employment Contract to fire Mr. Luck, *i.e.*, the termination of Mr. Callaway was not a permissible, enumerated reason for firing Mr. Luck, or even it was, Mr. Luck's failure to terminate Mr. Callaway could have been reasonably susceptible to cure, any alleged misuse of the Alpha-issued iPhone cannot be used as evidence to limit the scope of any damages allegedly owed to Mr. Luck, as a matter of law.

Finally, while both Mr. Luck's motion to strike and motion for sanctions have been denied, Defendants are entitled to sanctions for Mr. Luck's spoliation of evidence. This case will

not be dismissed as a sanction, and the sanctions will only be monetary and shall not exceed $25,000 in total, given the limited role this evidence ultimately played in this case. Any motion for an award of monetary sanctions shall be due fourteen (14) days after the jury renders its verdict.

SO ORDERED at Bridgeport, Connecticut, this 11th day of February, 2022.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE