# EXHIBIT 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ALPHA ENTERTAINMENT LLC,[1]<br><br>    Debtor. | Chapter 11<br>Case No. 20-10940 (LSS) |
| PETER HURWITZ, solely in his capacity as Plan Administrator of Alpha Entertainment LLC,<br><br>    Plaintiff,<br><br>OLIVER LUCK,<br><br>    Defendant. | Adv. No. Proc. No. _____ (LSS)<br><br><br>**Jury Trial Demanded** |

### COMPLAINT

Peter Hurwitz, solely in his capacity as Plan Administrator (Plaintiff" or "Plan Administrator") of Alpha Entertainment LLC ("Alpha" or "Debtor"), as and for his Complaint for Avoidance of Fraudulent Transfers and Avoidance of Preferences (this "Complaint") against defendant Oliver Luck ("Luck" or "Defendant"), respectfully states as follows:

### PARTIES

1. The Debtor filed a chapter 11 bankruptcy case in the U.S. Bankruptcy Court for the District of Delaware on April 13, 2020 (the "Petition Date").

2. Plaintiff is the Plan Administrator appointed pursuant to the Second Amended Chapter 11 Plan of Alpha Entertainment LLC ("Plan") and confirmed by order entered December

---

[1] The last four digits of the Debtor's federal tax identification number are 7778. The Debtor's mailing address is c/o Peter Hurwitz, Plan Administrator, 40 Half Moon Lane, Irvington, NY 10533.

11, 2020.  Pursuant to the Plan, the Plan Administrator was vested with the authority to, among other things, commence this adversary proceeding.

3.      Plaintiff is informed and believes, and based upon such information and belief, alleges that Luck resides in Indiana.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).  Plaintiff does not consent to entry of final orders or judgment by the bankruptcy court and does not consent to the bankruptcy court presiding over a jury trial.

## FACTUAL BACKGROUND

### I.  The Determination to Form the XFL Professional Football League

7.      On January 25, 2018, the Debtor was formed for the purpose of operating the XFL Professional Football League ("XFL").  The Debtor was principally owned and capitalized  by Vincent K. McMahon ("McMahon").

8.      The XFL had eight active teams, all of which were owned by the Debtor, and intended to operate as a spring football league.  To differentiate itself from other professional football leagues, among other things, the XFL altered several traditional football rules.

### II.  The Retention of Luck as Commissioner and CEO

9.      On or about May 30, 2018, Luck and the Debtor entered into a Contract for Employment as Commissioner and CEO (the "Contract"), a copy of which is attached hereto as Exhibit 1 and incorporated herein by this reference.

10.     Under the Contract, Luck received a base salary of $5 million, a guaranteed annual bonus of $2 million, and numerous other financial benefits (collectively, the "Compensation"). There was little financial risk to Luck as payments under the Contract were guaranteed by McMahon, who has a substantial net worth. In total, Luck received above $7 million during his first year of employment with the XFL.

11.     The Debtor contemplated hiring a president to fulfill the role served by Luck. During the negotiations which led to the consummation of the Contract, Luck insisted upon receiving the title of Commissioner and CEO.

12.     The Compensation was excessive and many multiples of what Luck was by being paid by his employer immediately prior to Alpha.

13.     Luck lacked experience and business acumen to serve as a CEO and was not qualified for this position.

14.     Even if Luck had the requisite business skill sets, the amount paid by the nascent XFL was grossly in excess of what should reasonably have been paid for someone to serve in this position. The Compensation was many millions of dollars higher than market value and significantly greater than the value of the services to be rendered under the Contract. The value of what was required to be transferred, even if represented solely by the Compensation Luck was to receive under the Contract, was vastly greater than the value of what the Debtor was to receive in connection with the performance of Luck's duties under the Contract.

### III.    Luck's Deficient Performance and Termination

15.     Luck served as Commissioner and CEO of the Debtor commencing on May 30, 2018, through April 9, 2020. Luck was required to report to McMahon, and McMahon's preapproval was required for material business decisions.

16.     Luck's performance as Commissioner and CEO was woefully inadequate for numerous reasons.  Among other things, he failed to exercise proper business judgment; failed to comply with league policies; failed to comply with the XFL Employee Handbook; failed to attend meetings; disclosed confidential information without proper authorization; and effectively abandoned his responsibilities when faced with the Covid crisis.

