# EXHIBIT 1

CONFIDENTIAL

# Oliver Luck / XFL
## Contract for Employment as Commissioner and CEO
### May 30, 2018

This employment contract (this "Contract") contains the terms and conditions of the employment of Oliver Luck by Alpha Entertainment LLC ("Alpha"), an affiliate of Vince McMahon, as the Commissioner and CEO of a new professional football league expected to be known as the XFL (the "XFL").

This Contract will be legally binding on and enforceable against Mr. Luck and Alpha in accordance with its terms upon (i) the execution of this Contract by Mr. Luck and Alpha and (ii) Mr. McMahon's execution of a Guaranty dated as of the date hereof and attached hereto as Exhibit A (the "Guaranty"), without any further action by any party being required. The parties acknowledge that following the execution of this Contract, they will negotiate in good faith the terms of the Equity Agreement (as defined below), provided that any failure of the parties to negotiate or execute the Equity Agreement will not affect the legally binding and enforceable nature of this Contract, nor shall such failure modify in any way any of the rights, benefits or obligations set forth herein.

| Titles | Commissioner and CEO of the XFL |
|---|---|
| Duties | Mr. Luck will have authority, duties and responsibilities consistent with the commissioners of the major U.S. professional sports leagues (including oversight of all football and business-related operations), and will be the senior-most executive of the XFL. Mr. Luck will have full authority to hire, dismiss, replace or reassign any employee, consultant or contractor of the XFL, all of whom will report, directly or indirectly, to Mr. Luck, subject to Mr. McMahon's preapproval for material business decisions. Mr. Luck will report exclusively and directly to Mr. McMahon. |
| | Mr. Luck will devote substantially all of his business time to the performance of his duties to the XFL, provided that he may (i) continue to serve as a member of the board of American Campus Communities, Inc. and (ii) serve on not-for-profit boards and participate in other civic and charitable activities, so long as such activities do not interfere with the performance of his duties to the XFL. |
| Grant of Rights | Mr. Luck acknowledges that, as Commissioner and CEO of the XFL, he will be photographed and otherwise recorded in the performance of his duties under this Contract by Alpha and its agents, employees, and contractors. Accordingly, Mr. Luck grants the following rights to Alpha: (1) the exclusive right during the Term to use his name, image, and likeness for commercial purposes; and (2) the exclusive right during the Term to videotape, film, photograph, or otherwise record him (the "Recordings") and to produce, reproduce, manipulate, license, manufacture, exhibit, broadcast, or otherwise disseminate the Recordings in perpetuity by any form of media now known or hereafter devised. |
| | Mr. Luck's appearance in the Recordings shall be deemed work for hire under the Copyright Act (17 U.S.C. § 101 et seq.) and, notwithstanding the termination of this Contract for any reason, Alpha shall own in perpetuity the Recordings, including the entire copyright in and to the Recordings, and all of the results, products, and proceeds derived from the Recordings. Mr. Luck shall not be entitled to any compensation of any kind in respect of Alpha's use of the Recordings. |

Luck-00000894

| | |
|---|---|
| Location of XFL Headquarters | Decisions regarding the permanent location of XFL headquarters will be made by mutual agreement between Mr. Luck and Mr. McMahon following consultation with senior WWE staff. |
| Relocation | Mr. Luck will be reimbursed for any expenses incurred by him and his family in connection with his relocation to the location of the XFL headquarters (including, without limitation, (i) any travel between his current home and such headquarters or any other location where Mr. Luck performs his duties (including any interim headquarters), including accommodations at such location, and (ii) temporary housing), up to a maximum of $100,000. |
| Term | July 1, 2018 – June 30, 2023 (the "Term"). Thereafter, the Term will automatically renew for successive one year periods (each a "Renewal Period") unless either party gives notice of its intent to not to renew at least 180 days prior to the end of the then-scheduled term. Each 12 month period from July 1 through the immediately following June 30, beginning with the period from July 1, 2018 through June 30, 2019, is referred to herein as a "Contract Year." |
| Base Salary | $5,000,000 per Contract Year (the "Base Salary"), payable in substantially equal semi-monthly installments. |
| Guaranteed Annual Bonus | Mr. Luck will be paid a guaranteed annual bonus of $2,000,000.00 (the "Guaranteed Annual Bonus") on the last day of each Contract Year, subject to his continued employment on the scheduled payment date. |
| Equity Award | The parties will use good faith efforts to negotiate and execute an equity award opportunity (the "Equity Agreement") for Mr. Luck to be mutually determined by Mr. Luck and Mr. McMahon. The parties will use good faith efforts to negotiate and execute the Equity Agreement by December 31, 2018. However, this Contract shall remain legally binding on, and enforceable against, Mr. Luck and Alpha regardless of whether or not they execute the Equity Agreement. |
| Potential Team Sales | The XFL will initially be operated as a "single entity" league in which the XFL owns all of the teams in the league. However, if at any time during the Term, the XFL sells any franchises, operating rights or other rights to own or otherwise exploit individual XFL teams, then Mr. Luck and Mr. McMahon will work together in good faith to develop an additional bonus opportunity for Mr. Luck that is based on the number and/or proceeds of such team sales. |
| Benefits | Mr. Luck and his spouse and other dependents will be entitled to participate in all pension, savings, life, disability, medical, accident and dental insurance, 401(k) plans, and all other fringe benefit and retirement plans that the XFL provides for its senior executives. Alpha will use commercially reasonable efforts to provide employee benefits that are substantially similar in the aggregate to corresponding benefits provided by World Wrestling Entertainment, Inc. ("WWE") to its most senior executives. |
| Travel | If Mr. Luck is traveling for business purposes by commercial aircraft, he will be entitled to fly first class on all domestic and international flights. In addition, Mr. Luck will be entitled to stay in first class accommodations and to have a car |

