# Exhibit A

CINDY WAGNER – 5/20/2021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

OLIVER LUCK                    )
                               )
 Plaintiff,                    )
                               )
VS.                            )   CIVIL NO. 3:20-cv-00516-VAB
                               )
VINCENT K. McMAHON and         )
ALPHA ENTERTAINMENT            )
LLC,                           )
                               )
 Defendants.                   )
                               )
                               )
                               )

*********************************
ORAL AND VIDEOTAPED DEPOSITION OF
CINDY WAGNER
May 20, 2021
*********************************
REPORTED REMOTELY IN ACCORDANCE WITH THE CURRENT
EMERGENCY ORDER REGARDING THE COVID-19
STATE OF DISASTER

ORAL AND VIDEOTAPED DEPOSITION OF
CINDY WAGNER, produced as a witness at the instance
of the PLAINTIFF, and duly sworn, was taken in the
above-styled and numbered cause on May 20, 2021,
from 8:00 a.m. to 1:16 p.m., by machine shorthand
before MICHELLE R. PROPPS, CSR, in and for the State
of Texas, reported via Zoom videoconference,
pursuant to the Federal Rules of Civil Procedure and
the provisions stated in the record or attached
hereto.

CINDY WAGNER - 5/20/2021

```
 1                   A P P E A R A N C E S
 2              (All Appearing Via Videoconference)
 3      FOR THE PLAINTIFF:
 4      MS. VANESSA L. PIERCE
        Dobrowski, Larkin & Stafford, L.L.P.
 5      4601 Washington Avenue, Suite 300
        Houston, Texas 77077
 6      Tel: 713.659.2900
        Fax: 713.659.2908
 7      Email: vpierce@doblaw.com
 8      MS. JOETTE KATZ
        Shipman & Goodwin LLP
 9      300 Atlantic Street. 3rd Floor
        Stamford, Connecticut 06901
10      Tel: 203.324.8100
        Fax: 203.324.8199
11      Email: jkatz@goodwin.com
12      FOR THE DEFENDANTS AND CINDY WAGNER:
13      MR. CURTIS B. KRASIK
        MR. JERRY McDEVITT
14      K&L Gates LLP
        K&L Gates Center
15      210 Sixth Avenue
        Pittsburgh, Pennsylvania 15222
16      Tel: 413.355.6500
        Email: curtis.krasik@klgates.com
17              jerry.mcdevitt@klgates.com
18
        MR. JEFFREY P. MUELLER
19      Day Pitney LLP
        242 Trumbull Street
20      Hartford, Connecticut 06103
        Tel: 860.275.0100
21      Fax: 860.275.0343
        Email: jmueller@daypitney.com
22
        ALSO PRESENT:
23
        Mr. Mike Davis, Video Technician
24
                        * * * * *
25
```

HANNA & HANNA, INC.
713-840-8484

CINDY WAGNER - 5/20/2021

Page 80

```
         1        A.     No.
         2        Q.     (By Ms. Pierce)  Specific to the XFL
         3   now, what -- do you know what hiring policies apply
         4   to potential players?
09:43    5                    MR. KRASIK:  Objection; form.
         6        Q.     (By Ms. Pierce)  Football players.
         7                    MS. PIERCE:  Sorry for...
         8                    MR. KRASIK:  Objection to form;
         9   vague.
09:43   10                    THE WITNESS:  So I can answer?
        11                    MR. KRASIK:  If you can answer.
        12        A.     Can you be more specific?
        13        Q.     (By Ms. Pierce)  Specific to the XFL
        14   now, not just your general HR hiring experience, are
09:43   15   you aware of hiring policies that apply to potential
        16   football players?
        17        A.     We had specific process and policies
        18   during the recruiting process.  Yes, I'm aware of
        19   those.
09:44   20        Q.     What were those specific process and
        21   policies?
        22        A.     The process was when an employee, either
        23   a football player or anyone else, that was offered a
        24   position or -- for the XFL went through a background
09:44   25   check that was conducted by an outside vendor,
```

CINDY WAGNER - 5/20/2021

| | |
|---|---|
| 1 | Sterling.  The company was an electronic process, |
| 2 | where employees -- or potential employees, |
| 3 | candidates would sign off their permission to |
| 4 | conduct a background check.  Then Sterling would |
| 09:44 5 | provide the talent acquisition team with a report |
| 6 | for the background check.  Anything that had a red |
| 7 | flag on the background check would be reviewed by |
| 8 | the talent acquisition department for football |
| 9 | players.  It would then go to the commissioner, |
| 09:44 10 | Oliver Luck.  And then after Oliver Luck's review, |
| 11 | it would ultimately go to Vince McMahon -- |
| 12 | Q.    What was -- I'm sorry.  Were you done? |
| 13 | A.    I was going to say.  -- for review and |
| 14 | final decision. |
| 09:45 15 | Q.    What was considered a red flag on a |
| 16 | background check? |
| 17 | A.    A red flag would be anything that came |
| 18 | up that would harm the reputation of the |
| 19 | organization. |
| 09:45 20 | Q.    Can you give me an example, please? |
| 21 | A.    Anything that was racially motivated. |
| 22 | Q.    What's an example of something that's |
| 23 | racially motivated? |
| 24 | A.    An example, in my experience, would be |
| 09:45 25 | the "N" word. |

CINDY WAGNER - 5/20/2021

1    Q.    Someone using that word in -- in the

2 past.  Correct?

3    A.    That is correct.

4    Q.    Okay.  Is there anything else that would

09:45 5 be considered harmful to the reputation of the

6 organization?

7              MR. KRASIK:  Objection to form.

8    A.    I cannot answer that.

9    Q.    (By Ms. Pierce)  Do you know the answer

09:46 10 to that?

11    A.    Can you repeat the question?

12    Q.    Other than something being racially

13 motivated in someone's past, what's another example

14 of something that would be considered harmful to the

09:46 15 reputation of the organ- -- of the organization such

16 that it would be considered a red flag in someone's

17 background?

18    A.    Some examples would be sexual -- sexual

19 assault, sexual harassment, abuse.  And if there was

09:46 20 anything that came up from a criminal record.

21    Q.    Was part of your role ensuring that

22 background -- that football players completed their

23 background checks?