17.     Luck took a leading role in overseeing venue agreements the XFL entered into with respect to the stadiums in which its teams would play.  His involvement was extremely detrimental to the process.  Luck announced publicly the venues in which the league would play in advance of contracts being signed.  As a consequence, much leverage was lost in negotiating the underlying stadium deals.  Luck approved terms sheets with disadvantageous terms, including above market rent,  agreed to a deal in which there was virtually uncapped risk to the league in the event of a default, and agreed to a deal in which the league would not share in any of the food and beverage revenue from game day sales.  Other personnel from the XFL were required to become involved in an effort to negotiate more advantageous terms and help remedy a bad situation.

18.     A principal concern of the XFL was to ensure that its players were of good character as this was essential to the product that was being marketed to the fans and viewing audiences.  A clear cut policy was that no player with a criminal record or facing criminal charges would be signed.  Notwithstanding this policy, without consulting with McMahon, Luck had the XFL sign a receiver, Mr. Callaway, who Luck knew failed to meet the league's employment criteria.  After the signing, Luck was not forthcoming about what he had done and the signing resulted in a significant contractual cost to the XFL despite the fact that Mr. Callaway never played in the league.

19.     After the Covid crisis developed, which represented the most critical challenge to the survival of the league, Luck essentially abandoned his responsibilities.  Among other things, Luck failed to attend weekly business operation meetings in March 2020, failed to attend Covid working groups, and was not cooperative in helping to put together a video thanking fans for their loyalty.

20.     The XFL had a policy that company issued computers and phones could not be used for personal business.  Luck ignored this policy.  Content on his phone prompted him to seek and obtain a protective order in separate litigation involving Luck and McMahon  in light of the scandalous material it contained.  Further, notwithstanding his background as an attorney, he willfully destroyed evidence of his misdeeds.

21.     Luck also violated XFL policies by disclosing confidential information to one of his family members without prior approval.

22.     Luck's business shortcomings necessitated the Debtor's hiring of Jeffrey Pollack as President in February 2019, at significant expense to the Debtor.

23.     Luck was terminated on April 9, 2020, days before the Petition Date.

**IV.    The Debtor's Financial Condition**

24.     McMahon contributed all of the Debtor's capital.  From the inception of the Debtor through the Petition Date, McMahon contributed more than $200 million, but was never required to do so.  Even with McMahon's contributions, Alpha was consistently undercapitalized and required almost monthly capital contributions to meet basic cash needs.  From the outset of the league, including but not limited to the time that the Contract was signed, the Debtor's projections demonstrated that the XFL would not be profitable until it had operated at least several seasons, and that it would need in excess of $500 million in capital to reach profitability.  Neither McMahon

nor any other financing source ever committed to provide the capital needed to ensure that it would operate until it reached profitability.

25.     McMahon's decision not to contribute further capital resulted in Alpha filing for bankruptcy and selling substantially all of its assets pursuant to section 363 of the Bankruptcy Code. With no firm capital commitment and Alpha requiring monthly capital injections to remain operational, the Debtor was never adequately capitalized.  At all times from and after the date the Debtor entered into the Contract, the Debtor  had unreasonably small capital and intended to incur and believed it would incur obligations that were beyond the Debtor's ability to pay as the debts matured unless McMahon provided it with capital, and McMahon had no obligation to do so. Notwithstanding McMahon's capital contributions, following the sale of assets, the Debtor projected that general unsecured creditors would receive an 8-12% dividend in the case.

26.     As of the date each Transfer was made, the Debtor was insolvent, as the value of its assets was exceeded by the value of its liabilities.  At all times from and after the date the Debtor entered into the Contract, the Debtor was undercapitalized, had a cash flow insufficient to satisfy its obligations, never generated a profit, and depended on capital contributions to pay its obligations.

**V.  The  Transfers**

27.     During the two (2) years prior to the Petition Date, the Debtor made transfers consisting of its entering into the Contract and making payments thereunder totaling not less than $11,099,387.54  (collectively, together with entry into the Contract, the " Transfers").  A detailed listing of the Transfers is attached hereto as Exhibit 2 and incorporated herein by this reference.