2

Luck-00000895

| | |
|---|---|
| | and driver for all business-related travel. During the Term, Mr. Luck will be provided a leased vehicle for his use. |
| Termination by Employer | Mr. Luck's employment may be terminated by Alpha at any time, with or without Cause. For purposes of this Contract, Alpha shall have "Cause" to terminate Mr. Luck's employment hereunder by reason of any of the following which is materially and demonstrably injurious to the interest, property, operations, business or reputation of Alpha or its affiliates: (i) Mr. Luck's theft or embezzlement, or attempted theft or embezzlement, of money or property of the XFL or its affiliates, (ii) Mr. Luck's intentional perpetration or attempted perpetration of fraud, or participation in a fraud or attempted fraud, on the XFL or its affiliates, (iii) Mr. Luck's willful and intentional material misconduct in performance of his duties or gross negligence of his duties (other than due to any illness or disability), including an intentional failure to follow any applicable XFL policies or directives, (iv) Mr. Luck's conviction of or plea of guilty or *nolo contendere* to a misdemeanor involving moral turpitude or any felony, (v) Mr. Luck's willful and intentional material breach of this Contract, or (vi) Mr. Luck's willful disregard of the lawful instructions of Mr. McMahon concerning Mr. Luck's material duties hereunder. For purposes of this paragraph, no act or failure to act on the part of Mr. Luck shall be considered "willful" unless it is done, or omitted to be done, by Mr. Luck in bad faith or without reasonable belief that Mr. Luck's action or omission was in the best interests of the XFL. If the act or omission that would otherwise constitute "Cause" hereunder is reasonably susceptible to cure, Mr. Luck shall have 30 days from his receipt of written notice from Alpha describing such act or omission to effect the cure of such circumstances. If the act or omission that would otherwise constitute "Cause" hereunder is not reasonably susceptible to cure, or such circumstances have not been cured within such 30-day cure period, such act or omission will thereupon constitute "Cause" hereunder.<br><br>Upon a termination for Cause, Mr. Luck will only be entitled to be paid for previously accrued salary and any vested employee benefits ("Accrued Obligations").<br><br>Upon a termination by Alpha without Cause, Mr. Luck will be entitled to receive a lump sum cash amount, payable to him within 60 days of such termination, which shall be equal to (i) the aggregate amount of Base Salary and Guaranteed Annual Bonuses that would otherwise be payable to him during the remaining scheduled term of this Contract (i.e., through June 30, 2023 or, if applicable, any Renewal Periods) plus (ii) all Accrued Obligations plus (iii) the aggregate amount of premiums for coverage for Mr. Luck and his dependents under the health, accident, life and other insurance benefits that he was receiving immediately prior to such termination for a period of 24 months following such termination.<br><br>All severance payments under this section (other than the Accrued Obligations) are conditioned upon (i) Mr. Luck's execution and delivery to Alpha of a waiver and release of all claims against Alpha and its affiliates and their respective officers, directors, employees, and agents in a reasonable and customary form furnished by Alpha and reasonably acceptable to Mr. Luck (the "Release") within 45 days of termination; (ii) Mr. Luck not revoking the Release; (iii) Mr. Luck remaining in material compliance with those terms of the CNNA (as defined below) that survive the termination of Mr. Luck's employment; and (iv) the |