24    A.    No, that was not my responsibility.

09:46 25    Q.    Did you ensure that those -- that those

CINDY WAGNER - 5/20/2021

Page 86

```
        1    Correct?
        2         A.     Correct.
        3         Q.     And David Walden is replying -- reply
        4    says "Thanks, Oliver.  We will discuss next steps
09:50   5    and get back to the group," in response to an email
        6    from Oliver Luck dated that same day that says
        7    "Vince is onboard with the following criteria to
        8    disqual-" -- "with the following criteria
        9    disqualifying a player:  Any felony charge or
09:50  10    conviction, any credible allegation of domestic
       11    violence, any repeat misdemeanor, i.e. 2X or more,
       12    any conviction of distributing illegal drugs."  And
       13    he asked David "Where does this need to live from an
       14    HR perspective?  Thanks."
09:51  15                   Did I read that correctly?
       16         A.     Yes, you did.
       17         Q.     Do you remember receiving this email?
       18         A.     No, I do not remember.
       19         Q.     Were you part of any conversation
09:51  20    between Oliver and Vince McMahon regarding these
       21    four criteria?
       22         A.     No, I was not.
       23         Q.     Do you know if anyone else was part of
       24    this conversation?
09:51  25                   MR. KRASIK:  Could you clarify what
```

CINDY WAGNER - 5/20/2021

Page 87

```
 1    you mean "this conversation"?
 2         Q.    (By Ms. Pierce)  Do you know if anyone
 3    else was part of a conversation between Vince
 4    McMahon and Oliver Luck regarding these four
09:51  5    criteria?
 6                   MR. KRASIK:  Objection to form,
 7    lacks foundation.
 8                   You can answer.
 9         A.    No, I am not aware of any conversations.
09:51 10         Q.    (By Ms. Pierce)  Did you ever -- were
11    you ever aware of these four criteria for
12    disqualifying a football player from the XFL?
13         A.    There were no criteria for disqualifying
14    players.  There -- after, there was definitely
09:52 15    discussion with internal counsel, as well as
16    external counsel, regarding our background check
17    process.  But we did not have a policy or specific
18    items disqualifying anyone in the organization.
19         Q.    Other than looking for potential red
09:52 20    flags in someone's background, like sexual assault,
21    sexual harassment, abuse, or a criminal record or
22    potentially using racial slurs?
23                   MR. KRASIK:  Objection; form.  Those
24    are examples that the witness gave to the question.
09:52 25    Can you restate the question?
```

CINDY WAGNER - 5/20/2021

Page 88

```
 1        Q.     (By Ms. Pierce)  Other than the red
 2   flags we previously discussed that could be
 3   potentially harmful to the reputation of the
 4   organization, which included racial -- prior use of
09:52  5   racial slurs, sexual assault, sexual harassment,
 6   abuse or a criminal record, were there any other
 7   concrete criteria for disqualifying potential
 8   football players?
 9                  MR. KRASIK:  Objection; form.
09:53 10   Mischaracterizes the witness' testimony.
11                  She can answer.
12        A.     There was no, again, disqualifying
13   criteria.  The background checks and information
14   were collected with ob- -- with objective
09:53 15   information that was reviewed by talent acquisition,
16   if necessary, Oliver Luck and then up to Vince
17   McMahon for final decision.
18        Q.     (By Ms. Pierce)  Did Vince McMahon make
19   the final decision on hiring every single football
09:53 20   player?
21        A.     I don't know how many were presented to
22   him for review and decision-making.
23        Q.     Did you ever learn that these four
24   criteria were not -- let me back up.  Having
09:53 25   received this email, did you ever confirm in writing
```

CINDY WAGNER - 5/20/2021

```
 1    any policy not to hire a player -- a football player
 2    based on an -- an NFL suspension?
 3                    MR. KRASIK:  You can answer the
 4    question.
 5        A.     Again, we did not have any disqualifying
 6    reasons for anybody to not be employed by the XFL.
 7        Q.     (By Ms. Pierce) So what concrete
 8    criteria did you use to weed out people who --
 9    players who automatically could not play in the
10    XFL --
11                    MR. KRASIK:  Objection.  That
12    mischaracterizes her testimony.  I was gonna say
13    asked and answered, but now it mischaracterizes your
14    testimony, so you can answer.
15        A.      There were no specific criteria that
16    disqualified a player.  We would gather all of the
17    facts that were available to us through the
18    background check, through a social media check.  And
19    all of the objective information was then reviewed
20    by the appropriate parties, again, including talent
21    acquisition, the commissioner and ultimately Vince
22    McMahon.
23                    MS. PIERCE:  I'm going to pull up
24    Doc 11, Michelle.
25        Q.      (By Ms. Pierce)  But just to clarify,
```

09:57 5
09:58 10
09:58 15
09:58 20
09:59 25

```
  1     you don't know which specific players Vince McMahon

  2     considered or reviewed?

  3          A.     That is correct.  I was not aware of

  4     those conversations and I was not involved.

09:59 5               MS. PIERCE:  And this will be

  6     Plaintiff's 81, I believe.

  7               (Exhibit No. 81 marked.)

  8          Q.     (By Ms. Pierce)  Do you see this PDF,

  9     Forward: Player Acquisition Strategy - Slide Deck,

09:59 10    Ms. Wagner?

  11         A.     Yes, I do.

  12         Q.     Okay.  And I'm just going to scroll.

  13    The email is one page, I'll get to the attachment

  14    shortly.  And the top-level email is between Oliver

09:59 15    and Liz VanderKamp, but -- and it is a forward

  16    from an original email from Eric Galko to numerous

  17    recipients, one of which is you.

  18               Do you see your name?

  19         A.     Yes, I do.

10:00 20    Q.     Okay.  Who is Eric Galko?

  21         A.     He was a consultant of the XFL in our

  22    player acquisition department.

  23         Q.     What was the player acquisition

  24    department?

10:00 25    A.     Player personnel is the individuals that
```