28.     During the one (1) year prior to the Petition Date, the Debtor made transfers totaling not less than $7,288,461.75 under the Contract (the "One-Year Transfers"). A detailed listing of the One-Year Transfers is contained in Exhibit 2.

29.     During the ninety (90) days prior to the Petition Date, the Debtor made transfers totaling not less than $1,596,153.91 under the Contract (the "Ninety Day Transfers"). A detailed listing of the Ninety Day Transfers is contained in Exhibit 2.

30.     Prior to filing this litigation, Plaintiff requested that Luck return at least some portion of the Transfers. Luck has failed to do so as of the date of this Complaint.

31.     At all times material hereto, the Debtor had at least one general unsecured creditor holding an allowable claim who, but for the Debtor's bankruptcy filing, would have standing to bring claims to avoid and recover the Transfers (collectively, the "Predicate Creditors").

## COUNT I – FRAUDULENT TRANSFERS AND OBLIGATIONS (11 U.S.C. §§ 544(b) and 550 and Del. Code Ann. Tit. 6, § 1304(a)(2) et seq.) (Constructive Fraud)

32.     Plaintiff realleges the allegations contained in paragraphs 1-31, which are incorporated by reference as if set forth fully herein.

33.     Pursuant to 11 U.S.C. § 544, Plaintiff brings this claim on behalf of the Debtor's estate and its creditors under the Delaware Uniform Fraudulent Transfer Act, title 6 §§ 1301 et seq. ("DUFTA").

34.     The Debtor has one of more creditors for whom the Plaintiff can act whose claim arose before or within a reasonable time after the Transfers were incurred. DUFTA § 1304(a)(2).

35.     The Debtor made the Transfers to or for the benefit of Luck within two (2) years of the Petition Date.

36.    The Debtor did not receive reasonably equivalent value in exchange for the Transfers because the consideration purportedly provided in exchange was not reasonably equivalent.

37.    At the time the Transfers were made, the Debtor (a) was engaged in a business or a transaction, or was about to engage in a business or transaction, for which the assets remaining with the Debtor were unreasonably small in relation to the business or transaction and/or (b) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured and/or (c) was insolvent or became insolvent as a result of the Transfers.

38.    Pursuant to 11 U.S.C. § 550(a), the Transfers are recoverable against Luck as well as any mediate and immediate transferees.

### COUNT II – FRAUDULENT TRANSFER (11 U.S.C. §§ 548(A)(1)(B) AND 550) (Constructive Fraud)

39.    Plaintiff realleges the allegations contained in paragraphs 1-38, which are incorporated by reference as if set forth fully herein.

40.    The Debtor made the Transfers to or for the benefit of Luck on or within two years of the Petition Date.

41.    The Debtor received less than a reasonably equivalent value in exchange for the Transfers. At the time the Transfers were made, the Debtor was insolvent or became insolvent as a result of the Transfers.

42.    At the time the Transfers were made, the Debtor (a) was engaged in a business or a transaction, or was about to engage in a business or transaction, for which the assets remaining with the Debtor were unreasonably small in relation to the business or transaction and/or (b) intended to incur or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

43.     The  Transfers constitute fraudulent transfers avoidable by Plaintiff pursuant to sections 548(a)(1)(B) of the Bankruptcy Code and are recoverable from Luck pursuant to section 550(a).

44.     As a result of the foregoing, Plaintiff is entitled to a judgment pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code (a) avoiding and preserving each  Transfer to Luck on or within two years prior to the Petition Date, (b) directing that the  Transfers, including but not limited to the Contract, be set aside, and (c) recovering the Transfers, or the value thereof, from Luck, and any mediate and immediate transferees.

45.     Pursuant to 11 U.S.C. § 550(a), the Transfers are  recoverable against the initial transferee of the  Transfers as well as the mediate and immediate transferees of such transfer.

### COUNT III – PREFERENTIAL TRANSFERS (11 U.S.C. §§ 547 AND 550)

46.     Plaintiff realleges the allegations contained in paragraphs 1-45, which are incorporated by reference as if set forth fully herein.