Luck-00000896

| | |
|---|---|
| | absence of circumstances that would constitute Cause. |
| Termination by Employee | Mr. Luck may voluntarily terminate his employment with Alpha at any time, with or without Good Reason (as defined below), upon 90 days' notice. If such termination is with Good Reason, Mr. Luck shall give Alpha written notice, which shall identify with reasonable specificity the grounds for Mr. Luck's resignation and provide Alpha with 30 days from the day such notice is given to cure the alleged grounds for resignation contained in the notice. A termination shall not be for Good Reason if such notice is given by Mr. Luck to Alpha more than 90 days after the occurrence of the event that Mr. Luck alleges is Good Reason for his termination hereunder. For purposes of this Contract, "Good Reason" shall mean any of the following: (i) Mr. McMahon (or his heirs, in the event of his death) ceasing to have a controlling interest in the XFL or Alpha, (ii) a material diminution in Mr. Luck's positions, authority or duties, or (iii) any material breach by Alpha of this Contract or the Equity Agreement.<br><br>Upon a termination without Good Reason, Mr. Luck will only be entitled to be paid the Accrued Obligations.<br><br>Upon a termination for Good Reason, Mr. Luck will be entitled to receive the same compensation and benefits that he would be entitled to receive if his employment were terminated by Alpha without Cause (as described above), subject to the same Release and other post-termination requirements (also as described above). |
| No Mitigation or Offset | Mr. Luck will not be required to mitigate the amount of any payment or benefit due to him following the termination of his employment hereunder by seeking other employment or otherwise, and such payments and benefits will not be subject to offset or otherwise reduced by any compensation, earnings or benefits received by Mr. Luck from any other employment or other ventures that he may choose to undertake following the termination of his employment. |
| Restrictive Covenants | Mr. Luck understands and agrees that as an additional condition of his employment and compensation and benefits under this Contract, he must also execute the agreement dated as of the date hereof and attached hereto as Exhibit B (the "CNNA"), the terms of which are hereby incorporated by reference as if fully set forth in this Contract. |
| Governing Law | This Contract shall be governed by and construed in accordance with the laws of the State of Connecticut without regard to its choice of law rules. |
| Indemnification | To the fullest extent permitted by law, both during and after the Term, Alpha shall pay all reasonable expenses incurred by Mr. Luck and any judgments or fines rendered or levied against Mr. Luck in any action, arbitration, investigation or other proceeding brought by any third party against Mr. Luck (whether or not the XFL, Alpha or any of their affiliates is a party to that action) that arises from or otherwise relates to the course or scope of Mr. Luck's employment, unless such action or other proceeding arises directly from Mr. Luck's gross negligence or willful misconduct. Payments authorized hereunder shall include reasonable amounts paid and expenses incurred in connection with any settlement of any such action or threatened action, provided Alpha is consulted with respect to, and has preapproved (which approval may not be unreasonably withheld or |

4

Luck-00000897

| | |
|---|---|
| | conditioned), any such settlement. This paragraph shall survive any expiration or termination of this Contract. |
| Miscellaneous | This Contract, the Guaranty and the CNNA together embody the entire understanding of Mr. Luck, Alpha and Mr. McMahon, and supersede all other oral or written agreements or understandings among them, regarding the subject matter hereof. This Contract may not be assigned by either party without the prior written consent of the other party. This Contract shall be binding upon and shall inure to the benefit of the parties and their respective estates, heirs, executors, legatees, devisees, personal representatives, successors and permitted assigns. This Contract may not be amended, waived or otherwise modified except by a writing signed by both Alpha and Mr. Luck. This Contract may be executed in one or more counterparts (including by PDF or other electronic transmission), each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument. |
| Compliance with Section 409A: | The parties intend that this Contract complies with or is exempt from Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"), and that this Contract be interpreted in a manner consistent with that intention. Notwithstanding any other provision of this Contract to the contrary, and solely to the extent necessary for compliance with Section 409A and not otherwise eligible for exclusion from the requirements of Section 409A, if as of the date of Mr. Luck's "separation from service" (within the meaning of Section 409A and the applicable regulations) from Alpha, (a) Mr. Luck is deemed to be a "Specified Employee" and (b) the Alpha or any member of a controlled group including Alpha is publicly traded on an established securities market or otherwise, no payment or other distribution required to be made to Mr. Luck hereunder (including any payment of cash, any transfer of property and any provision of taxable benefits) solely as a result of Mr. Luck's separation from service shall be made earlier than the first day of the seventh month following the date on which Mr. Luck separates from service with Alpha. A termination under this Contract shall only occur upon a separation from service. Each installment of any series of payments shall be deemed to be a separate payment. |

IN WITNESS WHEREOF, the parties have duly executed this Contract to be legally binding and effective as of the date first above written.