CINDY WAGNER - 5/20/2021

Page 94

```
 1    went out and recruited players that may be
 2    interested and qualified to play in the XFL from a
 3    football perspective.
 4         Q.    And let me -- I'm going to have to
10:00 5   rotate this for y'all.
 6                   MR. KRASIK:  That worked.
 7         Q.    (By Ms. Pierce)  Okay.  So this email
 8    from Eric Galko to numerous participants, including
 9    you, dated April 23rd, 2019 has an attachment -- the
10:01 10  Player Acquisition Strategy attachment.  Correct?
11         A.    Yes, that is correct.
12         Q.    And -- make this bigger.  Let me just
13    make sure its -- okay.  So this is the title page of
14    that PowerPoint presentation or presentation,
10:01 15  whatever you want to call it, titled XFL 2020 Player
16    Acquisition Strategy, April 22nd, 2019.  Correct?
17         A.    That is correct.
18         Q.    Do you recall being in meetings or
19    reviewing or receiving player acquisition strategy
10:01 20  decks or presentations when you worked at the XFL?
21         A.    No, I do not recall.
22         Q.    Do you recall being part of
23    conversations regarding player acquisition strategy?
24         A.    No, I was not involved.
10:01 25        Q.    How did you confirm that players that
```

CINDY WAGNER - 5/20/2021

Page 95

```
 1     were being hired were in line with the XFL's player
 2     acquisition strategy?
 3                    MR. KRASIK:  Objection to form.
 4     Lack of foundation.
10:02 5                    You can answer.
 6          A.    I was not involved in that process.
 7     I -- I don't have expertise in football players or
 8     positions, so I was not included.
 9          Q.    (By Ms. Pierce)  From an HR perspective,
10:02 10   how did you confirm that players complied with the
11     XFL's policy not to hire football players that could
12     harm the reputation of the organization?
13                    MR. KRASIK:  Objection to form.
14     Lack of foundation.
10:02 15                   You can answer.
16          A.    Can you repeat the question?
17          Q.    (By Ms. Pierce)  As part of your role in
18     onboarding potential football players, how did you
19     confirm that the players you were onboarding met the
10:02 20   qualifications of not harming the reputation of the
21     XFL?
22                    MR. KRASIK:  Objection to form.
23     Lack of foundation.
24                    You can answer.
10:02 25        A.    I was -- the talent acquisition team was
```

CINDY WAGNER - 5/20/2021

Page 96

```
            1    responsible for determining if -- somebody working

            2    with Oliver and ultimately Vince to determine who

            3    was going to be hired.  And then I was notified once

            4    a player was assigned to a team and needed to be

   10:03     5    moved through the onboarding process.  I was not

            6    involved in the selection process or the review

            7    process of any player.

            8         Q.    (By Ms. Pierce)  But you were involved

            9    in confirming that their background checks were

   10:03    10    complete.  Correct?

           11                MR. KRASIK:  Objection to form.

           12    Mischaracterizes prior testimony.

           13                You can answer.

           14         A.    Yes.

   10:03    15         Q.    (By Ms. Pierce)  Do you remember seeing

           16    this presentation at all?

           17                And if you'll promise to give me the

           18    mouse back, I'll let you have control.  Just don't

           19    make me fight -- don't make me fight you for it.

   10:03    20                MR. KRASIK:  We agree.

           21                MS. PIERCE:  Yeah.  Good.  Let's

           22    see.

           23                THE WITNESS:  Can you make --

           24                MS. PIERCE:  Curt Krasik?  You want

   10:03    25    me to give it to you, Curt?  Or who's the best?  I
```

CINDY WAGNER - 5/20/2021

Page 100

```
 1    ever hear of an XFL policy not to hire a player
 2    based on his character?
 3         A.    The XFL did not have a policy that
 4    excluded anyone.  We, again, did not want to hire
10:22  5    anybody that impacted the reputation of the
 6    organization, but we did not have criteria that
 7    would eliminate someone.
 8         Q.    My specific question is, did you ever
 9    hear of any XFL -- whether it's policy or practice
10:22 10    to not hire a potential player based on their
11    character?
12         A.    No, I did not.
13         Q.    Do you know if the XFL considered a
14    player's character in whether or not to hire that
10:23 15    player?
16                MR. KRASIK:  Objection; form.  Calls
17    for speculation.
18                You can answer.
19         A.    No, I'm not aware of that.  I was not
10:23 20    involved in the review process of candidates or
21    players.
22         Q.    (By Ms. Pierce)  Do you know if the XFL
23    considered a player's reputation when they -- in
24    their decision to hire or not hire a player?
10:23 25                MR. KRASIK:  Objection to form.
```

CINDY WAGNER - 5/20/2021

```
 1      Calls for speculation.
 2           A.     No, I'm not aware of the process.
 3           Q.     (By Ms. Pierce)  Are you -- but are you
 4      aware of whether or not the XFL considered a
10:24 5      player's reputation in whether to hire or not hire
 6      them?
 7                  MR. KRASIK:  Objection; form.  Calls
 8      for speculation.
 9                  You can answer.
10:24 10           A.     No, I'm not aware of that.
11           Q.     (By Ms. Pierce)  Okay.  Let me go back
12      to this document we were looking at before we took
13      our break.  It's the player acquisition strategy --
14      wait.  Am I sharing the right screen?  Yeah.  Okay.
10:24 15      The Player Acquisition Strat- -- Strategy,
16      April 22nd, 2019, attached to this email, do you
17      remember the -- looking at this before our break?
18           A.     Yes, I do.
19           Q.     Okay.  And I want to look at page --
10:24 20      let's see.  Here we go.  -- Slide 8 of this
21      presentation titled Player Personnel:  Who are our
22      Target Players:  Generally.
23                  Do you see that?
24           A.     Yes, I do.
10:25 25           Q.     And under What Key Factors Are We
```

CINDY WAGNER - 5/20/2021

Page 104

```
            1                     Do you see that?
            2          A.     Yes, I do.
            3          Q.     Do you know how the XFL would confirm
            4     whether or not a player had major criminal
10:27       5     infractions?
            6                     MR. KRASIK:  Objection to form.
            7     Lack of foundation.
            8                     You can answer.
            9          A.     My understanding is -- of the process is
10:27      10     that information would have been collected in the
           11     background check that was conducted by Sterling.
           12          Q.     (By Ms. Pierce)  Did you ever review any
           13     of the background checks that were -- the completed
           14     background checks for football players?
10:27      15          A.     No, I did not.
           16          Q.     Did you ever hear about -- well, let me
           17     back up.  Hold on.  Do you know if anyone -- if --
           18     do you know if arrests were considered as part of
           19     the player background check?
10:28      20          A.     No, I'm not aware, because I did not
           21     review the background checks.  I was not -- I'm not
           22     aware of what was on the report.
           23          Q.     Were you ever alerted to prior arrests
           24     during your onboarding of potential players?
10:28      25          A.     No, not that I recall.
```

CINDY WAGNER - 5/20/2021

Page 105

1      Q.      Were there any background checks, other

2    than the one performed by Sterling?