47.     Based on reasonable due diligence in the circumstances of the case and taking into account Luck's known or reasonably knowable affirmative defenses under 11 U.S.C. § 547(c), the One-Year Transfers constitute avoidable preferential transfers pursuant to 11 U.S.C. § 547.

48.     The One-Year Transfers were to or for the benefit of Luck, who was an insider of the Debtor.

49.     The One-Year Transfers were made for or on account of an antecedent debt or debts owed by the Debtor to Luck before these transfers were made.

50.     The One-Year Transfers were made while the Debtor was insolvent.

51.     The One-Year Transfers were made within the one (1) year preceding the Petition Date to an insider, Luck.

52.     The One-Year Transfers enabled Luck to receive more than he would have received if: (a) this case was a case under chapter 7 of the Bankruptcy Code; (b) if the One-Year Transfers had not been made; and (c) if Luck received payment on the subject antecedent debts in accordance with applicable provisions of the Bankruptcy Code as, without limitation, the Debtor's general unsecured creditors would not be paid in full.

53.     Based upon the foregoing, the One-Year Transfers constitute avoidable preferential transfers pursuant to 11 U.S.C. § 547 and, in accordance with 11 U.S.C. § 550, Plaintiff may recover from Luck (and any mediate or immediate transferees) the amount of these transfers, plus interest.

**Count IV – PREFERENTIAL TRANSFERS (11 U.S.C. §§ 547 and 550)**

54.     Plaintiff realleges the allegations contained in paragraphs 1-53, which are incorporated by reference as if set forth fully herein.

55.     Based on reasonable due diligence in the circumstances of the case and taking into account Luck's known or reasonably knowable affirmative defenses under 11 U.S.C. § 547(c), the Ninety Day Transfers constitute avoidable preferential transfers pursuant to 11 U.S.C. § 547.

56.     The Ninety Day Transfers were to or for the benefit of Luck.

57.     The Ninety Day Transfers were made for or on account of an antecedent debt or debts owed by Debtor to Luck before these transfers were made.

58.     The Ninety Day Transfers were made while the Debtor was insolvent.

59.     The Ninety Day Transfers were made within the ninety (90) preceding the Petition Date to Luck.

60.     The Ninety Day Transfers enabled Luck to receive more than he would have received if: (a) this case were a case under chapter 7 of the Bankruptcy Code; (b) if the Ninety

Day Transfers had not been made; and (c) if Luck received payment on the subject antecedent debts in accordance with applicable provisions of the Bankruptcy Code as, without limitation, the Debtor's general unsecured creditors would not be paid in full.

61.     Based upon the foregoing, the Ninety Day Transfers constitute avoidable preferential transfers pursuant to 11 U.S.C. § 547 and, in accordance with 11 U.S.C. § 550, Plaintiff may recover from Luck (and any mediate or immediate transferees) the amount of these transfers, plus interest.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff is entitled to a judgment against Luck as follows:

A.      Avoiding the Transfers;

B.      Awarding Plaintiff a judgment against Luck, and any mediate or immediate transferees of Luck, for the value of the Transfers received by, or made for the benefit of Luck;

C.      Awarding interest from the date of the Transfers and expenses; and

D.      For such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury for all issues so triable pursuant to FED. R. CIV. P. 38(b)

and 38(c), as made applicable by Rule 9015(a) of the Bankruptcy Rules of Procedure.

April 11, 2022                                  **GREENBERG TRAURIG, LLP**

                                          */s/ Dennis A. Meloro*
                                          Dennis A. Meloro (DE Bar. No. 4435)
                                          1007 North Orange Street, Suite 1200
                                          Wilmington, Delaware 19801
                                          Telephone: (302) 661-7395
                                          Facsimile: (302) 661-7165
                                          Email: melorod@gtlaw.com

                                          and

                                          Howard J. Steinberg
                                          (admitted pro hac vice)
                                          Greenberg Traurig, LLP
                                          1840 Century Park East, Suite 1900
                                          Los Angeles, CA  90067
                                          Telephone: (310) 586-7702
                                          Facsimile:  (310) 587-7800
                                          Email:  steinbergh@gtlaw.com

                                          **Counsel for Plaintiff PETER HURWITZ, solely in his capacity as Plan Administrator of Alpha Entertainment LLC**