ALPHA ENTERTAINMENT LLC                           OLIVER LUCK

By: _____                         _____
Name: Vince McMahon                                    /s/ Oliver Luck
Title: Owner

5

Luck-00000898

Exhibit A

## GUARANTY

This GUARANTY is made as of May 30, 2018 by VINCENT K. McMAHON (the "Guarantor"), for the benefit of OLIVER LUCK (the "Executive"). Capitalized terms used but not defined herein have the meanings set forth in the Employment Contract (as defined below).

WHEREAS, Alpha Entertainment LLC ("Alpha") desires to enter into an employment contract with the Executive dated as of the date hereof (as it may be amended or otherwise modified from time to time, the "Employment Contract"); and

WHEREAS, the Guarantor, as the controlling owner of Alpha, will materially benefit from the Executive entering into the Employment Contract and, in order to induce the Executive to enter into the Employment Contract, the Guarantor desires to guarantee the performance by Alpha (the "Obligor") of its agreements and obligations under the Employment Contract and the Equity Agreements (together, the "Transaction Documents").

NOW, THEREFORE, in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor hereby agrees as follows for the benefit of the Executive and his successors and assigns:

1. The Guarantor hereby irrevocably and unconditionally guarantees, as primary obligor and not merely as a surety, the due and punctual payment ad performance by the Obligor of all of its agreements and obligations under the Transaction Documents. This Guaranty is a guaranty of payment and not of collection.

2. The obligations of the Guarantor hereunder shall be absolute, unconditional, continuing and irrevocable and shall remain in full force and effect until the full performance by the Obligor of all of its agreements and its obligations under the Transaction Documents, irrespective of the validity, regularity or enforceability of any Transaction Document, any amendment or other modification or change thereto, the absence of any action to enforce the same, any waiver or consent by the Executive or the Obligor with respect to any provision of any Transaction Document, the recovery of any judgment against the Obligor or any action to enforce the same, any dissolution, liquidation or termination of the Obligor, or any other circumstances that may otherwise constitute a legal or equitable discharge or defense of the Guarantor, all of which are hereby waived by the Guarantor. The Guarantor further waives any right of set-off or counterclaim it may have against the Executive arising from any other obligations that the Executive may have to the Obligor or the Guarantor. This Guaranty shall be binding upon the Guarantor and shall inure to the benefit of the Executive and, in each case, their respective estates, heirs, executors, legatees, devisees, personal representatives, successors and permitted assigns.

3. This Guaranty shall be governed by and construed in accordance with the laws of the State of Connecticut without regard to its choice of law rules.

IN WITNESS WHEREOF, the Guarantor has executed and delivered this Guaranty as of the date first above written.

_____
VINCENT K. McMAHON

<u>CONFIDENTIAL</u>

Exhibit B

## CONFIDENTIALITY, NON-SOLICITATION AND NON-COMPETITION AGREEMENT

This Confidentiality, Non-Solicitation and Non-Competition Agreement ("<u>Agreement</u>"), dated as of May 30, 2018, is made by and between Alpha Entertainment LLC ("<u>Employer</u>") and Oliver Luck ("<u>Employee</u>"). For purposes of this Agreement, any reference to Employer includes, if the context so permits, any of its present or future Affiliates.

    A.    Employer is an Affiliate of Vince McMahon and intends to establish a new American-style professional football league expected to be known as the XFL.

    B.    Employer has developed technologies, industry knowledge, goodwill and relationships through an investment of considerable human and capital resources, and Employer has strong, legitimate interests in protecting its investments, developments, and human and capital resources.

    C.    Employee, who is being hired as the Commissioner and CEO of the XFL, recognizes Employer's legitimate interests, and desires to assist Employer in protecting them.