3      A.      I do know, from a process perspective,

4    there was an additional firm that did social media

10:29 5    background checks, but I'm not sure which level, if

6    they did it for executives or players.  But we did

7    have an additional third-party vendor that did

8    social media checks.

9      Q.      Did you ever see any of those social

10:29 10   media checks?

11     A.      Not that I recall.

12     Q.      Do you know if it was XFL policy to

13   consider a player's reputation in whether or not to

14   hire them?

10:30 15           MR. KRASIK:  Objection to form.

16   Calls for speculation.

17           You can answer.

18     A.      Can you repeat the question?

19     Q.      (By Ms. Pierce)  Do you know if it was

10:30 20   XFL policy to consider a player's reputation in

21   whether or not to hire them?

22           MR. KRASIK:  Same objection.

23     A.      Since there was no policy in regards to

24   what would qualify or disqualify, no, I am not aware

10:30 25   of that.

CINDY WAGNER - 5/20/2021

Page 106

1    Q.    (By Ms. Pierce)  If a player were to ask
2  why they were not hired, from an HR perspective, how
3  would that be answered without a policy to fall back
4  upon?
10:30  5              MR. KRASIK:  Objection to form.
6  Hypothetical question.
7    A.    I do -- based on not being responsible
8  for the process or involved, I am not sure how those
9  were handled.
10:30  10    Q.    (By Ms. Pierce)  Were you ever asked
11  why -- were you ever asked by a player why they were
12  or were not hired?
13    A.    No, I was not.
14    Q.    Do you know if anyone else was ever
10:31  15  asked by a player why they were or were not hired?
16    A.    No, I do not.
17    Q.    During your onboarding of XFL players,
18  how did you conform -- how did you confirm that
19  players met the criteria for being hired?
10:31  20              MR. KRASIK:  Objection to form.
21  Lack of foundation.
22    A.    The only way I knew a player had
23  completed the background check and any appropriate
24  evaluation that needed to be done was if I was told
10:31  25  they'd been assigned to a team, I need to implement

CINDY WAGNER – 5/20/2021

1    them into our HRIS system and begin the onboarding

2    process from a paperwork and benefit pers- -- and

3    contract perspective.

4          Q.     (By Ms. Pierce)  As an HR professional

10:31  5    with quite a bit of experience, did it surprise you

6    that there were no policies on how to exclude

7    candidates for employment?

8                MR. KRASIK:  Objection; form.

9          A.     In my experience, no, it did not,

10:32 10    because you look at each background check from an

11    individual perspective, you look at the objective

12    information that is provided and you evaluate the

13    individual and the situation and make a decision.

14          Q.     (By Ms. Pierce)  And that decision is

10:32 15    based on the objective information that you obtain

16    during their application process?

17          A.     In my experience, that is correct.

18          Q.     And was that your experience at the XFL?

19          A.     Again, I was not involved in the review

10:32 20    process.  That is my understanding of the process.

21    And that was how it was handled, but I did not sit

22    down during those discussions or reviews.

23          Q.     As an HR professional, how did you

24    guarantee that there was uniformity across XFL

10:33 25    employ- -- XFL players?

CINDY WAGNER - 5/20/2021

```
 1                   MR. KRASIK:  Objection to form.
 2     Lack of foundation, ambiguous question.
 3          A.     Yeah.  Can you please clarify?
 4          Q.     (By Ms. Pierce)  Sure.  As an HR
10:33  5     professional who was responsible for onboarding XFL
 6     players, how did you ensure that those players were
 7     objectively uniform as far as their backgrounds?
 8                   MR. KRASIK:  Objection to form.
 9     Lack of foundation.
10:33 10                   You can answer.
11          A.     In my experience in working with the
12     talent acquisition team and understanding the
13     process of what was -- how things were done, I was
14     under -- I believed that the process was handled
10:33 15     appropriately.
16          Q.     (By Ms. Pierce)  Did you ever go back
17     and confirm what players were not hired?
18          A.     Not that I recall, no.
19          Q.     So you never did a comparison of players
10:34 20     that were not hired versus players that were hired.
21     Correct?
22          A.     That is correct.  The talent acquisition
23     team gave a report to show how many background
24     checks were conducted on a weekly basis or specific
10:34 25     time period, how many of them were incomplete, how
```

CINDY WAGNER - 5/20/2021

```
  1    many of them either didn't pass or did pass or are
  2    outstanding for additional information.  And that
  3    was the extent of my knowledge.
  4         Q.    Okay.  I'm gonna -- I think I'm still
10:34 5    sharing.
  6              Okay.  Do you know who Antonio
  7    Callaway is, Ms. Wagner?
  8         A.    Yes.  He was a player for the XFL.
  9         Q.    Did you ever personally meet Antonio
10:34 10   Callaway?
 11         A.    No, not that I recall.
 12         Q.    Did you ever speak to anyone who
 13    personally knew Antonio Callaway?
 14         A.    Yes.
10:35 15        Q.    Who did you speak to?
 16         A.    Eric Galko, who was responsible for
 17    player personnel.  I spoke to Oliver Luck.  I don't
 18    recall speaking specifically about Antonio Callaway,
 19    but I know that he knew him.
10:35 20        Q.    Did you ever speak to anyone about
 21    Antonio Callaway?  And let's -- I'm gonna limit the
 22    time frame.  Not in your entire lifetime.  When you
 23    worked at the XFL, before the -- I know we haven't
 24    gotten there yet, but before the season was --
10:35 25   before the -- before the XFL shut down, did you ever
```