Accordingly, in exchange for Employer offering to Employee and entering into an employment contract dated as of May 30, 2018 (as it may be amended or otherwise modified from time to time in accordance with its terms, the "<u>Employment Contract</u>"), Employer's provision of Confidential Information to Employee, and, in exchange for Employee's employment with Employer under the terms of the Employment Contract, and other good and valuable consideration contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Employer and Employee agree as follows:

    1.    <u>Acknowledgments</u>. Employee acknowledges that: (a) as an employee of Employer, Employee will be in a position of trust and confidence in which Employee will learn of, have access to, and/or develop Confidential Information (as defined below) related to the businesses and operations of Employer and its Affiliates (as defined below); (b) Employer would be seriously and irreparably injured by unauthorized or inappropriate disclosure of any such Confidential Information; (c) the documents and information regarding Employer and its Affiliates' services, products, techniques, trade secrets, know how, show how, methods of operation, business plans and forecasts, sales, pricing, and costs are highly confidential and constitute trade secrets; (d) Employee will develop and further relationships of special trust and confidence with Employer's and its Affiliates' customers, suppliers, contractors, and their respective employees, and such relationships of trust and confidence are of great value and importance to Employer and are for Employer's exclusive benefit; (e) Employee has read and understands the provisions of this Agreement, and Employee has been given an opportunity for Employee's legal counsel to review this Agreement; (f) Employer's business is to a large extent based upon its Confidential Information, the confidential, proprietary, and trade secret information of its customers, suppliers, employees and contractors, and its relationships with its customers, suppliers, employees and contractors; (g) Employer's agreement to provide Employee with Confidential Information and access to its customers, suppliers, employees and contractors justifies the restrictions provided for in this Agreement; (h) Employee has the skills and background necessary to obtain employment and provide a livelihood for Employee in a business other than a Competing Business (as defined in Section 4 below) in the event of the termination of his employment with Employer; and (i) the provisions of this Agreement are reasonable.

For purposes of this Agreement, the term "<u>Affiliate</u>" means any person or entity that controls, is controlled by, or is under common control with, Employer.

Luck-00000900

2. <u>Agreement to Provide Confidential Information</u>. During the term of Employee's employment with Employer, Employer and/or its Affiliates agree to provide Employee with, and Employee will otherwise be exposed to and become familiar with, Confidential Information.

"<u>Confidential Information</u>" means all information disclosed or made available to Employee or otherwise known by Employee as a consequence of or through Employee's employment by, or affiliation with, Employer about Employer's or any of its Affiliates' business, products, processes, facilities, and services, including but not limited to information relating to research, development, inventions, computer program designs, flow charts, source and object codes, products and services under development, forecasts, sales, pricing and pricing strategies, marketing and selling strategies, servicing, purchasing, accounting, engineering, costs and costing strategies, sources and amounts of supply, customer lists, customer requirements and contract terms, training and training programs, business methods or practices, business plans, financial information, audited or unaudited financial reports or statements, and related information or documentation. Confidential Information includes, but is not limited to, secret, proprietary, or confidential information of or relating to Employer or its Affiliates, including, without limitation, all existing or contemplated products, services, reports, pricing, proposed modeling, terms, sales proposals, designs, technical information, methods, trade secrets, know-how, show-how, formulae, processes, materials, equipment, discoveries, inventions or research; information relating to business plans, sales or marketing methods, and customer lists or requirements, and information which Employer or its Affiliates treat as confidential; and all notes, analyses, compilations, studies, reports, interpretations, or other material prepared by Employee or another employee of Employer or its Affiliates which contain or reflect or are based upon, in whole or in part, the foregoing. Confidential Information disclosed to Employee by a customer or other third party will be deemed for purposes of this Agreement to be Confidential Information. "Confidential Information" does not include (i) any information generally available to the public through reasonable sources of inquiry, including publications, internet or social media (other than as a result of Employee's breach of his obligations under this Agreement, other misconduct, or a breach by any third party bound by confidentiality obligations), (ii) any information that was known by Employee before Employee was given access to such information by Employer or any of its Affiliates, or (iii) any personal information regarding Employee or any of his family members (including the terms of the Employment Contract, provided that Employee will not disclose the terms of the Employment Contract to any third party other than his attorneys, accountants, financial advisors and family members, other than as permitted by Sections 3 and 12 below).