CINDY WAGNER - 5/20/2021

Page 110

```
       1    speak to anyone about Antonio Callaway?
       2          A.    Yes, I did.
       3                MR. KRASIK:  And -- and let me
       4    caution you in your answer not to reveal the
10:35  5    substance of any communications with an attorney.
       6          A.    Yes, I did.
       7          Q.    (By Ms. Pierce)  And other than
       8    privileged conversations, who did you have
       9    conversations about Antonio Callaway with during
10:36 10    this relevant time frame?
      11                MR. KRASIK:  She's ex- -- not --
      12    she's excluded --
      13                THE WITNESS:  Right.
      14                MR. KRASIK:  -- privileged
10:36 15    communication --
      16                THE WITNESS:  Okay.
      17                MR. KRASIK:  -- so you can answer.
      18          A.    I would have internal communication
      19    with -- or written communication, I should say, with
10:36 20    Eric Galko and potentially members of the team
      21    regarding his employment, his state of employment,
      22    et cetera.
      23          Q.    (By Ms. Pierce)  Did you engage in any
      24    sort of reputational analysis of Antonio Callaway as
10:36 25    part of your employment with the XFL?
```

CINDY WAGNER - 5/20/2021

Page 111

```
  1                      MR. KRASIK:  Objection; vague -- as
  2      to form.  It's vague.
  3                      But you can answer.
  4          A.      No, I did not.
10:37 5          Q.      (By Ms. Pierce)  But you did ensure that
  6      Antonio Callaway completed his background check.
  7      Correct?
  8                      MR. KRASIK:  Objection; form.  Lack
  9      of foundation.
10:37 10                      You can answer.
 11          A.      Yes, that is correct.
 12                      MS. PIERCE:  I'm gonna -- I'm gonna
 13      pull up 20, Michelle, which will be 82, Plaintiff's
 14      Exhibit 82.
10:37 15                      (Exhibit No. 82 marked.)
 16                      MS. PIERCE:  Okay.  Let me see.
 17      Just -- I'm just seeing what I'm working with here,
 18      Curt?
 19                      MR. KRASIK:  Uh-huh.
10:37 20          Q.      (By Ms. Pierce)  Okay.  I'm going to
 21      start at the top.  Do -- do you see the PDF, first
 22      of all?
 23                      MR. KRASIK:  Yes, we do.
 24          Q.      (By Ms. Pierce)  Okay.  And at the top,
10:37 25      the subject is Player Administration Memo - Priority
```

CINDY WAGNER - 5/20/2021

Page 114

```
           1                    Did I read that correctly?
           2         A.     Yes, you did.
           3         Q.     Did you do anything else in response to
           4    seeing that Callaway had background issues, other
10:41      5    than confirming that he completes a background
           6    check?
           7         A.     No, not that I recall.
           8         Q.     At this point, did you know whether or
           9    not Antonio Callaway would pose a -- pose harm to
10:42     10    the reputation of the XFL?
          11                    MR. KRASIK:  Objection; form.  Lack
          12    of foundation.
          13                    You can answer.
          14         A.     No, I was not aware.
10:42     15         Q.     (By Ms. Pierce)  And I'm just gonna show
          16    you one more document here.  And just to confirm --
          17                    MS. PIERCE:  This -- I'm sorry,
          18    Michelle.  This is 21.  And this would be
          19    Plaintiff's 83.
10:43     20                    (Exhibit No. 83 marked.)
          21         Q.     (By Ms. Pierce)  Ms. Wagner, do you see
          22    the name Sterling Talent Solutions in the top left?
          23         A.     Yes, I do.
          24         Q.     Okay.  And do you say -- see where it
10:43     25    says "Report:  Antonio Devon Callaway"?
```

CINDY WAGNER - 5/20/2021

```
 1           A.     Yes, I do.

 2           Q.     And it says "Requested by Ian Decker."

 3      "Report Status:  Complete."

 4                     Do you see that?

10:43 5      A.     Yes, I do.

 6           Q.     Have you ever seen this document before?

 7           A.     No, I have not.

 8           Q.     Okay.  All right.  Moving on.  Let's

 9      see.  Sitting here today, are you aware of any XFL

10:43 10     written policies that would have excluded Antonio

11      Callaway from playing for the XFL?

12           A.     No, I'm not aware of any written

13      policies that would have excluded him.

14           Q.     I want to turn to -- oops, I didn't mean

10:43 15     to close that -- player compensation now,

16      Ms. Wagner.

17           A.     Okay.

18           Q.     What was your understanding of how

19      players were compensated for playing in the XFL?

10:44 20                     MR. KRASIK:  Objection; form.  Lack

21      of foundation.

22                     You can answer.

23           A.     Players were compensated based on a

24      biweekly rate that for most of our players was

10:44 25     $2,080.  We paid on a biweekly basis.  We also had
```

CINDY WAGNER - 5/20/2021

Page 189

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF CONNECTICUT
 2

 3   OLIVER LUCK,                )
                                 )
 4     Plaintiff,                )
                                 )
 5   VS.                         )  CIVIL NO. 3:20-cv-00516-VAB
                                 )
 6   VINCENT K. McMAHON          )
     and, ALPHA                  )
 7   ENTERTAINMENT LLC,          )
                                 )
 8     Defendants.               )

 9                  REPORTER'S CERTIFICATION

10                  ORAL DEPOSITION OF
                        CINDY WAGNER
11                     MAY 20, 2021

12   REPORTED REMOTELY IN ACCORDANCE WITH THE CURRENT
        EMERGENCY ORDER REGARDING THE COVID-19
13                  STATE OF DISASTER

14              I, MICHELLE R. PROPPS, Certified

15   Shorthand Reporter in and for the State of Texas,

16   hereby certify to the following:

17              That the witness, CINDY WAGNER, was

18   duly sworn by the officer and that the transcript of

19   the oral deposition is a true record of the

20   testimony given by the witness;

21              I further certify that pursuant to

22   FRCP Rule 30 (f) (1) that the signature of the

23   deponent:

24              __X__ was requested by the deponent

25   or a party before the completion of the deposition
```

CINDY WAGNER – 5/20/2021