3. <u>Disclosure of Confidential Information</u>. Confidential Information at all times remains the property of Employer or its Affiliates, as applicable. During the term of his employment with Employer, Employee shall reasonably safeguard, to the extent reasonably practicable in the performance of Employee's work for Employer, all documents and things that contain or embody Confidential Information. Except in connection with the course of Employee's duties to Employer, or as otherwise required by any applicable law, rule or regulation, Employee shall not, during his employment by Employer or at any time thereafter, directly or indirectly use, divulge, disseminate, discuss, disclose, lecture upon, or publish any Confidential Information without having first obtained the prior written consent from Employer to do so. This obligation extends to all forms of disclosure, whether oral, written, or electronic. Upon termination of Employee's employment with Employer, or upon written request by Employer, Employee shall deliver to Employer all materials containing Confidential Information then in Employee's possession or under Employee's custody or control, including all copies; <u>provided</u> that Employee shall be permitted to keep his contacts file so long as it contains only contact information. Notwithstanding any other provision of this Agreement, for the avoidance of doubt, nothing in this Agreement prevents reporting (or receiving any financial awards from the government resulting from reporting) possible violations of federal law or regulation to any governmental agency or entity, or making other disclosures, protected under the whistleblower provisions of federal law or regulation, including, without limitation, good faith disclosure on a confidential basis of Confidential Information constituting "Trade Secrets" as defined in 18 U.S.C. § 1839, and so long as such disclosures are consistent with 18 U.S.C. § 1833.

Luck-00000901

4. <u>Restrictions on Competition</u>.

(a) During Employee's employment with Employer, Employee shall devote substantially all of Employee's business efforts and time to Employer and to the performance of his duties to Employer under the Employment Contract. Employee covenants and agrees that during the period in which Employee is employed by Employer under the Employment Contract, Employee shall not engage, directly or indirectly, whether as principal or as agent, officer, director, employee, consultant, shareholder (other than ownership by Employee, as a passive investment, in (x) shares of a publicly traded business if the number of shares of such business that are owned beneficially by Employee represents less than two percent (2%) of the total number of shares of such business' outstanding capital stock and (y) private equity funds and similar investment vehicles), independent contractor, or otherwise, alone or in association with any other domestic or foreign person or entity, in any other employment, occupation or business activity; <u>provided</u> that Employee may (i) continue to serve as a member of the board of American Campus Communities, Inc., (ii) serve on not-for-profit boards and participate in other civic and charitable activities and (iii) subject to the prior written consent of Alpha (which consent may not be unreasonably withheld or conditioned), co-invest in any business in which his son or any other family member of Employee is a participant, in each case of (i) – (iii), so long as such activities do not interfere with the performance of his duties to Employer and do not create a conflict of interest between Employee and Employer.

(b) Employee covenants and agrees that for a period of one (1) year following the termination of Employee's employment with Employer for any reason, Employee shall not engage, directly or indirectly, whether as principal or as agent, officer, director, employee, consultant, shareholder (other than ownership by Employee, as a passive investment, in (x) shares of a publicly traded business if the number of shares of such business that are owned beneficially by Employee represents less than two percent (2%) of the total number of shares of such business' outstanding capital stock and (y) private equity funds and similar investment vehicles), independent contractor, or otherwise, alone or in association with any other domestic or foreign person or entity, in a Competing Business at any location throughout the world.

The term "<u>Competing Business</u>" means any person, corporation, or other entity engaged in the operation of a professional American-style football league at any location in the world, including but not limited to the National Football League. For the avoidance of doubt, (i) none of the NCAA, any college or university, any collegiate conference, collegiate bowl or other collegiate football organization shall be deemed to constitute a "professional American-style football league" at any time regardless of whether the football players receive compensation of any kind at such time, and (ii) nothing in this Section 4(b) shall prevent or restrict Employee from being employed by or associated with any organization or entity that conducts business with a Competing Business so long as Employee is not directly providing his services to such Competing Business.

5. <u>No Solicitation of Customers</u>. Employee covenants and agrees that for a period of one (1) year following the termination of Employee's employment with Employer for any reason, Employee shall not, directly or indirectly, solicit or induce the business of, do business with, any Customer in a manner that could reasonably be expected to interfere with Employer's or any of its Affiliates' business relationship with such Customer, including persuading such Customers to not do business with or do less business with Employer or any of its Affiliates. The term "<u>Customer</u>" means any of Employer's or its Affiliates' current or prospective customers, vendors, sponsors, telecasters or other material business partners with whom Employee has or had direct or indirect contact or about whom Employee may have acquired any Confidential Information while employed by Employer.