```
 1    and returned within 30 days from date of receipt of
 2    the transcript.  If returned, the attached Changes
 3    and Signature Page contains any changes and the
 4    reasons therefor;
 5                   _____ was not requested by the
 6    deponent or a party before the completion of the
 7    deposition.
 8                   I further certify that I am neither
 9    attorney nor counsel for, related to, nor employed
10    by any of the parties to the action in which this
11    testimony was taken.  Further, I am not a relative
12    or employee of any attorney of record in this cause,
13    nor am I financially or otherwise interested in the
14    outcome of the action.
15                   Subscribed and sworn to on this the
16    24th day of May, 2021.
17
18
19            MICHELLE PROPPS, CSR
              Expiration Date 10-31-21
20            Hanna & Hanna, Inc.
              8582 Katy Freeway, Suite 105
21            Houston, Texas 77024
              713.840.8484
22
23
24
25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

OLIVER LUCK                         )
                                    )
      Plaintiff                     )
                                    ) CIVIL NO. 3:20-cv-00516-VAB
v.                                  )
                                    )
VINCENT K. MCMAHON and ALPHA        )
ENTERTAINMENT LLC                   )
                                    )
      Defendant.                    )


************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

CINDY WAGNER

VOLUME 2

OCTOBER 20TH, 2021

(REPORTED REMOTELY)

************************************************


        ORAL AND VIDEOTAPED DEPOSITION OF CINDY WAGNER,

produced as a witness at the instance of the Plaintiff and duly

sworn, was taken in the above-styled and numbered cause on

October 20th, 2021, from 8:57 AM to 9:51 AM, before Sara T.

Green, CSR, in and for the State of Texas, reported remotely in

Houston, Texas, by computerized stenotype machine pursuant to

the Federal Rules of Civil Procedure.

CINDY WAGNER - VOLUME 2 - 10/20/2021

Page 2

```
 1                        APPEARANCES
 2               (All Appearing Via Videoconference)
 3
     FOR THE PLAINTIFF:
 4
 5        MS. VANESSA L. PIERCE
          MR. JARED A. McHAZLETT
 6        Dobrowski, Larkin & Stafford LLP
          4601 Washington Avenue, Suite 300
 7        Houston, Texas  77007
          T: 713.659.2900
 8        F: 713.659.2908
          vpierce@doblaw.com
 9        jmchazlett@doblaw.com
10
     FOR THE DEFENDANTS:
11
12        MR. CURTIS B. KRASIK
          MR. JERRY McDEVITT
13        K & L Gates LLP
          210 Sixth Avenue
14        Pittsburgh, Pennsylvania  15222
          T: 412.355.6500
15        curtis.krasik@klgates.com
          jerry.mcdevitt@klgates.com
16
          MR. JEFFREY PAUL MUELLER
17        Day Pitney LLP
          242 Trumbull Street
18        Hartford, Connecticut  06103
          T: 860.275.0100
19        F: 860.275.0343
          jmueller@daypitney.com
20
21   ALSO PRESENT:
22        Mr. Mike Davis, Videographer
23
24
25
```

 1      Q.   Obviously, you respond to this -- to Mr. Decker's

 2   e-mail, correct?

 3      A.   Correct.

 4      Q.   So you must have read his e-mail, correct?

 5      A.   Correct.

 6      Q.   And so -- and he -- if Mr. Decker is telling you

 7   these are the criteria he is going to use during the background

 8   check process, would you have done anything to confirm whether

 9   or not those criteria were accurately set forth prior to

10   responding?

11             MR. KRASIK:   Object to form.   Lack of

12   foundation.

13      A.   No, I would not.

14      Q.   (BY MS. PIERCE)  You would not have done anything to

15   confirm that what he is saying is accurate?

16      A.   That is correct.

17      Q.   Were you Mr. Decker's supervisor, Ms. Wagner?

18      A.   No, I was not.

19      Q.   Who was his supervisor?

20      A.   David Walden.

21      Q.   Why would you have taken it upon yourself to respond

22   to his e-mail if you weren't going to confirm that what he was

23   saying was accurate?

24             MR. KRASIK:   Objection to form.

25   Mischaracterizes the document.   You can answer.

CINDY WAGNER - VOLUME 2 - 10/20/2021

```
 1        A.   We did not have a process at that time for background

 2   checks that I was responsible for, so I wanted everyone to

 3   clearly understand that we were not going to communicate about

 4   background checks in writing.

 5             MS. PIERCE:  Objection.  Not responsive.

 6        Q.   (BY MS. PIERCE)  That's not the question I asked, but

 7   that brings about another question.  If you were not

 8   responsible for background checks, why did you take it upon

 9   yourself to respond to his e-mail?

10             MR. KRASIK:  Objection to form.

11   Mischaracterizes the document.  You can answer.

12        A.   Can you -- sorry.  Can you restate the question?

13        Q.   (BY MS. PIERCE)  Why would you have responded to an

14   e-mail from Mr. Decker that involved a process you were not

15   responsible for?

16             MR. KRASIK:  Objection to form.  You can answer.

17        A.   As an HR professional, I wanted to make sure that

18   people understood background checks should not be documented in

19   writing and everything should be handled outside of e-mail.

20        Q.   (BY MS. PIERCE)  Where in this e-mail do you say that

21   background checks should not be documented in writing?

22        A.   I state that we do not want to be e-mailing about any

23   of these issues.

24        Q.   Okay.  And can you specify what issues you're

25   referring to?
```

CINDY WAGNER - VOLUME 2 - 10/20/2021

1       A.   In response to Ian's specific statement about

2  background check process.

3       Q.   Well, he also said the criteria for me to use during

4  the background check process, correct?

5       A.   Correct.

6       Q.   Why didn't you want to document any of this

7  internally?

8            MR. KRASIK:  Cindy, let me caution you in

9  answering the question not to reveal the contents of any

10 communications with counsel.

11      A.   I cannot answer, because it would reveal

12 communications with counsel.

13      Q.   (BY MS. PIERCE)  Okay.  So you sought and obtained a

14 legal opinion within 12 minutes; is that correct?

15           MR. KRASIK:  Objection to form.

16 Mischaracterizes -- lack of foundation.  Mischaracterizes.

17      A.   I had spoken to outside counsel previously regarding

18 background checks.