6. <u>No Solicitation of Employees</u>. Employee covenants and agrees that for a period of one (1) year following the termination of Employee's employment with Employer for any reason, Employee shall not, directly or indirectly: (a) solicit or induce, or attempt to solicit or induce, any employee, contractor, agent, or consultant of Employer or its Affiliates to terminate his, her, or its relationship with Employer or its Affiliates; or (b) hire any such employee, contractor, agent, or consultant (other than any non-exclusive engagement of any contractor,

- 3 -

agent or consultant that does not interfere with Employer's business relationship with such person), except, in each case in clauses (a) and (b) above, (x) pursuant to a general solicitation through the media or by a search firm that, in either case, is not directed specifically to any particular employee, contractor, agent or consultant of Employer or its Affiliates, or (y) if the employment or other engagement by Employer of such employee, contractor, agent or consultant terminated prior to Employee having solicited or otherwise contacted such person regarding potential employment or other engagement.

7. **Ownership of Intellectual Property.** Employee agrees that all inventions, improvements, developments, discoveries, trade secrets, processes, formulae, and/or other Confidential Information (in each case, whether or not patentable), and all works of authorship (whether or not copyrightable) (collectively, the "Intellectual Property"), which are conceived of, created, or made within the scope of Employee's duties for Employer, whether solely or jointly with others, are the sole and exclusive property of Employer or its Affiliates, as applicable. Employee further agrees to promptly and fully disclose all such Intellectual Property to Employer and shall execute, acknowledge, and deliver, upon the reasonable request of Employer and without further compensation, either during or subsequent to employment, all instruments which are desirable or necessary to protect, exploit, or prosecute an application for and to acquire, maintain, and enforce all patents, copyrights or registrations covering such Intellectual Property in all countries. Moreover, Employee hereby conveys, assigns, and transfers Employee's entire right, title, and interest in and to such Intellectual Property to Employer and otherwise agrees to cooperate as necessary to perfect Employer's rights and ownership to such Intellectual Property. Upon termination of employment, or at any time upon request by Employer, Employee shall deliver to Employer all materials relating to Intellectual Property in Employee's possession or under Employee's control.

8. **Nondisparagement.** Each party hereto confirms and agrees that, to the extent permitted by applicable law, such party will not make any oral or written statements to any third party about the other party or any of such other party's Affiliates that are intended or reasonably likely either to disparage the other party or any of such other party's Affiliates (other than any statement made to correct or rebut any false or misleading statement made by any other person). Employer shall cause its officers and directors (including Vincent K. McMahon) to comply with the terms of this Section 8. If Employee is compelled by legal process from any non-governmental entity or person to provide statements, information, or testimony regarding his employment with Employer or any of its Affiliates, he will, to the extent permitted by such legal process, promptly notify Employer in writing and then do so in a truthful manner. Nothing in this Section 8 shall be construed to prevent or restrict either party from enforcing its respective rights under this Agreement, the Employment Contract or the Guaranty (as defined in the Employment Contract).

9. **Rights and Remedies upon Breach.** If Employee breaches, or threatens to breach, any material terms and conditions of this Agreement, then Employer shall have the following rights and remedies, each of which shall be independent of the other and severally enforceable, and all of which rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to Employer under law or in equity:

(a) **Specific Performance.** The right to have all provisions of this Agreement specifically enforced by any court having jurisdiction, including obtaining an injunction, without bond or other security (other than a nominal bond or other nominal security), to prevent any continuing violation of this Agreement; Employee acknowledges that Employee's services to Employer are of a unique character and have a special value to Employer, that any such breach or threatened breach will cause irreparable injury to Employer, and that money damages will be difficult to ascertain and will not provide an adequate remedy to Employer.

Luck-00000903

(b) <u>Accounting</u>. The right and remedy to require Employee to account for and pay over to Employer all compensation, profits, monies, accruals, increments, or other benefits derived or received by Employee as a result of any transactions constituting a breach of any material provision of this Agreement.

(c) <u>Damages, Costs, and Attorneys' Fees</u>. If Employee is found to have breached any provision of this Agreement by any court having jurisdiction, Employee shall be liable for: (i) all damages suffered by Employer as a result of the breach, and (ii) all costs and reasonable attorneys' fees incurred by Employer to enforce its rights under this Agreement.

10. <u>Obligations Survive Termination of Employment</u>. The termination of Employee's employment for whatever reason will not impair or relieve Employee of any of Employee's obligations under this Agreement which, by their express terms, extend beyond the term of Employee's employment.

11. <u>Binding Effect and Assignability</u>. This Agreement may not be assigned by either party without the prior written consent of the other party, except that in the event Employer should undergo any change in ownership or change in structure or control, or should Employer transfer some or all of its assets to another person or entity, this Agreement may be assigned by Employer without Employee's further consent, and Employee will continue to remain bound by this Agreement. Subject to the foregoing, this Agreement is binding upon, and will inure to the benefit of, the parties and their respective heirs, legatees, devisees, personal representatives, successors, and assigns.