19      Q.   (BY MS. PIERCE)  Who else was a part of those

20 conversations with counsel, Ms. Wagner?

21      A.   Mr. Decker.

22      Q.   If you're going to be aware of this process

23 internally, what is the concern about documenting it?

24           MR. KRASIK:  Same caution, Cindy.  You can

25 answer the question, but don't reveal the contents of any

CINDY WAGNER - VOLUME 2 - 10/20/2021

 1  communications with counsel.

 2       A.   The result of background checks and the review

 3  process was to be handled by certain individuals and should not

 4  be disclosed to others that are not involved in the process.

 5       Q.   (BY MS. PIERCE)  Okay.  And so, again, I'll ask you:

 6  Where in here do you say do not reveal background checks?

 7       A.   I do not specifically state that.

 8       Q.   All right.

 9            MS. PIERCE:  I'll -- that will be 143, Sara, I

10  believe.

11            THE REPORTER:  Yes, that's correct.

12            MS. PIERCE:  Thank you.

13       Q.   (BY MS. PIERCE)  Is it typical as an HR professional

14  to not document policies and procedures?

15            MR. KRASIK:  Objection to form.  You can answer.

16       A.   We did not have a policy or -- excuse me, we did not

17  have a policy related to background checks; otherwise, no

18  documentation.

19       Q.   (BY MS. PIERCE)  Let me ask you this, Ms. Wagner:

20  How would not having a formal policy for permitting players

21  into the XFL assist the XFL in achieving its goals?

22            MR. KRASIK:  Objection to form.  You can answer.

23       A.   Background -- background checks, there were no

24  automatic disqual -- disqualifiers, excuse me, for background

25  checks, so there was no process.  Each individual background

CINDY WAGNER - VOLUME 2 - 10/20/2021

Page 15

 1    check was reviewed and discussed between Ian Decker and, if

 2    necessary, Oliver Luck and Vince McMahon for decisions to be

 3    made.

 4         Q.   (BY MS. PIERCE)  So Ian Decker just took it upon

 5    himself to review background checks and decide whether or not

 6    this was a player that could play for the XFL?

 7              MR. KRASIK:  Objection to form.

 8    Mischaracterizes the testimony.  You can answer.

 9         A.   I do not know how Ian Decker handled the process of

10    background checks.  I was not involved.

11         Q.   (BY MS. PIERCE)  You're not involved, but you know

12    that there was no policy?

13         A.   That's correct.

14         Q.   Is that correct?  Is that your testimony?

15         A.   Correct.

16         Q.   How would permitting -- how would not having a policy

17    for recruiting players into the XFL make the XFL a credible

18    organization as far as the players allowed to play?

19              MR. KRASIK:  Objection to form.

20    Mischaracterizes testimony.  You can answer.

21         A.   We knew that we wanted players that would not impact

22    the reputation of the organization, so that was the higher

23    standard that we held.  The specifics of the background checks

24    was not my process.

25         Q.   (BY MS. PIERCE)  What was the reputation of the XFL?

CINDY WAGNER - VOLUME 2 - 10/20/2021

```
 1    guidelines or you weren't going to document background checks?
 2                  MR. KRASIK:  Cindy, let me caution you not to
 3    reveal the content of communications with counsel.  You can, of
 4    course, state what the policy was.
 5          A.   We did not document a policy, because there was not a
 6    policy.  I believe the next e-mail is Ian Decker responding
 7    with the procedure that he would be responsible for.
 8          Q.   (BY MS. PIERCE)  I just want to make sure I'm
 9    correctly understanding, because I thought earlier you said
10    that the whole point of not documenting was that background
11    checks shouldn't be going back and forth between, you know,
12    more than a select few qualified people; is that correct?
13                  MR. KRASIK:   Objection to form.
14    Mischaracterizes the testimony.  You can answer.
15          A.   Yes.
16          Q.   (BY MS. PIERCE)  So then what would the reason for
17    not documenting these four criteria be?
18          A.   Because we did not have automatic disqualifiers for
19    anyone's background checks, so there was no need to document
20    them when it did not exist.
21          Q.   But, again, you were not a part of that process,
22    correct?
23          A.   I was not part of the review process of background
24    checks that were completed on players, that is correct.
25          Q.   Did the XFL maintain records of the background checks
```

 1    that it obtained on players?

 2         A.   I was not responsible for that, so I'm not sure.

 3         Q.   But to your knowledge they didn't immediately destroy

 4    those background checks upon receiving them, as far as you

 5    know?

 6                   MR. KRASIK:  Objection.  Form.  Lack of

 7    foundation.  You can answer.

 8         A.   The background checks were done by an external party,

 9    Sterling Background Checks.  I'm not sure what the retention

10    process or procedure was.

11                   MS. PIERCE:  Moving to Doc 6, Sara.  Where did

12    it go?  My whole folder just disappeared.  Okay.  Sorry.

13                   (EXHIBIT 147 MARKED)

14         Q.   (BY MS. PIERCE)  Do you see my screen, Ms. Wagner?

15         A.   Yes, I can.

16         Q.   Okay.  And, again -- there is nothing on the second

17    page.  There is the e-mail from Mr. Luck, correct?

18         A.    Correct.

19         Q.   And, again, your response.  And you referenced a few

20    moments ago that Mr. Decker responded and he says, "Our process

21    that is already is on place, is that I discuss any questionable

22    checks with ONLY Oliver.  He will either make the decision on

23    whether to proceed or not.  If necessary, he will go to Vince

24    for final approval.  Due to the sensitivity of this, only

25    Oliver and I will know the background check results.  Any

CINDY WAGNER - VOLUME 2 - 10/20/2021

```
 1    questions, please let me know."
 2               Did I read that correctly?
 3       A.   Yes.
 4       Q.   And is this what you were referencing a few moments
 5    ago regarding Mr. Decker's response --
 6       A.   Yes.
 7       Q.   -- about this process?  Sorry.
 8       A.   Sorry.  Yes.
 9       Q.   Okay.  Did you do anything after receiving
10    Mr. Decker's e-mail here confirming whether or not this was
11    actually the process?
12       A.   I confirmed in writing.  I think I said "perfect,"
13    but I did not have a conversation regarding this e-mail, no.
14       Q.   Did you -- to your knowledge, did this process ever
15    change?
16               MR. KRASIK:  Objection to form.  Lack of
17    foundation.
18       A.   I am not aware that it changed.
19       Q.   (BY MS. PIERCE)  Did Mr. Decker inform you that this
20    process ever changed?
21       A.   No, he did not.
22       Q.   Did Mr. Luck ever inform you that this process
23    changed?
24       A.   No.
25       Q.   Did anyone else ever inform you that the process
```

CINDY WAGNER - VOLUME 2 - 10/20/2021

Page 31

 1   process that is already is on place," Mr. Whaley's response and

 2   your response.  Do you see that, Ms. Wagner?