12. <u>Notice to New Employer and Notice to Employer</u>. Employee agrees that, prior to the commencement of any new employment, Employee will (and Employer hereby agrees that Employee is permitted to) notify the new employer of the existence and terms of, or furnish the new employer with a copy of, this Agreement. Employee also agrees that Employer may advise any new employer of Employee of the existence and terms of this Agreement and furnish the employer with a copy of this Agreement. Accordingly, Employee agrees to notify Employer upon the commencement of any new employment of the name and mailing address of the new employer.

13. <u>Severability and Authorization to Modify Restrictions</u>. The parties hereto recognize that the laws and public policies of various jurisdictions may differ as to the validity and enforceability of covenants similar to those set forth in this Agreement. It is the intention of the parties that the provisions hereof be enforced to the fullest extent permissible under the laws and policies of each jurisdiction in which enforcement may be sought, and that the unenforceability (or the modification to conform to such laws or policies) of any provisions hereof shall not render unenforceable, or impair, the remainder of the provisions of this Agreement. Accordingly, in the event that any term or provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable for any reason, in whole or in part, the remaining terms and provisions of this Agreement will be unaffected thereby and will remain in full force and effect to the fullest extent permitted by law. Should a court determine that the character, duration, or geographical scope of any covenant of this Agreement is unreasonable in light of the circumstances as they then exist, then it is the intention and the agreement of the parties that this Agreement be construed by the court so as to impose only those restrictions on the conduct of Employee which are reasonable in light of the circumstances as they then exist and as are necessary to assure Employer of the intended benefit of this Agreement.

14. <u>Tolling</u>. The period of time set forth in Section 4, 5 or 6, as applicable, of this Agreement shall be extended for a period of time equal to all periods during which Employee is or was in material violation of such Section and to extend the restricted period to run from the date of any injunction which may be issued against Employee to enable Employer to receive the full benefit of such Section.

Luck-00000904

15.  **Waiver.** Waiver of any term or condition of this Agreement by any party will not be construed as a waiver of a subsequent breach or failure of the same term or condition, or as a waiver of any other term or condition of this Agreement.

16.  **Governing Law.** This Agreement and all determinations made and actions taken pursuant to this Agreement are governed by the laws of the State of Connecticut, without regard to its conflict of law doctrines.

17.  **Consent to Jurisdiction and Service of Process.** Employer and Employee shall be deemed to have expressly agreed and consented to the personal jurisdiction of the state or federal courts located in the State of Connecticut with respect to any dispute or controversy related to, arising under, or in connection with this Agreement or the Employment Contract. Employer and Employee shall also be deemed to have expressly agreed that such courts are convenient forums for the parties to any such controversy or dispute and for any potential witnesses, and that process issued out of any such court or in accordance with the rules of practice of such court may be served by mail or other forms of substituted service to Employer at the address of its principal executive office, and to Employee, at his last known address as reflected in Employer's records. Employee and Employer acknowledge that: (a) their agreement to have Connecticut law govern this Agreement was made because Employer or its Affiliates have operations in the State of Connecticut and that, for purposes of ensuring certainty and consistency in the interpretation of its contracts, Employer desires, to the extent possible, to have all contracts to which Employer or any of its Affiliates is a party governed and construed by the laws of a single jurisdiction; and (b) such desire of Employer for certainty and consistency with respect to the interpretation of its contracts is a valid and legitimate business purpose.

18.  **Waiver of Jury.** In the event any dispute relating to or arising out of this Agreement is submitted to a court of competent jurisdiction, Employer and Employee hereby waive any right to a jury trial.

19.  **Employment Contract.** This Agreement does not modify or alter, in any way, any of the terms or conditions of the Employment Contract. In the event of any conflict or inconsistency between any term of the Employment Contract and any term of this Agreement, the term of the Employment Contract shall govern and control.

20.  **Entire Agreement.** This Agreement and the Employment Contract together embody the entire agreement and understanding between Employer and Employee with respect to the subject matter hereof and supersede all prior agreements and understandings and may not be changed, modified, released, discharged, abandoned or otherwise amended, in whole or in part, except by an instrument in writing, signed by Employee and Employer.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

*[signature]*
**OLIVER LUCK**

**ALPHA ENTERTAINMENT LLC**

By: *[signature]*

Name:  Vince McMahon

Title:  Owner

Luck-00000905