 3       A.   Yes.

 4       Q.   Okay.  And in Mr. Decker's e-mail he says, "Our

 5   process that is already is on place, is that I discuss any

 6   questionable checks with ONLY Oliver," correct?

 7       A.   Correct.

 8       Q.   Do you know what made a background check

 9   questionable?

10       A.   No, I do not.

11       Q.   Do you know how Ian Decker decided whether a check

12   was questionable?

13       A.   No, I do not.

14       Q.   And I just want to confirm your testimony that there

15   were no automatic disqualifiers for potential players from the

16   XFL, correct?

17       A.   Correct.

18       Q.   And earlier you testified also that the XFL wanted

19   players who were good citizens, correct?

20       A.   Correct.

21       Q.   Wouldn't that then necessarily make a player who was

22   a, quote, "bad citizen" disqualified from the XFL?

23            MR. KRASIK:  Objection to form.

24   Mischaracterizes testimony.  You can answer.

25       A.   It depends on what the results of the background

```
 1   check are.  And those would be evaluated on an individual
 2   basis.
 3        Q.   (BY MS. PIERCE)  But, again, you don't know how they
 4   were evaluated or what criteria Mr. Decker used?
 5        A.   That is correct.
 6        Q.   And did you do anything to confirm what criteria he
 7   was using?
 8        A.   No, I did not.
 9        Q.   Did you do anything to confirm that he was following
10   any criteria he may have had?
11        A.   No, I did not.
12        Q.   And earlier you testified that you disagreed with
13   Mr. Luck's four criteria, but you did not correct it, because
14   he was your boss and you wanted to be agreeable.  Is that a
15   fair statement?
16             MR. KRASIK:  Objection to form.
17   Mischaracterizes testimony.  You can answer.
18        A.   I responded to an e-mail in a polite and professional
19   way and communicated that we were going to have an additional
20   separate conversation regarding it.  I did not agree or not
21   agree with the criteria in that particular e-mail.
22        Q.   (BY MS. PIERCE)  Did you have separate conversations
23   with Mr. Luck stating these four criteria are not the criteria
24   to be used?
25        A.   I --
```

CINDY WAGNER - VOLUME 2 - 10/20/2021

Page 33

```
 1            MR. KRASIK:  Cindy, you're free to answer the
 2   question, but in answering the question I don't -- you are not
 3   allowed to reveal the content of any communications with
 4   counsel.
 5       A.   Yes, there were additional conversations with Oliver
 6   Luck regarding background checks.
 7       Q.   (BY MS. PIERCE)  And was Mr. Luck not following the
 8   criteria set by the XFL for potential players?
 9       A.   I was not involved in the process or the procedure or
10   privy to the results of the background checks, so I cannot
11   answer that.
12       Q.   But you know that there were no disqualifying
13   criteria?
14       A.   I do know there were no automatic disqualifiers,
15   correct.  There was a process and procedure that was followed
16   to review background checks, but there was not automatic
17   disqualifiers.
18       Q.   What was the process or procedure?
19       A.   It was what Ian Decker put in his e-mail in how he
20   handled background checks.
21       Q.   If you had learned that these four criteria were not
22   the criteria to be used to disqualify or disqualify a player
23   from playing in the XFL, would you have informed football ops?
24            MR. KRASIK:  Objection.  Hypothetical question.
25   Calls for speculation.
```

CINDY WAGNER - VOLUME 2 - 10/20/2021

Page 39

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF CONNECTICUT
 2

 3   OLIVER LUCK                )
                                )
 4        Plaintiff             )
                                )  CIVIL NO. 3:20-cv-00516-VAB
 5   v.                         )
                                )
 6   VINCENT K. MCMAHON and     )
     ALPHA ENTERTAINMENT LLC    )
 7                              )
          Defendant.            )
 8
                         REPORTER'S CERTIFICATION
 9                        ORAL DEPOSITION OF
                             CINDY WAGNER
10                             VOLUME 2
                        TAKEN OCTOBER 20, 2021
11

12        I, Sara T. Green, Certified Shorthand Reporter in and for

13   the State of Texas, hereby certify to the following:

14        That the witness, CINDY WAGNER, was duly sworn by the

15   officer and that the transcript of the oral deposition is a

16   true record of the testimony given by the witness;

17        I further certify that pursuant to FRCP Rule 30(f)(1) that

18   the signature of the deponent:

19        __X___ was requested by the deponent or a party before the

20   completion of the deposition and returned within 30 days from

21   date of receipt of the transcript.  If returned, the attached

22   Changes and Signature Page contains any changes and the reasons

23   therefor;

24        _____ was not requested by the deponent or a party before

25   the completion of the deposition.
```

HANNA & HANNA, INC.
713.840.8484

 1          I further certify that I an neither attorney nor counsel

 2     for, related to, nor employed by any of the parties to the

 3     action in which this testimony was taken.  Further, I am not a

 4     relative or employee of any attorney of record in this cause,

 5     nor am I financially or otherwise interested in the outcome of

 6     the action.

 7          Subscribed and sworn to on this the 3rd day of November,

 8     2021.

 9

10

11

12     _____

13     SARA T. GREEN, Texas CSR #2436
       Certification expires: 04-30-2023
14     HANNA & HANNA, INC.
       CRF - 10434 - Expiration: 10-31-2022
15     8582 Katy Freeway, Suite 105
       Houston, Texas  77024
16     713.840.8484 - 713.583.2442
       www.hannareporting.com

17

18

19

20

21

22

23

24

25